No. 16-1247

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

JANE DOE,

Plaintiff-Appellant

v.

MERCY CATHOLIC MEDICAL CENTER,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL
_____

JAMES COLE, JR.
  General Counsel
VANESSA SANTOS
MICHELLE TUCKER
  Attorneys
  U.S. Department of Education

MARGARET M. DOTZEL
  Acting General Counsel
AARON SCHUHAM
  Associate General Counsel
CARY LACHEEN
  Attorney
  U.S. Department of Health and
    Human Services

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

SHARON M. MCGOWAN
CHRISTINE A. MONTA
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section – RFK 3716
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9035

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................1

STATEMENT OF THE ISSUES..........................................................................3

STATEMENT OF THE CASE..............................................................................3

    *1.*   *Background* .................................................................................3

    *2.*   *Statement Of Facts* ...................................................................6

    *3.*   *Procedural History*...................................................................8

ARGUMENT

    I    MERCY'S MEDICAL RESIDENCY
        PROGRAM IS AN "EDUCATION PROGRAM OR
        ACTIVITY" SUBJECT TO TITLE IX..............................................11

        A.   *Medical Residency Falls Within The Plain Meaning
            Of Title IX*................................................................................11

        B.   *Both The Department Of Education And The
            Department Of Health And Human Services
            Interpret Title IX To Cover Medical Residency
            Programs*................................................................................14

        C.   *The District Court's "Narrow Construction"
            Of Title IX Is Erroneous*........................................................16

            1.   *Title IX Applies To "Any Education
                Program Or Activity," Not Just To
                Traditional "Schooling"*.................................................16

            2.   *The Fact That Residents Are Also Employees
                Does Not Preclude Medical Residency From
                Falling Within Title IX's Ambit* ......................................20

**TABLE OF CONTENTS (continued):**                    **PAGE**

3.   *The Question Whether Medical Residency Is An "Education Program Or Activity" Under Title IX Is Distinct From And Independent Of The Question Whether Title IX Provides Medical Residents A Private Cause Of Action* ............................24

II   THE FACT THAT A MEDICAL RESIDENT MAY BRING A SEX DISCRIMINATION CLAIM UNDER TITLE VII DOES NOT PRECLUDE HER FROM BRINGING A TITLE IX CLAIM .........................................25

CONCLUSION ....................................................................................31

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                  **PAGE**

*Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36 (1974)..........................................27

*Alexander* v. *Riga*, 208 F.3d 419 (3d Cir. 2000),
      cert. denied, 531 U.S. 1069 (2001).............................................2, 30

*Auer* v. *Robbins*, 519 U.S. 452 (1997).......................................................15

*Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152 (1999) .......................................... 21-22

*Bureau of Worker's & Unemployment Comp.* v. *Detroit Med. Ctr.*,
      705 N.W.2d 524 (Mich. Ct. App. 2005).........................................21

*Cannon* v. *University of Chi.*, 441 U.S. 677 (1979) ..................................... 2, 26-27

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
      467 U.S. 837 (1984)................................................................15

*Davis* v. *Mann*, 882 F.2d 967 (5th Cir. 1989)............................................. 13-14, 21

*Fenje* v. *Feld*, 398 F.3d 620 (7th Cir.),
      reh'g denied (7th Cir. Apr. 6, 2005).............................................21

*Franklin* v. *Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992) ............................... 26-29

*Glickstein* v. *Neshaminy Sch. Dist.*, No. 96-CV-6236,
      1997 WL 660636 (E.D. Pa. Oct. 22, 1997)....................................30

*Grove City Coll.* v. *Bell*, 465 U.S. 555 (1984)..........................................17

*Guardians Ass'n* v. *Civil Serv. Comm'n*,
      463 U.S. 582 (1983).................................................................28

*Gul* v. *Center for Family Med.*, 762 N.W.2d 629 (S.D. 2009)...............................21

*Gupta* v. *Albright Coll.*, No. 05-CV-1921,
      2006 WL 162977 (E.D. Pa. Jan. 19, 2006)....................................30

**CASES (continued):** PAGE

*Gupta* v. *New Britain Gen. Hosp.*, 687 A.2d 111 (Conn. 1996) ..................... 14, 21

*Henry Ford Health Sys.* v. *Department of Health & Human Servs.*,
  654 F.3d 660 (6th Cir. 2011), cert. denied, 133 S. Ct. 73 (2012) ..................5

*Henschke* v. *New York Hosp.-Cornell Med. Ctr.*,
  821 F. Supp. 166 (S.D.N.Y. 1993) .................................................... 20, 29-30

*In re Siu*, 664 N.Y.S.2d 187 (N.Y. App. Div. 1997) ...............................................21

*Ivan* v. *Kent State Univ.*, No. 94-4090,
  1996 WL 422496 (6th Cir. July 26, 1996) ...................................................29

*Jeldness* v. *Pearce*, 30 F.3d 1220 (9th Cir. 1994) ...................................... 14, 19-20

*Knapik* v. *Mary Hitchcock Mem'l Hosp.*,
  90 F. Supp. 3d 292 (D. Vt. 2015) ......................................................... 20-21

*Lakoski* v. *James*, 66 F.3d 751 (5th Cir. 1995),
  cert. denied, 519 U.S. 947 (1996)............................................................ 24, 29

*Lakoski* v. *University of Tex. Med. Branch at Galveston*,
  519 U.S. 947 (1996)..............................................................................29

*Lipsett* v. *University of P.R.*, 864 F.2d 881 (1st Cir. 1998) ........................ 19-20, 29

*Mayo Found. for Med. Educ. & Research* v. *United States*,
  562 U.S. 44 (2011).......................................................................... 21-22

*McCormick ex rel. McCormick* v. *School Dist.*,
  370 F.3d 275 (2d Cir. 2004) ................................................................. 15, 19

*McKeesport Hosp.* v. *Accreditation Council for Graduate Med. Educ.*,
  24 F.3d 519 (3d Cir. 1994) .......................................................................12

*McLaughlin* v. *State Sys. of Higher Educ.*, No. 97-CV-1144,
  1999 WL 239408 (E.D. Pa. Mar. 31, 1999) .................................................30

**CASES (continued):**                                                    **PAGE**

*NCAA* v. *Smith*, 525 U.S. 459 (1999) ....................................................17

*North Haven Bd. of Educ.* v. *Bell*, 456 U.S. 512 (1982)....................... 11, 22, 26-27

*O'Connor* v. *Davis*, 126 F.3d 112 (2d Cir. 1997),
    cert. denied, 522 U.S. 1114 (1998).......................................... 13, 20

*Preston* v. *Virginia*, 31 F.3d 203 (4th Cir. 1994)....................................29

*Roubideaux* v. *North Dakota Dep't of Corr. & Rehab.*,
    570 F.3d 966 (8th Cir. 2009) ........................................... 13, 15, 20

*Sternberg* v. *U.S.A. Nat'l Karate-Do Fed'n, Inc.*,
    123 F. Supp. 2d 659 (E.D.N.Y. 2000).......................................20

*Tcherepnin* v. *Knight*, 389 U.S. 332 (1967)...........................................11

*Thomas Jefferson Univ.* v. *Shalala*, 512 U.S. 504 (1994) ........................5

*Winter* v. *Pennsylvania State Univ.*, No. 3:15-CV-1166,
    2016 WL 1110215 (M.D. Pa. Mar. 22, 2016) ...............................30

**STATUTES:**

Title IX of the Education Amendments of 1972 (Title IX),
    20 U.S.C. 1681 *et seq.* ........................................................1
    20 U.S.C. 1681(a) .......................................................... *passim*
    20 U.S.C. 1681(a)(1)–(5)...................................................18
    20 U.S.C. 1681(a)(6)–(7)...................................................18
    20 U.S.C. 1681(a)(7)–(8)...................................................18
    20 U.S.C. 1681(c)...............................................................9
    20 U.S.C. 1687............................................................. 11, 17
    20 U.S.C. 1687(1)..............................................................16
    20 U.S.C. 1687(3)(A)(ii) ...................................................16

Title VII of the Civil Rights Act of 1964 (Title VII),
    42 U.S.C. 2000e *et seq.* .....................................................3

**STATUTES (continued):**                                             **PAGE**

15 U.S.C. 37b(b)(1)(B)(i) ........................................................................12

42 U.S.C. 1395ww(d)(5)(B) ......................................................................5

42 U.S.C. 1395ww(h) .................................................................................5

42 U.S.C. 2000d-1.....................................................................................2

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259
    sec. 2(2), 102 Stat. 28 ......................................................................17
    102 Stat. 28-31 ...........................................................................11, 17

Education Amendments of 1972, Pub. L. No. 92-318, Tit. IX,
    86 Stat. 373-375............................................................................23

Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261,
    sec. 3, § 702, 86 Stat. 103-104.....................................................23

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 213, 89th Cong., 1st Sess. (1965) .................................6, 13

H.R. Rep. No. 554, 92d Cong., 1st Sess. (1971) ............................ 10, 23

S. Rep. No. 64, 100th Cong., 1st Sess. (1987).........................................17

S. Rep. No. 404, 89th Cong., 1st Sess. (1965)..........................................6

**RULES:**

Fed. R. App. P. 29(a) ...............................................................................2

**REGULATIONS:** **PAGE**

28 C.F.R. 0.51 ...................................................................2

28 C.F.R. Pt. 54 ...............................................................2

34 C.F.R. Pt. 106 .............................................................2

34 C.F.R. 106.1 ..............................................................19

34 C.F.R. 106.31(a) .......................................................15

34 C.F.R. 106.51(a)(1) ...................................................23

42 C.F.R. 412.105 ...........................................................5

42 C.F.R. 413.75–413.83 .................................................5

42 C.F.R. 413.75(a) .......................................................13

45 C.F.R. Pt. 86 ...............................................................2

45 C.F.R. 86.1 ................................................................19

45 C.F.R. 86.31(a) .........................................................15

45 C.F.R. 86.51(a)(1) .....................................................23

65 Fed. Reg. (Aug. 30, 2000)
    52,858 .....................................................................2
    52,859 ...................................................................19
    52,861 ...................................................................19
    52,865 ................................................................2, 19

Exec. Order No. 12,250, 3 C.F.R. 298 (1981) ..........................2

**MISCELLANEOUS:**                                                                                     **PAGE**

*About Us:  Overview*, Accreditation Council for
         Graduate Medical Education, http://www.acgme.org/
         About-Us/Overview (last visited June 9, 2016) ..............................................5

Accreditation Council for Graduate Medical Education,
         *Common Program Requirements* (2015),
         http://www.acgme.org/Portals/0/PFAssets/Program
         Requirements/CPRs_07012015.pdf ................................................4-5, 14-15

Accreditation Council for Graduate Medical Education,
         *Glossary of Terms* (2013), http://www.acgme.org/LinkClick
         aspx?link=PDFs%2fab_ ACGMEglossary.pdf ......................................... 3-4

Department of Justice, Civil Rights Division, Federal Coordination and
         Compliance Section, *Nondiscrimination on the Basis of Sex in
         Federally Assisted Programs*, https://www.justice.gov/crt/federal-
         coordination-and-compliance-section-186
         (last updated Aug. 6, 2015) .........................................................................19

Department of Justice, *Title IX Legal Manual*
         https://www.justice.gov/crt/title-ix (last updated Aug. 6, 2015)...................19

*Initial Certification:  Diagnostic Radiology*, American Board of
         Radiology, http://www.theabr.org/ic-dr-landing
         (last visited June 9, 2016) .............................................................................6

*Mercy Catholic Medical Center Medical Education Program*, Mercy
         Health System, http://www.mercyhealth.org/healthcare-
         professionals/medical-students/mcmc (last visited June 9, 2016) ..................6

*Requirements for Becoming a Physician*, American Medical
         Association, http://www.ama-assn.org/ama/pub/education-careers/
         becoming-physician.page? (last visited June 9, 2016).................... 3-4, 12, 15

Robert N. Wilkey, *The Non-Negotiable Employment Contract—
         Diagnosing the Employment Rights of Medical Residents*,
         44 Creighton L. Rev. 705 (2011)..................................................................22

**MISCELLANEOUS (continued):**                                    **PAGE**

Stephen L. Sepinuck, *Hospital Residents and Interns:  Inconsistent Treatment Under Federal Law*, 29 St. Louis U. L.J. 665 (1985)..................22

Stewart R. Reuter, *Professional Liability in Postgraduate Medical Education*, 15 J. Legal Med. 485 (1994).........................................4-5, 12-13

*What is the Match?*, National Resident Matching Program, http://www.nrmp.org/about/ (last visited June 9, 2016)..................................4

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1247

JANE DOE,

Plaintiff-Appellant

v.

MERCY CATHOLIC MEDICAL CENTER,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLANT
_____

## INTEREST OF THE UNITED STATES

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. 1681 *et seq.*, prohibits sex discrimination in education programs and activities receiving federal financial assistance. The United States has substantial enforcement responsibilities under Title IX and therefore a considerable interest in its proper interpretation. The United States Departments of Education (ED) and Health and Human Services (HHS), through their respective Offices for Civil Rights (OCRs), oversee funding recipients' compliance with Title IX, promulgate regulations, *see*

- 2 -

34 C.F.R. Pt. 106 (ED), 45 C.F.R. Pt. 86 (HHS), and issue guidance to help

recipients understand their obligations.  ED's OCR enforces Title IX in the context

of ED funding recipients, while HHS's OCR enforces Title IX in the context of

HHS funding recipients, including hospitals that receive Medicare payments.[1]

The Department of Justice (DOJ) enforces Title IX in the context of DOJ

funding recipients and coordinates federal agencies' implementation and

enforcement of Title IX.  28 C.F.R. Pt. 54; Exec. Order No. 12,250, 3 C.F.R. 298

(1981); 28 C.F.R. 0.51.  Although DOJ may file federal actions in Title IX cases

where DOJ provides financial assistance to recipients or where another agency

refers a matter to DOJ, see 42 U.S.C. 2000d-1, private plaintiffs play a critical role

in enforcing Title IX.  See *Cannon* v. *University of Chi.*, 441 U.S. 677, 704-708

(1979); see also *Alexander* v. *Riga*, 208 F.3d 419, 425-426 (3d Cir. 2000), cert.

denied, 531 U.S. 1069 (2001).  Thus, to facilitate Title IX's effective enforcement,

the United States has a strong interest in ensuring that an individual's right to sue

and obtain relief under the statute is properly recognized and protected.  The

United States files this brief pursuant to Federal Rule of Appellate Procedure 29(a).

---

[1]  Other federal agencies have similar enforcement obligations under Title
IX.  See, *e.g.*, 65 Fed. Reg. 52,858, 52,865 (Aug. 30, 2000) (adoption of Title IX
Final Common Rule by 21 federal agencies).

- 3 -

## STATEMENT OF THE ISSUES

We address the following issues:

1.  Whether a teaching hospital's medical residency program is an "education program or activity" covered by Title IX.

2.  Whether the availability of a private cause of action under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e *et seq.*, for sex-based employment discrimination in an education program or activity precludes a private cause of action under Title IX for the same conduct.

## STATEMENT OF THE CASE

*1.     Background*

 "The education of physicians in the United States is lengthy and involves undergraduate education, medical school and graduate medical education." *Requirements for Becoming a Physician*, American Medical Association (AMA) (AMA Requirements), http://www.ama-assn.org/ama/pub/education-careers/ becoming-physician.page? (last visited June 9, 2016).  "Graduate medical education," an umbrella term that includes both medical residency and fellowship training, see *ibid.*, is "[t]he period of didactic and clinical education in a medical specialty which follows the completion of [medical school] and which prepares physicians for the independent practice of medicine in that specialty," Accreditation Council for Graduate Medical Education (ACGME), *Glossary of*

- 4 -

*Terms* 5 (2013), http://www.acgme.org/LinkClick.aspx?link=PDFs%2fab_

ACGMEglossary.pdf.  The medical profession considers residency an "essential"

component of "the transformation of the medical student to the independent

practitioner along the continuum of medical education."  ACGME, *Common*

*Program Requirements* 1 (2015) (ACGME Requirements), http://www.acgme.org/

Portals/0/PFAssets/ProgramRequirements/CPRs_07012015.pdf.

"Although physicians receive their M.D. degrees at the completion of

medical school, most states require at least one year of clinical training before

granting an unlimited license to practice medicine."  Stewart R. Reuter,

*Professional Liability in Postgraduate Medical Education*, 15 J. Legal Med. 485,

485 (1994); see also AMA Requirements (medical school graduates "must

complete additional training before practicing on their own as a physician").

Residencies are typically three to seven years long, depending on the specialty, and

are a prerequisite to board certification in that specialty.  See AMA Requirements.

Graduating medical school students are placed into residency programs

through the National Resident Matching Program (NRMP), which uses a computer

algorithm to match students' rank-order preferences with residency programs'

preferred candidates.  See generally *What Is The Match?*, NRMP,

http://www.nrmp.org/about/ (last visited June 9, 2016).  Residency programs are

accredited by ACGME, a private nonprofit organization whose mission is to

- 5 -

"assess[] and advanc[e] the quality of resident physicians' education through accreditation." *About Us: Overview*, ACGME, http://www.acgme.org/About-Us/Overview (last visited June 9, 2016).  ACGME "sets broad educational policy" for residency programs, Reuter, 15 J. Legal Med. at 486, and outlines core requirements such programs must meet to ensure "an educational environment conducive to educating the residents in each of the ACGME competency areas," ACGME Requirements 3.  ACGME also encourages residency programs to "allocate adequate educational resources to facilitate resident involvement in scholarly activities." *Id.* at 10.

Hospitals that provide medical residency programs are eligible, under the Medicare statute and HHS regulations, to receive Medicare reimbursements for portions of the direct and indirect costs of their graduate medical education programs.[2]  42 U.S.C. 1395ww(d)(5)(B) and (h); 42 C.F.R. 412.105, 413.75–413.83; see generally *Thomas Jefferson Univ.* v. *Shalala*, 512 U.S. 504, 506-508 (1994).  In providing for this payment, Congress expressly recognized the important role that "educational activities" like medical residency programs play in

---

[2]  "Direct" costs are "education-related expenses," such as teachers' and residents' salaries and classroom costs.  *Henry Ford Health Sys.* v. *Department of Health & Human Servs.*, 654 F.3d 660, 663 (6th Cir. 2011), cert. denied, 133 S. Ct. 73 (2012).  "Indirect" costs are "costs incurred by teaching hospitals due to the general inefficiencies and extra demands placed on other staff that result from educating residents."  *Ibid.* (citation and internal quotation marks omitted).

- 6 -

enhancing hospitals' quality of care.  H.R. Rep. No. 213, 89th Cong., 1st Sess. 32 (1965); S. Rep. No. 404, 89th Cong., 1st Sess. 36 (1965).

2.    *Statement Of Facts*

Plaintiff is a former radiology resident at Mercy Catholic Medical Center (Mercy), a two-campus teaching hospital system in Philadelphia affiliated with Drexel University College of Medicine.  Completion of a four-year ACGME-approved diagnostic radiology residency program is required for a physician to be eligible for board certification in radiology.  App. 103 (Third Am. Compl. (TAC)); see also *Initial Certification:  Diagnostic Radiology*, American Board of Radiology, http://www.theabr.org/ic-dr-landing (last visited June 9, 2016).

Mercy's website stresses its "deep commitment to medical education," citing its "four [ACGME] accredited residency programs."  *Mercy Catholic Medical Center Medical Education Program*, Mercy Health System, http://www.mercyhealth.org/healthcare-professionals/medical-students/mcmc (last visited June 9, 2016); see App. 104 (TAC).  Plaintiff states that, under the "defined curriculum" of Mercy's radiology residency, she was required, among other things, to attend mandatory morning and afternoon lectures, to take a physics class on Drexel's campus, and to take annual examinations to assess her progress.  App. 105-106 (TAC).  Mercy receives federal financial assistance, in the form of

- 7 -

Medicare payments, to offset the costs of its graduate medical education programs. App. 116 (TAC).

Plaintiff alleges that, over the course of nearly two years as a Mercy resident, she experienced continuous and increasingly severe sexual harassment from Dr. James Roe, the program director of the medical residency program. According to plaintiff, shortly after she started her residency, Dr. Roe began inquiring into her personal life and learned that she was living apart from her husband.  App. 107 (TAC).  Plaintiff asserts that, although she informed Dr. Roe that she was not interested in a romantic relationship, Dr. Roe's advances intensified when he learned that plaintiff was getting a divorce.  App. 110-111, 113 (TAC) (describing conduct ranging from inappropriate and jealous comments to unwanted touching).

When she continued to rebuff Dr. Roe's romantic advances, plaintiff alleges, Dr. Roe retaliated against her by, among other things, giving her a poor recommendation for a post-residency fellowship (App. 111 (TAC)); ordering another resident to remove her as an author from a research paper to which she had contributed (App. 113 (TAC)); and falsely reporting to the hospital vice president that she had performed poorly on her in-service examination (App. 112, 114 (TAC)).  Plaintiff alleges that, although she informed hospital administration of Dr. Roe's history of harassment and retaliatory behavior toward her, Mercy responded

to Dr. Roe's false reports about her performance by suspending her from the residency program and, shortly thereafter, notifying her that it intended to terminate her residency.  App. 109, 111-112, 114-115 (TAC).  Plaintiff appealed the termination decision and was given a hearing, at which Dr. Roe advocated for her dismissal from the program.  App. 115 (TAC).  When Mercy informed plaintiff that it intended to uphold its decision to terminate her, plaintiff resigned.  App. 115 (TAC).  Plaintiff alleges that, as a result of these events, she has been unable to obtain another residency position and, consequently, has not been able to become fully licensed.  App. 115-116 (TAC).

## 3.    *Procedural History*

Plaintiff sued Mercy, raising three counts of sex discrimination under Title IX and three state-law breach-of-contract counts.[3]  App. 117-123 (TAC).  Mercy moved to dismiss the complaint, arguing, *inter alia*, that its residency program is not an "education program or activity" covered by Title IX.  App. 143-147.

The district court granted Mercy's motion to dismiss.  App. 13 (Op.).  Observing that the issue whether medical residency constitutes an "education program or activity" under Title IX is a question "of first impression in this Circuit" (App. 3-4), the court concluded that Title IX's text, its legislative history,

---

[3]  Plaintiff could not bring a Title VII claim because she did not satisfy Title VII's administrative requirements within the requisite timeframe.  See App. 9 (Op.); Appellant's Br. 36.

and "principles of judicial restraint" compel "a narrow construction of Title IX" that would exclude medical residency programs (App. 6-7).

a. First, the court concluded that, as a matter of plain meaning, the term "education program or activity" does not encompass medical residency. App. 7-9. Although the court acknowledged that residency "contains educational aspects," it concluded that "education" under Title IX must be construed narrowly or else Title IX "would govern any interaction in which one party could potentially learn something." App. 7. The court relied, for this interpretation, on a subsection of Title IX that defines the term "educational institution" to mean "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education," 20 U.S.C. 1681(c), concluding that this subsection "clearly contemplates cabining Title IX to 'education' programs in the sense of schooling." App. 7-8. Medical residency, the court reasoned, falls outside this "narrow" definition because, unlike medical school students, residents have "already achieved their M.D. or D.O. degree" and "do not pay tuition or receive a degree, but instead are paid for their services" and "are protected by labor laws." App. 7. That the hospital itself considers residency to be "education," the court concluded, "does not ipso facto  *  *  *  turn a residency program into an education program" within the meaning of Title IX. App. 9.

- 10 -

b.  Second, the court concluded that Title IX's legislative history "compels the interpretation" that Title VII provides "the exclusive avenue" of relief for employment discrimination claims, at least when against a "private sector employer" that is not an educational institution.  App. 9-10.  Specifically, the court reasoned that a passage in a House report accompanying a prior, unenacted version of Title IX, which stated that the proposed legislation would remove the then-existing exemption for educational institutions in Title VII, demonstrated that private sector employers, unlike educational institutions, were "already considered covered exclusively by Title VII when Title IX was enacted."  App. 9 (citing H.R. Rep. No. 554, 92d Cong., 1st Sess. 51-52 (1971)).  The court also expressed concern that interpreting Title IX to cover medical residency would permit plaintiff "to circumvent Title VII's administrative requirements," observing that "[s]everal courts have held that even within the context of employment discrimination in educational institutions, such circumvention is improper."  App. 9.

c.  Finally, the court concluded that interpreting Title IX to cover medical residency would constitute "judicial fiat."  App. 10.  Having thus determined that Mercy's residency program is not subject to Title IX, the court dismissed plaintiff's Title IX claims with prejudice.[4]  App. 10.

_____

[4]  The court alternatively dismissed Count 1 as time-barred (App. 10-13); it also declined to exercise supplemental jurisdiction over plaintiff's state-law claims

(continued…)

- 11 -

## ARGUMENT

## I

## MERCY'S MEDICAL RESIDENCY PROGRAM IS AN "EDUCATION PROGRAM OR ACTIVITY" SUBJECT TO TITLE IX

A.    *Medical Residency Falls Within The Plain Meaning Of Title IX*

Title IX prohibits sex discrimination in "any education program or activity receiving Federal financial assistance."  20 U.S.C. 1681(a).  The statute does not define the phrase "education program or activity."[5]  The Supreme Court has emphasized, however, that courts must accord Title IX "a sweep as broad as its language" to give it "the scope that its origins dictate."  *North Haven Bd. of Educ.* v. *Bell* (*North Haven*), 456 U.S. 512, 521 (1982) (citation omitted); see also *Tcherepnin* v. *Knight*, 389 U.S. 332, 336 (1967) (observing "the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes").

---

(…continued)
(App. 13).  The United States takes no position on the timeliness ruling or any state-law issues.

   [5] In 1988, Congress added a definition of "program or activity" to Title IX and three other civil rights statutes to make clear that that term includes "all of the operations of" a funding recipient, not just the specific activities receiving the funding.  Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100-259, 102 Stat. 28-31; see 20 U.S.C. 1687; note 6, *infra*.  That provision did not, however, add a definition of the modifier "education," which occurs only in Title IX.

- 12 -

Medical residency easily falls within the plain meaning of "any education program or activity."  20 U.S.C. 1681(a).  First, there can be no question that residency involves "education."  As this Court has recognized, "[m]edical residencies are a vital component of medical education, providing new doctors with a supervised transition between the pure academics of medical school and the realities of medical practice."  *McKeesport Hosp.* v. *Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 525 (3d Cir. 1994) (citation and internal quotation marks omitted).  The purpose of residency is to train recent medical school graduates to practice medicine independently by giving them "graduated, progressive responsibility" for treating patients "under the watchful eye of a university faculty member or an attending private practitioner."  Stewart R. Reuter, *Professional Liability in Postgraduate Medical Education*, 15 J. Legal Med. 485, 487 (1994).  The medical profession, represented by the AMA and ACGME, among others, considers medical residency an essential stage in a physician's education—indeed, the medical field refers to residency as "graduate medical education."  See AMA Requirements; see also 15 U.S.C. 37b(b)(1)(B)(i) (defining "graduate medical education program" as "a residency program for the medical education and training of individuals following graduation from medical school").  Completion of at least one year of residency is required for permanent licensure in most states, and graduation from a three-to-seven year residency program is a

prerequisite to board certification in a particular specialty. Reuter, 15 J. Legal Med. at 485-486. Indeed, it is precisely because residency programs are "educational activities" that teaching hospitals like Mercy receive Medicare payments for them. See 42 C.F.R. 413.75(a); see also H.R. Rep. No. 213, 89th Cong., 1st Sess. 32 (1965) (deeming "residency programs" to be one of the "substantial education activities" hospitals undertake).

Further, the education that medical residents receive is not merely "incidental" to their employment or akin to "on-the-job training." See *Roubideaux* v. *North Dakota Dep't of Corr. & Rehab.*, 570 F.3d 966, 977-978 (8th Cir. 2009) (holding that a prison work program was not an "education program" because, although prisoners may learn skills while working, "that benefit is incidental to and is not the primary focus of" the program, which was "to provide employment, not educational opportunities"); *O'Connor* v. *Davis*, 126 F.3d 112, 118 (2d Cir. 1997) (fact that a college student permitted to volunteer at a hospital received "some modicum of on-the-job training" does not transform the ad hoc volunteer opportunity into an "education program"), cert. denied, 522 U.S. 1114 (1998). Rather, educating new physicians is the core mission of medical residency programs. As the Fifth Circuit has noted in another context, "the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program." *Davis* v.

- 14 -

*Mann*, 882 F.2d 967, 974 (5th Cir. 1989); see also *Gupta* v. *New Britain Gen. Hosp.*, 687 A.2d 111, 117 (Conn. 1996) ("The ultimate objective of the residency program is to educate the physician in the healing arts."). Residency programs are formal and structured, involving both "didactic and clinical" components, ACGME Requirements 3, and residents are subject to regular evaluations to assess their progress, see *id.* at 10-12; App. 105-106 (TAC) (describing Mercy's didactic and examination requirements).

In short, medical residency falls within the plain meaning of "any education program or activity." 20 U.S.C. 1681(a). Had Congress wished to exclude residency programs from Title IX's coverage, it could have done so explicitly, as it did for military academies, religious schools, and social fraternities and sororities, among other things. See *ibid.* It did not. "When a statute lists specific exemptions, other exemptions are not to be judicially implied." *Jeldness* v. *Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (holding that prisons receiving federal funding are bound by Title IX, which provides "no exemption for correctional institutions").

B.   *Both The Department Of Education And The Department Of Health And Human Services Interpret Title IX To Cover Medical Residency Programs*

Even if there were some ambiguity about whether medical residency qualifies as an "education program or activity" under Title IX, 20 U.S.C. 1681(a), ED's and HHS's regulations resolve any such ambiguity in favor of inclusion.

- 15 -

Both agencies' Title IX implementing regulations construe the phrase "education program or activity" broadly, to include "any academic, extracurricular, research, *occupational training*, or other education program or activity operated by a recipient" of federal funding.  34 C.F.R. 106.31(a) (emphasis added); 45 C.F.R. 86.31(a) (emphasis added).  ED's and HHS's regulations interpreting the term "any educational program or activity" to encompass "occupational training" are entitled to deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-844 (1984).  See *McCormick ex rel. McCormick* v. *School Dist.*, 370 F.3d 275, 287-288 (2d Cir. 2004).

Furthermore, both ED and HHS consider medical residency to be a form of "occupational training" within the meaning of their respective Title IX regulations.  An agency's interpretation of its own regulation is entitled to controlling weight unless it is "plainly erroneous or inconsistent with the regulation."  *Auer* v. *Robbins*, 519 U.S. 452, 461 (1997) (citation omitted).  ED's and HHS's interpretation is reasonable:  medical residency falls easily within the definition of "occupational training," its purpose being to prepare medical school graduates to practice medicine independently in a particular specialty.  ACGME Requirements 1; AMA Requirements; see also *Roubideaux*, 570 F.3d at 978 (construing "occupational training" to mean "[e]ducational programs that prepare an individual to pursue a particular occupation or trade").  Accordingly, ED's and HHS's Title

- 16 -

IX regulations confirm that medical residency programs fall within the term

"education program or activity."  20 U.S.C. 1681(a).

C.    *The District Court's "Narrow Construction" Of Title IX Is Erroneous*

The district court's "narrow construction" of Title IX as limited to

"'education' programs in the sense of schooling" (App. 6, 8) is inconsistent with

the statute's text, the legislative history, the governing regulations, and the

Supreme Court's instruction that courts must interpret Title IX broadly.  To the

extent the court's erroneous interpretation was driven by a belief that residents'

employment status precludes medical residency from qualifying as a covered

education program, that aspect of the court's analysis is likewise faulty.

1.    *Title IX Applies To "Any Education Program Or Activity," Not Just To Traditional "Schooling"*

First, Title IX is clear on its face that its application is not limited to

conventional "schooling."  The statute expressly defines the term "program or

activity" to include numerous entities that are not educational institutions,

including state and local governments and private organizations or corporations

"principally engaged in the business of providing  *  *  *  *health care*, housing,

social services, or parks and recreation."  20 U.S.C. 1687(1) and (3)(A)(ii)

(emphasis added).  While it is true that Section 1687 does not "change or expand

Title IX's core requirement that the statute only covers 'education' programs"

(App. 8), this provision plainly contemplates that entities other than educational

institutions can administer an "education program or activity" covered by Title IX. See 20 U.S.C. 1687.

Indeed, Section 1687's legislative history shows that Congress expressly envisioned that hospitals could have an "education program or activity." The Senate report accompanying Section 1687 provides the following example to illustrate how its definition of "program or activity"[6] would apply to private entities "principally engaged in  *  *  *  health care":

> *Example:* If a private hospital corporation is extended federal assistance for its emergency room, all the operations of the hospital, including for example, the operating rooms, the pediatrics department, admissions, discharge offices, etc., are covered under Title VI, section 504, and the Age Discrimination Act. *Since Title IX is limited to education programs or activities, it would apply only to the students and employees of educational programs operated by the hospital, if any.*

S. Rep. No. 64, 100th Cong., 1st Sess. 18 (1987) (second emphasis added); see also *ibid.* (making the same point regarding nursing homes).

---

[6] Congress enacted Section 1687 to overturn the Supreme Court's decision in *Grove City College* v. *Bell*, 465 U.S. 555, 570-574 (1984), which held that Title IX applied only to the programs within an institution that receive federal funds, not to the institution as a whole. See *NCAA* v. *Smith*, 525 U.S. 459, 466 n.4 (1999). The legislation added a definition of "program or activity" to four civil rights statutes containing that phrase—Title IX, Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1975—that "restore[d] the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." CRRA sec. 2(2), 102 Stat. 28; see also CRRA, 102 Stat. 28-31.

That Title IX expressly exempts several programs and activities that do not readily qualify as "schooling"—for example, the YMCA and YWCA, Boy Scouts and Girl Scouts, and the American Legion's Boys State/Nation and Girls State/Nation programs, 20 U.S.C. 1681(a)(6)–(7)—further demonstrates that Congress intended the term "education program or activity" to be broader than traditional "schooling." If Title IX were limited to "schooling," then there would have been no need for Congress to create these exemptions, as these non-schooling activities would already fall outside Title IX's coverage.

The district court's reliance "by analogy" on 20 U.S.C. 1681(c) (App. 7-8) is misplaced, as that provision does not purport to limit the scope of the phrase "education program or activity." Section 1681(c) defines the term "educational institution," a phrase that appears in several of Title IX's exemptions. See 20 U.S.C. 1681(a)(1)–(5) and (7)–(8). Title IX's *nondiscrimination* prohibition, however, is not limited to "educational institutions." Rather, it applies to "*any education program or activity*" operated by a federal funding recipient. 20 U.S.C. 1681(a) (emphasis added). Thus, the court's restriction of Title IX to traditional "schooling" has no basis in, and in fact contradicts, the statute's plain text.

The district court's "narrow construction" also directly contradicts both ED's and HHS's Title IX regulations, as well as those of 21 federal agencies that adopted consistent regulations in 2000, which state explicitly that Title IX's

antidiscrimination provision applies to "any education program or activity receiving Federal financial assistance, *whether or not such program or activity is offered or sponsored by an educational institution as defined in this part*." 34 C.F.R. 106.1 (emphasis added); 45 C.F.R. 86.1 (emphasis added); 65 Fed. Reg. at 52,865 (emphasis added); see *Jeldness*, 30 F.3d at 1226 ("[I]t is clear that the regulations are not meant to apply only to traditional educational institutions.").[7] Those regulations set forth a reasonable interpretation of Title IX's scope and are entitled to *Chevron* deference. See *McCormick*, 370 F.3d at 287-288.

Indeed, numerous courts have recognized that Title IX governs education programs outside of traditional educational institutions, in a variety of contexts— including medical residency programs. See *Lipsett* v. *University of P.R.*, 864 F.2d 881, 897 (1st Cir. 1998) (medical resident's Title IX claim survived summary

---

[7] See also 65 Fed. Reg. at 52,859 ("Title IX prohibits discrimination on the basis of sex in * * * education programs conducted by noneducational institutions."); *id.* at 52,861 ("[W]hile educational institutions are certainly one type of covered education program, clearly there are many others as well."); DOJ, Civil Rights Division, Federal Coordination and Compliance Section, *Nondiscrimination on the Basis of Sex in Federally Assisted Programs*, https://www.justice.gov/crt/federal-coordination-and-compliance-section-186 (last updated Aug. 6, 2015) (noting that "many entities that are not educational institutions * * * carry out federally assisted education and training programs" covered by Title IX, including "libraries and museums," "state and local government agencies whose primary purpose is not education-related, community organizations, professional and non-profit associations, and private businesses"); DOJ, *Title IX Legal Manual*, § I, https://www.justice.gov/crt/title-ix (last updated Aug. 6, 2015) (listing examples of the "diverse activities" Title IX covers outside the context of traditional "educational institutions").

judgment); *Henschke* v. *New York Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 173 (S.D.N.Y. 1993) (allowing faculty physician at a teaching hospital to proceed on a Title IX employment discrimination claim); see also *Jeldness*, 30 F.3d at 1224-1226 (Title IX governs correctional institutions); *Sternberg* v. *U.S.A. Nat'l Karate-Do Fed'n, Inc.*, 123 F. Supp. 2d 659, 662 (E.D.N.Y. 2000) (Title IX could apply to karate federation's training camp and preparatory contests).  In short, the district court's conclusion that Title IX applies only to "schooling" is incorrect.

2.    *The Fact That Residents Are Also Employees Does Not Preclude Medical Residency From Falling Within Title IX's Ambit*

The district court's erroneous interpretation appears to have been largely driven by the fact that medical residents are also hospital employees.  But whether a program or activity is subject to Title IX turns on whether it has "features such that one could reasonably consider its mission to be, at least in part, educational." *O'Connor*, 126 F.3d at 117; see also *Roubideaux*, 570 F.3d at 977-978.  Nothing in Title IX or its regulations suggests that, for the statute to apply, the persons receiving the "education" may not also be employees of the entity providing it.

Unlike typical employment settings, medical residency is a "mixed employment-training context"—a resident is "both an employee *and* a student." *Lipsett*, 864 F.2d at 897.  Accordingly, "whether the resident is to be treated as an employee or a student in a given case" depends on the context and the purpose underlying the statute or doctrine at issue.  *Knapik* v. *Mary Hitchcock Mem'l*

- 21 -

*Hosp.*, 90 F. Supp. 3d 292, 300 (D. Vt. 2015). In some contexts, residents'

employee status governs: for example, residents and their employers must pay

FICA taxes under Treasury Department regulations, *Mayo Found. for Med. Educ.*

*& Research* v. *United States* (*Mayo Found.*), 562 U.S. 44 (2011), and residents are

entitled to collective bargaining rights under the National Labor Relations Act,

*Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152, 168 (1999). At the same time, courts

have held that, because medical residency is an academic program, residents facing

termination from their program are entitled only to the limited procedural due

process rights of students, not the more robust rights of employees.[8] Courts have

also, on similar reasoning, held that residency does not constitute "employment"

for purposes of state unemployment benefits statutes that exclude work done

primarily for educational, as opposed to pecuniary, reasons.[9]

Title IX is a broad remedial statute designed to eliminate sex discrimination

in "any education program or activity" receiving federal funding. 20 U.S.C.

---

[8] See, *e.g.*, *Fenje* v. *Feld*, 398 F.3d 620, 624-626 (7th Cir.), reh'g denied (7th Cir. Apr. 6, 2005); *Davis*, 882 F.2d at 973-974; *Knapik*, 90 F. Supp. 3d at 300-301; *Gul* v. *Center for Family Med.*, 762 N.W.2d 629, 635-636 (S.D. 2009); *Gupta*, 687 A.2d at 117. As these courts explain, the fact that residents "receive[] a stipend" does not "alter the fact that [they are] participating in an academic program in order to receive academic certification." *Davis*, 882 F.2d at 974.

[9] See, *e.g.*, *Bureau of Worker's & Unemployment Comp.* v. *Detroit Med. Ctr.*, 705 N.W.2d 524, 530-531 (Mich. Ct. App. 2005); *In re Siu*, 664 N.Y.S.2d 187, 188 (N.Y. App. Div. 1997).

1681(a).  Medical residency falls within the plain meaning of that term.  The fact
that residents are compensated for their services, and receive some legal
protections as employees,[10] does not alter the educational nature of medical
residency.  Indeed, even in those cases treating residents as employees for a
particular legal purpose, courts and agencies still recognize that medical residency
is an educational activity.  See, *e.g.*, *Mayo Found.*, 562 U.S. at 60 ("We do not
doubt that Mayo's residents are engaged in a valuable educational pursuit or that
they are students of their craft."); *Boston Med. Ctr.*, 330 N.L.R.B. at 161 (medical
residents' "status as students is not mutually exclusive of a finding that they are
employees").

It is beyond dispute, moreover, that Title IX protects against employment
discrimination in covered education programs.  See *North Haven*, 456 U.S. at 530;

---

[10]  Although residents are hospital employees, medical residency differs
from typical employment in numerous ways.  For example, as noted on pp. 4-5,
*supra*, medical students apply to residency programs through a "matching"
program unique to the medical profession.  Once a match is made, it is binding on
both the resident and the hospital.  "Thus, unlike other employees, a medical
resident is [both] constructively prohibited from negotiating offers between
prospective employers" and "contractually obligated to the terms of the program
contract, including a start date."  Robert N. Wilkey, *The Non-Negotiable
Employment Contract—Diagnosing the Employment Rights of Medical Residents*,
44 Creighton L. Rev. 705, 716 (2011).  Moreover, "a good argument can be made
that [residents] do not really receive compensation for the services they render," as
the "stipends" they receive are disproportionately low relative to the hours they
work.  Stephen L. Sepinuck, *Hospital Residents and Interns:  Inconsistent
Treatment Under Federal Law*, 29 St. Louis U. L.J. 665, 686 (1985).

- 23 -

34 C.F.R. 106.51(a)(1); 45 C.F.R. 86.51(a)(1). That prohibition applies to "*any*

education program or activity*." 20 U.S.C. 1681(a) (emphasis added); see also 34

C.F.R. 106.51(a)(1); 45 C.F.R. 86.51(a)(1). Neither the statute nor the regulations

distinguish between employment discrimination in traditional "educational

institution[s]" and employment discrimination in education programs sponsored by

"private sector employer[s]." App. 9 (Op.).

The district court's conclusion that Congress intended to include only the

former category (employment discrimination in traditional educational institutions)

in Title IX, leaving the latter category (private sector employers) "covered

exclusively by Title VII" (App. 9), was based on a misreading of the legislative

history. The excerpt the court quotes is from a House report accompanying a prior,

unenacted version of Title IX and concerned a proposal to amend *Title VII* to

remove the then-existing exemption for employment discrimination in educational

institutions. See H.R. Rep. No. 554, 92d Cong., 1st Sess. 51-52 (1971). Congress

ultimately did so in the Equal Employment Opportunity Act of 1972, Pub. L. No.

92-261, sec. 3, § 702, 86 Stat. 103-104 (Mar. 24, 1972)—*three months before it

enacted Title IX*.[11] Thus, at the time Title IX was enacted, Title VII covered

employment discrimination in *both* "educational institution[s]" and "private sector

---

[11] Title IX was enacted on June 23, 1972, via the Education Amendments of
1972, Pub. L. No. 92-318, Tit. IX, 86 Stat. 373-375.

employer[s]."  App. 9 (Op.).  Title IX provided additional protection for employees

in education programs receiving federal funds; there is no evidence that Congress

intended to extend that protection only to "educational institution[s]" and not to

education programs sponsored by "private sector employer[s]."  See App. 9 (Op.).

> 3.    *The Question Whether Medical Residency Is An "Education Program Or Activity" Under Title IX Is Distinct From And Independent Of The Question Whether Title IX Provides Medical Residents A Private Cause Of Action*

The district court also expressed concern that a holding that Title IX covers

medical residency programs would permit medical residents like plaintiff to "use

Title IX to circumvent Title VII's administrative requirements."  App. 9.  The

court relied, for this reasoning, on cases holding that the availability of a private

damages action for employment discrimination under Title VII precludes a private

right of action for damages under Title IX, even in cases involving traditional

"educational institutions."  See App. 9-10 (citing cases); see generally *Lakoski* v.

*James*, 66 F.3d 751, 753 (5th Cir. 1995), cert. denied, 519 U.S. 947 (1996) (the

leading case espousing this view).

As explained in Part II, *infra*, the United States disagrees with those cases

and takes the position that individuals alleging sex-based employment

discrimination in a federally funded education program or activity may bring a

private cause of action for damages or injunctive relief under Title IX, irrespective

of the availability of a Title VII cause of action for the same conduct.  But even if

this Court were to hold that Title VII precludes medical residents from bringing

private claims under Title IX—which it should not, for the reasons explained

below—such a conclusion would not affect the question whether medical

residency *qualifies* as an "education program or activity" covered by Title IX.

This distinction is important, as a ruling on Title IX's scope affects not just

private plaintiffs' ability to sue for damages but also federal agencies' ability to

enforce Title IX as applied to their funding recipients.  As explained above,

medical residency unquestionably qualifies as an "education program or activity"

covered by Title IX.  20 U.S.C. 1681(a).  Thus, hospitals receiving federal funds

are obligated to comply with Title IX's provisions—and the federal government is

empowered to enforce such compliance—regardless of whether residents or faculty

members may vindicate Title IX violations through private damages actions.

## II

## THE FACT THAT A MEDICAL RESIDENT MAY BRING A SEX DISCRIMINATION CLAIM UNDER TITLE VII DOES NOT PRECLUDE HER FROM BRINGING A TITLE IX CLAIM

The district court's dismissal of plaintiff's Title IX claims rested in part on

its conclusion that Congress intended Title VII to be "the exclusive avenue for

relief" for employment discrimination claims, at least against private sector

employers that are not traditional educational institutions.  App. 9-10.  That is

incorrect.  Title VII and Title IX are separate enforcement mechanisms, either or

- 26 -

both of which an individual may use to challenge sex-based employment discrimination in an education program receiving federal funding.[12]

The conclusion that Title IX provides a private right of action to seek damages for employment discrimination, irrespective of the remedies available under Title VII, flows from the rationale of three Supreme Court cases: *Cannon* v. *University of Chicago*, 441 U.S. 677, 703 (1979), *North Haven Board of Education* v. *Bell*, 456 U.S. 512, 531 (1982), and *Franklin* v. *Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992). In *Cannon*, the Court held that individuals can bring private causes of action to remedy sex discrimination in violation of Title IX. In *North Haven*, the Court held that claims of sex-based employment discrimination are cognizable under Title IX. And in *Franklin*, the Court held that damages are available in private causes of action under Title IX to redress intentional violations of the statute. These cases, read together, lead to the

---

[12] We do not mean to suggest, by addressing this issue, that plaintiff's complaint is more properly construed as alleging employment-based, as opposed to education-based, discrimination. Compare App. 12-13 (Mot. to Dismiss) (arguing that plaintiff is attempting to "bring employment claims under the guise of" educational discrimination), with App. 193 (Pl.'s Opp.) (arguing that the relief plaintiff seeks "is more educational than it is employment"-based). As plaintiff notes, she "is both an employee and a student," and thus even if Title VII were held to preempt employment claims under Title IX, that would not affect her "right to bring a Title IX claim against the residency program" for education-based discrimination. App. 193 (Pl.'s Opp.); see also Appellant's Br. 41. We treat plaintiff's claims as alleging employment discrimination solely for purposes of addressing this legal issue.

inexorable conclusion that an employee who is a victim of intentional sex-based discrimination by a federally funded education program or activity has a private right of action to seek damages under Title IX, *i.e.*, that employees are among the persons protected by Title IX (*North Haven*) who have a private right of action (*Cannon*) that includes a damages remedy for intentional sex-based discrimination (*Franklin*).

Nothing in these cases suggests that the availability of a Title VII remedy to redress employment discrimination affects the availability of remedies under Title IX.  To the contrary, the Court expressly rejected that proposition in *North Haven*, explaining that "even if alternative remedies are available and their existence is relevant, this Court repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination."  456 U.S. at 535 n.26 (citation omitted).  And as the Court noted in *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 48 (1974), "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes."

Moreover, a ruling that Title VII preempts employment discrimination claims under Title IX would mean that the rights recognized in *Cannon* and *Franklin* would be limited to cases in which the Title IX plaintiff is a student—a subgrouping of the statutory term "person," 20 U.S.C. 1681(a), that has no basis in

the law.  Although *Cannon* and *Franklin* both involved students, neither case

suggested that the right it recognized was *limited* to students.  To the contrary,

*Cannon* described the class possessing an implied right of action under Title IX

broadly, as coextensive with the class of "persons benefitted by [the] legislation."

441 U.S. at 717; see also *id.* at 694 ("persons discriminated against on the basis of

sex"); *id.* at 703 ("victims of illegal discrimination").  *Franklin* spoke in equally

broad terms, reiterating that "Title IX is enforceable through an implied right of

action," 503 U.S. at 65, and concluding that Congress did not intend to "limit[] the

remedies available to a complainant in a suit brought under Title IX," *id.* at 73.

Further, *Franklin*'s reasoning strongly suggests that its conclusion that Title

IX provides a damages remedy applies equally to cases involving employees as to

those involving students:  First, *Franklin* expressly relied on *Guardians

Association* v. *Civil Service Commission*, 463 U.S. 582 (1983), an employment

discrimination case in which "a clear majority expressed the view that damages

were available" in an employment suit brought through an implied cause of action

under Title VI, the statute upon which Title IX was patterned.  *Franklin*, 503 U.S.

at 70.  Given the similarities between Title VI and Title IX, it is apparent that

"Congress intended similar remedies to be available under Title IX."  *Guardians

Ass'n*, 463 U.S. at 594 (opinion of White, J.).  Second, *Franklin* expressly

addressed (and rejected) the argument that Title IX remedies should be limited to

backpay and prospective relief, 503 U.S. at 75-76—a question that would have been irrelevant if employment complaints seeking damages were not covered by *Franklin*'s ruling. See also *id.* at 76 (recognizing that in *Franklin* the question of the availability of backpay was irrelevant because plaintiff was a student).

For these reasons, the cases holding that Title VII preempts a private cause of action for employment discrimination under Title IX, see, *e.g.*, *Lakoski* v. *James*, 66 F.3d 751, 753 (5th Cir. 1995), cert. denied, 519 U.S. 947 (1996), were, in the United States' view, wrongly decided.[13]  Rather, the United States agrees with the courts that have permitted plaintiffs to pursue a private right of action for employment discrimination under Title IX, notwithstanding the availability of Title VII remedies.  See, *e.g.*, *Lipsett* v. *University of P.R.*, 864 F.2d 881, 896-897 (1st Cir. 1998); *Preston* v. *Virginia*, 31 F.3d 203, 205-206 (4th Cir. 1994); *Ivan* v. *Kent State Univ.*, No. 94-4090, 1996 WL 422496, at *2 n.10 (6th Cir. July 26, 1996); *Henschke* v. *New York Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 172 (S.D.N.Y.

---

[13]  On the Supreme Court's invitation, the United States submitted a brief at the certiorari stage in *Lakoski* arguing that the Fifth Circuit's ruling was incorrect and that the availability of a Title VII remedy "does not preempt Title IX remedies."  U.S. Br., *Lakoski* v. *University of Tex. Med. Branch at Galveston*, 519 U.S. 947 (1996) (No. 95-1439), 1996 WL 936619, at *7.  The Court denied certiorari in *Lakoski* and has not addressed the Title VII preemption issue since.

1993).[14]  That approach not only is consistent with the Supreme Court's decisions

in *Cannon*, *North Haven*, and *Franklin*, but preserves the important role that

private litigation plays in enforcing and effectuating Title IX.  As this Court has

recognized, "enforcement of the civil rights statutes depends, in large measure, on

the willingness of private plaintiffs to pursue individual cases."  *Alexander* v. *Riga*,

208 F.3d 419, 425 (3d Cir. 2000), cert. denied, 531 U.S. 1069 (2001).

---

[14]  This Court does not appear to have addressed this question, and the
district courts within the circuit are divided on it.  Compare *Winter* v. *Pennsylvania
State Univ.*, No. 3:15-CV-1166, 2016 WL 1110215, at *11 (M.D. Pa. Mar. 22,
2016) (concluding that Title VII does not preempt Title IX), and *Gupta* v. *Albright
Coll.*, No. 05-CV-1921, 2006 WL 162977, at *3 (E.D. Pa. Jan. 19, 2006) (same),
with *Glickstein* v. *Neshaminy Sch. Dist.*, No. 96-CV-6236, 1997 WL 660636, at
*15 (E.D. Pa. Oct. 22, 1997) (concluding that Title VII preempts employment
discrimination claims under Title IX), and *McLaughlin* v. *State Sys. of Higher
Educ.*, No. 97-CV-1144, 1999 WL 239408, at *2 (E.D. Pa. Mar. 31, 1999) (same).

- 31 -

# CONCLUSION

Because medical residency is an "education program or activity" under Title IX, and because the availability of a Title VII remedy does not preclude a cause of action under Title IX, the district court erred in dismissing plaintiff's Title IX claims on these grounds.

Respectfully submitted,

JAMES COLE, JR.
  General Counsel
VANESSA SANTOS
MICHELLE TUCKER
  Attorneys
  U.S. Department of Education

MARGARET M. DOTZEL
  Acting General Counsel
AARON SCHUHAM
  Associate General Counsel
CARY LACHEEN
  Attorney
  U.S. Department of Health and
    Human Services

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

s/ Christine A. Monta
SHARON M. MCGOWAN
CHRISTINE A. MONTA
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section – RFK 3716
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9035

# CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), I hereby certify that I am a member of good

standing of the bar of this Court.


s/ Christine A. Monta
CHRISTINE A. MONTA
 Attorney

Date:  June 9, 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief does not exceed the type-volume limitation imposed by Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(d).  The brief was prepared using Microsoft Word 2007 and contains 7,000 words of proportionally spaced text.  The type face is Times New Roman, 14-point font.

I also certify that the copy of this brief that has been electronically filed is an exact copy of what has been submitted to the Court in hard copy.  I further certify that the electronic copy has been scanned with the most recent version of Symantec Endpoint Protection (version 12.1.6) and is virus-free.


s/ Christine A. Monta
CHRISTINE A. MONTA
 Attorney


Date:  June 9, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2016, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the Appellate CM/ECF system and that ten paper copies identical to the brief filed electronically were sent to the Clerk of the Court by first class mail.  I further certify that counsel of record are CM/ECF participants and will be served electronically by the Appellate CM/ECF system.

s/ Christine A. Monta
CHRISTINE A. MONTA
 Attorney