IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-1247

_____

JANE DOE

Appellant/Plaintiff,

vs.

MERCY CATHOLIC MEDICAL CENTER, et al.,

Appellees/Defendants

_____

**APPELLANT'S APPENDIX VOLUME II**
**(Pages 14-228)**

_____

APPEAL FROM GRANT OF MOTION TO DISMISS FOR FAILURE TO
STATE A CLAIM ON JANUARY 26, 2016 IN THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
AT CIVIL ACTION NO. 2:15-CV-02085

_____

Joshua Boyette, Esq. (PA #309863)

SWARTZ SWIDLER LLC
1101 Kings Highway North Suite 402
Cherry Hill, New Jersey 08003
Phone: (856) 685-7420
Fax: (856) 685-7417

Attorneys for Appellant

## TABLE OF CONTENTS

**VOLUME I**

App. Ex. 1  NOTICE OF APPEAL……………………………………….…..........…... 1

App. Ex. 2  ORDER dated January 1, 2016…………………………………….…….…... 2

App. Ex. 3  MEMORANDUM OPINION………………………….……….…...…… 3

**VOLUME II**

App. Ex. 4  DOCKET ENTRIES .………………………………………….…… 14

App. Ex. 5  SECOND AMENDED COMPLAINT………………………………….…... 17

App. Ex. 6  DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT …………………………………………………………………….............. 34

App. Ex. 7  PLAINTIFF'S RESPONSE IN OPPOSITION .…………………….………… 72

App. Ex. 8  ORDER DENYING DEFENDANT'S MOTION DISMISS……..……..…………99

App. Ex. 9  THIRD AMENDED COMPLAINT…………………………….………… 100

App. Ex. 10  DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT …………………………………………………………………….... …… 125

App. Ex. 11  PLAINTIFF'S RESPONSE IN OPPOSITION………………………... …… 168

App. Ex. 12  DEFENDANT'S REPLY IN FURTHER SUPPORT………….......................... 211

**2:15-cv-02085-MMB** DOE v. MERCY CATHOLIC MEDICAL CENTER et al
MICHAEL M. BAYLSON, presiding
**Date filed:** 04/20/2015
**Date terminated:** 01/26/2016
**Date of last filing:** 02/19/2016

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| | *Filed:*<br>*Entered:* | 04/20/2015<br>04/21/2015 | 🌐 Summons Issued |
| | *Filed:*<br>*Entered:* | 04/20/2015<br>04/21/2015 | 🌐 Jury Demand |
| [1](#) | *Filed & Entered:* | 04/20/2015 | 🌐 Complaint (Attorney) |
| | *Filed:*<br>*Entered:* | 04/29/2015<br>04/30/2015 | 🌐 Summons Issued |
| [2](#) | *Filed:*<br>*Entered:* | 04/29/2015<br>04/30/2015 | 🌐 Amended Complaint |
| [3](#) | *Filed & Entered:*<br>*Terminated:* | 04/30/2015<br>04/30/2015 | 🌐 Motion to Seal |
| | *Filed:*<br>*Entered:* | 05/01/2015<br>05/04/2015 | 🌐 Disclosure Statement Form |
| [4](#) | *Filed & Entered:* | 05/01/2015 | 🌐 Notice of Appearance |
| [5](#) | *Filed & Entered:* | 05/01/2015 | 🌐 Notice of Appearance |
| [6](#) | *Filed & Entered:* | 05/01/2015 | 🌐 Disclosure Statement Form |
| [7](#) | *Filed & Entered:* | 05/01/2015 | 🌐 Amended Document |
| [8](#) | *Filed & Entered:* | 05/01/2015 | 🌐 Disclosure Statement Form |
| | *Filed:*<br>*Entered:* | 05/05/2015<br>05/06/2015 | 🌐 Set/Reset Hearings |
| [9](#) | *Filed & Entered:* | 05/05/2015 | 🌐 Notice of Hearing |
| [10](#) | *Filed & Entered:* | 05/05/2015 | 🌐 Waiver of Service Executed |
| [11](#) | *Filed & Entered:* | 05/05/2015 | 🌐 Waiver of Service Executed |
| [12](#) | *Filed & Entered:* | 05/11/2015 | 🌐 Notice of Hearing |
| [13](#) | *Filed & Entered:* | 06/15/2015 | 🌐 Notice of Appearance |
| [14](#) | *Filed & Entered:*<br>*Terminated:* | 06/29/2015<br>07/21/2015 | 🌐 Dismiss for Failure to State a Claim |
| [15](#) | *Filed & Entered:* | 07/09/2015 | 🌐 Stipulation |
| [16](#) | *Filed:* | 07/10/2015 | 🌐 Amended Complaint |

| | | | |
|---|---|---|---|
| | *Entered:* | 07/13/2015 | |
| <u>17</u> | *Filed:*<br>*Entered:* | 07/21/2015<br>07/22/2015 | Order on Motion to Dismiss for Failure to State a Claim |
| <u>18</u> | *Filed & Entered:*<br>*Terminated:* | 07/24/2015<br>10/01/2015 | Motion to Dismiss |
| <u>19</u> | *Filed & Entered:* | 08/10/2015 | Response in Opposition to Motion |
| <u>20</u> | *Filed & Entered:* | 08/17/2015 | Reply to Response to Motion |
| <u>21</u> | *Filed & Entered:*<br>*Terminated:* | 08/26/2015<br>08/26/2015 | Motion for Leave to File |
| <u>22</u> | *Filed & Entered:* | 09/21/2015 | Notice of Hearing |
| <u>23</u> | *Filed & Entered:*<br>*Terminated:* | 09/22/2015<br>11/25/2015 | Motion for Miscellaneous Relief |
| <u>24</u> | *Filed & Entered:* | 09/29/2015 | Notice of Withdrawal of Appearance |
| <u>25</u> | *Filed & Entered:* | 10/01/2015 | Order on Motion to Dismiss |
| <u>26</u> | *Filed & Entered:* | 10/01/2015 | Motion Hearing |
| <u>27</u> | *Filed & Entered:* | 10/14/2015 | Notice of Appearance |
| <u>28</u> | *Filed & Entered:* | 10/15/2015 | Amended Complaint |
| <u>29</u> | *Filed & Entered:*<br>*Terminated:* | 10/19/2015<br>10/21/2015 | Motion for Protective Order |
| <u>30</u> | *Filed:*<br>*Entered:* | 10/21/2015<br>10/22/2015 | Order on Motion for Protective Order |
| <u>31</u> | *Filed:*<br>*Entered:* | 10/21/2015<br>10/22/2015 | Protective Order |
| <u>32</u> | *Filed & Entered:*<br>*Terminated:* | 10/29/2015<br>01/26/2016 | Dismiss for Failure to State a Claim |
| <u>33</u> | *Filed & Entered:* | 11/05/2015 | Praecipe/Request |
| <u>34</u> | *Filed & Entered:* | 11/06/2015 | Notice of Hearing |
| <u>35</u> | *Filed & Entered:* | 11/12/2015 | Response |
| <u>36</u> | *Filed & Entered:* | 11/12/2015 | Notice of Hearing |
| <u>37</u> | *Filed & Entered:* | 11/17/2015 | Praecipe/Request |
| <u>38</u> | *Filed & Entered:* | 11/19/2015 | Response |
| <u>39</u> | *Filed & Entered:* | 11/25/2015 | Order on Motion for Miscellaneous Relief |
| <u>40</u> | *Filed & Entered:* | 12/03/2015 | Audio File |
| <u>41</u> | *Filed & Entered:* | 12/09/2015 | Response in Opposition to Motion |
| <u>42</u> | *Filed:*<br>*Entered:* | 12/10/2015<br>12/11/2015 | Stipulation and Order |
| <u>43</u> | *Filed & Entered:* | 12/23/2015 | Reply to Response to Motion |
| <u>44</u> | *Filed & Entered:* | 01/26/2016 | Memorandum and/or Opinion |
| <u>45</u> | *Filed & Entered:* | 01/26/2016 | Order (Memorandum and/or Opinion) |
| <u>46</u> | *Filed & Entered:* | 02/03/2016 | Notice of Appeal |

| 47 | *Filed & Entered:* 02/04/2016 | Clerks Notice to USCA |
|---|---|---|
| | *Filed:* 02/05/2016 *Entered:* 02/08/2016 | USCA Appeal Fees |
| | *Filed:* 02/05/2016 *Entered:* 02/08/2016 | USCA Notice of Docketing ROA |
| 48 | *Filed:* 02/16/2016 *Entered:* 02/17/2016 | Transcript - PDF |
| 49 | *Filed:* 02/16/2016 *Entered:* 02/17/2016 | Notice of Filing of Official Transcript |
| 50 | *Filed:* 02/19/2016 *Entered:* 02/22/2016 | Copy of TPO Form |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/02/2016 16:39:46 | | |
| **PACER Login:** | swlaw2014:3609225:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 2:15-cv-02085-MMB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE<br>1122 Spruce Street, Apt. A<br>Philadelphia, PA 19107<br><br>       Plaintiff,<br><br>  v.<br><br>MERCY CATHOLIC MEDICAL CENTER<br>1500 Lansdowne Avenue<br>Darby, PA 19023<br><br>and<br><br>MERCY HEALTH SYSTEM<br>One West Elm Street<br>Suite 100<br>Conshohocken, PA 19428<br><br>       Defendants. | Civil Action No:   15-2085<br><br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiff Jane Doe ("Plaintiff") hereby complains as follows against Defendant Mercy Catholic Medical Center and/or Defendant Mercy Health System ("Defendant Mercy").

## INTRODUCTION

1.    Plaintiff has initiated the instant action to redress violations by Defendant Mercy of Title IX of the Education Amendments Act of 1972 ("Title IX").  In essence, Plaintiff was subjected to a sexually hostile work environment and retaliated against for complaining of same; this retaliation culminated in the termination of her residency with Defendant Mercy.

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States and seeks redress for violations of a federal law.

3.     This Court may also maintain supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure, because they are sufficiently related to the claim(s) within the Court's original jurisdiction that they form part of the same case or controversy.

4.     This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

5.     Pursuant to 28 U.S.C. § 1391, venue is properly laid in this judicial district because all off the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## **PARTIES**

6.     The foregoing paragraphs are incorporated herein as if set forth in full.

7.     Plaintiff is an adult individual and citizen of Pennsylvania living at 1122 Spruce Street, Apt. A, Philadelphia, PA 19107. "Jane Doe" is a pseudonym to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received as part of her corrective plan as outlined below.[1]

8.     Defendant Mercy Health System ("Defendant MHS") is a not-for-profit corporation which operates health care facilities in Southeastern Pennsylvania and which is headquartered at the address set forth in the caption.

---

[1] Plaintiff's name will be provided to Defendant and the Court in a non-public filing.

9. Defendant Mercy Catholic Medical Center ("Defendant MCMC") is a not-for-profit hospital system which operates multiple facilities as set forth in the caption and which is headquartered in Darby, PA. On information and belief, Defendant MCMC is a part of Defendant Mercy Health with no separate corporate identity from Defendant MHS, and the two defendants are referred to herein collectively as "Defendant Mercy."

10. At all times relevant herein, Defendant Mercy acted through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

11. The foregoing paragraphs are incorporated herein as if set forth in full.

12. Plaintiff is an adult female.

13. Plaintiff began a residency with Defendant Mercy in July 2011.

14. Dr. James Roe[2] was a director of Defendant Mercy's residency program during Plaintiff's residency.

15. Shortly after Plaintiff's residency began, Roe initiated a personal relationship with Plaintiff that involved discussions of Roe's private life, and relatives, and hobbies.

16. Roe also asked about and learned about Plaintiff's marriage and her circumstances of living away from her husband during the Mercy residency.

17. During this period, Plaintiff also noticed Roe on many occasions looking at her in a suggestive manner that made Plaintiff feel uncomfortable.

---

[2] Roe, Plaintiff's alleged harasser, name has also been replaced by a pseudonym to preserve Mr. Roe's privacy interest, should he choose to assert one. His name will be provided to the Defendant and the Court in a non-public filing.

3

18.    On one occasion, within about a few months of beginning her residency, Plaintiff and Roe were in a reading room sitting next to each and reviewing radiology reports on a computer terminal. Plaintiff observed Roe and Roe's demeanor and appearance made Plaintiff uncomfortable.

19.    Plaintiff further noticed that Roe would find opportunities to see her and speak with her more than would otherwise be expected.

20.    During the course of her residency, Plaintiff observed several other occasions in which the two of them were alone in the reading room in which Roe made her feel uncomfortable.

21.    From the conversations that she had with Roe, Plaintiff reasonably concluded that Roe was sexually attracted to Plaintiff and wished to pursue a romantic relationship with her, despite the fact that both Plaintiff and Roe were married to other people.

22.    Within approximately three months of Plaintiff beginning her residency program, Plaintiff sent Roe an email expressing concern that other individuals were aware of Roe's romantic interest in Plaintiff.

23.    After Roe received this communication, he approached Plaintiff and asked her if she had sent that email or whether someone else had gained access to her email system. Plaintiff told him that she had sent the email, and wanted their relationship to remain professional.

24.    After this conversation, Roe continued behaving in a manner that made Plaintiff believe he was romantically and/or sexually interested in her.

25.    Plaintiff believed that the other residents and the faculty were aware of Roe's interest in Plaintiff and Plaintiff was uncomfortable about this.

26.     Plaintiff was scheduled through Johns Hopkins to give an oral presentation at the RSNA Conference in Chicago in November 2011. Roe was also attending that same conference. Roe told Plaintiff that he wanted to see her when they were both in Chicago.

27.     Plaintiff was concerned about Roe's apparent romantic and/or sexual interest in her given that she was a resident and he was the director, and hoped that at a personal meeting in Chicago, she would be able to have a frank conversation with him about his interest in her. Specifically, she intended to "let him down easy" – i.e., tell him that her lack of interest was because she was in the residency program, not that she was unattracted to him. Her hope was that this rejection would be flattering and therefore minimize the chance that Roe would be hurt and would retaliate against her.

28.     Once in Chicago, Plaintiff reached out to Roe and sent him a telephone text message asking if he wanted to meet her. When Roe did not respond, Plaintiff, in an attempt to clear the air, sent him additional text messages relating that she did not want to be in a compromising position with him and that she did not want to pursue a romantic relationship with him during the residency.

29.     Upon returning from Chicago, Roe reported these text messages to Human Resources, claiming that Plaintiff was sending these text messages in order to make it appear as if there was a relationship between them.

30.     In response, Human Resources met with Plaintiff, at which point Plaintiff explained the unwelcome sexual and/or romantic attention she believed she was receiving from Roe. Plaintiff further explained that Plaintiff had sent the text messages to Roe in an effort to get him to stop paying her the unwelcome sexual attention.

31.    Human Resources asked Plaintiff if Roe had ever touched Plaintiff and Plaintiff related how Roe had touched Plaintiff's hand in the Reading Room.

32.    Plaintiff told Human Resources that she believed that Roe's unwelcome sexual attention was negatively affecting her training.

33.    On the following day, Plaintiff met with Human Resources again and Human Resources referred Plaintiff to a psychologist. Plaintiff asked if going to the psychologist was mandatory; Human Resources said that it was not, that they would get a report as to whether Plaintiff went, but if Plaintiff chose not to go, no negative effect would be taken.

34.    Nevertheless, Plaintiff believed that in response to her complaint about Roe, Human Resources was directing her to go see a psychologist and it would be held against her if she did not go. Plaintiff went to the psychologist for three sessions, and told the psychologist about the unwanted sexual attention she was receiving from Roe.

35.    Human Resources told Plaintiff nothing else about the results of any investigation into Plaintiff's complaints.

36.    Subsequent to this, Roe's supervision and training of Plaintiff appears to be limited for a period of time; specifically, Roe was no longer scheduled to supervise Plaintiff.

37.    However, within days after Plaintiff met with HR, Roe approached Plaintiff and apologized for giving the emails for giving to HR and explained that he did it because he was concerned that he would be reprimanded for having an inappropriate relationship with Plaintiff.

38.    After this, on information and belief, Roe directed other faculty members to give Plaintiff special scrutiny because of the complaints she had made to him and to Human Resources.

39.     Subsequent to Plaintiff's meeting with HR, Plaintiff received significantly less training and interaction from two other male members of the faculty who were close with Roe.

40.     Roe continued to behave inappropriately with Plaintiff; for instance, in 2012, Plaintiff asked to leave early to meet with her husband, at which point Roe became jealous.

41.     In Fall 2012, Plaintiff began the process of getting a divorce.

42.     On information and belief, Roe learned of Plaintiff's divorce proceedings from another faculty member.

43.     Within a few weeks, Roe approached Plaintiff and told Plaintiff that he was getting a divorce as well and wanted to be in a relationship with her.

44.     During this period, after Plaintiff began the divorce process, Roe intensified his interest in her; during conversations, Roe suggested that they go shooting together and that they travel together and being in a relationship with her after her residency program ended.

45.     In December 2012, Roe told Plaintiff that he was uncomfortable with her going to dinner as part of her interview process for a post-residency fellowship.

46.     In or around December 2012, Roe complained to Plaintiff that she was rejecting his advances more; Plaintiff explained that she simply did not have time for or interest in any relationship at that point.

47.     Roe also expressed unhappiness with the idea of Plaintiff leaving Philadelphia to attend a post-residency fellowship.

48.     During this same period, Plaintiff asked Roe and another faculty member ("Faculty Member #2") to provide her with letters of recommendation for her application to a fellowship program.

49.     Roe and the other faculty member provided short, cursory, and perfunctory letters of recommendation.

50.     When the director of the fellowship program called Roe for clarification, Roe told the director that Plaintiff was a poor candidate.

51.     Subsequently the director of the fellowship program called Plaintiff to let her know that Roe had given her a poor recommendation.

52.     After this, Plaintiff called Roe at the hospital and asked him why she had been given such a poor recommendation.

53.     Roe told Plaintiff that he did it to teach her a lesson, and then hung up on her.

54.     In response to Plaintiff's complaints about Roe's treatment of her, Roe reported Plaintiff to the Vice President of Defendant Mercy, Dr. Arnold Eiser.

55.     Plaintiff was asked to meet with Roe, Eiser, Faculty Member #2, and Pam Fierro. In this meeting, Plaintiff complained about the manner in which Roe was treating her and that she believed she was not getting the training she needed because of Roe's attitude towards her.

56.     Plaintiff reminded Fierro and Eiser that Plaintiff had not been scheduled with her since her complaint to HR, and that the residency program was aware of this issue and her underlying complaint about Roe. The participants than asked Plaintiff to wait outside.

57.     Eiser then took Plaintiff to see a psychiatrist at Defendant Mercy.

58.     During the walk to the psychiatrist, Eiser told Plaintiff that Defendant Mercy had received Plaintiff's scores for her second in service examination, and the results were poor, and that Plaintiff needed to address this.

59.     However, at a later date, Plaintiff learned that Eiser's comments were false, and that her second year in service examination scores were actually in the 70th percentile.

8

-24-

60.     Plaintiff spoke with the psychiatrist about Roe's romantic interest in her and his romantic overtures.

61.     The following day, Defendant Mercy instructed Plaintiff that if she wished to remain in the residency, she had to sign a letter of acknowledgment and be placed on a corrective plan.

62.     Plaintiff did not wish to sign the letter and be placed on the corrective plan, but ultimately did so in order to continue her residency.

63.     Contrary to Eiser's comments to her on the way to the psychiatrist, Plaintiff did very well and demonstrated great improvement on her second year (2012-2013) in-service examinations, but no one at the residency program ever met with her to deliver her results.

64.     After Plaintiff learned of her results on her second in-service examinations, she went to Roe and asked Roe if he would communicate with the program director at the fellowship to let him know about her improvement. Roe told Plaintiff that he would not do so.

65.     In the early spring of 2013, Roe increased his harassment of Plaintiff by scheduling more sessions with Plaintiff.

66.     In spring 2013, Plaintiff and Roe were in the Reading Room reviewing radiology reports when Plaintiff was operating a computer mouse with her right hand and Roe was sitting to her left. Roe then reached his right arm across Plaintiff's chest and placed his hand over Plaintiff's and moved her hand and the computer mouse. While doing this, Roe's arm was pressed against Plaintiff's breasts. Plaintiff pushed herself backwards and stood up, and told Roe that she wanted their relationship to remain professional.

67.    On another occasion, an oncologist/hematologist in the hospital unaffiliated with the residency program asked Roe if Plaintiff was single; Roe responded by becoming very jealous and telling Plaintiff she should not date the other physician.

68.    In early April 2013, one of the other residents asked Plaintiff to assist on a research paper the other resident was writing with Roe. For the paper, Plaintiff read the relevant studies and met with the resident to give feedback and advice and planned to continue to contribute as needed.

69.    Nevertheless, when Roe learned that Plaintiff had been added as an author to the paper, he instructed the other resident to remove Plaintiff.

70.    The other resident than told Plaintiff that Roe had order Plaintiff's removal as an author.

71.    Plaintiff went to Roe to complain as to his continued unfair treatment.

72.    Roe then insisted that Plaintiff was acting unprofessional and ordered Plaintiff to another meeting with the Vice President Eiser.

73.    Plaintiff met with the Eiser, Roe and Pam Fierro again. Eiser asked Plaintiff if she had contributed to the paper, and Plaintiff explained her contributions. Eiser told Plaintiff that the other residents "loved [Roe]," to which Plaintiff explained that Roe was torturing her due to his romantic intentions. She further told Eiser that the information provided to him about her results on the second in-service examination had been false, that she had in fact done well, and that Roe had given Eiser false information about her performance on the in-service examination.

74.    Plaintiff further explained that the issue went beyond the authorship issue but extended to Roe's entire retaliatory behavior over the past year, especially the negative recommendation he provided to the fellowship program. Eiser then directed Plaintiff to

apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his "special attention."

75.    Roe responded by stating that he would not accept Plaintiff's apology, because it was not "sincere."

76.    Eiser then suggested Plaintiff receive another psychiatric consultation and informed Plaintiff she was suspended.

77.    After being suspended, Plaintiff had no further contact from Defendant Mercy until April 20, 2013.

78.    On April 20, 2013, Plaintiff received a letter sent via FedEx overnight mail from Defendant Mercy informing Plaintiff for the first time that Defendant Mercy intended to terminate Plaintiff's residency, while giving her the option to appeal that decision.

79.    Prior to receiving and reading the termination letter from Defendant Mercy on April 20, 2013, no individual from Defendant Mercy contacted Plaintiff to inform her about the status of her residency.

80.    April 20, 2013, was the first day that Plaintiff learned that Defendant Mercy intended to terminate her residency.

81.    The termination letter, though received on April 20, 2013, was dated April 19, 2013.

82.    Plaintiff appealed the termination decision, and was given a hearing on or around April 24, 2013.

83.    At the hearing, the committee members heard about Plaintiff's allegations that Roe had romantic and/or sexual interest in her and it was her rejection of this that had motivated Roe's harassment and retaliation against her.

11

84.     At the hearing, Roe advocated for Plaintiff's dismissal from the residency program. Roe's advocacy for Plaintiff's dismissal was caused by Plaintiff's rebuffing of Roe's romantic interest in Plaintiff.

85.     After the hearing, on April 24, 2013, Plaintiff was informed that the committee intended to uphold the decision to terminate, but that Plaintiff had five days to file a further appeal if she so chose.

86.     Plaintiff resigned from the residency program prior to the expiration of her right to appeal, and her resignation was accepted by Defendant Mercy.

87.     After resigning, Plaintiff tried unsuccessfully to apply to another residency program so that she could finish her medical education.

88.     To date, Plaintiff has not been accepted to another residency program because of the manner in which her residency with Defendant Mercy ended.

89.     Defendants' actions have impaired Plaintiff's ability to advance her career as a physician and her ability to get fully licensed.

90.     For the aforementioned reasons, Plaintiff has suffered damages.

### COUNT I
### Violation of Title IX of the Education Amendments Act of 1972
### (Sexual Harassment and hostile educational environment)

91.     The foregoing paragraphs are incorporated herein as if set forth in full.

92.     Defendant Mercy operates a medical residency program that receives federal financial assistance from the Medicare program.

93.     Plaintiff was a participant in Defendant Mercy's medical residency program.

94.     Plaintiff was consistently subjected to pervasive and severe sexual harassment during her residency with Defendant Mercy that was both offensive and unwelcome.

12

95.    This harassment included Defendant Roe's repeated romantic and sexual advances, his unwelcome touching of Plaintiff, and his retaliatory behavior when his overtures were rebuffed.

96.    Defendant Mercy had repeated notice of the sexual harassment because Plaintiff complained of same to Human Resources in the winter of 2011/2012, and Plaintiffs complaints were brought up again in the hearing related to her potential termination from the program in or around April 24, 2013.

97.    Defendant Mercy failed to remedy the sexually hostile educational environment to which Plaintiff was exposed even after having notice of the sexual harassment which was occurring in its workplace.

98.    Defendant Mercy's failure to stop or remedy the sexual harassment and sexually hostile educational environment was deliberately indifferent to Plaintiff's rights.

99.    Any reasonable person would have felt that he or she was being subjected to a sexually hostile educational environment due to Defendant's conduct in failing to effectively remedy the pervasive and severe sexual harassment of which Plaintiff was exposed.

100.    These actions constitute sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

## COUNT II
## <u>Violation of Title IX of the Education Amendments Act of 1972</u>
### (Retaliation)

101.    The foregoing paragraphs are incorporated herein as if set forth in full.

102.    Plaintiff complained about Roe's unwelcome sexual and/or romantic interest in her meeting with Defendant's HR department in or around winter 2011/2012.

103.    After this, Plaintiff continued to complain to Roe directly that his sexual and/or romantic interest in her was unprofessional and unwelcome.

104.    In or around February 2013, Plaintiff complained that Roe gave her a negative review because Roe was retaliating against her.

105.    In or around April 2013, Plaintiff complained that Roe was retaliating against her by removing her name from a research project she had contributed to.

106.    On April 19, Defendant Mercy decided to terminate Plaintiff's residency because of her complaints about Roe.

107.    Defendant Mercy knew that Plaintiff had complained that Roe's retaliation was motivated by Plaintiff's rejection of his sexual and romantic intentions.

108.    Defendant Mercy decided to terminate in retaliation for Plaintiff making complaints about Defendant Roe's sexual/romantic advances and his subsequent retaliatory behavior.

109.    These actions constitute gender discrimination/retaliation against Plaintiff under Title IX of the Education Amendments Act of 1972.

## COUNT III
### Violation of Title IX of the Education Amendments Act of 1972
### (Quid Pro Quo Sexual Harassment)

110.    The foregoing paragraphs are incorporated herein as if set forth in full.

111.    Defendant Roe was the Program Director of the Medical Residency program and had significant (if not controlling) input on Plaintiff's success as a medical resident.

112.    Defendant Roe's advances wanted to have a sexual and romantic relationship with Plaintiff during Plaintiff's residency.

113.    Plaintiff repeatedly rejected Defendant Roe's advances.

114.    Defendant Roe engaged in a series of acts designed to end Plaintiff's residency because of Plaintiff's rejection of his advances.

115.    Defendant Roe acted within the scope of his educational duties in retaliating against Plaintiff.

116.    Defendant Roe made a complaint against Plaintiff that lead directly to the decision to terminate Plaintiff from the residency program.

117.    Defendant Roe recommended that Plaintiff be removed from the residency program, and provided misleading testimony against Plaintiff in order to do so.

118.    Defendant Mercy and its review committee acted as a cat's paw and rubber stamp for Defendant Roe's decision to remove Plaintiff from Defendant Mercy's residency program.

119.    These actions constitute quid pro quo sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

**COUNT IV**
**Intentional Infliction of Emotional Distress**
**(Pennsylvania common law)**
**(Respondeat Superior)**

120.    The foregoing paragraphs are incorporated herein as if set forth in full.

121.    Roe's actions in repeatedly subjecting Plaintiff to unwanted sexual and romantic interest and advances was extreme and outrageous conduct, retaliating against Plaintiff by writing her negative recommendations and by removing her from a research project, and then having her investigated and recommending her termination constitutes extreme and outrageous conduct.

122.    Plaintiff suffered severe emotional distress as a result of Roe's actions.

123.    Roe performed his actions within the scope of his employment as the Program Director of Defendant Mercy's residency program.

124.    Roe's actions constitute tortious intentional infliction of emotional distress under Pennsylvania common law.

125.    Defendant Mercy is liable for the tortious intentional infliction of emotional distress committed by Roe against Plaintiff because it employed Roe as the Program Director of its residency program.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

i.    Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of harassing, discriminating, and retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful activities and to adhere thereto;

ii.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions.

iii.    Plaintiff is to be awarded punitive and/or liquidated damages as permitted by applicable law, to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

iv.    Plaintiff is to be accorded damages for emotional distress and/or pain and suffering and any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

v.    Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

vi.    Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.

16

Respectfully Submitted,

/s/ Joshua S. Boyette

Joshua S. Boyette, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy. N., Suite 402
Cherry Hill, NJ 08032
Phone: (856) 685-7420
Fax: (856) 685-7417
Attorney for Plaintiff

Date: July 7, 2015

**IN THE UNITED STATES DISTRICT COURT**
**FOR EASTERN DISTRICT OF PENNSYLVANIA**

JANE DOE,

               Plaintiff,

                    v.

MERCY CATHOLIC MEDICAL CENTER
and MERCY HEALTH SYSTEM,

               Defendants.

NO. 2:15-cv-02085

## ORDER

    NOW, this _____ day of _____, 2015, upon consideration of Defendants

Mercy Catholic Medical Center and Mercy Health System's Partial Motion to Dismiss Plaintiff's

Second Amended Complaint and Motion for More Definite Statement, and upon consideration of

the briefs of the parties,

    **IT IS ORDERED** that the Motion is GRANTED.  Plaintiff's claims against Defendant

Mercy Health System, as well as Plaintiff's Title IX hostile environment claim (Count I), Title

IX claims related to any discrete acts prior to April 20, 2013 (Counts II and III), and common

law claim for intentional infliction of emotional distress (Count IV) are hereby DISMISSED

with prejudice.  Plaintiff's demand for punitive and/or liquidated damages under Title IX is

hereby stricken.  Plaintiff is hereby prohibited from proceeding under pseudonym and Plaintiff is

hereby ORDERED to file a Third Amended Complaint identifying herself using her real name.

                              **BY THE COURT:**

                              _____

                              **BAYLSON, J.**

# IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE,

                Plaintiff,

                                          NO. 2:15-cv-02085

           v.

MERCY CATHOLIC MEDICAL CENTER
and MERCY HEALTH SYSTEM,

                Defendants.

## PARTIAL MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND MOTION FOR A MORE DEFINITE STATEMENT

Defendants Mercy Catholic Medical Center and Mercy Health System (collectively referred to as "Defendants"), by counsel, hereby move to dismiss Plaintiff Jane Doe's ("Plaintiff") claims against Defendant Mercy Health System, as well as Plaintiff's Title IX hostile environment claim (Count I), Title IX claims related to any discrete acts prior to April 20, 2013 (Counts II and III), and common law claim for intentional infliction of emotional distress (Count IV) with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.  Defendants also move to strike Plaintiff's demand for punitive and/or liquidated damages under Title IX pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

Defendants further move this Honorable Court for an Order for a more definite statement pursuant to Federal Rule of Civil Procedure Rule 12(e), requiring Plaintiff to identify herself using her real name.  In support, Defendants rely upon the accompanying Memorandum of Law, which is incorporated herein by reference as if set forth in full.

**WHEREFORE**, Defendants respectfully request that this Court dismiss Plaintiff's Second Amended Complaint with prejudice, prohibit Plaintiff from proceeding under a pseudonym, and require that Plaintiff's real name be identified in a Third Amended Complaint.

Respectfully submitted,

**POST & SCHELL, P.C.**

Dated: _July 24, 2015_               By:     _s/ Andrea M. Kirshenbaum_
A. James Johnston, Esquire
Andrea M. Kirshenbaum, Esquire
David E. Renner, Esquire
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA  19103
215-587-1000

**Attorneys for Defendants**

2

**IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA**

JANE DOE,

                Plaintiff,

                                NO. 2:15-cv-02085

        v.

MERCY CATHOLIC MEDICAL CENTER
and MERCY HEALTH SYSTEM,

                Defendants.


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
PARTIAL MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
<u>COMPLAINT AND MOTION FOR A MORE DEFINITE STATEMENT</u>**


**POST & SCHELL, P.C.**


**A. JAMES JOHNSTON, ESQUIRE
ANDREA M. KIRSHENBAUM, ESQUIRE
DAVID E. RENNER, ESQUIRE
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA  19103
215-587-1000**

**Attorneys for Defendants**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................... ii

I.    INTRODUCTION ........................................................................................... 1

II.   ALLEGED FACTS (AS OPPOSED TO LEGAL CONCLUSIONS) AND
      PROCEDURAL HISTORY ............................................................................ 2

III.  ARGUMENT .................................................................................................. 9

      A.    MOTION TO DISMISS STANDARD ................................................... 9

      B.    NO MHS LIABILITY IS PLAUSIBLY PLED ..................................... 10

      C.    PLAINTIFF'S TITLE IX CLAIMS IN COUNTS II AND III
            RELATED TO ANY DISCRETE ACTS PRIOR TO APRIL 20, 2013
            ARE BARRED BY THE STATUTE OF LIMITATIONS ....................... 11

      D.    COUNT I OF PLAINTIFF'S COMPLAINT ASSERTING A
            HOSTILE ENVIRONMENT UNDER TITLE IX IS TIME BARRED ... 11

      E.    PLAINTIFF CANNOT DRESS UP EMPLOYMENT CLAIMS,
            WHICH SHOULD HAVE BEEN BROUGHT AND
            ADMINISTRATIVELY EXHAUSTED UNDER TITLE VII, AS
            TITLE IX CLAIMS. ............................................................................... 13

      F.    ANY DEMAND FOR PUNITIVE AND/OR LIQUIDATED
            DAMAGES AS TO PLAINTIFF'S TITLE IX CLAIMS SHOULD
            BE STRICKEN ...................................................................................... 15

      G.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL
            DISTRESS CLAIM IS BARRED BY THE WORKERS
            COMPENSATION EXCLUSIVITY PROVISION. ................................. 16

            1.    The third-party attack/personal animus exception does not apply
                  to Plaintiff's intentional infliction of emotional distress claim. ........... 17

      H.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL
            DISTRESS CLAIM ALSO IS BARRED BY THE STATUTE OF
            LIMITATIONS ....................................................................................... 18

      I.    PLAINTIFF CANNOT PROCEED UNDER A PSEUDONYM ............... 20

IV.   CONCLUSION .............................................................................................. 27

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Ahmed v. Lowe's Co.,* Civ. A. No. 06-4798, 2008 U.S. Dist. LEXIS 58568 (E.D.
Pa. July 31, 2008), *aff'd* 346 F. App'x 816 (3d Cir. 2009)................................ 17

*Anspach v. City of Phila.,* 503 F.3d 256 (3d Cir. 2007)...................................................... 2

*Aquilino v. The Phila. Catholic Archdiocese,* 884 A.2d 1269 (Pa. Super. Ct. 2005) .................. 20

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ............................... 9

*Barnes v. Gorman,* 526 U.S. 181 (2002) ................................................................. 16

*Baselice v. Franciscan Friars Assumption BVM Province, Inc.,* 879 A.2d 270 (Pa.
Super. Ct. 2005) ................................................................................. 20

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929
(2007) ...................................................................................................... 9

*Bougher v. Univ. of Pittsburgh,* 882 F.2d 74 (3d Cir. 1989) ................................................. 11, 20

*Brookhaven Baptist Church v. Workers' Compensation Appeal Bd. (Halvorson),*
912 A.2d 770 (Pa. 2006) ........................................................................ 16

*Campion v. Northeast Utils.,* 598 F. Supp. 2d 638 (M.D. Pa. 2009) ........................................... 11

*Cannon v. Univ. of Chicago,* 441 U.S. 677 (1978) ........................................................ 14

*Crandell v. New York Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304 (S.D.N.Y.
2000) ...................................................................................................... 14

*Dawn L. v. Greater Johnstown Sch. Dist.,* 586 F. Supp. 2d 332 (W.D. Pa. 2008) ...................... 15

*DeJohn v. Temple Univ.,* 537 F.3d 301 (3d Cir. 2008)................................................ 12

*Doe v. Blue Cross & Blue Shield United,* 112 F.3d 869 (7th Cir. 1997) .................................... 21

*Doe v. Borough of Morrisville,* 130 F.R.D. 612 (E.D. Pa. 1990) ................................................ 24

*Doe v. City of Chicago,* 360 F.3d 667 (7th Cir. 2004)................................................ 27

*Doe v. Megless,* 654 F.3d 404 (3d Cir. 2011) ................................................ *passim*

*Doe v. Old Forge Borough,* No. 12-2236, 2015 U.S. Dist. LEXIS 85902 (M.D.
Pa. July 1, 2015).................................................................................. 21-23

*Doe v. Temple Univ.,* No. 14-04729, 2014 U.S. Dist. LEXIS 122427 (E.D. Pa.
Sept. 3, 2014) ......................................................................................... 23

*Does 1 thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058 (9th Cir. 2000)............................ 24

*Durham Life Ins. Co. v. Evans,* 166 F.3d 139 (3d Cir. 1999)....................................... 18

ii

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                               **PAGE(S)**

*E.K. v. Massaro,* Civ. No. 12-2464, 2013 U.S. Dist. LEXIS 144579 (D.N.J. Oct. 7, 2013) .................................................................................................. 16

*Evancho v. Fisher,* 423 F.3d 347 (3d Cir. 2005) .......................................... 2

*F.B. v. E. Stroudsburg Univ.,* No. 09-525, 2009 U.S. Dist. LEXIS 57370 (M.D. Pa. July 7, 2009)...................................................................... 21, 23, 26

*Fleming v. Kramont Employer Royce Realty, Inc.,* Civ. A. No. 02-2703, 2002 U.S. Dist. LEXIS 15806 (E.D. Pa. Aug. 16, 2002).................................... 18

*Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.,* 214 F. Supp. 2d 273 (E.D.N.Y. 2002)........................................................................ 12

*Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir. 2009)............................ 9

*Frazer v. Temple Univ.,* 25 F. Supp. 3d 598 (E.D. Pa. 2014)...................... 25

*Fusco v. Bucks County,* Civ. A. No. 08-2082, 2009 U.S. Dist. LEXIS 118924 (E.D. Pa. Dec. 21, 2009) ............................................................... 12

*Gebster v. Lago Vista Independent School District,* 524 U.S. 274 (1998).................. 12

*Gibson v. Hickman,* 2 F. Supp. 2d 1481 (M.D. Ga. 1998)............................ 15

*Gjeka v. Del. County Comm. Coll.,* Civ. A. No. 12-4548, 2013 U.S. Dist. LEXIS 73054 (E.D. Pa. May 23, 2013) ........................................................ 12

*Glickstein v. Neshaminy Sch. Dist.,* Civ. A. No. 96-6236, 1997 U.S. Dist. LEXIS 16317 (E.D. Pa. Oct. 22, 1997) .............................................. 14

*Greineder v. Masonic Homes of the R.W. Grand Lodge,* Civ. A. No. 13-2376, 2014 U.S. Dist. LEXIS 56269 (E.D. Pa. Apr. 23, 2014) ............................... 9, 10

*Hartman v. Sterling, Inc.,* Civ. A. No. 01-CV-2630, 2003 U.S. Dist. LEXIS 18140 (E.D. Pa. Sept. 11, 2003) .............................................. 20

*Hoy v. Angelone,* 720 A.2d 745 (Pa. 1998) ........................................ 17, 20

*J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.,* No. 11-1751, 2013 U.S. Dist. LEXIS 87886 (M.D. Pa. June 24, 2013)................................................. 10

*Jackson v. Lehigh Valley Physicians Group,* Civ. A. No. 08-3043, 2009 U.S. Dist. LEXIS 6936 (E.D. Pa. Jan. 30, 2009)............................................... 18

*Kuhn v. Philip Morris U.S.A.,* 814 F. Supp. 450 (E.D. Pa. 1993) ................. 25

*L.A. v. Hoffman*, No. 14-6895, 2015 U.S. Dist. LEXIS 94564 (D.N.J. July 21, 2015) .................................................................................... 24

iii

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                   **PAGE(S)**

*Lakoski v. James,* 66 F.3d 751 (5th Cir. 1995) ............................................................. 14

*Lowenstein v. Catholic Health East,* 820 F. Supp. 2d 639 (E.D. Pa. 2011) ................................ 10

*Mandel v. M&Q Packaging Corp.,* 706 F.3d 157 (3d Cir. 2013) .................................................. 13

*Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933 (3d Cir. 1997) ............................ 17

*McGee v. The Proctor & Gamble Distributing Co.,* 445 F. Supp. 2d 481 (E.D. Pa. 2006) ............................................................................................................ 18, 20

*McInerney v. Moyer Lumber & Hardware,* 244 F. Supp. 2d 393 (E.D. Pa. 2002) ...................... 17

*McLaughlin v. State Sys. of Higher Educ.,* Civ. A. No. 97-CV-1144, 1999 U.S. Dist. LEXIS 4325 (E.D. Pa. Mar. 31, 1999) ............................................................ 14

*Mears v. Bd. of Educ. of the Sterling Reg'l High Sch. Dist.,* Civ. A. No. 13-3154 (NLH-JS), 2014 U.S. Dist. LEXIS 43236 (D.N.J. Mar. 31, 2014) .................................. 12

*Miller v. Kutztown Univ.,* No. 13-3993, 2013 U.S. Dist. LEXIS 173878 (E.D. Pa. Dec. 10, 2013) ............................................................................................................ 25

*Monger v. Purdue Univ.,* 953 F. Supp. 260 (S.D. Ind. 1997) ..................................................... 12

*Morris v. Wallace Community College-Selma,* 125 F. Supp. 2d 1315 (S.D. Ala. Jan. 8, 2001) .............................................................................................................. 15

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) .............................................. 11, 13

*Nationwide Mut. Ins. Co. v. Shaw,* 491 F. App'x 353 (3d Cir. 2012) ......................................... 16

*O'Shea v. Interboro Sch. Dist.,* Civ. A. No. 13-cv-06305, 2014 U.S. Dist. LEXIS 58374 (E.D. Pa. Apr. 28, 2014) ........................................................................................ 9

*Ormsby v. Luzerne County Dep't of Pub. Welfare Office of Human Servs.,* 149 F. App'x 60 (3d Cir. 2005) ................................................................................................... 19

*Rose v. Beaumont Indep. Sch. Dist.,* 240 F.R.D. 264 (E.D. Tex. 2007) ...................................... 27

*S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707 (5th Cir. 1979) ................................................................................................................. 21

*Sameric Corp. of Del., Inc. v. City of Phila.,* 142 F.3d 582 (3d Cir. 1998) ............................... 19

*Santiago v. Warminster Twp.,* 629 F.3d 121 (3d Cir. 2010) ......................................................... 9

*Schultz v. The Bd. of Trustees of the Univ. of West Florida,* Case No. 3:06cv442-RS-MD, 2007 U.S. Dist. LEXIS 36815 (N.D. Fla. May 21, 2007) .................................. 15

*Shenango Inc. v. Am. Coal Sales Co.,* No. 06-149, 2007 U.S. Dist. LEXIS 58110 (W.D. Pa. Aug. 9, 2007) ........................................................................................ 10

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                                                          **PAGE(S)**

*Stanley v. Trustees of The Cal. State Univ.,* 433 F.3d 1129 (9th Cir. 2006) ................................. 13

*Underwood v. La Salle Univ.,* Civ. A. No. 07-1441, 2007 U.S. Dist. LEXIS 88959
    (E.D. Pa. Dec. 3, 2007) ................................................ 11

*Vega v. State Univ. of N.Y. Bd. of Trustees,* 97 CIV. 5767 (DLC), 2000 U.S. Dist.
    LEXIS 4749 (S.D.N.Y. Apr. 13, 2000) ............................ 15

*Winterberg v. Transp. Inc. Co.,* 72 F.3d 318 (3d Cir. 1995) ....................................... 16

*Yan v. Penn State Univ.,* 529 F. App'x 167 (3d Cir. 2013) ....................................... 25

**STATUTES**

20 U.S.C. § 1681(a) ........................................................... 11

42 U.S.C. § 2000e-5(e) ...................................................... 13

42 U.S.C. § 2000e-5(g)(1) .................................................. 14

42 Pa. C.S.A. § 5524(2) ..................................................... 19, 20

77 P.S. §481(a) ................................................................ 16

77 P. S.§ 22. .................................................................. 16

**RULES**

Fed. R. Civ. P. 5.2(a) ........................................................ 24

Fed. R. Civ. P. 10(a) ........................................................ 21, 26

Fed. R. Civ. P. 12(b)(6) ..................................................... 9

Fed. R. Civ. P. 12(e) ........................................................ 2, 21, 27

Fed. R. Civ. P. 17(a)(1) ..................................................... 21

Fed. R. Civ. P. 17(a)(3) ..................................................... 21

**OTHER AUTHORITIES**

2-12 James Wm. Moore et al., Moore's Federal Practice – Civil § 12.34 ....................... 10

v

## I.    INTRODUCTION

Plaintiff "Jane Doe,"[1] has filed a four (4) count Second Amended Complaint ("Complaint") against Mercy Catholic Medical Center ("MCMC") and Mercy Health System ("MHS") (MCMC and MHS collectively referred to as "Defendants") alleging claims of hostile environment sexual harassment, retaliation and quid pro quo sexual harassment under Title IX as well as a claim of intentional infliction of emotional distress.  Plaintiff, who worked as a medical resident, alleges that she was harassed by the director of the residency program and ultimately removed from that program either due to her failure to submit to the director's advances or as retaliation for complaining of alleged mistreatment by the director.  Plaintiff further contends that such conduct qualifies as intentional infliction of emotional distress.  After Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint, by stipulation of the parties, on July 10, 2015, Plaintiff filed a Second Amended Complaint removing a claim of negligent supervision included in Plaintiff's First Amended Complaint, and providing limited additional factual averments.  ECF Nos. 14-16.

Plaintiff's claims against MHS should be dismissed in their entirety because Plaintiff fails to plausibly allege parent or joint enterprise liability.  Plaintiff's only allegation in support of her claims against MHS is her conclusory statement that MCMC "is part of" MHS "with no separate corporate identity from" MHS.  Second Amended Complaint ("SAC") at ¶ 9.  Plaintiff's allegation in this regard falls far short of *Iqbal*'s pleading requirements.

Moreover, Plaintiff's Title IX claims related to any alleged discrete discriminatory or retaliatory acts (Counts II and III) prior to April 20, 2013 are barred by the statute of limitations. Plaintiff's hostile environment claim (Count I) likewise is time barred.  Plaintiff's demand for

---

[1] "Jane Doe" is a pseudonym which Plaintiff has used "to avoid public disclosure." Second Amended Complaint at ¶ 7.

1

punitive and/or liquidated damages under Title IX also should be stricken as such remedies are not available under Title IX.

Plaintiff's intentional infliction of emotional distress claim is barred by the exclusivity provision of the Pennsylvania Worker's Compensation Act, and also is time barred.

Defendants further move for a more definite statement under Federal Rule of Civil Procedure Rule 12(e), requiring Plaintiff to identify herself using her real name rather than a pseudonym.

For all of these reasons, as well as those set forth in detail below, Defendants respectfully request that this Court dismiss MHS from this action, dismiss Counts II and III of Plaintiff's Second Amended Complaint related to any alleged discrete acts prior to April 20, 2013, dismiss Counts I and IV Plaintiff's Second Amended Complaint and order Plaintiff to file a Third Amended Complaint asserting only claims of retaliation and quid pro quo sexual harassment under Title IX related to the termination of her residency using her real name and not the pseudonym of Jane Doe.

## II.    ALLEGED FACTS (AS OPPOSED TO LEGAL CONCLUSIONS)[2] AND PROCEDURAL HISTORY

Plaintiff worked as a medical resident "with Defendant Mercy"[3] beginning in July 2011.

---

[2] The following facts are taken as true for the purpose of the instant motion only. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). Of course, any "bald assertions" contained in Plaintiff's Second Amended Complaint shorn of a factual basis therefore cannot be taken as true and should not be credited by this Court. *Anspach v. City of Phila.*, 503 F.3d 256, 260-61 (3d Cir. 2007).

[3] Throughout her Second Amended Complaint, Plaintiff refers to both Defendants collectively as "Defendant Mercy." SAC at ¶ 9. While in setting forth Plaintiff's allegations Defendants quote Plaintiff's allegations, Defendants challenge the sufficiency of the allegations made against Mercy Health System, as set forth in detail in Section III.B. *infra*.

2

SAC at ¶ 13.  Dr. "James Roe"[4] was "a director of Defendant Mercy's residency program during

Plaintiff's residency."  SAC at ¶ 14.  "Shortly after Plaintiff's residency began, Roe initiated a

personal relationship with Plaintiff that involved discussions of Roe's private life, and relatives,

and hobbies."  SAC at ¶ 15.  Roe learned that Plaintiff was living "away from her husband during

the Mercy residency."  SAC at ¶ 16.  Plaintiff believes that Roe looked at her "in a suggestive

manner" which "made Plaintiff feel uncomfortable."  SAC at ¶ 17.  For example, on one occasion

"within a few months of beginning her residency," Roe's "demeanor and appearance made

Plaintiff uncomfortable," while Plaintiff and Roe were in the Reading Room sitting next to each

other reviewing radiology reports.  SAC at ¶ 18; *see also* SAC at ¶ 20.  Plaintiff also "noticed"

that "Roe would find opportunities to see her and speak with her more than would otherwise be

expected."  SAC at ¶ 19.

Plaintiff "reasonably" believed "[f]rom the conversations that she had with Roe" that "Roe

was sexually attracted to Plaintiff and wished to pursue a romantic relationship with her, despite

the fact that both Plaintiff and Roe were married to other people."  SAC at ¶ 21.  "Within

approximately three months of Plaintiff beginning her residency program, Plaintiff sent Roe an

email expressing concern that other individuals were aware of Roe's romantic interest in

Plaintiff."  SAC at ¶ 22.  After receiving this communication, Roe "approached Plaintiff and

asked if she had sent that email or whether someone else had gained access to her email system."

SAC at ¶ 23.  Plaintiff informed Roe that "she had sent the email, and wanted their relationship to

remain professional."  SAC at ¶ 23.  Plaintiff avers that, following this conversation, Roe

"continued behaving in a manner that made Plaintiff believe he was romantically and/or sexually

interested in her."  SAC at ¶ 24.  "Plaintiff believed that the other residents and the faculty were

---

[4] Plaintiff has used a pseudonym here.  SAC at ¶ 14.

3

aware of Roe's interest in Plaintiff and Plaintiff was uncomfortable about this." SAC at ¶ 25.

In November 2011, Plaintiff and Roe attended a medical conference in Chicago. SAC at ¶ 26. Roe "told Plaintiff that he wanted to see her when they were both in Chicago." SAC at ¶ 26. "Once in Chicago, Plaintiff reached out to Roe and sent him a telephone text message asking if he wanted to meet her. When Roe did not respond, Plaintiff . . . sent him additional text messages relating that she did not want to be in a compromising position with him and that she did not want to pursue a romantic relationship with him during the residency." SAC at ¶ 28. After he returned from Chicago, Roe "reported the text messages to Human Resources, claiming that Plaintiff was sending these text messages in order to make it appear as if there was a relationship between them." SAC at ¶ 29.[5] At that point, Plaintiff met with Human Resources and "explained the unwelcome sexual and/or romantic attention she believed she was receiving from Roe." SAC at ¶ 30. In response to a question by Human Resources whether Roe "ever touched Plaintiff," Plaintiff "related how Roe touched Plaintiff's hand in the Reading Room." SAC at ¶ 31. "Plaintiff told Human Resources that she believed that Roe's unwelcome sexual attention was negatively affecting her training." SAC at ¶ 32. On the following day when Plaintiff met with Human Resources again "Human Resources referred Plaintiff to a psychologist." SAC at ¶ 33. Plaintiff went to three sessions with the psychologist and "told the psychologist about the unwanted sexual attention she was receiving from Roe." SAC at ¶ 34.

Following her communications with Human Resources, "Roe's supervision and training of Plaintiff appear[ed] to be limited for a period of time; specifically, Roe was no longer scheduled to supervise Plaintiff." SAC at ¶ 36. According to Plaintiff, "Human Resources told

---

[5] Plaintiff avers that Roe later apologized to her for providing the emails to Human Resources, "and explained that he did it because he was concerned that he would be reprimanded for having an inappropriate relationship with Plaintiff." SAC at ¶37.

Plaintiff nothing about the results of any investigation into Plaintiff's complaints." SAC at ¶ 35.

"[O]n information and belief, Roe directed other faculty members to give Plaintiff special scrutiny because of the complaints she had made to him and to Human Resources." SAC at ¶ 38. "Subsequent to" Plaintiff's "meeting" with Human Resources, Plaintiff received "significantly less training and interaction from two other male members of the faculty who were close with Roe." SAC at ¶ 39.

In 2012, Roe "continued to behave inappropriately with Plaintiff." SAC at ¶ 40. For example, "in 2012," Plaintiff asked to "leave early to meet her husband, at which point Roe became jealous." SAC at ¶ 40.[6]

In the "Fall" of 2012, Plaintiff "began the process of getting a divorce," which "[o]n information and belief," Roe learned about through another faculty member. SAC at ¶¶ 41, 42. "Within a few weeks, Roe approached Plaintiff and told Plaintiff that he was getting a divorce as well and wanted to be in a relationship with her." SAC at ¶ 43. During the period "after Plaintiff began the divorce process," Roe "intensified his interest in her," suggesting that "they go shooting together," "travel together and be[] in a relationship . . . after her residency program ended." SAC at ¶ 44.

"In December 2012, Roe told Plaintiff that he was uncomfortable with her going to dinner as part of her interview process for a post-residency fellowship." SAC at ¶ 45. "In or around December 2012, Roe complained to Plaintiff that she was rejecting his advances more; Plaintiff explained that she simply did not have time for or interest in any relationship at that point." SAC at ¶ 46. Roe "expressed unhappiness" with the prospect "of Plaintiff leaving Philadelphia to

---

[6] "On another occasion, an oncologist/hematologist in the hospital unaffiliated with the residency program asked Roe if Plaintiff was single; Roe responded by becoming very jealous and telling Plaintiff she should not date the other physician." SAC at ¶ 67.

5

attend a post-residency fellowship." SAC at ¶ 47.

"During this same period," Plaintiff asked both Roe and another faculty member (identified by Plaintiff as "Faculty Member #2") to provide Plaintiff with letters of recommendation for her application to a fellowship program. SAC at ¶ 48. Both Roe and Faculty Member #2 "provided short, cursory, and perfunctory letters of recommendation." SAC at ¶ 49. When the director of the fellowship program contacted Roe "for clarification," Roe "told the director that Plaintiff was a poor candidate." SAC at ¶ 50. "Subsequently the director of the fellowship program called Plaintiff to let her know that Roe had given her a poor recommendation." SAC at ¶ 51. After Plaintiff learned this, she "called Roe at the hospital and asked him why she had been given such a poor recommendation." SAC at ¶ 52. "Roe told Plaintiff that he did it to teach her a lesson, and then hung up on her." SAC at ¶ 53. Roe also "reported Plaintiff to the Vice President of Defendant Mercy, Dr. Arnold Eiser." SAC at ¶ 54. In a meeting which Plaintiff was asked to attend with Roe, Eiser and two others, "Plaintiff complained about the manner in which Roe was treating her and that she believed she was not getting the training she needed because of Roe's attitude towards her." SAC at ¶ 55. Following this meeting, Eiser brought Plaintiff to see a psychiatrist "at Defendant Mercy." SAC at ¶ 57. While walking with Plaintiff to the psychiatrist, Eiser informed Plaintiff that "Defendant Mercy had received Plaintiff's scores for her second in service examination, and the results were poor, and that Plaintiff needed to address this." SAC at ¶ 58.[7] During her meeting with the psychiatrist, Plaintiff spoke about "Roe's romantic interest in her and his romantic overtures." SAC at ¶ 60.

---

[7] "[A]t a later date, Plaintiff learned that Eiser's comments were false, and that her second year in service examination scores were actually in the 70th percentile." SAC at ¶ 59. Plaintiff avers that she "did very well" and "demonstrated great improvement" in her second year examinations. SAC at ¶ 63. After Plaintiff learned of her examination results, she "went to Roe and asked Roe if he would communicate with the program director at the fellowship to let him know about her improvement. Roe told Plaintiff that he would not do so." SAC at ¶ 64.

6

"The following day, Defendant Mercy instructed Plaintiff that if she wished to remain in the residency [program], she had to sign a letter of acknowledgment and be placed on a corrective plan." SAC at ¶ 61. While "Plaintiff did not wish to sign the letter and be placed on the corrective plan," she "ultimately did so in order to continue her residency." SAC at ¶ 62.

"In the early spring of 2013, Roe increased his harassment of Plaintiff by scheduling more sessions with Plaintiff." SAC at ¶ 65. "In spring 2013, Plaintiff and Roe were in the Reading Room reviewing radiology reports when Plaintiff was operating a computer mouse with her right hand and Roe was sitting to her left. Roe then reached his arm right across Plaintiff's chest and placed his hand over Plaintiff's and moved her hand and the computer mouse. While doing this, Roe's arm was pressed against Plaintiff's breasts. Plaintiff pushed herself backwards and stood up, and told Roe that she wanted their relationship to remain professional." SAC at ¶ 66.

In "early April 2013," another resident asked Plaintiff to assist with a research paper that the resident was writing with Roe. SAC at ¶ 68. "For the paper, Plaintiff read the relevant studies and met with the resident to give feedback and advice and planned to continue to contribute as needed." SAC at ¶ 68. "[W]hen Roe learned that Plaintiff had been added as an author to the paper, he instructed the other resident to remove Plaintiff." SAC at ¶ 69. Plaintiff learned about this from the "other resident." SAC at ¶ 70.

Plaintiff went to Roe "to complain as to his continued unfair treatment." SAC at ¶ 71. "Roe then insisted that Plaintiff was acting unprofessional [sic] and ordered Plaintiff to another meeting with the [sic] Vice President Eiser." SAC at ¶ 72. At the meeting with Eiser, Eiser "directed Plaintiff to apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his 'special attention.'" SAC at ¶ 74. Roe responded by "stating that he would not accept Plaintiff's apology, because it was not 'sincere.'"

7

SAC at ¶ 75.  Eiser then "suggested Plaintiff receive another psychiatric consultation and

informed Plaintiff she was suspended."  SAC at ¶ 76.  After Plaintiff was suspended, "Plaintiff

had no further contact from Defendant Mercy until April 20, 2013."  SAC at ¶ 77.

"On April 20, 2013, Plaintiff received a letter sent via FedEx overnight mail from

Defendant Mercy informing Plaintiff for the first time that Defendant Mercy intended to terminate

Plaintiff's residency, while giving her the option to appeal the decision."  SAC at ¶ 78.[8]  Plaintiff

appealed the decision and "was given a hearing on or around April 24, 2013."  SAC at ¶ 82.  At

the hearing "the committee members heard about Plaintiff's allegations that Roe had romantic

and/or sexual interest in her and it was her rejection of this that had motivated Roe's harassment

and retaliation against her."  SAC at ¶ 83.  At the hearing "Roe advocated for Plaintiff's dismissal

from the residency program."  SAC at ¶ 84.

After the hearing, Plaintiff "was informed that the committee intended to uphold the

decision to terminate, but that Plaintiff had five days to file a further appeal if she so chose."  SAC

at ¶ 85.  "Plaintiff resigned from the residency program prior to the expiration of her right to

appeal, and her resignation was accepted by Defendant Mercy."  SAC at ¶ 86.

On April 20, 2015, Plaintiff initiated this legal action by filing a Complaint.  ECF No. 1.

On April 29, 2015, Plaintiff filed a First Amended Complaint.  ECF No. 2.  On July 10, 2015,

following a stipulation by counsel, Plaintiff filed a Second Amended Complaint ("Complaint").

ECF No. 16.  In addition to other remedies, Plaintiff seeks to be made "whole for any and all pay

and benefits Plaintiff would have received" but for "Defendant's" alleged actions.  SAC at p. 16.

---

[8] Plaintiff previously alleged in her First Amended Complaint that "Defendant Mercy"
informed Plaintiff that "it intended to terminate Plaintiff's residency," on April 19, 2013.  First
Am. Compl. at ¶ 77, ECF No. 2.

8

## III.   ARGUMENT

### A.   MOTION TO DISMISS STANDARD

A claim may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." To state a viable claim and survive a motion to dismiss, Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," or accept as true unsupported conclusions and unwarranted inferences. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965, 167 L. Ed. 2d at 940 (citation omitted). Accordingly, courts in the Third Circuit engage in a three-step analysis at the motion to dismiss stage:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are not more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (alterations in original; footnote omitted). Without "sufficient factual matter to show that the claim is facially plausible," a complaint must be dismissed. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (noting that *Twombly*'s "plausibility paradigm . . . applies with equal force to analyzing the adequacy of claims of employment discrimination."); *see also O'Shea v. Interboro Sch. Dist.*, Civ. A. No. 13-cv-06305, 2014 U.S. Dist. LEXIS 58374, at *8-9 (E.D. Pa. Apr. 28, 2014) (Baylson, J.); *Greineder v. Masonic Homes of the R.W. Grand Lodge*, Civ. A. No. 13-2376, 2014

9

U.S. Dist. LEXIS 56269, at *4-5 (E.D. Pa. Apr. 23, 2014) ("The plausibility standard requires more than a 'sheer possibility that a defendant has acted unlawfully.'") (citations omitted); 2-12 James Wm. Moore et al. Moore's Federal Practice – Civil § 12.34 ("conclusory allegations . . . are not entitled to the assumption of truth. . . . While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions. The plaintiff . . . must allege a factual predicate concrete enough to warrant further proceedings.") (citations omitted).

### B. NO MHS LIABILITY IS PLAUSIBLY PLED.

The Complaint's allegation that Defendant MCMC "is a part of Defendant Mercy Health System with no separate corporate identity from Defendant MHS" falls far short of plausibly showing parent or joint enterprise liability under *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950, 173 L. Ed. 2d at 884. *See* SAC at ¶ 9. No factual allegations are made in support of this conclusory assertion, which is made, "[o]n information and belief." SAC at ¶ 9; *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.*, No. 11-1751, 2013 U.S. Dist. LEXIS 87886, at *11-12 (M.D. Pa. June 24, 2013) (rejecting plaintiff's "information and belief" pleading relating to the relationship between two corporate entities and dismissing the claims brought against the moving defendants); *Shenango Inc. v. Am. Coal Sales Co.*, No. 06-149, 2007 U.S. Dist. LEXIS 58110, at *8-11 (W.D. Pa. Aug. 9, 2007) (granting a motion to dismiss where the complaint alleged various elements of the cause of action "on information and belief" but did not specify any facts that would have led to this conclusion).

MHS should be dismissed with prejudice from the lawsuit. *Lowenstein v. Catholic Health East*, 820 F. Supp. 2d 639, 643-44 (E.D. Pa. 2011) ("a parent corporation, like any stockholder, is not normally liable for the wrongful acts . . . of a subsidiary even if or simply because the parent wholly owns the subsidiary") (citations omitted); *Campion v. Northeast*

10

*Utils.*, 598 F. Supp. 2d 638, 655-56 (M.D. Pa. 2009) ("Campion's complaint sets forth insufficient facts to allow the conclusion that NGS, NU, NU Enterprises and Select are interrelated companies, and therefore, his claims against the latter three entities will be dismissed.").

### C. PLAINTIFF'S TITLE IX CLAIMS IN COUNTS II AND III RELATED TO ANY DISCRETE ACTS PRIOR TO APRIL 20, 2013 ARE BARRED BY THE STATUTE OF LIMITATIONS.

Title IX provides, in relevant part, that, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Since Title IX does not specify a statute of limitations, courts in Pennsylvania have applied Pennsylvania's two-year statute of limitations for personal injury actions. *Underwood v. La Salle Univ.*, Civ. A. No. 07-1441, 2007 U.S. Dist. LEXIS 88959, at *14 (E.D. Pa. Dec. 3, 2007) (citing *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989)).

Plaintiff's Complaint was filed on April 20, 2015. ECF No. 1. Therefore, any alleged unlawful discrete acts set forth in Counts II and II of Plaintiff's Complaint which were committed more than two (2) years prior to the filing of her Complaint "fall beyond the relevant limitations period [under Title IX]," and are barred. *Bougher*, 882 F.3d at 78; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

### D. COUNT I OF PLAINTIFF'S COMPLAINT ASSERTING A HOSTILE ENVIRONMENT UNDER TITLE IX IS TIME BARRED.

Count I of Plaintiff's Complaint asserts a claim for "[s]exual harassment and hostile educational environment." SAC at pp. 12-13. To state a Title IX claim under a hostile environment theory, a plaintiff "must establish 'sexual harassment [] that is so severe, pervasive,

11

and objectively offensive, and that so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities.'" *Mears v. Bd. of Educ. of the Sterling Reg'l High Sch. Dist.*, Civ. A. No. 13-3154 (NLH-JS), 2014 U.S. Dist. LEXIS 43236, at *45 (D.N.J. Mar. 31, 2014) (quoting *DeJohn v. Temple Univ.*, 537 F.3d 301, 306 (3d Cir. 2008)).   As with her claims of retaliation and *quid pro quo* sexual harassment, Plaintiff's Title IX hostile environment claim is governed by a two (2) year statute of limitations.   *Bougher*, 882 F.2d at 78.

Plaintiff's hostile environment cause of action "accrued when [Plaintiff] knew she had suffered sexual harassment."   *Monger v. Purdue Univ.*, 953 F. Supp. 260, 264-65 (S.D. Ind. 1997) (dismissing hostile environment claim brought under Title IX as time barred).   Plaintiff avers that she knew, and complained of alleged sexual harassment as early as "the winter of 2011/2012," more than three (3) years before she filed her Complaint on April 20, 2015.   SAC at ¶ 96; *see also Monger*, 953 F. Supp. at 265 ("The record establishes that Monger knew about her injury right after it occurred," but failed to bring her claim within the limitations period).[9]

---

[9] Defendants anticipate that Plaintiff may try to argue that the continuing violations doctrine saves her untimely hostile environment claim under Title IX.   However, the continuing violations doctrine does not apply to Plaintiff's hostile environment claim under Title IX.   *Gjeka v. Del. County Comm. Coll.*, Civ. A. No. 12-4548, 2013 U.S. Dist. LEXIS 73054, at *13-15 (E.D. Pa. May 23, 2013) ("the Court will not expand the continuing violations theory beyond its application to a hostile work environment claim under Title VII") (citing *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 288-89 (E.D.N.Y. 2002)).   Citing to the Supreme Court's decision in *Gebster v. Lago Vista Independent School District*, 524 U.S. 274 (1998), the district court in *Folkes* explained that Title IX's "contractual framework," strongly mitigated against application of "the oft-disfavored continuing violation exception to Title IX claims."   214 F. Supp. 2d at 288-89; *see also Fusco v. Bucks County*, Civ. A. No. 08-2082, 2009 U.S. Dist. LEXIS 118924, at *22-23 (E.D. Pa. Dec. 21, 2009) (stating in the employment discrimination context that "the continuing violation theory is not viable where a plaintiff was aware of, and had complained about, hostile treatment because allowing the plaintiff 'to avoid the statutory filing requirement by invoking the continuing violations doctrine would be inconsistent with the doctrine's equitable premise that the statute of limitations should

12

Therefore, Plaintiff's hostile environment claim is time barred.

While Plaintiff avers that she complained about the alleged harassment (*i.e.*, harassment allegedly occurring prior to April 20, 2013) during the April 24, 2013 hearing related to her removal from the residency program, whether Plaintiff made such a complaint on that day is irrelevant to whether Plaintiff has stated a hostile environment claim here. SAC at ¶ 96. Plaintiff could complain today about conduct that happened years ago, but such a complaint would not resuscitate her time barred hostile environment claim. Accordingly, Count I of her Complaint is barred.

### E.    PLAINTIFF CANNOT DRESS UP EMPLOYMENT CLAIMS, WHICH SHOULD HAVE BEEN BROUGHT AND ADMINISTRATIVELY EXHAUSTED UNDER TITLE VII, AS TITLE IX CLAIMS.

Plaintiff likely has brought this lawsuit under Title IX because she failed to exhaust her administrative remedies under Title VII. *See* 42 U.S.C. § 2000e-5(e). Plaintiff now seeks to be relieved of her obligation under Title VII to exhaust her administrative remedies (and file a

---

not begin to run until a reasonable person would be aware that his or her rights have been violated.'") (citations omitted).

In the alternative, even assuming that this Court extends the continuing violations doctrine to apply in the Title IX context (which for the reasons set forth above, it should not), Plaintiff's hostile environment claim still fails. Under the continuing violations doctrine, in order for Plaintiff's hostile environment claim to be timely, Plaintiff must allege one act contributing to the alleged hostile environment within the two (2) years prior to the filing of her Complaint on April 20, 2015. *Morgan*, 536 U.S. at 118; *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165-66 (3d Cir. 2013). Plaintiff's Complaint fails to identify a timely component act of the alleged hostile environment. Rather, Plaintiff's affirmative allegations undermine, rather than support, any possible inference that Plaintiff experienced a contributing act during the limitations period. Specifically, Plaintiff avers that she was suspended in April 2013, and that following her suspension, "Plaintiff had no further contact from Defendant Mercy until April 20, 2013." SAC at ¶ 77. As a result, her hostile environment claim cannot survive dismissal. *See, e.g., Stanley v. Trustees of The Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) (dismissing Title IX hostile environment claim where plaintiff "has not alleged any 'acts' . . . within the limitations period that contributed to the hostile environment," reasoning that plaintiff could not have experienced any acts of harassment when she was no longer enrolled at the University).

13

Charge of Discrimination within 300 days of the alleged unlawful employment action) by

asserting claims under Title IX, which does not require administrative exhaustion.  *Cannon v.*

*Univ. of Chicago*, 441 U.S. 677, 707-08 (1978) (holding that there is no requirement that

plaintiffs must exhaust administrative remedies before bringing a Title IX suit in federal court).

While Plaintiff attempts to frame the claims in her Complaint as education-based claims,

Plaintiff still seeks employment-based remedies in her Complaint, asking to be awarded "all pay

and benefits" that she "would have received had it not been for Defendant's illegal actions" and

seeking an Order prohibiting "Defendant" from "harassing, discriminating and retaliating against

employees."  SAC at p. 16; 42 U.S.C. § 2000e-5(g)(1).  Plaintiff cannot have her cake and eat it

too.  If Plaintiff wanted to assert employment claims and seek employment-based remedies in

this lawsuit, she was required to exhaust her administrative remedies under Title VII.  Plaintiff

failed to do so, and should not be permitted to bring employment claims under the guise of Title

IX,[10] and seek employment-based remedies which she is barred from receiving because she

failed to exhaust her Title VII administrative remedies.  *See, e.g.*, *Lakoski v. James*, 66 F.3d 751,

755 (5th Cir. 1995) ("Congress intended Title VII to exclude a damage remedy under Title IX

for individuals alleging employment discrimination.") (citation omitted); *Glickstein v.*

*Neshaminy Sch. Dist.*, Civ. A. No. 96-6236, 1997 U.S. Dist. LEXIS 16317, at *38-45 (E.D. Pa.

Oct. 22, 1997) ("Congress did not intend that private plaintiffs be able to circumvent the

remedial process of Title VII and its state analogs merely by framing a complaint in terms of

Title IX"); *McLaughlin v. State Sys. of Higher Educ.*, Civ. A. No. 97-CV-1144, 1999 U.S. Dist.

LEXIS 4325, at *8-9 (E.D. Pa. Mar. 31, 1999) (holding that plaintiff could not bring an

---

[10] *See, e.g.*, *Crandell v. New York Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 307 n.5
(S.D.N.Y. 2000) (denying plaintiff's motion to amend her complaint to add a claim under Title
IX, reasoning that plaintiff's position as a medical resident was "properly governed by Title VII,
rather than Title IX.").

employment discrimination claim under Title IX); *see also Schultz v. The Bd. of Trustees of the Univ. of West Florida*, Case No. 3:06cv442-RS-MD, 2007 U.S. Dist. LEXIS 36815, at *6-9 (N.D. Fla. May 21, 2007); *Morris v. Wallace Community College-Selma*, 125 F. Supp. 2d 1315, 1342-43 (S.D. Ala. Jan. 8, 2001) ("In light of the weight of authority that a Title IX claim of employment discrimination may not be maintained to the extent that Title VII provides a parallel remedy . . . the Court rules that the plaintiff's Title IX claim is precluded by Title VII."); *Vega v. State Univ. of N.Y. Bd. of Trustees*, 97 CIV. 5767 (DLC), 2000 U.S. Dist. LEXIS 4749, at *7-10 (S.D.N.Y. Apr. 13, 2000) (finding that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex," and agreeing that "money damages under Title IX" be limited "to student plaintiffs"); *Gibson v. Hickman*, 2 F. Supp. 2d 1481, 1483-84 (M.D. Ga. 1998) ("Title VII preempts employment discrimination claims for money damages brought under Title IX.  To hold otherwise would eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded educational institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to the same rules required of every other employment discrimination plaintiff in the country.").  Accordingly, Defendants respectfully request that this Court strike i. and ii. of Plaintiff's wherefore clause, and prohibit Plaintiff from seeking any employment-based remedies in her Title IX action.

**F.    ANY DEMAND FOR PUNITIVE AND/OR LIQUIDATED DAMAGES AS TO PLAINTIFF'S TITLE IX CLAIMS SHOULD BE STRICKEN.**

The general wherefore clause in Plaintiff's Complaint seeks an award of "punitive and/or liquidated damages as permitted by applicable law."  SAC at p. 16.  Punitive and/or liquidated damages are not remedies available under Title IX.  *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 383 (W.D. Pa. 2008) ("punitive damages, which are not traditionally

15

available in cases of breach of contract, . . . are . . . not available for violations of Title IX")

(citing *Barnes v. Gorman*, 526 U.S. 181, 187-88 (2002)); *see also E.K. v. Massaro*, Civ. No. 12-

2464 (ES), 2013 U.S. Dist. LEXIS 144579, at *18 (D.N.J. Oct. 7, 2013) ("Plaintiff may not, as a

matter of law, seek punitive damages under Title IX.") (citation omitted).  Accordingly,

Plaintiff's demand for punitive and/or liquidated damages should be stricken as to her Title IX

claims.

### G.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS BARRED BY THE WORKERS COMPENSATION EXCLUSIVITY PROVISION.

The Pennsylvania Worker's Compensation Act ("PWCA") provides the exclusive

method for Plaintiff to recover for injuries allegedly sustained in the course of her residency.  *See*

77 P.S. § 481(a) ("The liability of an employer under [the PWCA] shall be exclusive and in place

of any and all other liability to such employe[e]s . . .").  The PWCA represents the legislature's

balance between employer and employee rights.  Employees gain the right to compensation for

injuries sustained in the course of their employment without the burden of establishing fault, but

they cannot bring tort claims against their employers for the same injuries.  *See Winterberg v.*

*Transp. Inc. Co.*, 72 F.3d 318, 322 (3d Cir. 1995).

The PWCA defines "employee" to include "[a]ll natural persons who perform services

for another for a valuable consideration, exclusive of persons whose employment is casual in

character and not in the regular course of the business of the employer . . . ."  77 P.S. § 22.  Three

elements must be satisfied to qualify as an employee under the PWCA:  (1) the presence of

valuable consideration; (2) employment that is not casual in character; and (3) employment in the

regular course of the employer's business.  *Nationwide Mut. Ins. Co. v. Shaw*, 491 F. App'x 353,

357-59 (3d Cir. 2012); *Brookhaven Baptist Church v. Workers' Compensation Appeal Bd.*

*(Halvorson)*, 912 A.2d 770, 776 (Pa. 2006).  Given the allegations in Plaintiff's Complaint,

16

Plaintiff clearly satisfies these three elements.  Plaintiff received pay and benefits as a resident, which she now seeks to obtain in this lawsuit to make her "whole."  SAC at p. 16.  Moreover, Plaintiff was continuously employed by MCMC as a medical resident from July 2011 through April 2013, which employment was in the regular course of the operation of a hospital.  SAC at ¶¶ 13, 78.

Because the PWCA bars Plaintiff from bringing her common law tort claim against Defendants, Plaintiff's intentional infliction of emotional distress claim should be dismissed. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997) (finding that plaintiff's claim of intentional infliction of emotional distress was barred by the PWCA); *McInerney v. Moyer Lumber & Hardware*, 244 F. Supp. 2d 393, 400-01 (E.D. Pa. 2002) (dismissing plaintiffs' intentional infliction of emotional distress claim as barred by the PWCA and collecting cases).

## 1. The third-party attack/personal animus exception does not apply to Plaintiff's intentional infliction of emotional distress claim.

Plaintiff alleges that she suffered intentional infliction of emotional distress (for which Defendants are responsible under "Respondeat Superior") due to Roe's actions as the Program Director of the residency program which were taken "within the scope of his employment."[11] SAC at ¶¶ 123, 125.  Plaintiff's allegations undermine, rather than support any possible inference that the third-party attack exception to the PWCA bar could apply here.  *Ahmed v. Lowe's Co.*, Civ. A. No. 06-4798, 2008 U.S. Dist. LEXIS 58568, at *23-24 (E.D. Pa. July 31, 2008) (holding that the personal animus exception did not apply because the claims revolved around actions

---

[11] The Supreme Court of Pennsylvania has made clear that a legally cognizable claim of intentional infliction of emotional distress must be based on conduct that "was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).

17

taken by Lowe's employees "in commission of their job-related responsibilities," relying on the allegation in plaintiff's complaint "that his intentional infliction of emotional distress claim arises from events that occurred in the regular course and scope of employment") (Baylson, J.), *aff'd* 346 F. App'x 816 (3d Cir. 2009); *Fleming v. Kramont Employer Royce Realty, Inc.*, Civ. A. No. 02-2703, 2002 U.S. Dist. LEXIS 15806, at *14-16 (E.D. Pa. Aug. 16, 2002) (dismissing plaintiff's intentional infliction of emotional distress claim, and explaining that the third-party attack exception applies "for employee injuries caused **by the intentional conduct of third parties** for reasons unrelated to an employee's employment") (citations omitted) (emphasis added) (Baylson, J.).

The "personal animus exception" does not apply because Plaintiff has not alleged third-party misconduct or misconduct in which a "fellow employee was involved." *Jackson v. Lehigh Valley Physicians Group*, Civ. A. No. 08-3043, 2009 U.S. Dist. LEXIS 6936, at *26 n.5 (E.D. Pa. Jan. 30, 2009); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 160 (3d Cir. 1999) (describing the "personal animus exception" as relating to "employee injuries caused by the intentional conduct of third parties for reasons personal to the tortfeasor and not directed against him as an employee or because of his employment"); *McGee v. The Proctor & Gamble Distributing Co.*, 445 F. Supp. 2d 481, 594 (E.D. Pa. 2006) ("Pennsylvania courts 'have construed this provision in a narrow manner'") (citations omitted).  Accordingly, this Court should reject any argument by Plaintiff regarding the third-party attack exception, and dismiss Plaintiff's intentional infliction of emotional distress claim as barred by the PWCA.

### H.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM ALSO IS BARRED BY THE STATUTE OF LIMITATIONS.

With respect to her claim of intentional infliction of emotional distress, Plaintiff avers that:

Roe's actions in repeatedly subjecting Plaintiff to unwanted sexual and romantic interest and advances was extreme and outrageous conduct, retaliating against Plaintiff by writing her negative recommendations and by removing her from a research project, and then having her investigated and recommending her termination constitutes extreme and outrageous conduct.

SAC at ¶ 121. Plaintiff's intentional infliction of emotional distress claim is time barred.

"Claims for . . . intentional infliction of emotional distress brought in Pennsylvania are . . . governed by [a] two year limitations period." *Ormsby v. Luzerne County Dep't of Pub. Welfare Office of Human Servs.*, 149 F. App'x 60, 62 (3d Cir. 2005) (citing 42 Pa. C.S.A. § 5524); *see also* 42 Pa. Const. Stat. Ann. § 5524(2), (7). Plaintiff's cause of action for intentional infliction of emotional distress "accrue[d] when the plaintiff kn[ew] or had reason to know of the injury that constitutes the basis of the cause of action." *Ormsby*, 149 F. App'x at 62 (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998)). Plaintiff's claim includes a litany of alleged actions, all of which, based on Plaintiff's own pleading, took place more than two years prior to Plaintiff's filing of her Complaint on April 20, 2015. The only alleged act which could conceivably be timely (Plaintiff's averment that Roe "recommend[ed] her termination") is not a well-pled allegation. SAC at ¶ 121. Plaintiff herself alleges that once she was suspended in April 2013, she had "no further contact with Defendant Mercy until April 20, 2013." SAC at ¶ 77. Therefore, Plaintiff would have no basis to allege whether (or when) Roe may have recommended that she be terminated. The termination decision clearly was made prior to the termination letter being sent to Plaintiff (which was dated April 19, 2013), that Plaintiff now alleges she received on April 20, 2013.[12] SAC at ¶ 81. Accordingly, Plaintiff's intentional

---

[12] Plaintiff's prior pleading alleged that "[o]n April 19, 2013, Defendant Mercy informed Plaintiff that it intended to terminate Plaintiff's residency." First Amended Complaint at ¶ 77, ECF No. 2.

19

inflication of emotional distress claim is time barred.[13]  42 Pa. C.S.A. § 5524(2), (7); *McGee v. The Proctor & Gamble Distributing Co.*, 445 F. Supp. 2d 481, 494-95 (E.D. Pa. 2006); *Hartman v. Sterling, Inc.*, Civ. A. No. 01-CV-2630, 2003 U.S. Dist. LEXIS 18140, at *46-47 (E.D. Pa. Sept. 11, 2003); *Aquilino v. The Phila. Catholic Archdiocese*, 884 A.2d 1269, 1275 (Pa. Super. Ct. 2005); *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 281 n.6 (Pa. Super. Ct. 2005).

## I.    PLAINTIFF CANNOT PROCEED UNDER A PSEUDONYM.

Plaintiff has filed her Complaint using the pseudonym "Jane Doe" "to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received as part of her corrective plan." SAC ¶ 7.  Plaintiff has provided Defendants with her real name as she represented she would in the Complaint, *see* SAC ¶ 7 n.1; however, she has not amended her Complaint to remove the pseudonym and proceed under her real name, nor has she sought leave of Court to proceed anonymously.  By proceeding under the pseudonym "Jane Doe," Plaintiff is hiding behind a mask of anonymity, free to make allegations against the Defendants without being held accountable for her statements under her real name.  Defendants are prejudiced by Plaintiff's use of a pseudonym because, as drafted, any person reviewing the allegations in this case will only be able to review Plaintiff's allegations of sexual harassment, without the context of the true identity of the individual making the allegations.  Accordingly, Defendants move this

---

[13]  In the alternative, even assuming that Plaintiff's allegation with regard to Roe's purported role in the decision to terminate her residency is well pled and timely, Plaintiff's intentional infliction of emotional distress claim as to Roe's alleged recommendation is certainly not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 754; *see also Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 80 (3d Cir. 1989).

Honorable Court, pursuant to Federal Rule of Civil Procedure 12(e), for an Order for a more definite statement to require Plaintiff to prosecute this action in her real name.[14]

The Third Circuit has held that a plaintiff's use of a pseudonym "runs afoul of the public's common law right of access to judicial proceedings." *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011). "'The people have a right to know who is using their courts.' And, defendants have a right to confront their accusers." *Megless*, 654 F.3d at 408 (plaintiff, who was accused by defendants of being a pedophile, was required to disclose his real name) (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997); citing *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979)). Federal Rule of Civil Procedure 10(a) also requires parties to a lawsuit to identify themselves in their respective pleadings.[15]

The Third Circuit has established nine factors for courts to consider when deciding whether to allow a party to proceed anonymously:

1. The extent to which the identity of the litigant has been kept confidential;

2. The bases upon which disclosure is feared or sought to be avoided and the substantiality of these bases;

3. The magnitude of public interest in maintaining confidentiality;

---

[14] Courts in the Third Circuit have allowed defendants to challenge a plaintiff's use of a pseudonym through a motion for more definite statement pursuant to Federal Rule of Civil Procedure 12(e). *See, e.g.*, *Doe v. Old Forge Borough*, No. 12-2236, 2015 U.S. Dist. LEXIS 85902, at *40-46 (M.D. Pa. July 1, 2015); *F.B. v. E. Stroudsburg Univ.*, No. 09-525, 2009 U.S. Dist. LEXIS 57370, at *9 (M.D. Pa. July 7, 2009).

[15] The Federal Rules of Civil Procedure also provide that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). A court may dismiss an action for failure to prosecute in the name of the real party if, after an objection, the plaintiff fails to amend the complaint within a reasonable period of time so as to name the real party. Fed. R. Civ. P. 17(a)(3).

21

4. Whether there is an atypically weak public interest in knowing the litigant's identity;

5. The undesirability of an outcome adverse to the pseudonymous party and attributable to her refusal to pursue the case at the price of being publicly identified;

6. Whether the party seeking anonymity has illegitimate ulterior motives;

7. The universal level of public interest in access to the identities of litigants;

8. Whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigants' identities, beyond the public's interest which is normally obtained; and

9. Whether the opposition to use of a pseudonym by counsel, the public, or the press is illegitimately motivated.

*Id.* at 409-10. A plaintiff should be permitted to proceed anonymously only in "exceptional cases." *Old Forge Borough*, 2015 U.S. Dist. LEXIS 85902, at *40-46 (granting defendants' motion for more definite statement relying on the *Megless* factors and requiring plaintiff to identify herself because she "has not sufficiently shown that she would suffer substantial harm that might sufficiently outweigh the public interest in open proceedings or that the disclosure of her identity may cause her to suffer irreparable harm."). For instance, the court in *Old Forge Borough* held that, despite the plaintiff's allegations that she was sexually abused and assaulted as a minor, such a case was not "exceptional," such that it merited use of a pseudonym. *Id.*

Considering the above factors in turn, it is clear that this is also not an "exceptional case" and the above factors strongly weigh in favor of disclosing Plaintiff's identity. First, while to date Plaintiff's name has been kept confidential in court filings, there can be no legitimate fear by Plaintiff that she will be "harmed" in any cognizable manner by allowing her identity to be public. The only "harm" she seems to allege that she may suffer is embarrassment. *See* SAC ¶ 7. However, the possibility "[t]hat a plaintiff may suffer embarrassment or economic harm is

22

not enough" to allow Plaintiff to proceed anonymously in this case.  *Id.* at \*40; *see also Doe v. Temple Univ.*, No. 14-04729, 2014 U.S. Dist. LEXIS 122427, at \*4-5 (E.D. Pa. Sept. 3, 2014) (damage to personal and professional reputation and a diminished chance to complete medical school training deemed insufficient to support the use of a pseudonym) (citing *Megless*, 654 F.3d at 408)).  "Instead, a plaintiff must show both (1) a fear of severe harm, and (2) that the fear of severe harm is reasonable."  *Old Forge Borough*, 2015 U.S. Dist. LEXIS 85902, at \*40.  Plaintiff here has not, and cannot, demonstrate that any harm would come to her if she were required to disclose her identity.  Plaintiff made the conscious decision to forego completing Defendants' internal appeal process, SAC ¶ 86, and instead filed suit in federal court in an apparent attempt to "clear her name."  Litigating publicly will afford Plaintiff the opportunity to exonerate herself in public and offer her own explanations regarding the facts at issue in this case.  As such, this factor weighs in favor of disclosure.  *See, e.g.*, *Temple Univ.*, 2014 U.S. Dist. LEXIS 122427, at \*3-4 (holding that plaintiff's choice to forego completing the internal appeal process at the school to clear his name and, instead, filing "suit in federal court to seek his exoneration" "comes with a consequence" that his name be made public) (citing *Megless*, 654 F.3d at 408).

Second, Plaintiff's vague allegation that she has used "a pseudonym to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received," SAC at ¶ 7, does not create a legitimate interest to allow her to proceed anonymously.  *Megless* makes clear that such fears (*i.e.*, fear of embarrassment and damage to personal and professional reputation) typically are insufficient to permit litigation under a pseudonym.  *Megless*, 654 F.3d at 408; *see also Temple Univ.*, 2014 U.S. Dist. LEXIS 122427, at \*3-4; *F.B. v. E. Stroudsburg Univ.*, No. 09-525, 2009 U.S. Dist. LEXIS 57370, at \*9 (M.D. Pa. July 7, 2009) (requiring

23

alleged victims of sexual harassment under Title IX to proceed using their real names). Therefore, this factor weighs in favor of disclosure as well.

Third, the level of interest the public might have in maintaining Plaintiff's anonymity is not unusually high. She is not a minor or a member of some other particularly vulnerable class. *See, e.g.*, Fed. R. Civ. P. 5.2(a) (requiring redaction of minor's full name in court filings); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1063 (9th Cir. 2000) (plaintiffs permitted to proceed under pseudonym where they demonstrated that they feared "that if their true identity is revealed, they will face actual physical violence, the threat of physical violence, immediate deportation to China or their country of origin, likely arrest upon arrival in China or their country of origin and an order by China and other authorities accelerating the repayment of debt incurred for recruitment fees and that they reasonably fear that their families may face similar threats of physical and economic retaliation if their true identity is revealed.") (quotations omitted). Moreover, none of the areas where courts have allowed pseudonyms are present here (*i.e.*, cases involving "abortion, birth control, tran[s]sexuality, mental illness, welfare rights of illegitimate children, AIDS, . . . ." and individuals bringing Constitutional challenges to amendment to Megan's Law requiring the publication of their information in the sex offender registry). *Megless*, 654 F.3d at 408 (citing *Doe v. Borough of Morrisville*, 130 F.R.D. 612, 614 (E.D. Pa. 1990)); *L.A. v. Hoffman*, No. 14-6895, 2015 U.S. Dist. LEXIS 94564, at *6 (D.N.J. July 21, 2015) (granting plaintiffs' (who were Tier I sex offenders) *unopposed* motion to proceed using pseudonyms in a lawsuit challenging an amendment to Megan's Law requiring sex offender registration by all Tier I sex offenders who previously were not required to have their information in the sex offender registry). Further, there is no evidence that requiring Plaintiff to disclose her identity will deter other similarly situated plaintiffs from suing in the future.

Therefore, this factor also weighs in favor of disclosure.

Fourth, there is no atypically weak public interest in knowing Plaintiff's identity due to the nature of the issues presented. Thus, this factor weighs in favor of disclosure.

Fifth, there is no evidence, or even a suggestion, that Plaintiff will dismiss her claim or choose not to pursue her claims if her identity is disclosed.[16] This factor, therefore also weighs in favor of disclosure.

Sixth, it is unclear whether Plaintiff has an ulterior motive attached to her desire to use a pseudonym; however, there does not seem to be any legitimate interest in her doing so.

Seventh, there is a high "level of public interest in access to the identities of litigants." *Megless*, 654 F.3d at 409 (internal quotation marks omitted). "[O]ne of the essential qualities of a Court of Justice [is] that its proceedings should be public." *Id.* at 408 (quotations omitted). The public has a right to know who is using their courts and defendants have a right to confront their accusers. *Id.* This factor weighs heavily in favor of the disclosure of Plaintiff's identity.

Eighth, Defendants concede that there is not a "particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained." *Id.* at 409.

Ninth, Defendants are not illegitimately motivated in their request that Plaintiff be required in this litigation to identify herself using her real name.

---

[16] Plaintiff should not be permitted to proceed under a pseudonym even if she attempts to argue that she will not pursue her claims if her identity is disclosed. Plaintiffs alleging that they were sexually harassed in violation of federal law, suffered emotional distress and/or received psychiatric treatment routinely bring such claims in their own names without using a pseudonym. *See, e.g., Yan v. Penn State Univ.*, 529 F. App'x 167 (3d Cir. 2013) (Title IX sexual harassment and emotional distress); *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598 (E.D. Pa. 2014) (Title IX sexual harassment); *Miller v. Kutztown Univ.*, No. 13-3993, 2013 U.S. Dist. LEXIS 173878 (E.D. Pa. Dec. 10, 2013) (Title IX sexual harassment and emotional distress); *Kuhn v. Philip Morris U.S.A.*, 814 F. Supp. 450 (E.D. Pa. 1993) (plaintiff alleged sexual harassment allegations against her employer, and that her employer conditioned her continued employment on receiving continued psychiatric treatment).

Accordingly, considering the factors above and the requirements of Federal Rule of Civil Procedure 10(a), Defendants respectfully request that Plaintiff be required to identify herself in the instant action.  Plaintiff simply cannot show that she would suffer substantial harm that might outweigh the public interest in open proceedings or that the disclosure of her identity may cause her to suffer irreparable harm.

Defendants anticipate Plaintiff may try to argue that, despite the above factors weighing heavily against her, she still should be permitted to proceed under the pseudonym "Jane Doe" because she alleges she was subjected to sexual harassment and required to seek psychiatric treatment.  Such an argument was roundly rejected by the district court in *F.B. v. East Stroudsburg University*:

> The court deals with cases alleging sexual harassment and assault on a regular basis.  ***In the vast majority of these cases, the plaintiffs file the lawsuit under their own names.***  While it is true that plaintiffs may be subjected to embarrassment and emotional distress should they be named, the complaint's allegation are [sic] that Defendant Sanders sexually harassed them, not that the plaintiffs themselves acted inappropriately.  Finding that these allegations are a valid reason to permit a plaintiff to proceed with a pseudonym would open up the court to requests for anonymity each time a plaintiff makes allegations of sexual harassment.  Accordingly, we find that this factor does not weigh in favor of the plaintiffs.

*F.B.*, 2009 U.S. Dist. LEXIS 57370, at *9 (emphasis added) (denying Title IX plaintiffs' request to proceed anonymously using pseudonyms).  The factual allegations in *F.B.* are far more egregious than those at issue in this case, yet the district court still denied the plaintiffs' request to prosecute the lawsuit using pseudonyms.  In *F.B.*, six undergraduate students filed suit against East Stroudsburg University ("ESU") alleging they were sexually assaulted and harassed by Defendant Sanders, the Vice President for University Advancement who also served as Executive Director of the ESU Foundation and Director of Alumni Engagement at ESU.  *Id.* at *1-2.  The ESU plaintiffs, like Plaintiff herein, brought suit against the defendants pursuant to,

*inter alia*, Title IX.  *Id.*  Those six students also identified themselves using pseudonyms instead

of their real names.  *Id.*  Defendant Sanders moved, pursuant to Federal Rule of Civil Procedure

12(e), for a more definite statement seeking to require the ESU plaintiffs to identify themselves

using their real names.  *Id.*  In analyzing Defendant Sanders' motion, the court, applying the

above factors, required the ESU plaintiffs to proceed using their real names holding that:

> The allegations against Defendant Sanders are at this point merely allegations.  As
> defendant argues, it is he, not the plaintiffs, who is disgraced if the complaint's
> allegations are ultimately found to be true.  Plaintiffs do not allege that they will
> be physically harmed, deported or arrested if they are named.  At most, they
> allege that they will be embarrassed and humiliated.  We find that such harm is
> not sufficient to justify allowing them to proceed anonymously.

*Id.* at *12-13.  Accordingly, as the *Megless* factors weigh heavily in favor of having Plaintiff

proceed using her real name and the court's decision in *F.B.* found that the Title IX plaintiffs'

potential for embarrassment and humiliation did not justify allowing them to proceed

anonymously, Plaintiff herein should be required to litigate this matter using her real name.  *See*

*Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) (explaining the district court erred in

permitting the plaintiff to proceed under pseudonym where the plaintiff alleged sexual

harassment, and was not a "minor, a rape or torture victim, a closeted homosexual, or a likely

target of retaliation by people who would learn her identity only from a judicial opinion or other

court filing."); *Rose v. Beaumont Indep. Sch. Dist.*, 240 F.R.D. 264, 267 (E.D. Tex. 2007)

(requiring plaintiff alleging explicit sexual harassment and assault as a minor to disclose her true

identity in her lawsuit seeking compensatory and punitive damages and collecting cases where

other courts denied requests for anonymity by plaintiffs alleging sexual assault).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court:  (1) dismiss

Plaintiff's claims against Defendant Mercy Health System; (2) dismiss Counts II and III of

Plaintiff's Second Amended Complaint related to any alleged discrete acts under Title IX prior to

April 20, 2013; (3) dismiss Count I of Plaintiff's Second Amended Complaint alleging a hostile

environment under Title IX; (4) dismiss Count IV of Plaintiff's Second Amended Complaint for

intentional infliction of emotional distress; (5) strike Plaintiff's demand for damages that are not

available under Title IX; (6) prohibit Plaintiff from proceeding with this action using a

pseudonym; and (7) order Plaintiff to file a Third Amended Complaint (limited to any remaining

claims contained in Plaintiff's Second Amended Complaint) which identifies her real name.

Respectfully submitted,

**POST & SCHELL, P.C.**

Dated: <u>July 24, 2015</u>          By:     <u>*s/ Andrea M. Kirshenbaum*</u>
                                              A. James Johnston, Esquire
                                              Andrea M. Kirshenbaum, Esquire
                                              David E. Renner, Esquire
                                              Four Penn Center
                                              1600 John F. Kennedy Blvd.
                                              Philadelphia, PA  19103
                                              215-587-1000

                                              *Attorneys for Defendants*

28

## CERTIFICATE OF SERVICE

I, Andrea M. Kirshenbaum, Esquire, hereby certify that on this date the foregoing Partial

Motion to Dismiss and for More Definite Statement with accompanying Memorandum of Law

has been electronically filed with the Court and is available for viewing and downloading from

the ECF System and thereby have been served upon the following counsel of record,

electronically:

Joshua S. Boyette
Swartz Swidler LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
jboyette@swartz-legal.com


*Attorney for Plaintiff*

s/ *Andrea M. Kirshenbaum*
ANDREA M. KIRSHENBAUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE<br><br>        Plaintiff,<br><br>   v.<br><br>MERCY CATHOLIC MEDICAL CENTER and MERCY HEALTH SYSTEM<br><br>        Defendants. | Civil Action No:   15-2085 |

## <u>RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>

By:     Joshua S. Boyette, Esq.


Dated: August 10, 2015

## I. __INTRODUCTION__

Plaintiff has filed claims in this Court against Defendants related to the termination of her medical residency on April 20, 2013. Defendants have moved to partially dismiss Plaintiffs' claims. After review, Plaintiffs consent to some of the relief Defendants request. For instance, Defendants claim that Mercy Health System, the parent of Mercy Catholic Medical Center, was not involved in Plaintiffs' residency program and should be dismissed. Plaintiff consents to dismiss Mercy Health System. Similarly, Defendants claim that Plaintiff was both a student and an employee, and that therefore, she was covered by workers compensation insurance and cannot bring the common law tort of intentional infliction of emotional distress against Defendants. Rather than litigate the issue of whether or not the Pennsylvania workers compensation law extends to students who are also employees, Plaintiff will voluntarily dismiss her claim for intentional infliction of emotional distress against Defendants. Plaintiff also agrees that liquidated damages and punitive damages are not available under Title IX, and does not seek such damages.

These concessions leave the following issues in dispute: (1) First, whether Plaintiff's claims of retaliation and quid pro quo sexual harassment under Title IX can recover for discrete acts that occurred prior to April 20, 2013; (2) whether Plaintiff's claim of hostile environment harassment under Title IX is time-barred either because Title IX does not recognize the "continuing violations" doctrine for hostile environment harassment, or because Plaintiff has not plausibly pleaded that her harassment constituted a continuing violation that included harassment after April 20, 2013; (3) whether Plaintiff

is entitled to employment-related remedies as part of her relief under Title IX; and (4) whether Plaintiff may proceed anonymously.

With respect to the first issue, Plaintiff agrees that only discrete acts occurring after April 20, 2013, are cognizable under Plaintiff's retaliation and quid pro quo claims, but disputes that she cannot recover damages for harassment that she suffered *as a result* of either retaliatory or quid pro quo animus. That issue ties closely in to Defendant's second argument, that continuing violations are not available under Title IX or that Plaintiff has not pleaded a continuing violation. As to the first point, the cases that hold that continuing violations are not cognizable under Title IX are outliers and wrongly decided; the continuing violation doctrine, as explained by Justice Thomas in *AMTRAK v. Morgan*, is not an equitable tolling of a statute of limitation but rather a core component of the definition of a harassing hostile environment, which extends over time. Title IX has limited damage remedies available because of its unique nature in which coverage under Title IX is based on an agreement to receive federal funds; however, Title IX has a broad prohibition of gender discrimination, and accordingly, most courts have either assumed or affirmatively held that the "continuing violations" doctrine set forth by the Supreme Court in *AMTRAK v. Morgan* for Title VII harassment claims applies with equal force to Title IX harassment claims.

As to the second point, Plaintiff has pleaded a timely hostile educational environment claim under a continuing violations theory because the harassing hostile environment continued after April 20, 2013, when Plaintiff's harasser continued to harass her through the appeals process in which Plaintiff fought to keep her residency. Accordingly, Plaintiff has brought a timely hostile educational environment claim under

Title IX, and can also aver that hostile educational environment as one of the adverse

education actions she suffered as a result of Defendant's retaliatory animus and as a result

of Defendant's *quid pro quo* sexual harassment. .

 With respect to the employment-related relief Plaintiff seeks, it is clear Plaintiff is

entitled to the loss of her stipend/backpay as part of the broad compensatory damages she

is entitled to under Title IX. Many, but not all, courts have found that Title IX protects

employment rights for employees of covered institutions even if those employees are not

students; Plaintiffs have not found a single case that has held that students who also

worked for their educational institution are not entitled to the full range of compensatory

damages for violations of Title IX.

 Finally, Plaintiff should be allowed to proceed anonymously because the nature of

her sexual harassment claim involved Defendant coercing Plaintiff to receive

psychological treatment, and a victim of sexual harassment should not have to reveal her

identity and reveal that she received repeated psychological treatment in order to

vindicate her rights under Title IX. While the public has an interest in knowing the

identity of litigants, in cases where bringing a claim would require revealing that the

Plaintiff may suffer from a mental illness, the public has a countervailing interest in

allowing that person to proceed anonymously because doing so will help persuade

similarly situated individuals that they can bring their own claims of forced or coerced

therapy without having to reveal their identity and subject themselves to the stigma that

psychological conditions still carry in our society, especially in the workplace.

 Thus, for the reasons fully discussed below, the Court should deny Defendant's

motion to dismiss to the extent that it seeks to limit Plaintiff's claims for hostile

educational environment and her claims for her unpaid stipend/backpay. The Court

should also allow Plaintiff to proceed anonymously.

## II.    PROCEDURAL BACKGROUND

Plaintiff filed her Complaint against Defendants on April 20, 2015. After

consultation with Defendants' inside counsel, Plaintiff filed her First Amended

Complaint on April 29, 2015. Defendants filed a motion to dismiss on June 30, 2015.

Pursuant to a stipulation, Plaintiff filed the Second Amended Complaint ("SAC") on July

14, 2015. The Court dismissed Defendants' first motion to dismiss as moot on July 21,

2015. Defendants filed a new motion to dismiss portions of the SAC on July 24, 2015.

Pursuant to the Local Rules and Federal Rule of Civil Procedure 6(e), Plaintiff now

timely responds.

## III.   FACTUAL BACKGROUND

As this is a Motion to Dismiss filed under Rule 12(b)(6), Plaintiff relies on the

facts pleaded in the SAC and incorporates them by reference.

## IV.   LEGAL ARGUMENT

### A.  MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement

of the claim showing that the pleader is entitled to relief," in order to "give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) *quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957).

While a complaint must include more than threadbare recitals of the elements of a cause

of action, the complaint need not include "detailed factual allegations." *Id; Ashcroft v.

Iqbal*, 129 S. Ct. 1937, 1949 (2009).

5

When deciding a 12(b)(6) motion, the issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support the claim. *Lake v. Arnold,* 112 F.3d 682, 688 (3d Cir.1997); *Niami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). The Court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002); *Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008); *Hollander v. Etymotic Research, Inc.*, Civ. A. No. 10-526 (E.D. Pa. 2010). Therefore, as long as Plaintiff's complaint sets forth plausible grounds for relief, a motion to dismiss under Rule 12(b)(6) must be denied. *Bell Atlantic Corp.  v. Twombly*, 127 S.Ct. 1955, 1965-66 (2007) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## B.  PLAINTIFF DOES NOT DISPUTE CERTAIN ISSUES RAISED IN DEFENDANTS' MOTION TO DISMISS.

As an initial matter, Plaintiff has elected not to contest certain issues raised by Defendants' motion to dismiss.

First, with respect to Defendant MHS, argued in Section III.A of Defendants' Brief, Plaintiff does not object to dismissing Defendant MHS from the lawsuit. When Plaintiff filed her Complaints, Plaintiff believed that MHS was closely related to the operation of her residency program, in part because Plaintiff was not and is still not privy to the corporate relationship between Defendant MCMC and Defendant MHS. However, based on Defendants' averments that Defendant MCMC is an appropriate defendant, Plaintiff consents to dismissing Defendant MHS from the lawsuit.

6

Second, with respect to Defendants' argument in Section III.F that liquidated and punitive damages are not available under Title IX, Plaintiff agrees and does not dispute that section or modifying/clarifying her prayer for relief such that it is clear that Plaintiff only seeks the remedies that are available under Title IX.

Third, after consideration of Defendants' arguments in Section III.G and III.H with respect to Plaintiff's common law Pennsylvania tort claims of intentional infliction of emotional distress, Plaintiff agrees to withdraw those claims rather than litigate the issue of whether or not as a student and employee, Plaintiff was covered by Pennsylvania's Workers Compensation Act.

Accordingly, as set forth in detail below, Plaintiff only opposes the arguments in the following sections of Defendants' Brief: Sections III.C, III.D, III.E, and III.I.

## C. WHILE PLAINTIFF CANNOT RECOVER FOR DISCRETE TANGIBLE ACTS OF RETALIATION OR QUID PRO QUO SEXUAL HARASSMENT THAT OCCCURRED BEFORE APRIL 20, 2013, SHE CAN RECOVER FOR A RETALIATORY AND QUID PRO QUO HOSTILE EDUCATIONAL ENVIRONMENT THAT BEGAN PRIOR TO APRIL 20, 2013, AND EXTENDED AFTER APRIL 20, 2013.

Defendant MCMC ("Defendant") has moved to dismiss the claims in Counts II (Retaliation) and III (Quid Pro Quo Sexual Harassment) to the extent that they relate to discrete acts that occurred prior to April 20, 2013. Defendant informed Plaintiff of their intent to terminate her on April 20, 2013, and the appeals process that then unfolded of course occurred after April 20, 2013. Thus, the termination of Plaintiff's residency – an act that Plaintiff alleges occurred in retaliation for her complaints about Dr. Roe and

7

because she did not submit to Dr. Roe's romantic advances – falls within Title IX's two-

year statute of limitations.[1]

Plaintiff does detail additional occurrences that occurred as a result of her refusal

to submit to Dr. Roe's romantic advances. To the extent that these occurrences do not

join together to form a continuing violation, Plaintiff agrees that she cannot

independently recover for these pre-April 20 occurrences.

On the other hand, if these acts are a continuing violation under a hostile

educational environment theory as discussed *infra,* then this continuing violation chain-

of-events that stretches past April 20 would allow the assertion of retaliation and quid pro

quo claims for behavior that began prior to April 20. Retaliation and quid pro quo sexual

harassment requires an adverse action. Quid pro quo sexual harassment does not require

that the employer be threatened with or must experience "economic" or "tangible"

discrimination. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286. In 2006, the U.S.

Supreme Court loosened the definition of adverse action in the employment law context

to cover all employer actions that would have been materially adverse to a reasonable

employee, harmful to the point that they could dissuade a reasonable worker from making

or supporting a charge of discrimination. *Burlington Northern & Santa Fe Ry. v. White*,

548 U.S. 53, 57 (2006). As courts interpret Title IX retaliation claims under the same

---

[1] The Third Circuit, like many other Circuits, applies the common law personal-injury statute of limitations to claims of discrimination under Title IX. *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77 (3d Cir. Pa. 1989). While a district court is bound to apply the holdings of the Third Circuit, the Supreme Court has repeatedly referred to Title IX as being a "contractual" cause of action. *See, e.g., Barnes v. Gorman*, 536 U.S. 181, 186 (U.S. 2002); *Gebser v. Lago Vista Indep*. Sch. Dist., 524 U.S. 274, 290-291 (U.S. 1998). Accordingly, though the Court cannot apply a longer statute of limitations to Plaintiff's Title IX claims as long as *Bougher* remains good law, it may well be that Pennsylvania's four year statute of limitations for contract claims may be the most analogous state statute of limitation and should be the actual one applied.

Regardless, Plaintiff's claims of retaliation and *quid pro quo* harassment accrued on April 20, 2013, making Plaintiff's claims timely.

framework as Title VII, *see Atkinson v. Lafayette College*, 653 F. Supp. 2d 581, 594 (E.D. Pa. 2009), the *Burlington Northern* standard should be used for determining what constitutes an adverse action in the educational context. *See also Dawn L. v. Greater Johnstown Sch. Dist.,* 2008 U.S. Dist. LEXIS 51411, *11 (W.D. Pa. July 2, 2008) (applying *Burlington Northern* to Title IX).

Under this broader standard, the institution of the hostile educational environment may itself constitute the adverse action of the retaliation/quid pro quo harassment. Defendant does not argue that Plaintiff cannot recover under Count II and Count III for retaliation or quid pro quo harassment for the termination of her residency on April 20 and for other adverse actions occurring after April 20, 2013. With respect to whether Plaintiff may also recover under Count II and Count III for Defendant's pre-April 20, 2013 actions, the answer depends on whether Plaintiff may apply the continuing violations theory to Title IX cases. As discussed below, Plaintiff can apply the continuing violations theory to Title IX, and Plaintiff therefore may include the hostile education environment averred and described below as one component of her claims of retaliation and quid pro quo harassment brought in Count II and Count III.[2]

### D. PLAINTIFF HAS BROUGHT A TIMELY HOSTILE EDUCATIONAL ENVIRONMENT CLAIM BECAUSE THAT CLAIM CONSTITUTES A CONTINUING VIOLATION THAT CONTINUED PAST APRIL 20, 2013.

#### 1) Sexual Harassment Claims are Actionable under Title IX.

Title IX states that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial

---

[2] Notably, however, even if the Court finds that Count II and Count III are limited to discrete acts, Defendant does not move that these accounts be dismissed in their entirety, only that they be limited to acts occurring after April 20, 2013, i.e., the residency termination and its aftermath.

Case 2:15-cv-02088-MMB   Document 19   Page: 70/10/15   Page 10 of 12

assistance." 20 U.S.C. § 1681(a). Discrimination is construed broadly under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2531 (U.S. 2013). "Title IX was enacted not only to prevent the use of federal dollars to support discriminatory practices, but also to provide individual citizens effective protection against those practices." *Jackson*, 544 U.S. at 180.

Title IX's prohibition on gender discrimination extends to prohibiting sexual harassment. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 75 (1992). In holding that Title IX's prohibition on discrimination extended to claims of sexual harassment where a teacher sexually harasses a student, the Supreme Court explicitly relied on its decision in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), a Title VII case that held that in the employer-employee context, sexual harassment constituted gender discrimination. *See Franklin*, 503 at 75 (citing *Meritor*); *see also Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 282 (1998).

### 2)  <u>The Continuing Violations Doctrine under Title VII.</u>

In *AMTRAK v. Morgan*, 536 U.S. 101 (2002), the Supreme Court dealt with the issue of the proper statute of limitation for a racial harassment claim brought under Title VII based on an allegation of a continuing hostile work environment. Justice Thomas rightly pointed out that the critical question in determining when a hostile work environment claim must be filed required answering two questions: (1) what constitutes an unlawful employment practice; and (2) when has the practice occurred. *Id.* at 110.

*AMTRAK* held that with respect to discrete unlawful employment practices such as terminations, suspensions, failures-to-hire, each act is a separate actionable "unlawful

10

practice" that must occur within the statute of limitations period in order to be timely. *Id.*

at 114. However, *AMTRAK* also held that "hostile environment claims are different in

kind from discrete acts." *Id.* at 115. *AMTRAK* went on to explain the conceptual

difference:

> "Their very nature involves repeated conduct. The unlawful employment practice
> therefore cannot be said to occur on any particular day. It occurs over a series of
> days or perhaps years and, in direct contrast to discrete acts, a single act of
> harassment may not be actionable on its own. Such claims are based on the
> cumulative effect of individual acts."

*Id.* (citations omitted).

After outlining this fundamental conceptual difference between hostile

environment claims and claims of discrimination based on discrete acts, the Supreme

Court held that for a hostile environment claim to be timely under Title VII, a charge

must be filed within 180 or 300 days of when the unlawful employment practice

occurred, and "[p]rovided that an act contributing to the claim occurs within the filing

period, the entire time period of the hostile environment may be considered by the court

for the purpose of determining liability." *Id.* at 117. Moreover, *AMTRAK* held that a

plaintiff does not need to sue for hostile environment harassment as soon as it became

reasonable for the plaintiff to do so, i.e., as soon as a sufficient number of component acts

had occurred to make the hostile environment claim actionable or as soon as the plaintiff

concluded that she might be being subjected to an actionable hostile work environment.

*Id.* at 119-120.

Since *AMTRAK*, the continuing violations theory for the statute-of-limitations

period has been explicitly adopted by the Third Circuit. "Under the continuing violation

doctrine, discriminatory acts that are not individually actionable may be aggregated to

make out a hostile work environment claim; such acts can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013); O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006). The Third Circuit has not had an opportunity to rule on whether the "continuing violations" theory applies to Title IX claims.

### 3) Most courts apply the continuing violations theory to claims of hostile educational environment harassment under Title IX.

Most courts that have had cause to address the issue of whether the continuing violations doctrine applies to hostile educational environment claims of gender-based harassment under Title IX have held that the doctrine can be applied.

For instance, the Ninth Circuit has applied the Supreme Court's Title VII continuing violations doctrine to Title IX claims in *Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006). Similarly, in *Jennings v. Univ. of N.C.*, 240 F. Supp. 2d 492, 500 (M.D.N.C. 2002), the court applied the "continuing violations" doctrine to a Title IX case, reasoning that hostile sexual environments under Title IX should be treated analogously to Title VII. On appeal and rehearing *en banc*, the Fourth Circuit reversed the district court's grant of summary judgment and found no issue with the application of a "continuing violations" theory to the plaintiffs' allegations of a continuing educational environment of sexual harassment by her soccer coach. *Jennings v. Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007).

Other cases in which the continuing violations theory has been applied to Title IX claims include *Summy-Long v. Pa. State Univ.*, 2010 U.S. Dist. LEXIS 27953, *35 (M.D. Pa. Mar. 24, 2010), *Beasley v. Alabama State Univ.*, F. Supp. 2d 1325966 F Supp 1117,

12

1130 (MD Ala. 1997), *Clifford v. Regents of Univ.*, 2012 U.S. Dist. LEXIS 60280, *16

(E.D. Cal. Apr. 27, 2012), and *Morrison v. N. Essex Cmty. College*, 56 Mass. App. Ct.

784, 798 (Mass. App. Ct. 2002) (relying on *AMTRAK v. Morgan*, 536 U.S. 101, 116-118

(2002)). "A plaintiff may base a hostile environment claim on acts occurring outside the

limitations period, as long as at least one of the component acts on which the claim is

based occurred within the filing period." *AB v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp.

2d 312, 314 (S.D.N.Y. 2005).

Defendant has cited to the district court case *Gjeka v. Del. County Cmty. College*,

2013 U.S. Dist. LEXIS 73054, *15 (E.D. Pa. May 23, 2013) for the proposition that it

would be inappropriate to extend the continuing violation theory from Title VII to Title

IX. *Gjeka* was based on an EDNY case, *Folkes v. N.Y. Coll. of Osteopathic Med. Of N.Y.

Inst. Of Tech.*, 214 F. Supp. 2d 273, 288-289 (E.D.N.Y. 2002).

*Folkes* suggested in *dicta* that the continuing violations theory did not apply to

Title IX cases because Title IX's contractual nature – i.e., the conditioning of the receipt

of federal funds upon a prohibition not to discriminate – made the continuing violations

theory a "poor fit" with the goals of Title IX. *Folkes* however failed to explain why this

was so, and the Supreme Court case it relied on, *Gebser*, said nothing as to whether a

sexual harassment claim brought under Title IX for hostile educational environment

could be brought under a continuing violations theory. *Gebser* involved imposing an

"actual notice" requirement on sexual harassment claims under Title IX, but should not

be read to restrict hostile environment claims that began before the statutory limitations

period but extended into the period.

The continuing violations theory should apply to Title IX hostile environment claims because the continuing violations theory is conceptually intrinsic to such claims. Hostile environments are **by their very nature** extensive in time across many days. *AMTRAK v. Morgan* clarified that the continuing violations theory is not an equitable exception to the statute of limitations but rather a textualist application of the statute-of-limitations to a claim that by definition extends over days, months, or even years, and the traditional calculation of statutes of limitation as tolling from the time that a violation occurs.

It is not unfair to impose a continuing violation theory on Title IX defendants, since the Title IX defendants were aware, based on the broad prohibition on discrimination contained in the statutory text, that hostile educational environments based on gender were prohibited. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 75 (1992). Given that, and given that *AMTRAK v. Morgan* was based on the **nature** of hostile environment harassment claims and no specific feature of Title VII, the Court should find that the continuing violations theory applies to claims of hostile educational environment brought under Title IX.

4) **Plaintiff has pleaded that she suffered from a hostile educational environment that extended throughout her residency and continued during the termination and grievance procedure that occurred after the statutory tolling period.**

Given that the continuing violations theory applies to Title IX hostile educational environment claims, Plaintiff must still allege that the hostile educational environment

continued past April 20, 2013. Plaintiff has done so here, and accordingly, her hostile environment claim should not be dismissed.

Plaintiff has alleged that her residency supervisor, identified in the Second Amended Complaint as John Roe, created a hostile educational environment for her during her residency because she rebuffed his romantic interests. Acts that contributed to this hostile educational environment consisted of the following:

- In 2011, Roe asking about Plaintiff's marriage and the circumstances of her living away from her husband. *See* SAC at ¶ 15.

- In 2011, Roe looking at Plaintiff in a suggestive manner. *See* SAC at ¶ 17.

- In 2011, an incident occurred in the reading room in which Roe and Plaintiff were alone and Roe's demeanor and bodily appearance suggested sexual interest. *See* SAC at ¶ 18.

- In 2011, Plaintiff received undue interest and attention from Roe. *See* SAC at ¶ 19.

- Throughout her residency (i.e., from 2011 until April 19, 2013), several other occurrences occurred in the reading room when the two were alone and Roe made Plaintiff uncomfortable. *See* SAC at ¶ 20.

- Throughout her residency (i.e., from 2011 until April 19, 2013), several conversations occurred in which Roe implied sexual attraction towards Plaintiff and a desire to pursue a romantic relationship with her. *See* SAC at ¶ 22.

- In November/December 2011, Roe reported Plaintiff to HR for sending him text messages related to her efforts to clarify and keep professional their working relationship. *See* SAC at ¶ 29.

- In November/December 2011, HR spoke with Plaintiff about her text messages, and in response to Plaintiff's complaint about Roe's unwelcome attention, HR directed Plaintiff to speak to a psychologist. *See* SAC at ¶ 30-34.

- Subsequent to this, Plaintiff received less supervision from Roe and other doctors, and Plaintiff was given special scrutiny. *See* SAC at ¶ 36, 38-39.

- In 2012, Roe became jealous and acted inappropriately when Plaintiff asked to leave early to meet her husband. *See* SAC at ¶ 40.

- In Fall and Winter 2012, Roe increased his interest in Plaintiff, regularly asking her to socialize outside of work and proposed starting a romantic relationship. *See* SAC at ¶ 44.

- In Winter 2012/2013, Roe and another colleague gave Plaintiff negative letters of recommendation for her post-residency fellowship application. *See* SAC at ¶ 48.

- In Winter 2012/2013, Plaintiff again complained to Roe about his treatment of her, Roe again reported her, and Defendant again directed Plaintiff to seek psychological help. *See* SAC at ¶ 52-58.

- In Spring 2013, Roe brushed Plaintiff's breast with his arm while in the reading room. *See* SAC at ¶ 66.

- In Spring 2013, Roe directed another resident to remove Plaintiff's name from a paper which she had contributed to. *See* SAC at ¶ 68-71.

- In April 2013, in the events leading up to her termination, Roe reported Plaintiff again to his supervisors and accused of her unprofessionalism, and refused to accept Plaintiff's apology. *See* SAC at ¶ 72.

- **<u>On April 24, 2013, in a hearing to grieve Plaintiff's termination, Roe actively advocated for Plaintiff's dismissal in public and in front of other faculty members</u>**. *See* SAC at ¶ 82-84.

Thus, while  a majority of the Defendant and Roe's harassment of Plaintiff occurred prior to April 20, 2013, the harassment and hostile educational environment continued after April 20, 2013, specifically on April 24, 2013, at Plaintiff's grievance of her termination. At that hearing, Roe attacked Plaintiff publicly and actively advocated for her termination. Roe's comments and advocacy at this hearing does not constitute a discrete actionable act of sexual harassment but rather one of the cumulative acts that contribute to a finding of a hostile work environment. Plaintiff is alleging that she was faced with a continuously hostile supervisor who, as her residency went on and even after it ended, engaged in hostile speech and behavior towards her because of his frustrated romantic interest in her. The sexual component of this hostile environment is established by Plaintiff's allegations that he continually spoke about entering into a romantic relationship with Plaintiff; the hostile acts consist of Roe's negative behavior when his romantic overtures were rebuffed. Roe's behavior at the April 24, 2013, grievance hearing was part and parcel of the hostile educational environment that Plaintiff was

17

forced to endure, and establish that the hostile educational environment extended and continued after April 20, 2013.[3]

Accordingly, because at least one component act of the hostile educational environment – Roe's advocacy for Plaintiff's termination during the April 24, 2013, hearing – occurred after April 20, 2013, Plaintiff's hostile educational environment claim is not time-barred.

### E.  AS A STUDENT/EMPLOYEE, PLAINTIFF IS ENTITLED TO VINDICATE HER EMPLOYMENT-RELATED RIGHTS UNDER TITLE IX.

Defendant has also argued that because Plaintiff has brought her claims under Title IX instead of Title VII, she cannot vindicate any employment rights she may have had, and accordingly, Defendant has asked the Court to strike the portions of Plaintiff's prayer for relief in which she asks for employment remedies such as claims for backpay and benefits and seeking injunctive relief prohibiting Defendant from harassing, discriminating and retaliating against employees.

Under Title IX, Plaintiff is entitled to recover money compensatory damages. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992). Moreover, Title IX has no administrative exhaustion requirement and no notice provisions; a plaintiff may file

---

[3] That the appeal hearing occurred after Plaintiff was notified of her termination does not preclude Plaintiff's claim of a hostile educational environment, as Plaintiff remained affiliated with and dependent on Defendant during the appeal hearing and Defendant remained in a position to discriminate against Plaintiff with respect to Plaintiff's participation in Defendant's educational programs during the appeals process. *Compare Stanley v. Trustees of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006) (holding that the plaintiff had not been enrolled in the school since 2000 and had not alleged any hostile acts had occurred while she was not present at the institution, but noting the possibility that plaintiff could have in theory been subjected to sexually-natured conduct after her enrollment ended).

But for Roe's comments and actions during her appeal hearing, Plaintiff's termination from her residency program might have been reversed; just as the decision not reverse its decision as to Plaintiff's termination constitutes a discrete act of discrimination by Defendant, so too Roe's *comments and actions* during the appeals process constitutes part of the continuing hostile educational environment Plaintiff was subjected to by Defendant.

directly in court under Title IX's implied private right of action and obtain the full range

of remedies. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-256 (2009).

With respect to the funding restrictions on educational institutions under Title IX,

the Supreme Court has held that Title IX prohibits employment discrimination as well as

educational discrimination in federally funded education programs. *N. Haven Bd. of*

*Educ. v. Bell*, 456 U.S. 512, 535-536 (1982). Likewise, the First and Fourth Circuit

Courts of Appeal have held that Title IX *does* extend employment discrimination

protections to the employees of covered entities, allowing employees of those institutions

who suffer gender discrimination an alternative to Title VII. *See Preston v. Virginia ex*

*rel. New River Cmty. Coll.,* 31 F.3d 203, 205-06 (4th Cir. 1994) ("An implied private

right of action exists for enforcement of Title IX. This implied right extends to

employment discrimination on the basis of gender by educational institutions receiving

federal funds."); *see also Ivan v. Kent State Univ.,* 92 F.3d 1185, 1996 WL 422496, at *2

n.10 (6th Cir. 1996) (per curiam) (unpublished disposition); *Lipsett v. Univ. of Puerto*

*Rico*, 864 F.2d 881, 897 (1st Cir. 1988) (finding employment discrimination against a

student-employee actionable under Title IX); *Bedard v. Roger Williams Univ.*, 989 F.

Supp. 94, 97-98 (D.R.I. 1997) (same); *Nelson v. University of Me. Sys*., 923 F. Supp. 275

(D. Me. 1996); *Bowers v. Baylor Univ*., 862 F. Supp. 142, 145 (W.D. Tex. 1994); *but see*

*Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995). The U.S. Department of Justice also

recognizes that employees of federally-funded education institutions may sue for gender

discrimination under Title IX. *See U.S. Dep't of Justice, Title IX Legal Manual IV.B.2.,*

*available at http://www.justice.gov/crt/about /cor/coord/ixlegal.php* ("The Department

takes the position that Title IX and Title VII are separate enforcement mechanisms.

Individuals can use both statutes to attack the same violations. This view is consistent with the Supreme Court's decisions on Title IX's coverage of employment discrimination, as well as the different constitutional bases for Title IX and Title VII.")

However, this Court need not decide whether Title IX permits a non-student employee of a covered institution to bring employment related claims because Plaintiff was a student of Defendant. Her employment was incidental to her studies, but the deprivation of that employment as part of Defendant's gender-based education discrimination constituted an actionable harm under Title IX.[4]

As a participant in Defendant's residency program, a component of professional medical education, Plaintiff was both a student and an employee of Defendant. *See Rosenberg v. City of New York*, 2011 U.S. Dist. LEXIS 112818, *17 (E.D.N.Y. Sept. 30, 2011); *Yog v. Texas Southern University*, 2010 U.S. Dist. LEXIS 113822, 2010 WL 4053766, *4 (S.D. Tex. Aug. 30, 2010). In *Rosenberg,* the plaintiff worked for the New York City public school system as part of participation in the New York City Teaching Fellows program, and the court found that the plaintiff was both a student and an employee and could therefore bring her claims under Title IX. Similarly, in *Yog*, a student working as a research assistant for a professor was covered by Title IX because the work she performed was part of her educational experience at the university.

---

[4] Notably, Defendant appears to concede that Plaintiff was a student of Defendant and may sue under Title IX for the deprivation of her educational opportunities based on her gender, as Section E of Defendant's Brief only seeks the dismissal of portions of Plaintiff's prayer that are specifically related to the employment-aspects of Plaintiff's residency and does not argue that Plaintiff should be precluded from asserting any of her legal theories against Defendant. As a practical matter, then, this argument seeks to preclude Plaintiff from recovering backpay damages that resulted from Plaintiff being terminated from her residency. As detailed above, because the residency was an educational program and because Plaintiff is entitled to all available remedies to rectify the harm she suffered, backpay damages are an available component of her available remedies.

Here, like the plaintiffs in *Rosenberg* and *Yog*, Plaintiff's work for Defendant was part of her educational experience. Accordingly, given that Title IX affords Plaintiff all available remedies to compensate her for the harm she suffered, *see Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-256 (2009), she should certainly be entitled to the loss of stipend and benefits she would have received but for Defendant's actions. However, Plaintiff does not object to modifying the prayer for injunctive relief to be limited to an Order directing Defendant to cease harassing, discriminating, and retaliating against students, as long as that term includes residents who were both students and employees.

## F. PLAINTIFF SHOULD BE PERMITTED TO PROCEED ANONYMOUSLY BECAUSE SHE SHOULD NOT HAVE TO REVEAL THAT SHE WAS COERCED INTO RECEIVING PYSCHOLOGICAL TREATMENT AS PART OF HER HARASSMENT.

In exceptional cases, courts have allowed a party to proceed anonymously. *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. Pa. 2011). That a party may suffer embarrassment or economic harm if their name is publicly released is not sufficient to allow anonymity; rather, a plaintiff must show both a fear of severe harm and that the fear of severe harm is reasonable. *Id.* Examples of cases where courts have allowed pseudonyms include cases involving abortion, birth control, transsexuality, mental illness, welfare rights of illegitimate children, AIDS, and homosexuality. *Id.* Where a plaintiff advances a reasonable fear of litigating without a pseudonym , courts should balance the plaintiff's interest and fear against the public's strong interest in an open litigation process. *Id.*

The Third Circuit has identified a list of non-exhaustive factors for the Court to consider in exercising this discretion. *Doe v. Megless*, 654 F.3d at 409-10. Factors favoring anonymity include:

"(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives."

*Id.*

Factors disfavoring anonymity include:

"(1) the universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (2) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated."

*Id.*

On several occasions during the course of Plaintiff's residency, she complained to HR about Roe's romantic interest in her and HR's response was to suggest that Plaintiff seek psychological treatment. *See* SAC at ¶¶ 33-34, 54-58, 76. Plaintiff acceded to HR's suggestion to seek psychological treatment because she felt obligated to do so; this coerced treatment in response to her good faith complaints of sexual harassment and unwelcome romantic attention is an essential part of the gravamen of her hostile educational environment claim and, under *Iqbal* and *Twombly*'s heightened pleading requirements, were pleaded in the body of the SAC in order to ensure that she had pleaded a plausible claim of gender-based hostile educational environment harassment.

Courts within the Third Circuit have allowed litigants to proceed anonymously in order to allow them to not identify that they suffer from a mental illness. *See, e.g., Doe v. Unum Life Ins. Co. of Am.*, 2014 U.S. Dist. LEXIS 54821, *6 (E.D. Pa. Apr. 18, 2014); *Doe v. United Behavioral Health,* 2010 U.S. Dist. LEXIS 131117, *3 (E.D. Pa. Dec. 10,

2010); *Doe v. Hartford Life and Accident Ins. Co.*, 237 F.R.D. 545, 550 (D.N.J. 2006); *Doe v. Doe v. Provident Life & Accident Ins. Co.*, 176 F.R.D. 464, 468 (E.D. Pa. 1997). Moreover, Plaintiff is a physician, and Plaintiff reasonably fears that her professional standing and ability to practice medicine may be negatively impacted if the public were to conclude, based on Plaintiff's Complaints, that she suffered from mental illness or even had to receive psychological treatment while enrolled in Defendant's residency program.

Furthermore, a review of the *Provident Life* factors support allowing Plaintiff to proceed anonymously. First, the identity of Plaintiff has been kept confidential. While Plaintiff has revealed her identity to Defendant through counsel so that Defendant can appropriately respond to and defend this lawsuit, neither party has previously revealed Plaintiff's name or have publicly discussed this lawsuit. Accordingly, this factor supports proceeding anonymously.

Second, the bases for Plaintiff avoiding disclosure of her identity is the allegations of psychological and psychiatric treatment and the underlying inferences can be drawn from same, i.e., that she suffered from some sort of psychological disorder. "Unfortunately, in our society, there is a significant stigma associated with being identified as suffering from a mental illness." *Doe v. Provident Life & Accident Ins. Co.*, 176 F.R.D. 464, 468 (E.D. Pa. 1997).

Moreover, since the coerced psychological treatment is one of the central ways in which Plaintiff was subjected to a hostile educational environment, there is no way that such treatment can be excised from the public documents at issue in this case such as the Complaints, Answers, and dispositive motions. Accordingly, should Plaintiff be required

to proceed without a pseudonym, there appears to be no way of avoiding disclosure that Plaintiff was repeatedly directed by Defendant – a hospital – to seek psychological treatment for making her sexual harassment complaints. As noted *supra*, many courts have found that protecting an individual from disclosing a mental disorder is a valid reason to allow a plaintiff to proceed anonymously. In *Provident Life*, the court found that the plaintiff's professional status as an insurance broker also made the risk of stigma greater. 176 F.R.D. at 468. Such risk is even greater for a doctor – patients routinely do internet searches on their doctors, and patients who might identify Plaintiff as an individual who made a sexual harassment complaint and was then directed to seek psychological treatment for same may well conclude that they would rather seek treatment from a physician who had not sought such treatment. Accordingly, this factor supports allowing Plaintiff to continue to proceed anonymously. *See id.*

The third factor, the public interest in maintaining the confidentiality of Plaintiff's name, also supports anonymity. "The public has an interest in preventing the stigmatization of litigants with mental illnesses." *Id.* Moreover, "plaintiff's identity should be protected in order to avoid deterring people with mental illnesses from suing to vindicate their rights." *Id.* Other individuals may follow this case who have similar experiences of having to undergo coerced psychological treatment as a result of making a sexual harassment complaint, but would be discouraged from bringing suit if they realized that doing so would require them to reveal their name to the public – including family, friends, acquaintances, and colleagues. Thus, the public has an interest in allowing Plaintiff to proceed anonymously.

The fourth factor – which asks whether there is an atypically weak public interest in knowing the litigant's identity – also supports allowing the Plaintiff to proceed anonymously. Here, the facts of this case are pleaded in detail in the Second Amended Complaint, and will, if this case proceeds that far, likely be presented again pursuant to a future Summary Judgment Motion and/or at trial. The public can follow both the factual record and the legal proceedings in this case without having to know the identities of either Plaintiff or Plaintiff's alleged harasser. The public will be able to learn about Defendant's sexual harassment policies and will able to learn from Defendant all the actions Defendant took that Defendant will argue justified its personnel decisions – and the public will be able to learn all of this without needing to know the identities of Plaintiff or her alleged harasser. The public will also be able to learn in detail Plaintiff's allegations of harassment and, if her harasser denies the harassment occurred, her harasser's denials.

Nevertheless, it is likely that the factual issues in dispute will be less important than some of the legal ones, and because the legal issues dominate the factual ones, the public has a weaker-than-normal interest in knowing the Plaintiff and her harasser's identity. On the other hand, this case is not a purely legal one – disputed factual issues do exist here. Accordingly, this factor at partially but does not completely support allowing the Plaintiff to proceed anonymously.

The fifth factor – which weighs the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified – is not relevant as Plaintiff will not dismiss her lawsuit even if she cannot proceed anonymously.

The sixth factor also supports proceeding anonymously because there is no evidence that Plaintiff seeks to proceed pseudonymously for illegitimate ulterior motives. Plaintiff seeks to proceed anonymously because she fears stigma and professional difficulty if it is revealed that she was asked to and agree to seek psychiatric treatment in connection with her complaints about her residency program.

With respect to the three *Provident Life* factors that weigh against allowing a plaintiff to proceed anonymously, the first such factor -- the universal level of public interest in access to the identities of the litigations – of course weighs against proceeding anonymously. However, Defendant concedes that this is the only one of the three negative factors that weigh against allowing Plaintiff to proceed anonymously. Defendant concedes that there is no particularly strong interest in knowing the litigant's identities in the instant matter beyond the public's interest which applies to every single litigation.

With respect to whether Defendant has an illegitimate motive in seeking Plaintiff to reveal her name, Plaintiff suspects that Defendant has such an illegitimate motion, namely that Defendant hopes that Plaintiff will abandon her claim if she is forced to proceed under her real name. Accordingly, while Plaintiff agrees that the Court should heavily consider the public's interest in Plaintiff proceeding anonymously, Plaintiff requests that the Court discount some of Defendant's arguments as to the unfairness of Plaintiff proceeding anonymously when Defendant's name must be revealed, especially given that Plaintiff has kept the identity of her alleged harasser anonymous as well.

Accordingly, of the factors that support allowing a Plaintiff to proceed anonymously, the first three factors and the sixth factor support allowing Plaintiff to proceed anonymously, the fourth factor at least partially supports anonymity, while the

fifth factor is neutral. With respect to the three factors that weigh against allowing

anonymity, only the public's general interest in having parties identify themselves

publicly weighs against allowing anonymity. While that factor is an important one, in the

instant case, where exploration of the case will necessitate delving into the coerced

psychological treatment Plaintiff received and may lead Plaintiff to being stigmatized

both personally and professionally as someone suffering from a mental illness, Plaintiff

respectfully requests that the Court allow Plaintiff to continue to proceed anonymously.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny

Defendant's motion to dismiss to the extent that it seeks to dismiss Plaintiff's claims of

hostile educational environment, her claims of retaliation and *quid pro quo* retaliation

related to the imposition of a hostile educational environment that began prior to April

20, 2013, and her claims for full compensatory damages for Defendant's Title IX

violations, including back-pay. Plaintiff also requests that the Court allow Plaintiff to

proceed anonymously.

Respectfully Submitted,

*/s/ Joshua S. Boyette*

Joshua S. Boyette, Esq.
**SWARTZ SWIDLER, LLC**
1101 North Kings Highway, Suite 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417

Date: August 10, 2015

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANE DOE** <br><br> v. <br><br> **MERCY CATHOLIC MEDICAL CENTER, et al.** | **CIVIL ACTION** <br><br> **NO.  15-2085** |

## O R D E R

**AND NOW**, this 1st day of October 2015, following oral argument of even date, it is

hereby **ORDERED**:

1.　　Defendants' motion to dismiss (ECF 18) is **DISMISSED** as moot.

2.　　Plaintiff may file a third amended complaint within fourteen (14) days.

3.　　Defendants motion to dismiss shall be filed within fourteen (14) days thereafter.

4.　　Plaintiff shall respond within fourteen (14) days.

5.　　Defendant may file a reply brief within seven (7) days.

BY THE COURT:

**/s/ Michael M. Baylson**
_____

**MICHAEL M. BAYLSON, U.S.D.J.**

O:\CIVIL 15\15-2085 doe v. mercy catholic\15cv2085.100115.oralarg.doc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE
1122 Spruce Street, Apt. A
Philadelphia, PA 19107

        Plaintiff,

    v.

MERCY CATHOLIC MEDICAL CENTER
1500 Lansdowne Avenue
Darby, PA 19023

        Defendant.

Civil Action No:   15-2085

**JURY TRIAL DEMANDED**

## THIRD AMENDED COMPLAINT

Plaintiff Jane Doe ("Plaintiff") hereby complains as follows against Defendant Mercy Catholic Medical Center ("Defendant Mercy").

## INTRODUCTION

1.    Plaintiff has initiated the instant action to redress violations by Defendant Mercy of Title IX of the Education Amendments Act of 1972 ("Title IX"), and for breaches of contract under Pennsylvania contract law.  In essence, Plaintiff was subjected to a sexually hostile work environment and retaliated against for complaining of same; this retaliation culminated in the termination of her residency with Defendant Mercy. Same constitutes a violation of Title IX, and constitutes a breach of Plaintiff's residency agreement and associated covenants of fair dealing with Defendant Mercy.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States and seeks redress for violations of a federal law.

3.      This Court may also maintain supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure, because they are sufficiently related to the claim(s) within the Court's original jurisdiction that they form part of the same case or controversy.

4.      This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

5.      Pursuant to 28 U.S.C. § 1391, venue is properly laid in this judicial district because all off the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES

6.      The foregoing paragraphs are incorporated herein as if set forth in full.

7.      Plaintiff is an adult individual and citizen of Pennsylvania living at 1122 Spruce Street, Apt. A, Philadelphia, PA 19107. "Jane Doe" is a pseudonym to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received as part of her corrective plan as outlined below.[1]

8.      Defendant Mercy Catholic Medical Center comprises the two-campus community teaching hospitals of Mercy Fitzgerald Hospital, in Darby, PA, and Mercy Philadelphia Hospital, located in Philadelphia, PA.

---

[1] Plaintiff's name will be provided to Defendant and the Court in a non-public filing.

9.      At all times relevant herein, Defendant Mercy acted through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein as if set forth in full.

11.     Plaintiff is an adult female.

12.     Plaintiff began a residency with Defendant Mercy in diagnostic radiology in July 2011.

13.     Plaintiff entered into a residency agreement with Defendant when she began her residency.

### Graduate Medical Education or Residency Education

14.     Graduate medical education is the period of didactic and clinical education in a medical specialty which follows the completion of a recognized undergraduate medical education and which prepares physicians for the independent practice of medicine in that specialty. It is also referred to as residency education.

15.     Graduate medical education programs are accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), a private, non-profit organization founded in 1981 from a consensus in the academic medical community for an independent accrediting organization.

16.     The ACGME's mission is to improve health care and population health by assessing and advancing the quality of resident physicians' education through accreditation.

17.     In the academic year 2013-2014, there were approximately 9,600 ACGME-accredited residency and fellowship programs in 130 specialities and subspecialities at

approximately 700 sponsoring institutions, enrolling over 120,000 full-time and part-time residents and fellows.

18.     On information and belief, according to the Association of American Medical Colleges, the cost to a hospital of training a resident averages $152,000 or more year.

19.     The federal government funds Graduate Medical Education through Medicare by providing two types of funding to teaching hospitals: Direct Graduate Medical Education ("DGME") and Indirect Medical Education ("IME") Payments.

20.     Medicare DGME payments cover a residency's programs' share of residents' stipends and fringe benefits. IME payments are meant to defray the higher cost of care at teaching hospitals.

21.     ACGME defines programs it accredits as a structured educational experience in graduate medical education, designed to conform to the Program Requirements of a particular specialty/subspecialty, the completion of which may result in eligibility for board certification.

22.     The ACGME defines a resident as any physician in an accredited graduate medical education program, including interns, residents, and fellows.

23.     The American Board of Radiology ("ABR") certifies radiologists, and requires one year of clinical training, and four years in an ACGME-approved diagnostic radiology residency program. Upon completion of the four-year residency program, the student becomes eligible to take the board examination and become board certified for a period of six years.

24.     In order to become certified by the ABR, the physician must **graduate** from an ACGME diagnostic radiology residency training program and pass both the ABR Core and Certifying Examinations.

## Educational Nature of Defendant's Residency Program

4

25.     Defendant Mercy Catholic Medical Center has affiliated itself with the Drexel University College of Medicine ("DUCOM") to provide its graduate medical residency programs.

26.     Defendant Mercy Catholic Medical Center operates four graduate medical education programs that are accredited by the American Council for Graduate Medical Education ("ACGME").

27.     Defendant Mercy Catholic Medical Center operates these residency programs because of its extreme commitment to medical education.

28.     The four residencies that Defendant Mercy Catholic Medical Center operate are: (a) Internal Medicine; (b) Diagnostic Radiology; (c) General Surgery; as well as a Transitional Year Residency.

29.     Defendant Mercy Catholic Medical Center also provides the clinical bases for DUCOM's Emergency Medicine residency.

30.     Defendant's Diagnostic Radiology Residency Program offers state-of-the-art training in radiology within a community hospital setting, which allows residents an opportunity to balance hands-on experience with didactic teaching.

31.     The Diagnostic Radiology Residency Program allows Residents to be educated in all subspecialties of radiology, including neuroradiology, gastrointestinal, genitourinary, musculoskeletal, nuclear medicine, mammography, cardiothoracic, and ultrasound.

32.     The Diagnostic Radiology Residents are also educated in the use of 3D imaging technology and workstations.

33.     All Diagnostic Radiology Residents also attend a four-week course in radiologic pathologic correlation.

34.    The educational program in Diagnostic Radiology at Mercy also consists of two daily conferences given by staff radiologists, lectures by visiting professors, departmental M&M, and journal club.

35.    The Diagnostic Radiology Residency also has its Residents participate in the citywide Pediatric Conferences at St. Christopher's Hospital for Children in Philadelphia; participation in the Philadelphia Roentgen Ray Society are also part of the curriculum, as well as a citywide physics course.

36.    In addition, to departmental didactic conferences, diagnostic radiology residents participate in interdepartmental conferences at Mercy Catholic Medical Center, including, Neuroradiology-Neurology-Neurosurgery conference, Tumor Board, Core Curriculum, Radiology/Pathology, and Radiology/Medicine conferences.

37.    Residents, per ACGME guidelines, were not permitted to work more than 80 hours per week.

### Facts Related to Plaintiff's Residency's Educational Factors

38.    Prior to her residency with Defendant, Plaintiff did two years of residency (R1 and R2) at Johns Hopkins in Nuclear Medicine. Under the American Board of Radiology, two years of nuclear medicine residency is counted as a single year of radiology residency, so Plaintiff entered Defendant as a second-year resident (R2).

39.    Plaintiff participated in Defendant's defined curriculum for Diagnostic Radiology.

40.    Plaintiff was required to attend mandatory daily lectures in the morning and afternoon. Morning lectures were typically presented by the faculty, afternoon lectures would usually be case presentations, prepared and presented by the resident under the supervision of the faculty/attending physicians.

41.     Plaintiff was required as part of her residency to take physics class, which was organized by Dr. James Roe and taught on Drexel's campus.

42.     Plaintiff was required as part of her residency to attend monthly radiology lectures at St. Christopher Children's Hospital.

43.     Plaintiff was required to attend monthly meetings of the Philadelphia Roentgen Ray Society, a radiology society, as part of the educational component of her residency.

44.     Plaintiff was required as part of her residency to attend tumor board, breast panel, and interdepartmental conferences, where radiology residents prepare and present cases under the supervision of the faculty.

45.     Plaintiff was sometimes required to attend lunch lectures organized by the internal medicine department as part of her residency.

46.     Plaintiff took an annual In-Training Examination to allow Defendant to assess her progress and competencies in the residency.

47.     Plaintiff entered into a Residency Agreement with Defendant at the beginning of her residency and renewed this agreement on an annual basis.

48.     The Residency Agreement provided that Defendant does not discriminate against a person because of their gender.

49.     The Residency Agreement provided Plaintiff with the option of participating in Defendant's grievance process for residents.

50.     The Residency Agreement further provided that Defendant could only **immediately** terminate or not renew a resident's contract for proper cause, which case the Defendant would provide the resident with due process and access to the grievance procedure.

51.     The Residency Agreement provided that if the Defendant decided not to renew or reappoint the Resident, the Resident would be given four months notice of the decision not to re-appoint, unless the events causing the decision not to re-appoint occurred within the four months prior.

### **Plaintiff's Interactions with Roe**

52.     Shortly after Plaintiff's residency began, Roe initiated a personal relationship with Plaintiff that involved discussions of Roe's private life, and relatives, and hobbies.

53.     Roe also asked about and learned about Plaintiff's marriage and her circumstances of living away from her husband during the Mercy residency.

54.     During this period, Plaintiff also noticed Roe on many occasions looking at her in a suggestive manner that made Plaintiff feel uncomfortable.

55.     On one occasion, within about a few months of beginning her residency, Plaintiff and Roe were in a reading room sitting next to each and reviewing radiology reports on a computer terminal. Plaintiff observed Roe and Roe's demeanor and appearance made Plaintiff uncomfortable.

56.     Plaintiff further noticed that Roe would find opportunities to see her and speak with her more than would otherwise be expected.

57.     During the course of her residency, Plaintiff observed several other occasions in which the two of them were alone in the reading room in which Roe made her feel uncomfortable.

58.     From the conversations that she had with Roe, Plaintiff reasonably concluded that Roe was sexually attracted to Plaintiff and wished to pursue a romantic relationship with her, despite the fact that both Plaintiff and Roe were married to other people.

8

59. Within approximately three months of Plaintiff beginning her residency program, Plaintiff sent Roe an email expressing concern that other individuals were aware of Roe's romantic interest in Plaintiff.

60. After Roe received this communication, he approached Plaintiff and asked her if she had sent that email or whether someone else had gained access to her email system. Plaintiff told him that she had sent the email, and wanted their relationship to remain professional.

61. After this conversation, Roe continued behaving in a manner that made Plaintiff believe he was romantically and/or sexually interested in her.

62. Plaintiff believed that the other residents and the faculty were aware of Roe's interest in Plaintiff and Plaintiff was uncomfortable about this.

63. Plaintiff was scheduled through Johns Hopkins to give an oral presentation at the RSNA Conference in Chicago in November 2011. Roe was also attending that same conference. Roe told Plaintiff that he wanted to see her when they were both in Chicago.

64. Plaintiff was concerned about Roe's apparent romantic and/or sexual interest in her given that she was a resident and he was the director, and hoped that at a personal meeting in Chicago, she would be able to have a frank conversation with him about his interest in her. Specifically, she intended to "let him down easy" – i.e., tell him that her lack of interest was because she was in the residency program, not that she was unattracted to him. Her hope was that this rejection would be flattering and therefore minimize the chance that Roe would be hurt and would retaliate against her.

65. Once in Chicago, Plaintiff reached out to Roe and sent him a telephone text message asking if he wanted to meet her. When Roe did not respond, Plaintiff, in an attempt to clear the air, sent him additional text messages relating that she did not want to be in a

compromising position with him and that she did not want to pursue a romantic relationship with him during the residency.

66.     Upon returning from Chicago, Roe reported these text messages to Human Resources, claiming that Plaintiff was sending these text messages in order to make it appear as if there was a relationship between them.

67.     In response, Human Resources met with Plaintiff, at which point Plaintiff explained the unwelcome sexual and/or romantic attention she believed she was receiving from Roe. Plaintiff further explained that Plaintiff had sent the text messages to Roe in an effort to get him to stop paying her the unwelcome sexual attention.

68.     Human Resources asked Plaintiff if Roe had ever touched Plaintiff and Plaintiff related how Roe had touched Plaintiff's hand in the Reading Room.

69.     Plaintiff told Human Resources that she believed that Roe's unwelcome sexual attention was negatively affecting her training.

70.     On the following day, Plaintiff met with Human Resources again and Human Resources referred Plaintiff to a psychologist. Plaintiff asked if going to the psychologist was mandatory; Human Resources said that it was not, that they would get a report as to whether Plaintiff went, but if Plaintiff chose not to go, no negative effect would be taken.

71.     Nevertheless, Plaintiff believed that in response to her complaint about Roe, Human Resources was directing her to go see a psychologist and it would be held against her if she did not go. Plaintiff went to the psychologist for three sessions, and told the psychologist about the unwanted sexual attention she was receiving from Roe.

72.     Human Resources told Plaintiff nothing else about the results of any investigation into Plaintiff's complaints.

73.     Subsequent to this, Roe's supervision and training of Plaintiff appears to be limited for a period of time; specifically, Roe was no longer scheduled to supervise Plaintiff.

74.     However, within days after Plaintiff met with HR, Roe approached Plaintiff and apologized for giving the emails for giving to HR and explained that he did it because he was concerned that he would be reprimanded for having an inappropriate relationship with Plaintiff.

75.     After this, on information and belief, Roe directed other faculty members to give Plaintiff special scrutiny because of the complaints she had made to him and to Human Resources.

76.     Subsequent to Plaintiff's meeting with HR, Plaintiff received significantly less training and interaction from two other male members of the faculty who were close with Roe.

77.     Roe continued to behave inappropriately with Plaintiff; for instance, in 2012, Plaintiff asked to leave early to meet with her husband, at which point Roe became jealous.

78.     In Fall 2012, Plaintiff began the process of getting a divorce.

79.     On information and belief, Roe learned of Plaintiff's divorce proceedings from another faculty member.

80.     Within a few weeks, Roe approached Plaintiff and told Plaintiff that he was getting a divorce as well and wanted to be in a relationship with her.

81.     During this period, after Plaintiff began the divorce process, Roe intensified his interest in her; during conversations, Roe suggested that they go shooting together and that they travel together and being in a relationship with her after her residency program ended.

82.     In December 2012, Roe told Plaintiff that he was uncomfortable with her going to dinner as part of her interview process for a post-residency fellowship.

83.    In or around December 2012, Roe complained to Plaintiff that she was rejecting his advances more; Plaintiff explained that she simply did not have time for or interest in any relationship at that point.

84.    Roe also expressed unhappiness with the idea of Plaintiff leaving Philadelphia to attend a post-residency fellowship.

85.    During this same period, Plaintiff asked Roe and another faculty member ("Faculty Member #2") to provide her with letters of recommendation for her application to a fellowship program.

86.    Roe and the other faculty member provided short, cursory, and perfunctory letters of recommendation.

87.    When the director of the fellowship program called Roe for clarification, Roe told the director that Plaintiff was a poor candidate.

88.     Subsequently the director of the fellowship program called Plaintiff to let her know that Roe had given her a poor recommendation.

89.    After this, Plaintiff called Roe at the hospital and asked him why she had been given such a poor recommendation.

90.    Roe told Plaintiff that he did it to teach her a lesson, and then hung up on her.

91.    In response to Plaintiff's complaints about Roe's treatment of her, Roe reported Plaintiff to the Vice President of Defendant Mercy, Dr. Arnold Eiser.

92.    Plaintiff was asked to meet with Roe, Eiser, Faculty Member #2, and Pam Fierro. In this meeting, Plaintiff complained about the manner in which Roe was treating her and that she believed she was not getting the training she needed because of Roe's attitude towards her.

12

93.     Plaintiff reminded Fierro and Eiser that Plaintiff had not been scheduled with her since her complaint to HR, and that the residency program was aware of this issue and her underlying complaint about Roe. The participants than asked Plaintiff to wait outside.

94.     Eiser then took Plaintiff to see a psychiatrist at Defendant Mercy.

95.     During the walk to the psychiatrist, Eiser told Plaintiff that Defendant Mercy had received Plaintiff's scores for her second in service examination, and the results were poor, and that Plaintiff needed to address this.

96.     However, at a later date, Plaintiff learned that Eiser's comments were false, and that her second year in service examination scores were actually in the 70th percentile.

97.     Plaintiff spoke with the psychiatrist about Roe's romantic interest in her and his romantic overtures.

98.     The following day, Defendant Mercy instructed Plaintiff that if she wished to remain in the residency, she had to sign a letter of acknowledgment and be placed on a corrective plan.

99.     Plaintiff did not wish to sign the letter and be placed on the corrective plan, but ultimately did so in order to continue her residency.

100.    Contrary to Eiser's comments to her on the way to the psychiatrist, Plaintiff did very well and demonstrated great improvement on her second year (2012-2013) in-service examinations, but no one at the residency program ever met with her to deliver her results.

101.    After Plaintiff learned of her results on her second in-service examinations, she went to Roe and asked Roe if he would communicate with the program director at the fellowship to let him know about her improvement. Roe told Plaintiff that he would not do so.

102.    In the early spring of 2013, Roe increased his harassment of Plaintiff by scheduling more sessions with Plaintiff.

103.    In spring 2013, Plaintiff and Roe were in the Reading Room reviewing radiology reports when Plaintiff was operating a computer mouse with her right hand and Roe was sitting to her left. Roe then reached his right arm across Plaintiff's chest and placed his hand over Plaintiff's and moved her hand and the computer mouse. While doing this, Roe's arm was pressed against Plaintiff's breasts. Plaintiff pushed herself backwards and stood up, and told Roe that she wanted their relationship to remain professional.

104.    On another occasion, an oncologist/hematologist in the hospital unaffiliated with the residency program asked Roe if Plaintiff was single; Roe responded by becoming very jealous and telling Plaintiff she should not date the other physician.

105.    In early April 2013, one of the other residents asked Plaintiff to assist on a research paper the other resident was writing with Roe. For the paper, Plaintiff read the relevant studies and met with the resident to give feedback and advice and planned to continue to contribute as needed.

106.    Nevertheless, when Roe learned that Plaintiff had been added as an author to the paper, he instructed the other resident to remove Plaintiff.

107.    The other resident than told Plaintiff that Roe had order Plaintiff's removal as an author.

108.    Plaintiff went to Roe to complain as to his continued unfair treatment.

109.    Roe then insisted that Plaintiff was acting unprofessional and ordered Plaintiff to another meeting with the Vice President Eiser.

110.     Plaintiff met with the Eiser, Roe and Pam Fierro again. Eiser asked Plaintiff if she had contributed to the paper, and Plaintiff explained her contributions. Eiser told Plaintiff that the other residents "loved [Roe]," to which Plaintiff explained that Roe was torturing her due to his romantic intentions. She further told Eiser that the information provided to him about her results on the second in-service examination had been false, that she had in fact done well, and that Roe had given Eiser false information about her performance on the in-service examination.

111.     Plaintiff further explained that the issue went beyond the authorship issue but extended to Roe's entire retaliatory behavior over the past year, especially the negative recommendation he provided to the fellowship program. Eiser then directed Plaintiff to apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his "special attention."

112.     Roe responded by stating that he would not accept Plaintiff's apology, because it was not "sincere."

113.     Eiser then suggested Plaintiff receive another psychiatric consultation and informed Plaintiff she was suspended.

114.     On information and belief, prior to this suspension, Defendant had previously decided to renew Plaintiff's residency agreement, as it had not notified her four months prior to expiration of its intention to not-renew Plaintiff's residency.

115.     After being suspended, Plaintiff had no further contact from Defendant Mercy until April 20, 2013.

116.     On April 20, 2013, Plaintiff received a letter sent via FedEx overnight mail from Defendant Mercy informing Plaintiff for the first time that Defendant Mercy intended to terminate Plaintiff's residency, while giving her the option to appeal that decision.

117.   Prior to receiving and reading the termination letter from Defendant Mercy on April 20, 2013, no individual from Defendant Mercy contacted Plaintiff to inform her about the status of her residency.

118.   April 20, 2013, was the first day that Plaintiff learned that Defendant Mercy intended to terminate her residency.

119.   The termination letter, though received on April 20, 2013, was dated April 19, 2013.

120.   Plaintiff appealed the termination decision, and was given a hearing on or around April 24, 2013.

121.   At the hearing, the committee members heard about Plaintiff's allegations that Roe had romantic and/or sexual interest in her and that Plaintiff thought her treatment was unfair.

122.   At the hearing, Roe advocated for Plaintiff's dismissal from the residency program. Roe's advocacy for Plaintiff's dismissal was caused by Plaintiff's rebuffing of Roe's romantic interest in Plaintiff.

123.   After the hearing, on April 24, 2013, Plaintiff was informed that the committee intended to uphold the decision to terminate, but that Plaintiff had five days to file a further appeal if she so chose.

124.   Plaintiff resigned from the residency program prior to the expiration of her right to appeal, and her resignation was accepted by Defendant Mercy.

125.   After resigning, Plaintiff tried unsuccessfully to apply to another residency program so that she could finish her medical education.

126.   To date, Plaintiff has not been accepted to another residency program because of the manner in which her residency with Defendant Mercy ended.

127.    Defendants' actions have impaired Plaintiff's ability to advance her career as a physician and her ability to get fully licensed.

128.    For the aforementioned reasons, Plaintiff has suffered damages.

## COUNT I
### Violation of Title IX of the Education Amendments Act of 1972
### (Sexual Harassment and hostile educational environment)

129.    The foregoing paragraphs are incorporated herein as if set forth in full.

130.    Defendant Mercy operates a medical residency educational program that receives federal financial assistance from the Medicare program through Direct Graduate Medical Education ("DGME") payments and Indirect Medical Education ("IME") payments. *See* 20 U.S.C. § 1681(a).

131.    Defendant Mercy's residency program is covered by Title IX because it is a program that is operated by a corporation that is principally engaged in the business of health care and because federal DGME assistance is extended to the corporation as a whole. *See* 20 U.S.C. § 1687(3).

132.    DGME payments are meant to cover the cost of stipends that are paid to residents.

133.    The residency program is also covered by Title IX because it is a postsecondary institution. *See* 20 U.S.C. § 1687(2)(A).

134.    Title IX instructs each federal department providing federal financial assistance to any education program or activity to issue regulations to allow for implementation of the statute. *See* 20 U.S.C. § 1982.

135.    The Department of Health has issued such regulations at 45 C.F.R. § 86.1 *et seq.*

136.    The Department of Health has defined federal financial assistance as wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity,

17

45 C.F.R. § 86.2(g)(1)(ii), and as any contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program. 45 C.F.R. § 86.2(g)(5).

137.    The Department of Health has defined a recipient of federal funding as any private institution or organization to whom federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance. 45 C.F.R. § 86.2(i).

138.    The Department of Health has defined an institution of graduate higher education as an institution which offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certification of any higher degree in the liberal arts or sciences. 45 C.F.R. § 86.2(l).

139.    The Department of Health has issued a regulation as to "education programs or activities," and have stated that no person on the basis of sex shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity. 45 C.F.R. § 86.31.

140.    Defendant Mercy's medical residency program constitutes an educational program or activity under 45 C.F.R. § 86.31 because it provides academic study, research opportunities, and occupational training.

141.    Defendant Mercy's medical residency program qualifies as an institution of graduate higher education because it provides post-baccalaureate academic study. 45 C.F.R. § 86.2(l).

142.    Plaintiff was a participant in Defendant Mercy's medical residency program.

18

143.   Plaintiff was consistently subjected to pervasive and severe sexual harassment during her residency with Defendant Mercy that was both offensive and unwelcome.

144.   This harassment included Defendant Roe's repeated romantic and sexual advances, his unwelcome touching of Plaintiff, and his retaliatory behavior when his overtures were rebuffed.

145.   Defendant Mercy had repeated notice of the sexual harassment because Plaintiff complained of same to Human Resources in the winter of 2011/2012, and Plaintiffs complaints were brought up again in the hearing related to her potential termination from the program in or around April 24, 2013.

146.   Defendant Mercy failed to remedy the sexually hostile educational environment to which Plaintiff was exposed even after having notice of the sexual harassment which was occurring in its workplace.

147.   Defendant Mercy's failure to stop or remedy the sexual harassment and sexually hostile educational environment was deliberately indifferent to Plaintiff's rights.

148.   Any reasonable person would have felt that he or she was being subjected to a sexually hostile educational environment due to Defendant's conduct in failing to effectively remedy the pervasive and severe sexual harassment of which Plaintiff was exposed.

149.   These actions constitute sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

150.   Plaintiff has suffered damages as a result.

## COUNT II
### <u>Violation of Title IX of the Education Amendments Act of 1972</u>
### (Retaliation)

151.   The foregoing paragraphs are incorporated herein as if set forth in full.

152. Plaintiff complained about Roe's unwelcome sexual and/or romantic interest in her meeting with Defendant's HR department in or around winter 2011/2012.

153. After this, Plaintiff continued to complain to Roe directly that his sexual and/or romantic interest in her was unprofessional and unwelcome.

154. In or around February 2013, Plaintiff complained that Roe gave her a negative review because Roe was retaliating against her.

155. In or around April 2013, Plaintiff complained that Roe was retaliating against her by removing her name from a research project she had contributed to.

156. On April 19, Defendant Mercy decided to terminate Plaintiff's residency because of her complaints about Roe.

157. Defendant Mercy knew that Plaintiff had complained that Roe's retaliation was motivated by Plaintiff's rejection of his sexual and romantic intentions.

158. Defendant Mercy decided to terminate in retaliation for Plaintiff making complaints about Defendant Roe's sexual/romantic advances and his subsequent retaliatory behavior.

159. These actions constitute gender discrimination/retaliation against Plaintiff under Title IX of the Education Amendments Act of 1972.

160. Plaintiff has suffered damages as a result.

## COUNT III
## Violation of Title IX of the Education Amendments Act of 1972
### (Quid Pro Quo Sexual Harassment)

161. The foregoing paragraphs are incorporated herein as if set forth in full.

162. Defendant Roe was the Program Director of the Medical Residency program and had significant (if not controlling) input on Plaintiff's success as a medical resident.

163.    Defendant Roe's advances wanted to have a sexual and romantic relationship with Plaintiff during Plaintiff's residency.

164.    Plaintiff repeatedly rejected Defendant Roe's advances.

165.    Defendant Roe engaged in a series of acts designed to end Plaintiff's residency because of Plaintiff's rejection of his advances.

166.    Defendant Roe acted within the scope of his educational duties in retaliating against Plaintiff.

167.    Defendant Roe made a complaint against Plaintiff that lead directly to the decision to terminate Plaintiff from the residency program.

168.    Defendant Roe recommended that Plaintiff be removed from the residency program, and provided misleading testimony against Plaintiff in order to do so.

169.    Defendant Mercy and its review committee acted as a cat's paw and rubber stamp for Defendant Roe's decision to remove Plaintiff from Defendant Mercy's residency program.

170.    These actions constitute quid pro quo sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

171.    Plaintiff has suffered damages as a result.

### COUNT IV
### Breach of Contract
### (Pennsylvania common law)
### (Contract-Based Gender Discrimination)

172.    The foregoing paragraphs are incorporated herein as if set forth in full.

173.    Defendant entered into a contract with Plaintiff to be a Resident.

174.    As part of that contract, Defendant agreed not to discriminate on the basis of gender.

175.    Quid pro quo sexual harassment is a form of gender discrimination as

21

contemplated by the contract.

176.     Defendant terminated Plaintiff's agreement and failed to renew her contract because Plaintiff refused to enter into a sexual relationship with Roe.

177.     But for this gender discrimination, Defendant would have renewed Plaintiff's residency agreement.

178.     Accordingly, Defendant breached its agreement with Plaintiff by discriminating against her.

179.     Plaintiff has suffered damages as a result of Defendant's breach, including loss of her stipend and loss of her ability to become board certified.

**COUNT V**
**Breach of Contract**
**(Pennsylvania common law)**
**(Wrongful Termination)**

180.     Defendant agreed to only terminate Plaintiff's residency agreement for cause.

181.     Defendant terminated Plaintiff because of "unprofessionalism."

182.     This unprofessionalism consisted of Plaintiff's complains to Roe about unfair, discriminatory, and retaliatory treatment for rejecting his romantic advances.

183.     Such complaints do not constitute "cause" for termination under the Residency Agreement.

184.     Accordingly, Defendant was not permitted to terminate Plaintiff under the agreement before the expiration of the contract.

185.     Plaintiff has suffered damages as a result of Defendant's breach, including loss of her stipend and loss of her ability to become board certified.

**COUNT VI**
**Breach of Contract**
**(Pennsylvania common law)**

22

**(Breach of Covenant of Good Faith and Fair Dealing)**

186.    The foregoing paragraphs are incorporated herein as if set forth in full.

187.    Defendant's provision of Plaintiff with due process and an opportunity to participate in its grievance process to grieve her termination was a sham.

188.    Defendant's Program Director Roe harassed and coerced Plaintiff into not formally complaining about sexual harassment by disciplining her for her attempts to complain about such.

189.    Defendant's agents failed to take Plaintiff's complaints seriously and instead interpreted them as "unprofessional behavior."

190.    Defendant used Plaintiff's complaints about unfair treatment as the reason for terminating Plaintiff's contract.

191.    Defendant could have decided to not renew Plaintiff's contract in February 2013, allowing Plaintiff to seek an alternative residency for her fourth year, but Defendant's agent Roe did not do this in retaliation for Plaintiff's rejection of him and her complaints.

192.    Defendant's grievance process was unfair because it was filled with individuals who were personal friends of Roe and who were offended and outraged that Plaintiff had made a sexual harassment complaint against Roe.

193.    Defendant's grievance hearing was a *fait acompli* and the decision to terminate Plaintiff had already been decided before the hearing.

194.    Defendant's pre-judged grievance process and outrageous behavior induced Plaintiff to sign a letter saying she was resigning from the program instead of continuing to pursue the grievance process.

195.    Roe's actions in repeatedly subjecting Plaintiff to unwanted sexual and romantic

interest and advances was extreme and outrageous conduct, retaliating against Plaintiff by writing her negative recommendations and by removing her from a research project, and then arranging for her to be disciplined when she complained about it constituted a breach of Defendant's contractual covenant of good faith and fair dealing in terms of its Residency Agreement with Plaintiff.

196.    But for Defendant's breach of these covenants, Plaintiff's residency would not have been terminated and Plaintiff would have been offered a renewal of her contract.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

i.    Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of harassing, discriminating, and retaliating against residents and is to be ordered to promulgate an effective policy against such unlawful activities and to adhere thereto;

ii.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions.

iii.    Plaintiff is to be awarded all damages as permitted by applicable law;

iv.    Plaintiff is to be accorded damages for emotional distress and/or pain and suffering and any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

v.    Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

vi.    Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.

Respectfully Submitted,

/s/ Joshua S. Boyette
Joshua S. Boyette, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy. N., Suite 402
Cherry Hill, NJ 08032
Phone: (856) 685-7420
Fax: (856) 685-7417
Attorney for Plaintiff

Date:  October 15, 2015

**IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA**

JANE DOE,

        **Plaintiff,**

                                NO. 2:15-cv-02085

      **v.**

**MERCY CATHOLIC MEDICAL CENTER,**

        **Defendant.**

## ORDER

NOW, this _____ day of _____, 2015, upon consideration of Defendant Mercy Catholic Medical Center's Motion to Dismiss Plaintiff's Third Amended Complaint and Motion for More Definite Statement, and upon consideration of the briefs of the parties, **IT IS ORDERED** that the Motion is GRANTED.  Plaintiff's Third Amended Complaint hereby is DISMISSED with prejudice.

                                     **BY THE COURT:**

                                    _____

                                    **BAYLSON, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA**

JANE DOE,

                    Plaintiff,

                                                    NO. 2:15-cv-02085

          v.

MERCY CATHOLIC MEDICAL CENTER,

                    Defendant.

**MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED
COMPLAINT AND MOTION FOR A MORE DEFINITE STATEMENT**

Defendant Mercy Catholic Medical Center ("Defendant"), by counsel, hereby moves to
dismiss Plaintiff Jane Doe's ("Plaintiff") Third Amended Complaint, with prejudice pursuant to
Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be
granted.

In the alternative, should any of Plaintiff's claims survive dismissal, Defendant moves
this Honorable Court for an Order for a more definite statement pursuant to Federal Rule of Civil
Procedure Rule 12(e), requiring Plaintiff to identify herself using her real name.

In support of its Motion, Defendant relies upon the accompanying Memorandum of Law,
which is incorporated herein by reference as if set forth in full.

**WHEREFORE**, Defendant Mercy Catholic Medical Center respectfully requests that
this Court dismiss Plaintiff's Third Amended Complaint with prejudice.  Should any of
Plaintiff's claims survive dismissal, Defendant Mercy Catholic Medical Center respectfully
requests that this Court prohibit Plaintiff from proceeding under a pseudonym, and order that the
caption in this matter be amended by Plaintiff to identify Plaintiff's real name.

Respectfully submitted,

**POST & SCHELL, P.C.**

Dated: <u>October 29, 2015</u>          By:          <u>*s/ Andrea M. Kirshenbaum*</u>
A. James Johnston, Esquire
Andrea M. Kirshenbaum, Esquire
Kate A. Kleba, Esquire
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA  19103
215-587-1000

**Attorneys for Defendant**
**Mercy Catholic Medical Center**

# IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE,

                  Plaintiff,

                                          NO. 2:15-cv-02085

      v.

MERCY CATHOLIC MEDICAL CENTER,

                  Defendant.


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT
<u>AND MOTION FOR A MORE DEFINITE STATEMENT</u>**


POST & SCHELL, P.C.


A. JAMES JOHNSTON, ESQUIRE
ANDREA M. KIRSHENBAUM, ESQUIRE
KATE A. KLEBA, ESQUIRE
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA  19103
215-587-1000

Attorneys for Defendant
Mercy Catholic Medical Center

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................ ii

I.    INTRODUCTION ................................................................................. 1

II.   ALLEGED FACTS (AS OPPOSED TO LEGAL CONCLUSIONS) AND
      PROCEDURAL HISTORY ................................................................... 3

III.  ARGUMENT ......................................................................................... 9

      A.    MOTION TO DISMISS STANDARD ........................................ 9

      B.    PLAINTIFF'S TITLE IX CLAIMS FAIL AS A MATTER OF LAW
            BECAUSE DEFENDANT IS NOT COVERED BY TITLE IX. ........... 10

      C.    PLAINTIFF'S TITLE IX CLAIMS IN COUNTS II AND III
            RELATED TO ANY DISCRETE ACTS PRIOR TO APRIL 20, 2013
            ARE BARRED BY THE STATUTE OF LIMITATIONS. ........... 14

      D.    COUNT I OF PLAINTIFF'S COMPLAINT ASSERTING A
            HOSTILE ENVIRONMENT UNDER TITLE IX IS TIME
            BARRED. ................................................................................. 14

      E.    PLAINTIFF'S BREACH OF CONTRACT CLAIM BASED ON
            ALLEGED GENDER DISCRIMINATION IS PREEMPTED BY
            THE PHRA. ............................................................................. 17

      F.    PLAINTIFF'S BREACH OF CONTRACT CLAIM BASED ON
            ALLEGED WRONGFUL TERMINATION IS NOT PLAUSIBLY
            PLED. ...................................................................................... 18

      G.    PLAINTIFF CANNOT MAINTAIN AN INDEPENDENT CAUSE
            OF ACTION FOR BREACH OF THE COVENANT OF GOOD
            FAITH AND FAIR DEALING UNDER PENNSYLVANIA LAW. ........ 20

      H.    PLAINTIFF CANNOT PROCEED UNDER A PSEUDONYM. ........ 20

IV.   CONCLUSION ..................................................................................... 28

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*Anspach v. City of Phila.,* 503 F.3d 256 (3d Cir. 2007)...................................... 3

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................ 9

*Bell Atl. Corp. v. Twombly, ,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)............................................................................................ 9, 10

*Boeynaems v. LA Fitness Int'l, LLC,* Civ, A, No. 10-2326, 2011 U.S. Dist. LEXIS 103611 (E.D. Pa. Sept. 13, 2011) ................................................ 20

*Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152 (1999) ....................................... 11

*Bougher v. Univ. of Pittsburgh*, 882 F.2d 74 (3d Cir. 1989) .................................. 14, 15

*Burton v. Teleflex Inc.,* 707 F.3d 417 (3d Cir. 2013) ......................................... 20

*Cannon v. Univ. of Chicago,* 441 U.S. 677 (1978).......................................... 12, 23, 24

*Crandell v. New York Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304 (S.D.N.Y. 2000) .......................................................................................... 11, 12, 13

*DeFebo v. Andersen Windows, Inc.,* Civ. A. No. 09-2993, 2009 U.S. Dist. LEXIS 87889 (E.D. Pa. Sept. 24, 2009) ................................................ 19

*DeJohn v. Temple Univ.,* 537 F.3d 301 (3d Cir. 2008)................................... 15

*Doe v. Blue Cross & Blue Shield United,* 112 F.3d 869 (7th Cir. 1997) ...................................... 21

*Doe v. Borough of Morrisville,* 130 F.R.D. 612 (E.D. Pa. 1990) ................................................ 25

*Doe v. City of Chicago,* 360 F.3d 667 (7th Cir. 2004).................................... 28

*Doe v. Megless,* 654 F.3d 404 (3d Cir. 2011) ........................................................ *passim*

*Doe v. Old Forge Borough,* No. 12-2236, 2015 U.S. Dist. LEXIS 85902 (M.D. Pa. July 1, 2015)................................................................................ 21, 22, 23

*Doe v. Temple Univ.,* No. 14-04729, 2014 U.S. Dist. LEXIS 122427 (E.D. Pa. Sept. 3, 2014) .............................................................................. 23, 24

*Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058 (9th Cir. 2000)............................ 24

*Evancho v. Fisher,* 423 F.3d 347 (3d Cir. 2005) ........................................... 3

*F.B. v. E. Stroudsburg Univ.,* No. 09-525, 2009 U.S. Dist. LEXIS 57370 (M.D. Pa. July 7, 2009)........................................................................... 21, 24, 27

*Fitzgerald v. Barnstable Sch. Committee,* 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) ............................................................................ 12

ii

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                                                   **PAGE(S)**

*Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d
    273 (E.D.N.Y. 2002)..................................................................................... 15

*Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir. 2009).......................................... 10

*Frazer v. Temple Univ.,* 25 F. Supp. 3d 598 (E.D. Pa. 2014)...................................... 25

*Fusco v. Bucks County,* Civ. A. No. 08-2082, 2009 U.S. Dist. LEXIS 118924
    (E.D. Pa. Dec. 21, 2009)............................................................................. 15

*Gebster v. Lago Vista Independent School District,* 524 U.S. 274 (1998).................. 15

*Geiger v. AT&T Corp.,* 962 F. Supp. 637 (E.D. Pa. 1997)........................................... 18

*Gibson v. Hickman,* 2 F. Supp. 2d 1481 (M.D. Ga. 1998)............................................ 13

*Gjeka v. Del. County Comm. Coll.,* Civ. A. No. 12-4548, 2013 U.S. Dist. LEXIS
    73054 (E.D. Pa. May 23, 2013).................................................................. 15

*Glickstein v. Neshaminy Sch. Dist.,* Civ. A. No. 96-6236, 1997 U.S. Dist. LEXIS
    16317 (E.D. Pa. Oct. 22, 1997)................................................................. 13

*Goleman v. York Int'l Corp.,* Civ. A. No. 11-1328, 2011 U.S. Dist. LEXIS 85477
    (E.D. Pa. Aug. 3, 2011)............................................................................... 20

*Greineder v. Masonic Homes* 13-2376, 2014 U.S. Dist. LEXIS 56269 (E.D. Pa.
    Apr. 23, 2014)............................................................................................. 10

*Guevara v. Marriott Hotel Svcs.,* No. 10-5347, 2012 U.S. Dist. LEXIS 132456
    (N.D. Cal. Sept. 14, 2012) ......................................................................... 16

*Gupta v. Sears, Roebuck & Co.,* Civ. A. No. 07-243, 2009 U.S. Dist. LEXIS
    24930 (W.D. Pa. Mar. 26, 2009)............................................................... 18

*Jamison v. Campbell Chain Cooper Tools,* Civ. A. No. 1:07-CV-0324, 2009 U.S.
    Dist. LEXIS 110919 (M.D. Pa. Nov. 27, 2009)........................................ 18

*Johnson v. Baptist Med. Ctr.,* 97 F.3d 1070 (8th Cir. 1996)........................................ 11

*Keck v. Commercial Union Ins. Co.,* 758 F. Supp. 1034 (M.D. Pa. 1991).................. 17

*Kuhn v. Philip Morris U.S.A.,* 814 F. Supp. 450 (E.D. Pa. 1993) ............................... 25

*L.A. v. Hoffman,* No. 14-6895, 2015 U.S. Dist. LEXIS 94564 (D.N.J. July 21,
    2015)........................................................................................................... 25

*Lakoski v. James,* 66 F.3d 751 (5th Cir. 1995) ........................................................... 13

*Loewen v. Grand Rapids Med. Educ. Partners,* Case No. 1:10-CV-1284, 2012
    U.S. Dist. LEXIS 49476 (W.D. Mich. Apr. 9, 2012) ............................... 12

iii

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                          **PAGE(S)**

*Mandel v. M&Q Packaging Corp.,* 706 F.3d 157 (3d Cir. 2013) ........................................... 16, 17

*McLaughlin v. State Sys. of Higher Educ.,* Civ. A. No. 97-CV-1144, 1999 U.S.
    Dist. LEXIS 4325 (E.D. Pa. Mar. 31, 1999) ..................................................... 13

*Mears v. Bd. of Educ. of the Sterling Reg'l High Sch. Dist.,* Civ. A. No. 13-3154
    (NLH-JS), 2014 U.S. Dist. LEXIS 43236 (D.N.J. Mar. 31, 2014) ................................. 15

*Miller v. Kutztown Univ.,* No. 13-3993, 2013 U.S. Dist. LEXIS 173878 (E.D. Pa.
    Dec. 10, 2013) ........................................................................................ 25

*Monger v. Purdue Univ.,* 953 F. Supp. 260 (S.D. Ind. 1997) ........................................... 15

*Moore v. Angie's List, Inc.,* Civ. A. No. 15-1243, 2015 U.S. Dist. LEXIS 103633
    (E.D. Pa. Aug. 8, 2015) ............................................................................. 20

*Morris v. Wallace Community College-Selma,* 125 F. Supp. 2d 1315 (S.D. Ala.
    Jan. 8, 2001) .......................................................................................... 13

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) ............................................ 14, 16

*O'Shea v. Interboro Sch. Dist.,* Civ. A. No. 13-cv-06305, 2014 U.S. Dist. LEXIS
    58374 (E.D. Pa. Apr. 28, 2014) ..................................................................... 10

*Rose v. Beaumont Indep. Sch. Dist.,* 240 F.R.D. 264 (E.D. Tex. 2007) ................................. 28

*S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707
    (5th Cir. 1979) ....................................................................................... 21

*Santiago v. Warminster Twp.,* 629 F.3d 121 (3d Cir. 2010) ............................................. 10

*Schultz v. The Bd. of Trustees of the Univ. of West Florida,* Case No. 3:06cv442-
    RS-MD, 2007 U.S. Dist. LEXIS 36815 (N.D. Fla. May 21, 2007) ................................. 13

*Shine v. Bayonne Bd. of Educ.,* No. 14-4184, 2015 U.S. App. LEXIS 16771 (3d
    Cir. Sept. 22, 2015) .................................................................................. 15

*Stanley v. Trustees of The Cal. State Univ.,* 433 F.3d 1129 (9th Cir. 2006) .......................... 16, 17

*Underwood v. La Salle Univ.,* Civ. A. No. 07-1441, 2007 U.S. Dist. LEXIS 88959
    (E.D. Pa. Dec. 3, 2007) .............................................................................. 14

*Vega v. State Univ. of N.Y. Bd. of Trustees,* 97 CIV. 5767, 2000 U.S. Dist. LEXIS
    4749 (S.D.N.Y. Apr. 13, 2000) ...................................................................... 13

*Waggaman v. Villanova Univ.,* Civ. No. 04-4447, 2008 U.S. Dist. LEXIS 67254
    (E.D. Pa. Sept. 4, 2008) ............................................................................. 18

*Williamson v. Chubb Indem. Ins. Co.,* Civ. A. No. 11-cv-6476, 2012 U.S. Dist.
    LEXIS 31648 (E.D. Pa. Mar. 8, 2012) ............................................................. 18

iv

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                   **PAGE(S)**

*Yan v. Penn State Univ.*, 529 F. App'x 167 (3d Cir. 2013) ........................................................ 25

**STATUTES**

20 U.S.C. § 1681 *et seq.* ............................................................................................................. 14

20 U.S.C. § 1681(a) ............................................................................................................. 10, 19

42 U.S.C. § 2000e-5(e) ............................................................................................................. 12

42 U.S.C. § 2000e-5(g)(1) ......................................................................................................... 12

**RULES**

Fed. R. Civ. P. 1 ....................................................................................................................... 29

Fed. R. Civ. P. 5.2(a) ................................................................................................................ 24

Fed. R. Civ. P. 10(a) ........................................................................................................... 22, 26

Fed. R. Civ. P. 12(b)(6) .......................................................................................................... 1, 9

Fed. R. Civ. P. 12(e) ...................................................................................................... 1,  21, 27

Fed. R. Civ. P. 17(a)(1) ............................................................................................................. 22

Fed. R. Civ. P. 17(a)(3) ............................................................................................................. 22

**OTHER AUTHORITIES**

*Dorland's Illustrated Medical Dictionary* (30th ed. 2003) ........................................................ 11

http://www.merriam-webster.com/dictionary/education (last visited on Oct. 27, 2015) ................................................................................................................................ 10

http://www.merriam-webster.com/dictionary/residency (last visited on Oct. 27, 2015) ................................................................................................................................ 11

2-12 James Wm. Moore et al. Moore's Federal Practice – Civil § 12.34 ......................................... 10

v

## I.    INTRODUCTION

Plaintiff "Jane Doe,"[1] has filed a six (6) count Third Amended Complaint ("Complaint") against Mercy Catholic Medical Center ("MCMC" or "Defendant") alleging claims of hostile environment sexual harassment, retaliation and quid pro quo sexual harassment under Title IX as well as a three (3) claims of breach of contract:  (1) contract-based gender discrimination; (2) wrongful termination; and (3) breach of the covenant of good faith and fair dealing.  Plaintiff, who worked at MCMC as a medical resident, alleges that she was harassed by the director of the residency program and ultimately removed from that program either due to her failure to submit to the director's alleged advances or in retaliation for complaining of alleged mistreatment by the director.

After MCMC and previously-named Defendant Mercy Health System filed a Motion to Dismiss Plaintiff's First Amended Complaint, by stipulation of the parties, on July 10, 2015, Plaintiff filed a Second Amended Complaint removing a claim of negligent supervision included in Plaintiff's First Amended Complaint, and providing limited additional factual averments.  ECF Nos. 14-16.  Defendant then filed a Motion to Dismiss Plaintiff's Second Amended Complaint, the parties fully briefed the Motion and this Court held oral argument on Defendant's Motion. ECF Nos. 18-21, 23, 26.  Following oral argument on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, this Court granted Plaintiff leave to file a Third Amended Complaint ("Complaint," "Third Amended Complaint" or "TAC"), which Plaintiff filed on October 15, 2015, containing the same three (3) Title IX claims advanced in Plaintiff's prior pleadings and adding the above-referenced three (3) breach of contract claims for the first time. ECF No. 28.

---

[1] "Jane Doe" is a pseudonym which Plaintiff has used "to avoid public disclosure."  Third Amended Complaint at ¶ 7.

Plaintiff's Title IX claims fail as a matter of law because Plaintiff has not plausibly pled that MCMC's residency program qualifies as an "education program or activity" under Title IX. In the alternative, Plaintiff's Title IX claims related to any alleged discrete discriminatory or retaliatory acts (Counts II and III) prior to April 20, 2013 are barred by the statute of limitations. Plaintiff's Title IX hostile environment claim (Count I) likewise is time barred.

Plaintiff's three (3) breach of contract claims fare no better. Plaintiff simply cannot bring a claim of gender discrimination under the guise of a purported breach of contract because such a claim is preempted by the Pennsylvania Human Relations Act ("PHRA"). Nor has Plaintiff plausibly alleged a sufficient factual basis to support her wrongful termination breach of contract claim. Finally, binding Third Circuit precedent precludes Plaintiff from advancing a claim of breach of the covenant of good faith and fair dealing because such a claim is not recognized under Pennsylvania law.

For all of these reasons, as well as those set forth in detail below, Defendant respectfully requests that this Court dismiss Plaintiff's Third Amended Complaint in its entirety. Plaintiff has had multiple opportunities to attempt to state a claim against Defendant here, and simply has not done so. Accordingly, Defendant respectfully requests that the dismissal be with prejudice. In the alternative, should any claims remain in this action following this Court's consideration of Defendant's Motion, Defendant respectfully requests that the Court order that Plaintiff file an amended caption in this matter identifying Plaintiff using her real name.

## II.   ALLEGED FACTS (AS OPPOSED TO LEGAL CONCLUSIONS)[2] AND PROCEDURAL HISTORY

Plaintiff worked as a medical resident "with Defendant Mercy" beginning in July 2011. TAC at ¶ 12.  Defendant "operates four graduate medical education programs that are accredited by the American Council for Graduate Medical Education."  TAC at ¶ 26.  When she began her residency, Plaintiff entered into a "residency agreement with Defendant."  TAC at ¶ 13.

"Shortly after Plaintiff's residency began, [Dr. James] Roe[3] initiated a personal relationship with Plaintiff that involved discussions of Roe's private life, and relatives, and hobbies."  TAC at ¶ 52.  Roe learned that Plaintiff was living "away from her husband during the Mercy residency."  TAC at ¶ 53.  Plaintiff believes that Roe looked at her "in a suggestive manner" which "made Plaintiff feel uncomfortable."  TAC at ¶ 54.  For example, on one occasion "within a few months of beginning her residency," Roe's "demeanor and appearance made Plaintiff uncomfortable," while Plaintiff and Roe were in the Reading Room sitting next to each other reviewing radiology reports.  TAC at ¶ 55.  Plaintiff also "noticed" that "Roe would find opportunities to see her and speak with her more than would otherwise be expected."  TAC at ¶ 56.

Plaintiff "reasonably" believed "[f]rom the conversations that she had with Roe" that "Roe was sexually attracted to Plaintiff and wished to pursue a romantic relationship with her, despite the fact that both Plaintiff and Roe were married to other people."  TAC at ¶ 58.  "Within

---

[2] The following facts are taken as true for the purpose of the instant motion only. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005).  Of course, any "bald assertions" contained in Plaintiff's Second Amended Complaint shorn of a factual basis therefore cannot be taken as true and should not be credited by this Court.  *Anspach v. City of Phila.*, 503 F.3d 256, 260-61 (3d Cir. 2007).

[3] Plaintiff has used a pseudonym here.  TAC at ¶ 41.  Dr. Roe has been identified as "the program Director of the Medical Residency program."  TAC at ¶ 162.

3

approximately three months of Plaintiff beginning her residency program, Plaintiff sent Roe an email expressing concern that other individuals were aware of Roe's romantic interest in Plaintiff." TAC at ¶ 59. After receiving this communication, Roe "approached Plaintiff and asked if she had sent that email or whether someone else had gained access to her email system." TAC at ¶ 60. Plaintiff informed Roe that "she had sent the email, and wanted their relationship to remain professional." TAC at ¶ 60. Plaintiff avers that, following this conversation, Roe "continued behaving in a manner that made Plaintiff believe he was romantically and/or sexually interested in her." TAC at ¶ 61. "Plaintiff believed that the other residents and the faculty were aware of Roe's interest in Plaintiff and Plaintiff was uncomfortable about this." TAC at ¶ 62.

In November 2011, Plaintiff and Roe attended a medical conference in Chicago. TAC at ¶ 63. Roe "told Plaintiff that he wanted to see her when they were both in Chicago." TAC at ¶ 63. "Once in Chicago, Plaintiff reached out to Roe and sent him a telephone text message asking if he wanted to meet her. When Roe did not respond, Plaintiff . . . sent him additional text messages relating that she did not want to be in a compromising position with him and that she did not want to pursue a romantic relationship with him during the residency." TAC at ¶ 65. After he returned from Chicago, Roe "reported the text messages to Human Resources, claiming that Plaintiff was sending these text messages in order to make it appear as if there was a relationship between them." TAC at ¶ 66.[4] At that point, Plaintiff met with Human Resources and "explained the unwelcome sexual and/or romantic attention she believed she was receiving from Roe." TAC at ¶ 67. In response to a question by Human Resources whether Roe "ever touched Plaintiff," Plaintiff "related how Roe touched Plaintiff's hand in the Reading Room."

---

[4] Plaintiff avers that Roe later apologized to her for providing the emails to Human Resources, "and explained that he did it because he was concerned that he would be reprimanded for having an inappropriate relationship with Plaintiff." TAC at ¶74.

4

TAC at ¶ 68. "Plaintiff told Human Resources that she believed that Roe's unwelcome sexual attention was negatively affecting her training." TAC at ¶ 69. On the following day when Plaintiff met with Human Resources again "Human Resources referred Plaintiff to a psychologist." TAC at ¶ 70. Plaintiff went to three sessions with the psychologist and "told the psychologist about the unwanted sexual attention she was receiving from Roe." TAC at ¶ 71.

Following her communications with Human Resources, "Roe's supervision and training of Plaintiff appear[ed] to be limited for a period of time; specifically, Roe was no longer scheduled to supervise Plaintiff." TAC at ¶ 73. According to Plaintiff, "Human Resources told Plaintiff nothing about the results of any investigation into Plaintiff's complaints." TAC at ¶ 72.

"[O]n information and belief, Roe directed other faculty members to give Plaintiff special scrutiny because of the complaints she had made to him and to Human Resources." TAC at ¶ 75. "Subsequent to" Plaintiff's "meeting" with Human Resources, Plaintiff received "significantly less training and interaction from two other male members of the faculty who were close with Roe." TAC at ¶ 76.

In 2012, Roe "continued to behave inappropriately with Plaintiff." TAC at ¶ 77. For example, "in 2012," Plaintiff asked to "leave early to meet with her husband, at which point Roe became jealous." TAC at ¶ 77.[5]

In the "Fall" of 2012, Plaintiff "began the process of getting a divorce," which "[o]n information and belief," Roe learned about from another faculty member. TAC at ¶¶ 78, 79. "Within a few weeks, Roe approached Plaintiff and told Plaintiff that he was getting a divorce as well and wanted to be in a relationship with her." TAC at ¶ 80. During the period "after Plaintiff

_____

[5] "On another occasion, an oncologist/hematologist in the hospital unaffiliated with the residency program asked Roe if Plaintiff was single; Roe responded by becoming very jealous and telling Plaintiff she should not date the other physician." TAC at ¶ 104.

began the divorce process," Roe "intensified his interest in her," suggesting that "they go shooting together," "travel together and be[] in a relationship . . . after her residency program ended." TAC at ¶ 81.

"In December 2012, Roe told Plaintiff that he was uncomfortable with her going to dinner as part of her interview process for a post-residency fellowship." TAC at ¶ 82. "In or around December 2012, Roe complained to Plaintiff that she was rejecting his advances more; Plaintiff explained that she simply did not have time for or interest in any relationship at that point." TAC at ¶ 83. Roe "expressed unhappiness" with the prospect "of Plaintiff leaving Philadelphia to attend a post-residency fellowship." TAC at ¶ 84.

"During this same period," Plaintiff asked both Roe and another faculty member (identified by Plaintiff as "Faculty Member #2") to provide Plaintiff with letters of recommendation for her application to a fellowship program. TAC at ¶ 85. Both Roe and Faculty Member #2 "provided short, cursory, and perfunctory letters of recommendation." TAC at ¶ 86. When the director of the fellowship program contacted Roe "for clarification," Roe "told the director that Plaintiff was a poor candidate." TAC at ¶ 87. "Subsequently the director of the fellowship program called Plaintiff to let her know that Roe had given her a poor recommendation." TAC at ¶ 88. After Plaintiff learned this, she "called Roe at the hospital and asked him why she had been given such a poor recommendation." TAC at ¶ 89. "Roe told Plaintiff that he did it to teach her a lesson, and then hung up on her." TAC at ¶ 90. Roe also "reported Plaintiff to the Vice President of Defendant Mercy, Dr. Arnold Eiser." TAC at ¶ 91. In a meeting which Plaintiff was asked to attend with Roe, Eiser and two others, "Plaintiff complained about the manner in which Roe was treating her and that she believed she was not getting the training she needed because of Roe's attitude towards her." TAC at ¶ 92. Following

6

this meeting, Eiser brought Plaintiff to see a psychiatrist "at Defendant Mercy."  TAC at ¶ 94.

While walking with Plaintiff to the psychiatrist, Eiser informed Plaintiff that "Defendant Mercy

had received Plaintiff's scores for her second in service examination, and the results were poor,

and that Plaintiff needed to address this."  TAC at ¶ 95.[6]  During her meeting with the psychiatrist,

Plaintiff spoke about "Roe's romantic interest in her and his romantic overtures."  TAC at ¶ 97.

"The following day, Defendant Mercy instructed Plaintiff that if she wished to remain in

the residency [program], she had to sign a letter of acknowledgment and be placed on a corrective

plan."  TAC at ¶ 98.  While "Plaintiff did not wish to sign the letter and be placed on the

corrective plan," she "ultimately did so in order to continue her residency."  TAC at ¶ 99.

"In the early spring of 2013, Roe increased his harassment of Plaintiff by scheduling more

sessions with Plaintiff."  TAC at ¶ 102.  "In spring 2013, Plaintiff and Roe were in the Reading

Room reviewing radiology reports when Plaintiff was operating a computer mouse with her right

hand and Roe was sitting to her left.  Roe then reached his arm right across Plaintiff's chest and

placed his hand over Plaintiff's and moved her hand and the computer mouse.  While doing this,

Roe's arm was pressed against Plaintiff's breasts.  Plaintiff pushed herself backwards and stood

up, and told Roe that she wanted their relationship to remain professional."  TAC at ¶ 103.

In "early April 2013," another resident asked Plaintiff to assist with a research paper that

the resident was writing with Roe.  TAC at ¶ 105.  "For the paper, Plaintiff read the relevant

studies and met with the resident to give feedback and advice and planned to continue to

contribute as needed."  TAC at ¶ 105.  "[W]hen Roe learned that Plaintiff had been added as an

---

[6] "[A]t a later date, Plaintiff learned that Eiser's comments were false, and that her
second year in service examination scores were actually in the 70th percentile."  TAC at ¶ 96.
Plaintiff avers that she "did very well" and "demonstrated great improvement" in her second year
examinations.  TAC at ¶ 100.  After Plaintiff learned of her examination results, she "went to
Roe and asked Roe if he would communicate with the program director at the fellowship to let
him know about her improvement.  Roe told Plaintiff that he would not do so."  TAC at ¶ 101.

author to the paper, he instructed the other resident to remove Plaintiff." TAC at ¶ 106. Plaintiff learned about this from the "other resident." TAC at ¶ 107.

Plaintiff went to Roe "to complain as to his continued unfair treatment." TAC at ¶ 108. "Roe then insisted that Plaintiff was acting unprofessional [sic] and ordered Plaintiff to another meeting with the [sic] Vice President Eiser." TAC at ¶ 109. At the meeting with Eiser, Eiser "directed Plaintiff to apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his 'special attention.'" TAC at ¶ 111. Roe responded by "stating that he would not accept Plaintiff's apology, because it was not 'sincere.'" TAC at ¶ 112. Eiser then "suggested Plaintiff receive another psychiatric consultation and informed Plaintiff she was suspended." TAC at ¶ 113. After Plaintiff was suspended, "Plaintiff had no further contact from Defendant Mercy until April 20, 2013." TAC at ¶ 115.

"On April 20, 2013, Plaintiff received a letter sent via FedEx overnight mail from Defendant Mercy informing Plaintiff for the first time that Defendant Mercy intended to terminate Plaintiff's residency, while giving her the option to appeal the decision." TAC at ¶ 116.[7] Plaintiff appealed the decision and "was given a hearing on or around April 24, 2013." TAC at ¶ 120. At the hearing "the committee members heard about Plaintiff's allegations that Roe had romantic and/or sexual interest and that Plaintiff thought her treatment was unfair." TAC at ¶ 121. At the hearing "Roe advocated for Plaintiff's dismissal from the residency program." TAC at ¶ 122.

After the hearing, Plaintiff "was informed that the committee intended to uphold the decision to terminate, but that Plaintiff had five days to file a further appeal if she so chose." TAC at ¶ 123. "Plaintiff resigned from the residency program prior to the expiration of her right to

_____

[7] Plaintiff previously alleged in her First Amended Complaint that "Defendant Mercy" informed Plaintiff that "it intended to terminate Plaintiff's residency," on April 19, 2013. First Am. Compl. at ¶ 77, ECF No. 2.

8

appeal, and her resignation was accepted by Defendant Mercy." TAC at ¶ 124.

On April 20, 2015, Plaintiff initiated this legal action by filing a Complaint. ECF No. 1. On April 29, 2015, Plaintiff filed a First Amended Complaint. ECF No. 2. On July 10, 2015, following a stipulation by counsel, Plaintiff filed a Second Amended Complaint. ECF No. 16. Defendant filed a Motion to Dismiss Plaintiff's Second Amended Complaint, and after the Motion was fully briefed, this Court held oral argument on Defendant's Motion on October 1, 2015. ECF Nos. 18, 26. Following the Oral argument, this Court granted Plaintiff leave to amend her pleading. ECF No. 25. On October 15, 2015, Plaintiff filed her Third Amended Complaint. ECF No. 28.

## III.    ARGUMENT

### A.    MOTION TO DISMISS STANDARD

A claim may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." To state a viable claim and survive a motion to dismiss, Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," or accept as true unsupported conclusions and unwarranted inferences. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965, 167 L. Ed. 2d at 940 (citation omitted). Accordingly, courts in the Third Circuit engage in a three-step analysis at the motion to dismiss stage:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are not more than conclusions, are not entitled to the

9

assumption of truth." *Id.* at 1950.  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (alterations in original; footnote omitted).  Without "sufficient factual matter to show that the claim is facially plausible," a complaint must be dismissed.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (noting that *Twombly*'s "plausibility paradigm . . . applies with equal force to analyzing the adequacy of claims of employment discrimination."); *see also O'Shea v. Interboro Sch. Dist.*, Civ. A. No. 13-cv-06305, 2014 U.S. Dist. LEXIS 58374, at *8-9 (E.D. Pa. Apr. 28, 2014) (Baylson, J.); *Greineder v. Masonic Homes of the R.W. Grand Lodge*, Civ. A. No. 13-2376, 2014 U.S. Dist. LEXIS 56269, at *4-5 (E.D. Pa. Apr. 23, 2014) ("The plausibility standard requires more than a 'sheer possibility that a defendant has acted unlawfully.'") (citations omitted); 2-12 James Wm. Moore et al. Moore's Federal Practice – Civil § 12.34 ("conclusory allegations . . . are not entitled to the assumption of truth. . . .  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.  The plaintiff . . . must allege a factual predicate concrete enough to warrant further proceedings.") (citations omitted).

### B.  PLAINTIFF'S TITLE IX CLAIMS FAIL AS A MATTER OF LAW BECAUSE DEFENDANT IS NOT COVERED BY TITLE IX.

Title IX prohibits discrimination on the basis of sex "under any education program or activity."  20 U.S.C. § 1681(a).  Merriam-Webster defines "education" as "the action or process of teaching someone especially in a school, college or university."  http://www.merriam-webster.com/dictionary/education (last visited on Oct. 27, 2015).  Likewise, Merriam-Webster defines residency in the medical context as "a period of advanced training in a medical specialty that normally follows graduation from medical school and licensing to practice medicine."

10

http://www.merriam-webster.com/dictionary/residency (last visited on Oct. 27, 2015); *see also*

Dorland's Illustrated Medical Dictionary at 1614 (30th ed. 2003) (defining "resident" as "a

graduate and licensed physician receiving training in a specialty in a hospital.").  Although

Plaintiff's Complaint goes on and on about medical residencies and makes various allegations

regarding Defendant's residency program, Plaintiff simply cannot ignore the fact that medical

residencies do not have any of the traditional indicia of an "education program or activity" and

rather are most akin to apprenticeship programs where employees receive on-the-job training to

learn a skill.  *Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152, 161 (1999) (stating that residents "bear

a close analogy to apprentices in the traditional sense . . . .  Nor does the fact that . . . residents . .

. are continually acquiring new skills negate their status as employees.  Members of all

professions continue learning throughout their careers and many professions, including those in

the healthcare industry, require individuals to be trained further after graduation in order to be

licensed and received in the field.") (citations omitted); *see also Johnson v. Baptist Med. Ctr.*, 97

F.3d 1070, 1072 (8th Cir. 1996) ("Although the residency program combines features of both

employment and academic study, it appears to be primarily an employment setting not unlike an

apprenticeship.").  Plaintiff does not allege, nor could she allege, that Defendant's residency

program confers any degrees, provides credits toward obtaining any advanced degree(s) or

charges tuition.  Rather, in order to be eligible for a medical residency, Plaintiff was required to

obtain an undergraduate and graduate degree.  The fact that Plaintiff seeks lost "pay and

benefits" that she would have received had she remained in Defendant's residency program is

further indication that even Plaintiff herself views her residency as employment.  TAC at p. 24.

    As the district court reasoned in *Crandell v. New York Coll. of Osteopathic Med.*, 87 F.

Supp. 2d 304, 307 n.5 (S.D.N.Y. 2000), "residency positions primarily involve employer-

employee relationships and therefore properly are governed by Title VII, rather than Title IX."
*See also Crandell v. New York Coll. of Osteopathic Med.*, Civ. A. No. 99 Civ. 2347 (LAK),
Order, July 1, 1999, attached hereto as Exhibit A; *Loewen v. Grand Rapids Med. Educ. Partners*,
Case No. 1:10-CV-1284, 2012 U.S. Dist. LEXIS 49476, at *33-34 (W.D. Mich. Apr. 9, 2012).

Plaintiff likely has brought this lawsuit under Title IX because she failed to exhaust her
administrative remedies under Title VII. *See* 42 U.S.C. § 2000e-5(e). Plaintiff now seeks to be
relieved of her obligation under Title VII to exhaust her administrative remedies (and file a
Charge of Discrimination within 300 days of the alleged unlawful employment action) by
asserting claims under Title IX, which does not require administrative exhaustion. *Cannon v.
Univ. of Chicago*, 441 U.S. 677, 707-08 (1978) (holding that there is no requirement that
plaintiffs must exhaust administrative remedies before bringing a Title IX suit in federal court).
While Plaintiff attempts to frame the claims in her Complaint as education-based claims,
Plaintiff continues to seek employment-based remedies in her Complaint, asking to be awarded
"all pay and benefits" that she "would have received had it not been for Defendant's illegal
actions." TAC at p. 24; 42 U.S.C. § 2000e-5(g)(1). Plaintiff cannot have her cake and eat it too.
*Cf. Fitzgerald v. Barnstable Sch. Committee*, 555 U.S. 246, 254-55, 129 S. Ct. 788, 795, 172 L.
Ed. 2d 582, 592 (2009) ("Allowing a plaintiff to circumvent the statutes' [administrative
exhaustion and other] provisions in this way would have been inconsistent with Congress'
carefully tailored scheme.") (citation omitted). If Plaintiff wanted to assert employment claims
and seek employment-based remedies in this lawsuit, she was required to exhaust her
administrative remedies under Title VII. Plaintiff failed to do so, and should not be permitted to

12

bring employment claims under the guise of Title IX,[8] and seek employment-based remedies

which she is barred from receiving because she failed to exhaust her Title VII administrative

remedies.  *See, e.g.*, *Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995) ("Congress intended

Title VII to exclude a damage remedy under Title IX for individuals alleging employment

discrimination.") (citation omitted); *Glickstein v. Neshaminy Sch. Dist.*, Civ. A. No. 96-6236,

1997 U.S. Dist. LEXIS 16317, at *38-45 (E.D. Pa. Oct. 22, 1997) ("Congress did not intend that

private plaintiffs be able to circumvent the remedial process of Title VII and its state analogs

merely by framing a complaint in terms of Title IX"); *McLaughlin v. State Sys. of Higher Educ.*,

Civ. A. No. 97-CV-1144, 1999 U.S. Dist. LEXIS 4325, at *8-9 (E.D. Pa. Mar. 31, 1999)

(holding that plaintiff could not bring an employment discrimination claim under Title IX); *see*

*also Schultz v. The Bd. of Trustees of the Univ. of West Florida*, Case No. 3:06cv442-RS-MD,

2007 U.S. Dist. LEXIS 36815, at *6-9 (N.D. Fla. May 21, 2007); *Morris v. Wallace Community*

*College-Selma*, 125 F. Supp. 2d 1315, 1342-43 (S.D. Ala. Jan. 8, 2001) ("In light of the weight

of authority that a Title IX claim of employment discrimination may not be maintained to the

extent that Title VII provides a parallel remedy . . . the Court rules that the plaintiff's Title IX

claim is precluded by Title VII."); *Vega v. State Univ. of N.Y. Bd. of Trustees*, 97 CIV. 5767

(DLC), 2000 U.S. Dist. LEXIS 4749, at *7-10 (S.D.N.Y. Apr. 13, 2000) (finding that "Title VII

provides the exclusive remedy for individuals alleging employment discrimination on the basis

of sex," and agreeing that "money damages under Title IX" be limited "to student plaintiffs");

*Gibson v. Hickman*, 2 F. Supp. 2d 1481, 1483-84 (M.D. Ga. 1998) ("Title VII preempts

employment discrimination claims for money damages brought under Title IX.  To hold

---

[8] *See, e.g.*, *Crandell*, 87 F. Supp. 2d at 307 n.5 (denying plaintiff's motion to amend her complaint to add a claim under Title IX, reasoning that plaintiff's position as a medical resident was "properly governed by Title VII, rather than Title IX.").

13

otherwise would eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded educational institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to the same rules required of every other employment discrimination plaintiff in the country.").

**C.    PLAINTIFF'S TITLE IX CLAIMS IN COUNTS II AND III RELATED TO ANY DISCRETE ACTS PRIOR TO APRIL 20, 2013 ARE BARRED BY THE STATUTE OF LIMITATIONS.**

Title IX does not specify a statute of limitations. 20 U.S.C. § 1681 *et seq.* Accordingly, courts in Pennsylvania have applied Pennsylvania's two-year statute of limitations for personal injury actions to claims brought under Title IX. *Underwood v. La Salle Univ.*, Civ. A. No. 07-1441, 2007 U.S. Dist. LEXIS 88959, at *14 (E.D. Pa. Dec. 3, 2007) (citing *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989)).

Plaintiff's original Complaint was filed on April 20, 2015. ECF No. 1. Therefore, any alleged unlawful discrete acts set forth in Counts II and III of Plaintiff's Complaint which were committed more than two (2) years prior to the filing of her Complaint "fall beyond the relevant limitations period [under Title IX]," and are barred. *Bougher*, 882 F.3d at 78; *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

**D.    COUNT I OF PLAINTIFF'S COMPLAINT ASSERTING A HOSTILE ENVIRONMENT UNDER TITLE IX IS TIME BARRED.**

Count I of Plaintiff's Complaint asserts a claim for "[s]exual harassment and hostile educational environment." TAC at pp. 17-19. To state a Title IX claim under a hostile environment theory, a plaintiff "must establish 'sexual harassment [] that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and

14

opportunities.'" *Mears v. Bd. of Educ. of the Sterling Reg'l High Sch. Dist.*, Civ. A. No. 13-3154

(NLH-JS), 2014 U.S. Dist. LEXIS 43236, at *45 (D.N.J. Mar. 31, 2014) (quoting *DeJohn v.*

*Temple Univ.*, 537 F.3d 301, 306 (3d Cir. 2008)).  As with her claims of retaliation and *quid pro*

*quo* sexual harassment, Plaintiff's Title IX hostile environment claim is governed by a two (2)

year statute of limitations.  *Bougher*, 882 F.2d at 78.

Plaintiff's hostile environment cause of action "accrued when [Plaintiff] knew she had

suffered sexual harassment."  *Monger v. Purdue Univ.*, 953 F. Supp. 260, 264-65 (S.D. Ind.

1997) (dismissing hostile environment claim brought under Title IX as time barred).  Plaintiff

avers that she knew, and complained of alleged sexual harassment as early as "the winter of

2011/2012," more than three (3) years before she filed her Complaint on April 20, 2015.  TAC at

¶ 145; *see also Monger*, 953 F. Supp. at 265 ("The record establishes that Monger knew about

her injury right after it occurred," but failed to bring her claim within the limitations period).[9]

---

[9] Defendant anticipates that Plaintiff will argue that the continuing violations doctrine
saves her untimely hostile environment claim under Title IX.  The continuing violations doctrine
does not apply to Plaintiff's hostile environment claim under Title IX.  *Shine v. Bayonne Bd. of
Educ.*, No. 14-4184, 2015 U.S. App. LEXIS 16771, at *7-8 (3d Cir. Sept. 22, 2015) (stating that
the limitations period on plaintiff's Title IX claim began to run "when the plaintiff knew or
should have known of the injury upon which its action is based") (citations omitted); *Gjeka v.
Del. County Comm. Coll.*, Civ. A. No. 12-4548, 2013 U.S. Dist. LEXIS 73054, at *13-15 (E.D.
Pa. May 23, 2013) ("the Court will not expand the continuing violations theory beyond its
application to a hostile work environment claim under Title VII") (citing *Folkes v. N.Y. Coll. of
Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 288-89 (E.D.N.Y. 2002)).  Citing
to the Supreme Court's decision in *Gebster v. Lago Vista Independent School District*, 524 U.S.
274 (1998), the district court in *Folkes* explained that Title IX's "contractual framework,"
strongly militated against application of "the oft-disfavored continuing violation exception to
Title IX claims."  214 F. Supp. 2d at 288-89; *cf. Fusco v. Bucks County*, Civ. A. No. 08-2082,
2009 U.S. Dist. LEXIS 118924, at *22-23 (E.D. Pa. Dec. 21, 2009) (stating in the employment
discrimination context that "the continuing violation theory is not viable where a plaintiff was
aware of, and had complained about, hostile treatment because allowing the plaintiff 'to avoid
the statutory filing requirement by invoking the continuing violations doctrine would be
inconsistent with the doctrine's equitable premise that the statute of limitations should not begin
to run until a reasonable person would be aware that his or her rights have been violated.'")
(citations omitted).

15

Therefore, Plaintiff's hostile environment claim is time barred.

Plaintiff's allegation that "Roe advocated for Plaintiff's dismissal from the residency program" during the April 24, 2013 hearing does not change the analysis as to the lack of timeliness of Plaintiff's hostile environment claim. TAC at ¶ 122. When faced with the identical issue, another district court rejected the argument that conduct occurring during a post-termination hearing can constitute a "component act" to support a hostile environment claim. *See Guevara v. Marriott Hotel Svcs.*, No. 10-5347, 2012 U.S. Dist. LEXIS 132456, at *16-21 (N.D. Cal. Sept. 14, 2012). In *Guevara*, the plaintiff argued, *inter alia*, that his hostile environment claim should not be dismissed where the only potentially timely component act was alleged false statements made by those who contributed to the alleged earlier workplace harassment during an employee's post-termination arbitration hearing. *Id.* However, the simple fact that the alleged harassers "testified at the arbitration hearing . . . without more, does not suffice to establish that the alleged false statements made at the arbitration hearing were premised on racial animus." *Id.* at *19. As such, the court dismissed the plaintiff's hostile environment claim.

---

In the alternative, even assuming that this Court extends the continuing violations doctrine to apply in the Title IX context (which for the reasons set forth above, it should not), Plaintiff's hostile environment claim still fails. Under the continuing violations doctrine, in order for Plaintiff's hostile environment claim to be timely, Plaintiff must allege one act contributing to the alleged hostile environment within the two (2) years prior to the filing of her Complaint on April 20, 2015. *Morgan*, 536 U.S. at 118; *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165-66 (3d Cir. 2013). Plaintiff's Complaint fails to identify a timely component act of the alleged hostile environment. Rather, Plaintiff's affirmative allegations undermine, rather than support, any possible inference that Plaintiff experienced a contributing act during the limitations period. Specifically, Plaintiff avers that she was suspended in April 2013, and that following her suspension, "Plaintiff had no further contact from Defendant Mercy until April 20, 2013." TAC at ¶ 115. As a result, her hostile environment claim cannot survive dismissal. *See, e.g., Stanley v. Trustees of The Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) (dismissing Title IX hostile environment claim where plaintiff "has not alleged any 'acts' . . . within the limitations period that contributed to the hostile environment," reasoning that plaintiff could not have experienced any acts of harassment when she was no longer enrolled at the University).

16

Likewise, Plaintiff's hostile environment claim should be dismissed as the only alleged timely conduct that she claims contributes to her alleged hostile environment claim is Roe's alleged advocacy at her April 24, 2013 termination hearing.  However, there is no allegation in the Complaint to suggest that Roe's conduct at the hearing was related to Roe's alleged prior conduct toward Plaintiff which Plaintiff contends comprises the purported hostile environment. Rather, it is clear that Roe's alleged advocacy at the appeal hearing was not a part of the same alleged unlawful employment practice which forms the basis of Plaintiff's hostile environment claim.  *Mandel*, 706 F.3d at 167; *see also Stanley v. Trustees of The Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) ("she has not alleged that she was subjected to any sexually-natured conduct at the University during a period when she was not present.").

Accordingly, Defendant respectfully requests that this Court dismiss with prejudice Count I of Plaintiff's Complaint as time barred.

### E.    PLAINTIFF'S BREACH OF CONTRACT CLAIM BASED ON ALLEGED GENDER DISCRIMINATION IS PREEMPTED BY THE PHRA.

Count IV of Plaintiff's Complaint seeks to advance a claim of "Contract-Based Gender Discrimination."  TAC at pp. 21-22.  Specifically, Plaintiff avers that the contract she entered into "to be a Resident" provided that Defendant "not . . . discriminate on the basis of gender." TAC at ¶¶ 173, 174.  Plaintiff contends that "Defendant breached its agreement with Plaintiff by discriminating against her."  TAC at ¶ 178.

Plaintiff simply cannot avoid her obligation to exhaust her administrative remedies under the PHRA by asserting a breach of contract claim bottomed on alleged gender discrimination. Rather, it is well established that Plaintiff's claim is preempted by the PHRA.  *Keck v. Commercial Union Ins. Co.*, 758 F. Supp. 1034, 1035-39 (M.D. Pa. 1991) ("the plaintiff claims that the act of discrimination was a breach of her employment contract . . . .  There is no separate

17

set of facts that support either the existence of a contract or a breach thereof outside of the act of

discrimination. Under the reasoning of the decisions discussed, the plaintiff's breach of contract

claim is preempted by the PHRA."); *see also Jamison v. Campbell Chain Cooper Tools*, Civ. A.

No. 1:07-CV-0324, 2009 U.S. Dist. LEXIS 110919, at *21-22 n.12 (M.D. Pa. Nov. 27, 2009)

("As a rule, when a plaintiff brings a common law claim, such as a breach of contract claim, that

is supported by nothing more than an alleged act of discrimination, the PHRA preempts such a

claim.") (citations omitted); *Gupta v. Sears, Roebuck & Co.*, Civ. A. No. 07-243, 2009 U.S. Dist.

LEXIS 24930, at *80-81 (W.D. Pa. Mar. 26, 2009) ("Plaintiff's breach of contract claims are

based on the same facts as her discrimination claims. . . .  Plaintiff alleges that Sears breached its

contract with her by discharging her wrongfully based on age, race and national origin.  Because

this conduct forms the basis of her discrimination claims, the PHRA preempts her common law

breach of contract claims.") (citation omitted); *Waggaman v. Villanova Univ.*, Civ. No. 04-4447,

2008 U.S. Dist. LEXIS 67254, at *73 n.29 (E.D. Pa. Sept. 4, 2008) ("Pennsylvania courts

disallow claims for breach of contract on the basis of discrimination alone because such claims

are preempted by statutory claims.") (citation omitted) (Pollak, J.); *Geiger v. AT&T Corp.*, 962

F. Supp. 637, 648 n.13 (E.D. Pa. 1997) (same).

Accordingly, Defendant respectfully requests that the Court dismiss Count IV of

Plaintiff's Complaint.

### F.    PLAINTIFF'S BREACH OF CONTRACT CLAIM BASED ON ALLEGED WRONGFUL TERMINATION IS NOT PLAUSIBLY PLED.

To state a claim of breach of contract under Pennsylvania law, Plaintiff must plausibly

allege "the existence of a contract, **including its essential terms**; . . . a breach of a duty imposed

by the contract, and . . . resultant damage." *Williamson v. Chubb Indem. Ins. Co.*, Civ. A. No.

11-cv-6476, 2012 U.S. Dist. LEXIS 31648, at *12-13 (E.D. Pa. Mar. 8, 2012) (citations omitted)

18

(emphasis added) (Baylson, J.). Plaintiff simply has not done so here. *See, e.g.*, *DeFebo v. Andersen Windows, Inc.*, Civ. A. No. 09-2993, 2009 U.S. Dist. LEXIS 87889, at *10-15 (E.D. Pa. Sept. 24, 2009) (Baylson, J.).

Count V of Plaintiff's Complaint is styled breach of contract, "Wrongful Termination." TAC at p. 22. In that Count, Plaintiff generically avers that Plaintiff's residency agreement provided "only" that she be terminated "for cause." TAC at ¶ 180. Plaintiff then contends that her termination due to "unprofessionalism" does "not constitute 'cause' for termination under the Residency Agreement." TAC at ¶ 183. Plaintiff's vague allegations regarding her residency contract fall far short of plausibly pleading a claim for breach of contract. *DeFebo*, 2009 U.S. Dist. LEXIS 87889, at *10-12. Plaintiff provides next to no factual allegations as to the nature of the contractual provision at issue or how Defendant allegedly breached it, other than a conclusory statement that Defendant's stated reason for terminating Plaintiff's residency purportedly "does not constitute 'cause.'" TAC at ¶ 183. More is required to comply with Plaintiff's pleading obligations.[10]

Accordingly, because Plaintiff has failed plausibly to plead a breach of contract claim regarding her alleged "wrongful termination," Defendant respectfully requests that Count V of Plaintiff's Complaint be dismissed.

---

[10] Plaintiff's failure to provide more than bare bones factual averments as to her breach of contract claim here is all the more stark given both the case's current procedural posture and the statements made on the record at the oral argument on October 1, 2015. Plaintiff's currently operative Complaint is the Plaintiff's fourth pleading. Plaintiff filed her Third Amended Complaint following the October 1, 2015 oral argument, during which Your Honor instructed Plaintiff's counsel to provide additional factual allegations with regard to Defendant's residency program. ECF No. 26. Your Honor noted on the record that Plaintiff's Second Amended Complaint failed to provide the Court with factual averments to assess whether Defendant's residency program qualified as an "education program or activity." 20 U.S.C. § 1681(a). The Court then provided Plaintiff with leave to amend to file a Third Amended Complaint.

19

### G.    PLAINTIFF CANNOT MAINTAIN AN INDEPENDENT CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING UNDER PENNSYLVANIA LAW.

In Count VI of the Complaint, Plaintiff asserts a claim for breach of the covenant of good faith and fair dealing.  TAC at pp. 22-24.  Binding Third Circuit precedent provides that such a claim is not cognizable under Pennsylvania law.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 432-33 (3d Cir. 2013) (holding that plaintiff "cannot maintain an independent cause of action for the breach of the covenant of good faith and fair dealing under Pennsylvania law."); *see also Moore v. Angie's List, Inc.*, Civ. A. No. 15-1243, 2015 U.S. Dist. LEXIS 103633, at *39-40 (E.D. Pa. Aug. 8, 2015) (same); *Boeynaems v. LA Fitness Int'l, LLC*, Civ. A, No. 10-2326, 2011 U.S. Dist. LEXIS 103611, at *35-38 (E.D. Pa. Sept. 13, 2011) (same) (Baylson, J.); *Goleman v. York Int'l Corp.*, Civ. A. No. 11-1328, 2011 U.S. Dist. LEXIS 85477, at *16-21 (E.D. Pa. Aug. 3, 2011) (same) (Baylson, J.).  Accordingly Defendant respectfully requests that this Court dismiss Count VI of Plaintiff's Complaint.[11]

### H.    PLAINTIFF CANNOT PROCEED UNDER A PSEUDONYM.[12]

Plaintiff has filed her Complaint using the pseudonym "Jane Doe" "to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received as

---

[11] Plaintiff's covenant of good faith and fair dealing claim is framed in language more akin to a tort claim for intentional infliction of emotional distress rather than a contractual claim, referencing Defendant's alleged "extreme and outrageous conduct."  *See, e.g.*, TAC at ¶ 195.  Plaintiff previously had attempted to assert an intentional infliction of emotional distress claim, which Defendant moved to dismiss as both time barred and barred by the exclusivity provision of the Pennsylvania Worker's Compensation Act.  ECF at 16, 18.  In response to Defendant's Motion to Dismiss, Plaintiff withdrew her intentional infliction of emotional distress claim.  ECF No. 19.  Plaintiff cannot dress up her tort claim as one sounding in contract to avoid dismissal of this claim, which in any event cannot be maintained under Pennsylvania law.

[12] Defendant appreciates the position articulated by the Court at the October 1, 2015 oral argument regarding this issue.  However, Defendant continues to believe that Plaintiff should not be permitted to prosecute this action under the cloak of anonymity for various reasons, including the fact that Plaintiff's identity is already otherwise in the public domain due to her own conduct.  Defendant would be happy to create a record before your Honor on this issue not on the public docket.

20

part of her corrective plan." TAC ¶ 7.  Plaintiff has provided Defendant with her real name as she represented she would in the Complaint, *see* TAC ¶ 7 n.1; however, she has not amended her Complaint to remove the pseudonym and proceed under her real name, nor has she sought leave of Court to proceed anonymously.  By proceeding under the pseudonym "Jane Doe," Plaintiff is hiding behind a mask of anonymity, free to make allegations against the Defendant without being held accountable for her statements under her real name.  Defendant is prejudiced by Plaintiff's use of a pseudonym because, as drafted, any person reviewing the allegations in this case will only be able to review Plaintiff's allegations of sexual harassment, without the context of the true identity of the individual making the allegations.  Accordingly, Defendant moves this Honorable Court, pursuant to Federal Rule of Civil Procedure 12(e), for an Order for a more definite statement to require Plaintiff to prosecute this action in her real name.[13]

The Third Circuit has held that a plaintiff's use of a pseudonym "runs afoul of the public's common law right of access to judicial proceedings." *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  "'The people have a right to know who is using their courts.'  And, defendants have a right to confront their accusers." *Megless*, 654 F.3d at 408 (plaintiff, who was accused by defendants of being a pedophile, was required to disclose his real name) (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997); citing *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979)).

---

[13] Courts in the Third Circuit have allowed defendants to challenge a plaintiff's use of a pseudonym through a motion for more definite statement pursuant to Federal Rule of Civil Procedure 12(e). *See, e.g.*, *Doe v. Old Forge Borough*, No. 12-2236, 2015 U.S. Dist. LEXIS 85902, at *40-46 (M.D. Pa. July 1, 2015); *F.B. v. E. Stroudsburg Univ.*, No. 09-525, 2009 U.S. Dist. LEXIS 57370, at *9 (M.D. Pa. July 7, 2009).

21

Federal Rule of Civil Procedure 10(a) also requires parties to a lawsuit to identify themselves in their respective pleadings.[14]

The Third Circuit has established nine factors for courts to consider when deciding whether to allow a party to proceed anonymously:

1. The extent to which the identity of the litigant has been kept confidential;

2. The bases upon which disclosure is feared or sought to be avoided and the substantiality of these bases;

3. The magnitude of public interest in maintaining confidentiality;

4. Whether there is an atypically weak public interest in knowing the litigant's identity;

5. The undesirability of an outcome adverse to the pseudonymous party and attributable to her refusal to pursue the case at the price of being publicly identified;

6. Whether the party seeking anonymity has illegitimate ulterior motives;

7. The universal level of public interest in access to the identities of litigants;

8. Whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigants' identities, beyond the public's interest which is normally obtained; and

9. Whether the opposition to use of a pseudonym by counsel, the public, or the press is illegitimately motivated.

*Id.* at 409-10. A plaintiff should be permitted to proceed anonymously only in "exceptional cases." *Old Forge Borough*, 2015 U.S. Dist. LEXIS 85902, at *40-46 (granting defendants' motion for more definite statement relying on the *Megless* factors and requiring plaintiff to identify herself because she "has not sufficiently shown that she would suffer substantial harm

---

[14] The Federal Rules of Civil Procedure also provide that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). A court may dismiss an action for failure to prosecute in the name of the real party if, after an objection, the plaintiff fails to amend the complaint within a reasonable period of time so as to name the real party. Fed. R. Civ. P. 17(a)(3).

that might sufficiently outweigh the public interest in open proceedings or that the disclosure of her identity may cause her to suffer irreparable harm."). For instance, the court in *Old Forge Borough* held that, despite the plaintiff's allegations that she was sexually abused and assaulted as a minor, such a case was not so "exceptional," that it merited use of a pseudonym. *Id.*

Considering the above factors in turn, it is clear that this is also not an "exceptional case" and the above factors strongly weigh in favor of disclosing Plaintiff's identity. First, while to date Plaintiff's name has been kept confidential in court filings, there can be no legitimate fear by Plaintiff that she will be "harmed" in any cognizable manner by allowing her identity to be public. The only "harm" she seems to allege that she may suffer is embarrassment. *See* TAC ¶ 7. However, the possibility "[t]hat a plaintiff may suffer embarrassment or economic harm is not enough" to allow Plaintiff to proceed anonymously in this case. *Old Forge Borough*, 2015 U.S. Dist. LEXIS 85902, at *40; *see also Doe v. Temple Univ.*, No. 14-04729, 2014 U.S. Dist. LEXIS 122427, at *4-5 (E.D. Pa. Sept. 3, 2014) (damage to personal and professional reputation and a diminished chance to complete medical school training deemed insufficient to support the use of a pseudonym) (citing *Megless*, 654 F.3d at 408)). "Instead, a plaintiff must show both (1) a fear of severe harm, and (2) that the fear of severe harm is reasonable." *Old Forge Borough*, 2015 U.S. Dist. LEXIS 85902, at *40. Plaintiff here has not, and cannot, demonstrate that any harm would come to her if she were required to disclose her identity. Plaintiff made the conscious decision to forego completing Defendant's internal appeal process, TAC at ¶ 124, and instead filed suit in federal court in an apparent attempt to "clear her name." Litigating publicly will afford Plaintiff the opportunity to exonerate herself in public and offer her own explanations regarding the facts at issue in this case. As such, this factor weighs in favor of disclosure. *See, e.g., Temple Univ.*, 2014 U.S. Dist. LEXIS 122427, at *3-4 (holding that plaintiff's choice to

23

forego completing the internal appeal process at the school to clear his name and, instead, filing "suit in federal court to seek his exoneration" "comes with a consequence" that his name be made public) (citing *Megless*, 654 F.3d at 408).

Second, Plaintiff's vague allegation that she has used "a pseudonym to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received," TAC at ¶ 7, does not create a legitimate interest to allow her to proceed anonymously. *Megless* makes clear that such fears (*i.e.*, fear of embarrassment and damage to personal and professional reputation) typically are insufficient to permit litigation under a pseudonym. *Megless*, 654 F.3d at 408; *see also Temple Univ.*, 2014 U.S. Dist. LEXIS 122427, at *3-4; *F.B. v. E. Stroudsburg Univ.*, No. 09-525, 2009 U.S. Dist. LEXIS 57370, at *9 (M.D. Pa. July 7, 2009) (requiring alleged victims of sexual harassment under Title IX to proceed using their real names). Therefore, this factor weighs in favor of disclosure as well.

Third, the level of interest the public might have in maintaining Plaintiff's anonymity is not unusually high. She is not a minor or a member of some other particularly vulnerable class. *See, e.g.*, Fed. R. Civ. P. 5.2(a) (requiring redaction of minor's full name in court filings); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1063 (9th Cir. 2000) (plaintiffs permitted to proceed under pseudonym where they demonstrated that they feared "that if their true identity is revealed, they will face actual physical violence, the threat of physical violence, immediate deportation to China or their country of origin, likely arrest upon arrival in China or their country of origin and an order by China and other authorities accelerating the repayment of debt incurred for recruitment fees and that they reasonably fear that their families may face similar threats of physical and economic retaliation if their true identity is revealed.") (quotations omitted). Moreover, none of the areas where courts have allowed pseudonyms are present here (*i.e.*, cases

24

involving "abortion, birth control, tran[s]sexuality, mental illness, welfare rights of illegitimate children, AIDS, . . . ." and individuals bringing Constitutional challenges to amendment to Megan's Law requiring the publication of their information in the sex offender registry).

*Megless*, 654 F.3d at 408 (citing *Doe v. Borough of Morrisville*, 130 F.R.D. 612, 614 (E.D. Pa. 1990)); *L.A. v. Hoffman*, No. 14-6895, 2015 U.S. Dist. LEXIS 94564, at *6 (D.N.J. July 21, 2015) (granting plaintiffs' (who were Tier I sex offenders) *unopposed* motion to proceed using pseudonyms in a lawsuit challenging an amendment to Megan's Law requiring sex offender registration by all Tier I sex offenders who previously were not required to have their information in the sex offender registry). Further, there is no evidence that requiring Plaintiff to disclose her identity will deter other similarly situated plaintiffs from suing in the future. Therefore, this factor also weighs in favor of disclosure.

Fourth, there is no atypically weak public interest in knowing Plaintiff's identity due to the nature of the issues presented. Thus, this factor weighs in favor of disclosure.

Fifth, there is no evidence, or even a suggestion, that Plaintiff will dismiss her claim or choose not to pursue her claims if her identity is disclosed.[15] This factor, therefore also weighs in favor of disclosure.

---

[15] Plaintiff should not be permitted to proceed under a pseudonym even if she attempts to argue that she will not pursue her claims if her identity is disclosed. Plaintiffs alleging that they were sexually harassed in violation of federal law, suffered emotional distress and/or received psychiatric treatment routinely bring such claims in their own names without using a pseudonym. *See, e.g.*, *Yan v. Penn State Univ.*, 529 F. App'x 167 (3d Cir. 2013) (Title IX sexual harassment and emotional distress); *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598 (E.D. Pa. 2014) (Title IX sexual harassment); *Miller v. Kutztown Univ.*, No. 13-3993, 2013 U.S. Dist. LEXIS 173878 (E.D. Pa. Dec. 10, 2013) (Title IX sexual harassment and emotional distress); *Kuhn v. Philip Morris U.S.A.*, 814 F. Supp. 450 (E.D. Pa. 1993) (plaintiff asserted sexual harassment claim against her employer, and that her employer conditioned her continued employment on receiving ongoing psychiatric treatment).

25

Sixth, it is unclear whether Plaintiff has an ulterior motive attached to her desire to use a pseudonym; however, there does not seem to be any legitimate interest in her doing so.

Seventh, there is a high "level of public interest in access to the identities of litigants." *Megless*, 654 F.3d at 409 (internal quotation marks omitted).  "[O]ne of the essential qualities of a Court of Justice [is] that its proceedings should be public." *Id.* at 408 (quotations omitted). The public has a right to know who is using their courts and defendants have a right to confront their accusers. *Id.*  This factor weighs heavily in favor of the disclosure of Plaintiff's identity.

Eighth, Defendant concedes that there is not a "particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained." *Id.* at 409.

Ninth, Defendant is not illegitimately motivated in its request that Plaintiff be required in this litigation to identify herself using her real name.

Accordingly, considering the factors above and the requirements of Federal Rule of Civil Procedure 10(a), Defendant respectfully requests that Plaintiff be required to identify herself using her real name in the instant action.  Plaintiff simply cannot show that she would suffer substantial harm that might outweigh the public interest in open proceedings or that the disclosure of her identity may cause her to suffer irreparable harm.

Defendant anticipates Plaintiff may try to argue that, despite the above factors weighing heavily against her, she still should be permitted to proceed under the pseudonym "Jane Doe" because she alleges she was subjected to sexual harassment and required to seek psychiatric treatment.  Such an argument was roundly rejected by the district court in *F.B. v. East Stroudsburg University*:

> The court deals with cases alleging sexual harassment and assault on a regular basis.  ***In the vast majority of these cases, the plaintiffs file the lawsuit under their own names.***  While it is true that plaintiffs may be subjected to embarrassment and emotional distress should they be named, the complaint's

26

allegation are [sic] that Defendant Sanders sexually harassed them, not that the
plaintiffs themselves acted inappropriately. Finding that these allegations are a
valid reason to permit a plaintiff to proceed with a pseudonym would open up the
court to requests for anonymity each time a plaintiff makes allegations of sexual
harassment. Accordingly, we find that this factor does not weigh in favor of the
plaintiffs.

*F.B.*, 2009 U.S. Dist. LEXIS 57370, at *9 (emphasis added) (denying Title IX plaintiffs' request

to proceed anonymously using pseudonyms). The factual allegations in *F.B.* are far more

egregious than those at issue in this case, yet the district court still denied the plaintiffs' request

to prosecute the lawsuit using pseudonyms. In *F.B.*, six undergraduate students filed suit against

East Stroudsburg University ("ESU") alleging they were sexually assaulted and harassed by

Defendant Sanders, the Vice President for University Advancement who also served as

Executive Director of the ESU Foundation and Director of Alumni Engagement at ESU. *Id.* at

*1-2. The ESU plaintiffs, like Plaintiff herein, brought suit against the defendants pursuant to,

*inter alia*, Title IX. *Id.* Those six students also identified themselves using pseudonyms instead

of their real names. *Id.* Defendant Sanders moved, pursuant to Federal Rule of Civil Procedure

12(e), for a more definite statement seeking to require the ESU plaintiffs to identify themselves

using their real names. *Id.* In analyzing Defendant Sanders' motion, the court, applying the

above factors, required the ESU plaintiffs to proceed using their real names holding that:

> The allegations against Defendant Sanders are at this point merely allegations. As
> defendant argues, it is he, not the plaintiffs, who is disgraced if the complaint's
> allegations are ultimately found to be true. Plaintiffs do not allege that they will
> be physically harmed, deported or arrested if they are named. At most, they
> allege that they will be embarrassed and humiliated. We find that such harm is
> not sufficient to justify allowing them to proceed anonymously.

*Id.* at *12-13. Accordingly, as the *Megless* factors weigh heavily in favor of having Plaintiff

proceed using her real name and the court's decision in *F.B.* found that the Title IX plaintiffs'

potential for embarrassment and humiliation did not justify allowing them to proceed

anonymously, Plaintiff herein should be required to litigate this matter using her real name. *See*

27

*Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) (explaining the district court erred in permitting the plaintiff to proceed under pseudonym where the plaintiff alleged sexual harassment, and was not a "minor, a rape or torture victim, a closeted homosexual, or a likely target of retaliation by people who would learn her identity only from a judicial opinion or other court filing."); *Rose v. Beaumont Indep. Sch. Dist.*, 240 F.R.D. 264, 267 (E.D. Tex. 2007) (requiring plaintiff alleging explicit sexual harassment and assault as a minor to disclose her true identity in her lawsuit seeking compensatory and punitive damages and collecting cases where other courts denied requests for anonymity by plaintiffs alleging sexual assault).

## IV.    CONCLUSION

For the foregoing reasons, Defendant Mercy Catholic Medical Center respectfully requests that this Court dismiss Plaintiff's Third Amended Complaint in its entirety.  Defendant respectfully requests that the dismissal be with prejudice and that this Court not provide Plaintiff with another chance to amend her pleading.  Plaintiff has had multiple opportunities to advance her claims, yet continues to attempt to circumvent well-established law which required her to exhaust her administrative remedies under Title VII and the PHRA to assert claims of employment discrimination related to her residency.  Plaintiff previously attempted to assert tort claims, to no avail (Plaintiff withdrew her tort claims following Defendant's prior Motion to Dismiss).  In the fourth iteration of her pleading Plaintiff now proffers contract claims, including one claim for alleged contract-based gender discrimination in yet another attempt to circumvent her obligation to exhaust her administrative remedies under federal and state employment discrimination law.  Yet the same result obtains.  Plaintiff simply cannot avoid the consequences of her failure to comply with her obligations under well-established law.

Defendant Mercy Catholic Medical Center is a non-profit entity that seeks to fulfill its mission by using its resources to provide healthcare to all, with a special focus on the poor and

disadvantaged.  This is the third motion to dismiss which Defendant has filed to address

Plaintiff's changing legal theories.  Accordingly, Defendant urges this Court not to permit

Plaintiff to amend her complaint, and to dismiss Plaintiff's Third Amended Complaint with

prejudice.  *See* Fed. R. Civ. P. 1 (stating that the Federal Rules of Civil Procedure "should be

construed and administered to secure the just, speedy, and inexpensive determination of every

action and proceeding.").

　　　　To the extent that any claims remain in this matter following consideration of

Defendant's Motion, Defendant respectfully requests that this Court order Plaintiff to submit an

amended caption in this matter which includes her legal name.

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　**POST & SCHELL, P.C.**

Dated: _October 29, 2015_　　　　By:　_s/ Andrea M. Kirshenbaum_
　　　　　　　　　　　　　　　　A. James Johnston, Esquire
　　　　　　　　　　　　　　　　Andrea M. Kirshenbaum, Esquire
　　　　　　　　　　　　　　　　Kate A. Kleba, Esquire
　　　　　　　　　　　　　　　　Four Penn Center
　　　　　　　　　　　　　　　　1600 John F. Kennedy Blvd.
　　　　　　　　　　　　　　　　Philadelphia, PA  19103
　　　　　　　　　　　　　　　　215-587-1000

　　　　　　　　　　　　　　　　**Attorneys for Defendant**
　　　　　　　　　　　　　　　　**Mercy Catholic Medical Center**

## CERTIFICATE OF SERVICE

I, Andrea M. Kirshenbaum, Esquire, hereby certify that on this date the foregoing Motion to Dismiss and for More Definite Statement with accompanying Memorandum of Law has been electronically filed with the Court and is available for viewing and downloading from the ECF System and thereby have been served upon the following counsel of record, electronically:

Joshua S. Boyette
Swartz Swidler LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
jboyette@swartz-legal.com

*Attorney for Plaintiff*

*s/ Andrea M. Kirshenbaum*
ANDREA M. KIRSHENBAUM

Case 2.15-cv-02085-MMB   Document 32   Filed 10/29/15   Page 40 of 43

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
COLLEEN CRANDELL, D.O.,

        Plaintiff,

      -against-

NEW YORK COLLEGE OF OSTEOPATHIC
MEDICINE, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

99 Civ. 2347 (LAK)

## ORDER

LEWIS A. KAPLAN, *District Judge.*

       Plaintiff, an osteopathic physician, has leveled claims of sexual harassment and gender discrimination under various federal, state and local statutes against (1) New York College of Osteopathic Medicine ("NYCOM"), the institution at which she received her medical education, (2) New York Institute of Technology, Inc., the school of which NYCOM allegedly is a branch, and (3) St. Barnabas Hospital, where plaintiff was employed as an intern at the time the complaint was filed. The complaint contains six claims for relief as follows:

      1.     Hostile work environment sexual harassment in violation of Title IX of the Civil Rights Act of 1964, as amended, as against all defendants.

      2.     Gender discrimination by St. Barnabas in violation of Title VII.

      3.     Hostile work environment sexual harassment in violation of the New York State Human Rights Law ("NYSHRL") as against all defendants.

      4.     Gender discrimination by St. Barnabas in violation of the NYSHRL.

      5.     Hostile work environment sexual harassment in violation of the New York City Human Rights Law ("NYCHRL") as against all defendants.

      6.     Gender discrimination by St. Barnabas in violation of the NYCHRL.

St. Barnabas moves to dismiss the complaint as against it or for other relief. Crandell has filed no papers in opposition to the motion although the time for doing so has expired. The motion is granted for the following reasons:

-165-

2

a.      The Title IX claim, the first claim for relief, is deficient.  First, the anti-discrimination provision of Title IX applies only to educational institutions receiving federal funding. 20 U.S.C. § 1681(a); *Nat'l Coll. Ath. Ass'n v. Smith,* 119 S.Ct. 924, 928 (1999).  The complaint does not allege that St. Barnabas is such an institution.  Even if it did, it makes clear that the bulk of Crandell's claims against St. Barnabas relate to her treatment during the period of her employment as an intern.  (Cpt ¶¶ 25 (first) -27)  Given the existence in Title VII of comprehensive remedies for employment discrimination, this Court is persuaded that an employee (as opposed to a student) has no claim under Title IX.  Any other conclusion would "create an avenue of relief for employees of federally funded educational institutions which differs significantly from the path afforded to other employees."  *Burrell v. City Univ. of New York,* 995 F. Supp. 398, 410 (S.D.N.Y. 1998). Accordingly, the first claim for relief fails to state a claim upon which relief may be granted.[1]

b.      The second claim for relief, which is brought under Title VII, requires as a statutory prerequisite that the plaintiff have received a "right to sue letter" from the EEOC.  *E.g., Nurse v. City of New York,* 739 F. Supp. 811 (S.D.N.Y. 1990); 42 U.S.C. § 2000e-5(f)(1).  Crandell, however, admits that she has not received a right to sue letter from the EEOC.  (*See* Cpt ¶ 2) Accordingly, this claim fails to state a cause of action.

c.      The remaining claims for relief against St. Barnabas all are based on state law. The complaint fails to allege any basis of subject matter jurisdiction over them other than supplemental jurisdiction premised on the pendency of the federal claims that must be dismissed for the reasons stated above.  The federal claims being dismissed before trial, the Court declines to exercise supplemental jurisdiction over the state claims against St. Barnabas.  *See* 28 U.S.C. § 1367(c)(3).

For the foregoing reasons, the motion of defendant St. Barnabas Hospital, Inc. to dismiss the complaint as to it is granted.  The first and second claims for relief are dismissed on the merits.  The remaining claims are dismissed for lack of subject matter jurisdiction.

SO ORDERED.

Dated: June 30, 1999

It is ORDERED that counsel to whom this Order is sent is responsible for faxing a copy to all counsel and retaining verification of such in the case file. Do not fax such verification to Chambers.

Lewis A. Kaplan
United States District Judge

_____

[1]

The Court recognizes that plaintiff asserts that she was harassed at St. Barnabas where she was in that hospital as a fourth year medical student (Cpt ¶ 24) and that this aspect of her claim is not subject to the objection that recognizing a cause of action in her favor would circumvent the Title VII remedies for employment discrimination.  In view of the failure to allege that St. Barnabas is subject to Title IX, however, there is no basis for retaining this claim.

Copies mailed 6/30
Chambers of Judge Kaplan

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

COLLEEN CRANDELL, D.O.,

Plaintiff,

-against-

NEW YORK COLLEGE OF OSTEOPATHIC MEDICINE, et.al.,

Defendants.

--------------- ------------------------------------------------X



99 **CIVIL** 2347 (LAK)

## JUDGMENT

Defendant St Barnabas having moved to dismiss the complaint, and the matter having come before the Honorable Lewis A Kaplan, United States District Judge, and the Court, on June 30, 1999 having issued its Order granting defendant St Barnabas' motion to dismiss as to it and dismissing the first and second claims for relief on the merits and dismissing the remaining claims for lack of subject matter jurisdiction, it is,

**ORDERED, ADJUDGED AND DECREED ,** That for the reasons stated in the Court's Order dated June 30, 1999, defendant St Barnabas' motion to dismiss is granted; the first and second claims are dismissed on the merits and the remaining claims are dismissed for lack of subject matter jurisdiction.

**DATED:** New York, New York
      June 30, 1999

JAMES M PARKISON
_____

**Clerk of Court**

(By)    Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON 7/6/99

-167-

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE | Civil Action No:  15-2085 |
| Plaintiff, | |
| v. | |
| MERCY CATHOLIC MEDICAL CENTER and MERCY HEALTH SYSTEM | |
| Defendants. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
THIRD MOTION TO DISMISS**

**SWARTZ SWIDLER, LLC**

*/s/ Joshua S. Boyette*
Joshua S. Boyette, Esq.
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08032
(856) 685-7420
(856) 685-7417 Fax

Dated: December 9, 2015

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................... iv

I.    INTRODUCTION .............................................................................................. 1

II.   PROCEDURAL BACKGROUND .................................................................... 3

III.  FACTUAL BACKGROUND ............................................................................ 3

IV.   LEGAL ARGUMENT ...................................................................................... 3

   A.  MOTION TO DISMISS STANDARD ............................................................. 4

   B.  DEFENDANT'S RESIDENCY PROGRAM IS COVERED BY TITLE IX BECAUSE A
   RESIDENCY PROGRAM IS EDUCATIONAL ...................................................... 4

      (1)   Plaintiff may proceed with her Title IX claim because Title IX covers educational
      programs and Defendant's medical residency program in which Plaintiff participated is
      educational. ...................................................................................................... 4

      (2)   The cases Defendant cites suggesting that it is not covered by Title IX do not stand
      for that proposition and are inapposite, since these stand only for the proposition that a
      medical resident is both a student and an employee. ........................................... 12

      (3)   Title VII does not preempt Title IX or any other statute seeking relief for
      discrimination based on the same facts and circumstances. .................................. 14

   C.  PLAINTIFF'S *QUID PRO QUO* SEXUAL HARASSMENT CLAIM AND
   RETALIATION CLAIM DERIVE FROM EVENTS OCCURRING LESS THAN TWO
   YEARS PRIOR TO THE FILING OF THE COMPLAINT, AND THREFORE ARE NOT
   BARRED UNDER THE STATUTE OF LIMITATIONS. ....................................... 19

   D.  UNDER THE CONTINUING VIOLATIONS DOCTRINE, THE HOSTILE
   EDUCATIONAL ENVIRONMENT IMPOSED BY ROE EXTENDED PAST APRIL 20,
   2013, AND THEREFORE FALLS WITHIN THE STATUTE OF LIMITATIONS. ........... 19

      (1)   Sexual Harassment Claims are Actionable under Title IX. ......................... 19

      (2)   The Continuing Violations Doctrine under Title VII. ................................. 20

      (3)   Most courts apply the continuing violations theory to claims of hostile educational
      environment harassment under Title IX. .............................................................. 22

      (4)   Plaintiff has pleaded that she suffered from a hostile educational environment that
      extended throughout her residency and continued during the termination and grievance
      procedure that occurred after the statutory tolling period. ................................... 24

E.  PLAINTIFF'S BREACH OF CONTRACT CLAIM FOR WRONGFUL TERMINATION IN CONTRADICTON OF TH RESIDENCY AGREEMENT IS SUFFICIENTLY PLEADED 28

F.  PLAINTIFF AGREES THAT HER BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING MERGES WITH HER BREACH OF CONTRACT CLAIM IN COUNT V. 33

G.  PLAINTIFF SHOULD BE PERMITTED TO PROCEED UNDER A PSEUDONYM ... 34

V.  CONCLUSION ..................................................................................................................... 34

iii

# TABLE OF AUTHORITIES

**Cases**

*AB v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144 (S.D.N.Y. 2004) ...................................... 23, 29

*Alegria v. Williams,* 314 F. App'x 687 (5th Cir. 2009) (O'Connor, Sct. J., Ret.) ........................ 13

*AMTRAK v. Morgan*, 536 U.S. 101 (2002) ............................................................................. 27, 28

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...................................................................................... 11

*Bedard v. Roger Williams Univ.,* 989 F. Supp. 94 (D.R.I. 1997) .................................................. 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 11

*Boeynaems v. LA Fitness Int'l, LLC*, Civ. A, No. 10-2326, 2011 U.S. Dist. LEXIS 103611 (E.D.
    Pa. Sept. 13, 2011) ................................................................................................................ 41

*Boston Med. Ctr. Corp.,* 330 N.L.R.B. 152 (1999) ....................................................................... 19

*Brd. of Curators of Missouri v. Horowitz,* 435 U.S. 78 (1978) .................................................... 16

*Brown v. Hamot Med. Ctr.*, 2008 U.S. Dist. LEXIS 467 (W.D. Pa. Jan. 2, 2008) ...................... 16

*Burton v. Teleflex Inc.*, 707 F.3d 417 (3d Cir. 2013) .................................................................... 40

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ................................................................ 17

*Clifford v. Regents of Univ.*, 2012 U.S. Dist. LEXIS 60280 (E.D. Cal. Apr. 27, 2012) .............. 29

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................................... 11

*Crandell v. New York College of Osteopathic Medicine*, Docket No. 99-cv-2347, Order
    (S.D.N.Y. Jul. 1, 1999 ............................................................................................................ 20

*Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989) ............................................................................... 17

*Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447 (9th Cir. 1995) ..................................................... 18

*Ezekwo v. N.Y.C. Health & Hosp. Corp.*, 940 F.2d 775 (2d Cir. 1991) ....................................... 17

*Fenje v. Feld*, 301 F. Supp. 2d 781 (N.D. Ill. 2003), *aff'd by* 398 F.3d 620 (7th Cir. 2005) ........ 17

iv

*Folkes v. N.Y. Coll. of Osteopathic Med. Of N.Y. Inst. Of Tech.*, 214 F. Supp. 2d 273 (E.D.N.Y. 2002) ............................................................................................................. 30

*Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992) ................................................. 27, 31

*Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998) ................................................. 20, 27

*Gjeka v. Del. County Cmty. College*, 2013 U.S. Dist. LEXIS 73054 (E.D. Pa. May 23, 2013)... 30

*Goleman v. York Int'l Corp.*, Civ. A. No. 11-1328, 2011 U.S. Dist. LEXIS 85477 (E.D. Pa. Aug. 3, 2011) ............................................................................................................. 41

*Goss v. Lopez,* 419 U.S. 565 (1975) ....................................................................................... 16

*Henschke v. N.Y. Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166 (S.D.N.Y. 1993)........................ 23

*Hollander v. Etymotic Research, Inc.*, Civ. A. No. 10-526 (E.D. Pa. 2010) ............................... 11

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ................................................... 22, 27

*Jeldness v. Pearce,* 30 F.3d 1220 (9th Cir. 1994)..................................................................... 13

*Jennings v. Univ. of N.C.*, 240 F. Supp. 2d 492 (M.D.N.C. 2002) ............................................ 29

*Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070 (8th Cir. 1996).................................................. 18, 20

*Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454 (1975)........................................................ 22

*King v. Burwell*, 135 S.Ct. 2480 (2015)................................................................................... 14

*Kohlhausen v. Suny Rockland Cmty. College*, 2011 U.S. Dist. LEXIS 42055 (S.D.N.Y. Feb. 9, 2011) ............................................................................................................. 23

*Lake v. Arnold,* 112 F.3d 682 (3d Cir.1997)............................................................................. 11

*Lakoski v. James*, 66 F. 3d 751 (1995) .................................................................................... 21

*Lipsett v. Univ. of P.R.*, 864 F.2d 881 (1st Cir. 1988) ............................................................... 17

*Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) ................................................... 23

v

*Loewen v. Grand Rapids Med. Educ. Partners*, 2012 U.S. Dist. LEXIS 49476, *33-34 (W.D. Mich. Apr. 9, 2012)..................................................................................................... 20

*Mandel v. M&Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013)................................... 28

*McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519 (3d Cir. 1994) .......................................................................................................................... 16

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986).............................................. 27

*Moore v. Angie's List, Inc.*, Civ. A. No. 15-1243, 2015 U.S. Dist. LEXIS 103633 (E.D. Pa. Aug. 8, 2015) ...................................................................................................... 41

*Morrison v. N. Essex Cmty. College*, 56 Mass. App. Ct. 784 (Mass. App. Ct. 2002) ................. 29

*Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir. 1995)............................. 23

*Nelson v. Univ. of Maine Sys.*, 923 F. Supp. 275 (D. Me. 1996).................................. 23

*Niami v. Fauver,* 82 F.3d 63 (3d Cir.1996) ................................................................ 11

*Nigro v. Va. Commonwealth Univ. Med. College of Va.*, 2010 U.S. Dist. LEXIS 56229 (W.D. Va. Jun. 4, 2010) .................................................................................................. 17

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) .............................................. 22

*O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006).......................................... 28

*O'Connor v. Davis*, 126 F.3d 112 (2d Cir. 1997) ........................................................ 13

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)..................................... 11

*Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir. 2002) ...................................... 11

*Preston v. Va. ex rel. New River Cmty. Coll.,* 31 F.3d 203 (4th Cir. 1994)................................. 23

*Rosenberg v. City of New York*, 2011 U.S. Dist. LEXIS 112818 (E.D.N.Y. Sept. 30, 2011) ...... 25

*Sarkissian v. W. Va. Univ. Bd. of Governors*, 2007 U.S. Dist. LEXIS 32881, *26 (N.D.W. Va. May 3, 2007)............................................................................................................. 17

vi

*Sellers v. Spiegel, In*c., 551 F. Supp. 235 (E.D. Pa. 1982) ............................................. 26

*Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001) ....................................................... 17

*Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006) ......................... 29

*Stanley v. Trustees of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006) .................. 34

*Summy-Long v. Pa. State Univ.*, 2010 U.S. Dist. LEXIS 27953 (M.D. Pa. Mar. 24, 2010) ........ 29

*United States v. Smith,* 499 U.S. 160, 167 (1991) ...................................................... 14

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) .................... 27

*Weinstock v. Columbia Univ.,* 224 F.3d 33 (2d Cir. 2000) ........................................... 23

*Yates v. United States*, 135 S.Ct. 1074 (2015) ............................................................ 14

*Yog v. Texas Southern University*, 2010 U.S. Dist. LEXIS 113822 (S.D. Tex. Aug. 30, 2010) .. 25

## Statutes

15 U.S.C. § 37b .............................................................................................................. 16

20 U.S.C. § 1681 ............................................................................................................ 15

20 U.S.C. § 1681(a) ........................................................................................................ 27

20 U.S.C. § 1687(2)(A) .................................................................................................. 14

20 U.S.C. § 1687(3)(A)(ii) .............................................................................................. 14

42 U.S.C. § 1981 ............................................................................................................ 22

## Other Authorities

118 Cong. Rec. 3371-3373 (1972) .................................................................................. 22

H.R. Rep. No. 92-238, p. 19 (1971) ................................................................................ 22

H.R. Rep. No. 92-554 (1972) .......................................................................................... 24

S. Rep. No. 100-64, 18 (1988) ........................................................................................ 15

S. Rep. No. 92-415, p. 24 (1971) .................................................................................... 22

Case 2:15-cv-02008-MMB   Document 41   Filed 12/09/15   Page 8 of 13

U.S. Dep't of Justice, Title IX Legal Manual ................................................................. 24

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 10

Fed. R. Civ. P. 6(a)(1) ................................................................................................... 26

Fed. R. Civ. P. 8(a)(2) ................................................................................................... 11

**Treatises**

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, Eleventh Edition (2014) ............................... 14

**Regulations**

45 C.F.R. § 86.31(a) ...................................................................................................... 16

## I. **INTRODUCTION**

Plaintiff, a former medical resident at Defendant, has filed claims asserting violations of Title IX in this Court against Defendants related to the termination of her medical residency, and to the hostile educational environment she suffered both before and after that termination decision was first communicated to her. Defendants have moved to dismiss Plaintiffs' Title IX claims, arguing that it is not covered by Title IX, that her hostile educational environment is untimely as it did not extend to or past the time the termination decision was first communicated to her. Defendant has also moved to dismiss Plaintiff's contract claims, arguing that she has not pleaded that claim with sufficient detail and arguing that she cannot maintain a separate contract claim for violations of the covenant of good faith and fair dealing. The Court should deny Defendants' motion to dismiss.

Defendant is covered by Title IX because a medical residency is an educational program, and Defendant has received federal education funding to support that program through Medicare. The few Circuit Courts of Appeal to have addressed whether a medical resident may bring a Title IX claim have held that graduate medical education—residency programs—are covered by Title IX. Both the facts of medical residency programs and case law demonstrate that education is the central focus of medical residencies, even if residents may also be employees subject to employment protections.

To the extent that Defendant argues that employment law claims must be brought under Title VII even if Defendant is an educational program, Supreme Court case law has explicitly held that Title IX covers employment claims brought against educational programs, and a significant number of courts have held that individuals may vindicate that right through a private right of action. Concurrent and overlapping remedies are explicitly contemplated by the legislative history of Title VII, and federal agencies and the Department of Justice have said that Title VII does not

1

preempt a Title IX claim. Moreover, even if Title VII did prevent pure employment claims from being brought under Title IX, this is not a pure employment claim, as Plaintiff was both a student and an employee.

With respect to Plaintiffs' hostile educational environment claim, the Court at oral argument suggested that such claims did not appear to extend past the statute of limitation period. Plaintiff has clarified her argument, focusing on the distinction between the outcome of her grievance hearing, which constituted a discrete act of sexual harassment and retaliation, and Defendants' agents' ***behavior*** during that grievance hearing, in which Plaintiff was once again subjected to painful and harassing behavior in being called a liar by her supervisor with respect to her claim that the supervisor and Defendants' actions were motivated by retaliatory animus. This distinction preserves Plaintiffs' hostile environment claim because it is separate and distinct from the outcome of the grievance hearing. Plaintiff would have found the hearing harassing even if the hearing had vindicated her and reinstated or rescinded the prospective termination decision.

With respect to Plaintiffs' contract claims, Plaintiff's Residency Agreement allowed termination only for cause. The agreement defines "cause" as repeated or serious infractions of policy, but for purposes of Plaintiff's claim, it turns on the true reason for her termination. Plaintiff alleges that she was terminated because she accused her supervisor, Dr. Roe, of retaliating against her because she refused to have a romantic relationship with him. Neither complaining about retaliation or complaining about sexual harassment constitutes "cause" for termination under the Residency Agreement. Accordingly, Plaintiff has pleaded a plausible contract claim. Plaintiff agrees that her claims for breach of contract for violating the covenant of good faith and fair dealing merges with her larger breach of contract claim.

2

Finally, at oral argument, the Court suggested that Plaintiff could maintain her anonymity for the present time but would eventually have to reveal her identity in open court. Plaintiff agrees that this is a fair compromise and requests that the Court allows her to proceed anonymously in that manner for the time being.

## II. <u>PROCEDURAL BACKGROUND</u>

Plaintiff filed her Complaint against Defendants on April 20, 2015. After consultation with Defendants' inside counsel, Plaintiff filed her First Amended Complaint on April 29, 2015. Defendants filed a motion to dismiss on June 30, 2015. Pursuant to a stipulation, Plaintiff filed the Second Amended Complaint on July 14, 2015. The Court dismissed Defendants' first motion to dismiss as moot on July 21, 2015. Defendants filed a new motion to dismiss portions of the Second Amended Compliant on July 24, 2015. The Court heard oral argument related to the Court's subject matter jurisdiction on October 1, 2015, after which the Court directed Plaintiff to file a Third Amended Complaint and dismissed the second motion to dismiss as moot. Plaintiff filed her Third Amended Complaint ("TAC") on October 15, and Defendant filed a third motion to dismiss on October 29. Plaintiff requested that the motion be partially converted to a motion for summary judgment as to the issue of Title IX coverage. The Court denied that request on November 25, and directed Plaintiff to respond to Defendant's Third Motion to Dismiss. Plaintiff now timely responds.

## III. <u>FACTUAL BACKGROUND</u>

As this is a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff incorporate by reference the facts in her Third Amended Complaint ("TAC") as if set forth here in full.

## IV. <u>LEGAL ARGUMENT</u>

3

## A. MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) *quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957). While a complaint must include more than threadbare recitals of the elements of a cause of action, the complaint need not include "detailed factual allegations." *Id; Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

When deciding a 12(b)(6) motion, the issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support the claim. *Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir.1997); *Niami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). The Court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002); *Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008); *Hollander v. Etymotic Research, Inc.*, Civ. A. No. 10-526 (E.D. Pa. 2010). Therefore, as long as Plaintiff's complaint sets forth plausible grounds for relief, a motion to dismiss under Rule 12(b)(6) must be denied.

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965-66 (2007) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## B. DEFENDANT'S RESIDENCY PROGRAM IS COVERED BY TITLE IX BECAUSE A RESIDENCY PROGRAM IS EDUCATIONAL

### (1) Plaintiff may proceed with her Title IX claim because Title IX covers educational programs and Defendant's medical residency program in which Plaintiff participated is educational.

Defendant argues that its residency program is not covered by Title IX because the program is not educational. As this question has been presented on a motion to dismiss, the Court must

4

assume the truth of Plaintiff's well-plead facts alleged in her complaint, which demonstrate the educational nature and focus of the residency program. These facts include the following:

- Graduate medical education, also referred to as residency education, is a period of didactic and clinical education in a medical specialty that follows completion of undergraduate medical education. *see* TAC at ¶ 14.

- All residency programs in the United States must be accredited by the Accreditation Council of Graduate Medical Education ("ACGME"). *See* TAC at ¶ 15.

- ACGME's mission is to improve health care and health by assessing and advancing the quality of resident physician's education. *See* TAC at ¶ 16.

- The average cost of training/educating a resident averages $152,000 or more per year, and this cost is supported by special subsidies from Medicare called Direct Graduate Medical Education payments and Indirect Medical Education payments. *See* TAC at ¶ 18-19.

- DGME payments cover the residency's programs' share of residents' stipends and benefits, while IME payments simply defray the higher cost of care associated with teaching hospitals. *See* TAC at ¶ 20.

- For radiology, the American Board of Radiology certifies radiologists, and requires one year of clinical training, graduation from a four-year residency program, and completion of the board examination within six years of graduating from the residency program. *See* TAC at ¶ 43.

- Defendant admits on its website that it operates its residency programs because of its commitment to medical education. *See* TAC at ¶ 27.

5

- The diagnostic radiology residency combines hands-on clinical training with didactic teaching, lectures, and conferences, including mandatory daily lectures in the morning and afternoon, a physics course, monthly radiology lectures, monthly meetings at radiology societies, and various boards at the hospital where case presentations were made. *See* TAC at ¶ 30-45.

- Plaintiff was required to take an annual examination to assess her progress and competence. *See* TAC at ¶ 46.

Title IX's prohibition against discrimination is as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any **education program or activity** receiving **Federal financial assistance**." 20 USC § 1681(a). Thus, in order to be covered by Title IX, a particular program must be, at a minimum, educational. *See, e.g., Alegria v. Williams,* 314 F. App'x 687, 692 (5th Cir. 2009) (O'Connor, Sct. J., Ret.) (noting that Tile IX's coverage's prerequisite requirement is that the program or activity must be educational). This question—whether a particular program is educational—has been described by the Ninth Circuit as a factual one. *See Jeldness v. Pearce,* 30 F.3d 1220 (9th Cir. 1994) (noting that the question of whether certain vocational training programs were "educational" was a factual issue, and remanding for resolution by the district court). "In order to implicate Title IX in the first instance, an entity must have features such that one could reasonably consider its mission to be, **at least in part**, educational." *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997) (distinguishing volunteer internship from the mixed employment-training context of a teaching hospital).

Defendant has not argued that it does not receive federal financial assistance or that it fails to satisfy the statutory definition of "program or activity" contained in the statute. *See* 20 U.S.C.

6

§ 1687(2)(A) (defining program or activity as all operations of postsecondary institution); 20 U.S.C. § 1687(3)(A)(ii) (defining program or activity as all operations of a corporation providing health care). Rather, Defendant has argued only that its program or activity is not educational.

"If the statutory language is plain, [courts] must enforce it according to its terms." *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015). When deciding whether the language is plain, [courts] must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* Ordinarily, a word's usage accords with its dictionary definition. *Yates v. United States*, 135 S.Ct. 1074, 1082 (2015). Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent. *United States v. Smith,* 499 U.S. 160, 167, 111 S.Ct. 1180, 1185 (1991).

The term "education" has two definitions in Merriam-Webster's Collegiate Dictionary: (1)(a): **the action or process of educating or of being educated**; *also*: a stage of such process; (b) the knowledge and development resulting from an educational process; (2): the field of study that deals mainly with methods of teaching and learning in schools. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, "Education", Eleventh Edition, 396 (2014). The first definition of the verb "educate" is defined as (1)(a): to provide schooling for; (b) **to train by formal instruction and supervised practice esp. in a skill, trade, or profession**. *See id.,* "Educate." Clearly, Plaintiffs pleadings establish that her medical residency program was educational under the common, dictionary, definition of that term.

Section 1687 is instructive in understanding the full scope of Title IX, since it delineates the different entities to which the statute can apply, and includes within that scope corporations who are principally engaged not in education but in providing health care. *See* 20 U.S.C. § 1687(3)(A)(ii). In including entities whose principal purpose are not education, the statute makes

7

clear that the educational programs covered by its provisions are not limited to those found only within formal schools.

Moreover, Section 1681 which contains the statutory prohibit on discrimination in educational programs also contains a detailed list of nine exceptions detailing institutions or programs that are not covered by Title IX. *See* 20 U.S.C. § 1681. These exempted programs include single-sex educational institutions, elementary and high schools with respect to their admissions policies, educational institutions of religious organizations with contrary religious tenets, military schools and colleges, social fraternities and sororities, the Boy and Girl Scouts, Boy and Girl conferences such as Boys Nation, Girls State, etc., father-son or mother-daughter activities at educational institutions, and higher education scholarship awards in "beauty pageants." *Id.* As stated in *Smith*, additional exceptions are not to be implied in the absence of evidence of a contrary legislative intent. If Congress had wished to exclude graduate medical education from the coverage of Title IX, it was well capable of doing so expressly.

Moreover, legislative history related to Title IX supports finding that graduate medical education programs are covered by Title IX. In the Senate Report accompanying the 1988 Amendment to Title IX, the following example was provided:

> If a private hospital corporation is extended federal assistance for its emergency rooms, the pediatrics department, admissions, discharge offices, etc., are covered under Title VI, section 504, and the Age Discrimination Act. Since Title IX is limited to education programs or activities, it would only apply to the students [19] and employees of educational programs operated by the hospital, if any.

S. Rep. No. 100-64, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 20.

The federal regulations that implement Title IX and which are entitled to *Chevron* deference state that Title IX prohibits gender discrimination "under any **academic**, extracurricular, **research**, **occupational training**, or any other educational program or activity operated by a

8

recipient" of federal funds. 45 C.F.R. § 86.31(a). Moreover, "institution of graduate higher education" explicitly includes institutions that offer academic study but do not lead to a certificate of any higher degree in the liberal arts or sciences.

With respect to the educational characteristics of medical residency programs, the Third Circuit has described medical residences as being "**a vital component of medical education providing new doctors with a supervised transition between the pure academics of medical school and the realities of medical practice**." *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 525 (3d Cir. 1994); *see also Brown v. Hamot Med. Ctr.*, 2008 U.S. Dist. LEXIS 467, *24 (W.D. Pa. Jan. 2, 2008) ("a medical residency is primarily an academic enterprise.") Moreover, in 2004, Congress amended the antitrust laws to exempt the medical residency matching programs from their ambit, and made explicit findings that "graduate medical education programs (popularly known as 'residency programs')" were part of an "educational system that has produced the finest physicians and medical researchers in the world." 15 U.S.C. § 37b.

The issue of whether a residency is more of an educational program or an employment program has been most significantly addressed in the context of Constitutional due process claims, as employees have greater due process rights than students with respect to termination by state entities. *See, e.g., Goss v. Lopez,* 419 U.S. 565 (1975); *Brd. of Curators of Missouri v. Horowitz,* 435 U.S. 78 (1978). The Fifth Circuit has treated medical residents as students as opposed to employees for purposes of determining the level of due process due when a state entity discharges a resident, and stated as follows:

> It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate, like the diploma, tells the world that the resident has

9

> successfully completed a course of training and is qualified to
> pursue further specialized training or to practice in specified areas.

*Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989).

The Fifth Circuit in *Davis* went on to note that "the fact that Davis received a stipend for his clinical training in addition to the opportunity to successfully complete the GPR program does not alter the fact that he was participating in an academic program in order to receive academic certification." *Id.* Since *Davis,* several other courts have reached the same result. *See Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001) (same); *Nigro v. Va. Commonwealth Univ. Med. College of Va.*, 2010 U.S. Dist. LEXIS 56229 (W.D. Va. Jun. 4, 2010); *Ezekwo v. N.Y.C. Health & Hosp. Corp.*, 940 F.2d 775, 784 (2d Cir. 1991) ("while a medical residency is largely an academic undertaking, it also is an employment relationship"); *Fenje v. Feld*, 301 F. Supp. 2d 781, 801 (N.D. Ill. 2003), *aff'd by* 398 F.3d 620 (7th Cir. 2005). On a similar issue, a court has used the fundamental educational nature of medical residency programs to hold that states lack a sovereign immunity defense to a claim for wrongful termination of a residency brought pursuant to Title II of the ADA. *Sarkissian v. W. Va. Univ. Bd. of Governors*, 2007 U.S. Dist. LEXIS 32881, *26 (N.D.W. Va. May 3, 2007).

With respect to Title IX specifically, there have been few cases that have ruled on whether a medical resident may bring a claim under Title IX. In *Cannon v. University of Chicago*, 441 U.S. 677, 680 (1979), the Supreme Court held that a woman had a private right of action under Title IX where she was excluded from medical school because of her gender, holding that what was relevant was her exclusion from "medical educational programs." The only United States Circuit Court of Appeal to have ruled directly on this issue in the context of a claim brought only under Title IX accepted that a medical resident could bring a Title IX gender discrimination claim against her residency program. *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 900-01 (1st Cir. 1988). In *Johnson v.*

10

*Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996), a claim filed under both Title VII and Title IX, the Eighth Circuit did not raise any objections to Title IX being brought by a medical resident and simply held that the standard for Title IX gender discrimination for a medical resident was the same as the standard for Title VII: "**When a plaintiff complains of discrimination with regard to conditions of employment in an institution of higher learning, the method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case**." In *Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1454 (9th Cir. 1995), the Ninth Circuit, in *dicta*, cited approvingly to *Lipsett* and its extension of Title VII sexual harassment to a Title IX case brought by a medical student who was "an employee as well as a student of the residency program."

Accordingly, the above case law demonstrates the following: (1) Plaintiff has pleaded that her residency program contained all of the significant indicia of education; (2) the plain language of the statute and its accompanying regulations do not exclude graduate medical education programs such as Plaintiff's from the coverage of Title IX; (3) courts who have examined medical residency programs in other contexts have found them to be more educational than employment based; and (4) the only federal appellate court decision to speak to this issue permitted a medical residents' Title IX claim to proceed.

Accordingly, there is nothing in the statutory language, facts of the case, nor case law to suggest that Title IX excludes medical residency programs from their reach, and to the extent that Defendant argues that Plaintiff's Title IX claims should be dismissed because Defendant is not covered by Title IX, Defendant's motion should be denied as Title IX applies to all educational programs receiving federal funding, and Defendant's residency program is such an educational program.

**(2)** **The cases Defendant cites suggesting that it is not covered by Title IX do not stand for that proposition and are inapposite, since these stand only for the proposition that a medical resident is both a student and an employee.**

In support of its argument that Defendant is not covered by Title IX because a residency program is more employment than education—despite Defendants' own admissions on its website that the residency program is profoundly educational, Defendant cites to a NLRB decision which permitted residents to unionize, an 8th Circuit decision which does not stand for the proposition that residency programs are not covered by Title IX, and two district court case from other Circuits which are also inapposite.

The NLRB case which Defendant cites does not stand for the proposition that medical residency programs are not educational endeavors, merely that they also involve sufficient indicia of an employment relationship to permit residents to unionize. Notably, the NLRB did not hold that residents were not students—it could not do so, since the residents **received diplomas** from the Boston University School of Medicine upon graduation and upon becoming board certified. *Boston Med. Ctr. Corp.,* 330 N.L.R.B. 152, 153 (1999). The NLRB overruled prior and long-standing precedent which had held that residents were students and could not unionize, and held that "**while they may be students learning their chosen medical craft**, [they] are also "employees" within the meaning of Section 2(3) of the Act." *Id.* at 152.

Thus, even the NLRB recognized that residents are both students and employees, and correctly held that if an individual satisfies the NLRA's definition of an employee, no further test is necessary to determine whether the individual is predominantly an employee or a student. Plaintiff does not argue that she is not an employee, and does not argue that, if she had so chosen, she could not have pursued her claims under both Title IX and Title VII. Rather, she argues simply that Title IX is the mirror-image of the NLRA, and simply asks whether the program in which the

12

individual seeks but is denied participation is "educational." Because a medical residency program is educational, and profoundly so, it is irrelevant that the resident may also be an employee.

Likewise, the Eighth Circuit case cited by Defendant, *Johnson v. Baptist Med. Ctr.*, 97 F. 3d 1070, 1072 (8th Cir. 1996), actually stands for the proposition that a medical resident can bring both a Title IX and Title VII case at the same time, but when she does, the two claims are evaluated in the same way: "When a plaintiff complains of discrimination with regard to conditions of employment in an institution of higher learning, the method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case." While this holding in *Johnson* is inconsistent insofar as sexual harassment claims have a higher standard for *respondeat superior* liability than Title VII claims under *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 283-84, 118 S.Ct. 1989, 1995-96 (1998), nothing in either *Gebser* or *Johnson* suggest that a medical resident – i.e., a student who is also an employee – cannot bring both Title VII and Title IX claims for gender discrimination.

The only other two cases Defendant cites for its proposition as to why its graduate medical educational residency programs should not be covered by Title IX are an order from the S.D.N.Y. case of *Crandell v. New York College of Osteopathic Medicine*, Docket No. 99-cv-2347, Order (S.D.N.Y. Jul. 1, 1999), which is discussed below, and *Loewen v. Grand Rapids Med. Educ. Partners*, 2012 U.S. Dist. LEXIS 49476, *33-34 (W.D. Mich. Apr. 9, 2012). *Loewen* does not stand for the proposition that a residency program is not covered by Title IX. Rather, in *Loewen*, the court dismissed the Title IX claims against entities such as the hospital and an affiliated medical school because the plaintiff had not pleaded that they had any knowledge of the acts of harassment or discrimination alleged in the complaint, and therefore, could not demonstrate *respondeat superior* liability under *Gebser*. *Id.* at *33-34. In dicta, and in not dismissing the plaintiff's claims

13

against the operator of her residency program, the *Loewen* court in fact suggests that a Title IX claim will lie against an entity who operates a residency program, as opposed to merely hosts one. Defendant constitutes such an operating entity, and accordingly, is covered by Title IX.

*Crandell* then is the only case cited by Defendant in which a medical resident was held to be an employee **and** prohibited from bringing a Title IX case because of that fact. *Crandell* of course is an unpublished order from a district court and its decision is not binding on this court. Moreover, for reasons discussed below, its order is not persuasive because nothing in Title VII's language or application over many years makes it an exclusive remedy to addressing claims of discrimination.

### (3) Title VII does not preempt Title IX or any other statute seeking relief for discrimination based on the same facts and circumstances.

Defendant has suggested that Plaintiff should be barred from bringing a Title IX claim because doing so would circumvent Title VII's administrative exhaustion requirements: "Plaintiff failed to [exhaust her administrative remedies under Title VII], and should not be permitted to bring employment claims under the guise of Title IX, and seek employment-based remedies which she is barred from receiving because she failed to exhaust her Title VII administrative remedies."

In support of its argument that Title VII's exhaustion requirements "preempt" Title IX, Defendant cites to the Fifth Circuit case of *Lakoski v. James*, 66 F. 3d 751, 755 (1995) and several other cases. These cases are wrongly decided, and fail to appreciate that Title VII by its very structure and nature permits wronged individuals to bring concurrent claims based on other theories of liability and other statutes, and that Title IX, by its nature and structure, clearly extends to employment discrimination claims brought against educational programs.

In *North Haven Bd. of Educ.,* the Supreme Court upheld regulations promulgated by the Department of Education pursuant to Title IX that prohibited gender-based employment

14

discrimination for federally-funded education programs. *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). In dicta, the Supreme Court noted that "a female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues." *Id.*[1]

Likewise, in *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719 (1975), the Supreme Court held that Title VII did not preempt or preclude a lawsuit brought under 42 U.S.C. § 1981, which has no administrative exhaustion requirement. "Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief." *Id. Johnson* was based in part on the legislative history related to Title VII, in which Congress noted "that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive." H.R. Rep. No. 92-238, p. 19 (1971). See also S. Rep. No. 92-415, p. 24 (1971). Later, in considering the Equal Employment Opportunity Act of 1972, the Senate rejected an amendment that would have deprived a claimant of any right to sue under § 1981. 118 Cong. Rec. 3371-3373 (1972). The Supreme Court noted that Section 1981 was not coextensive

---

[1] The Supreme Court has also held that an employee of an educational program who complains about a Title IX violation may bring a private retaliation action under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184, 125 S.Ct. 1497, 1510 (2005). Thus, if the Court were to find that Defendant is covered by Title IX, but that Plaintiff cannot bring a gender discrimination claim because of *Lakoski*, under *Jackson,* Plaintiff could still bring Count II of the TAC, which alleges that she was terminated because she complained of gender discrimination in the residency program.

15

with Title VII, in that Section 1981 does not extend to certain employers, and Title VII offered

aggrieved parties assistance in investigation, conciliation, counsel, etc., that are not available under

the Section 1981.

Several courts have accordingly held that because of the private right of action the Supreme

Court found to exist for students coupled with the Supreme Court's decision in *North Haven* that

Title IX extended to employment discrimination in educational programs means that employees

of federally-funded education programs suing for gender discrimination have a private right of

action under Title IX. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n.1 (2d Cir. 2000)

(identical standards apply to employment discrimination claims under Title VII and Title IX);

*Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 248 (2d Cir. 1995) (Title IX

construed to prohibit gender discrimination against both students and employees); *Preston v. Va.*

*ex rel. New River Cmty. Coll.,* 31 F.3d 203, 206 (4th Cir. 1994) (implied private right of action

extends to employment discrimination on the basis of gender by educational institutions receiving

federal fund); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988); *Kohlhausen v.*

*Suny Rockland Cmty. College*, 2011 U.S. Dist. LEXIS 42055, *32 (S.D.N.Y. Feb. 9, 2011) ("this

Court is nonetheless unpersuaded by the Defendants' argument that Title VII provides the sole

cause of action for employees of federally funded educational programs"); *AB v. Rhinebeck Cent.*

*Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004) ("Title IX was intended by Congress to function

as an additional safeguard against gender-based discrimination in the context of federally funded

education programs; notwithstanding the possibility of other available remedies, including without

limitation those available under Title VII."); *Bedard v. Roger Williams Univ.,* 989 F. Supp. 94, 97

(D.R.I. 1997); *Nelson v. Univ. of Maine Sys.*, 923 F. Supp. 275, 278-79 (D. Me. 1996); *Henschke*

*v. N.Y. Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993).

16

A review of Title IX's legislative history reveals Title IX's significant concern with remedying employment discrimination in educational institutions. In the House of Representatives, the legislation was proposed to combat, "at the faculty level[,] sex differences in rank and salary at colleges and universities" as well as disparities in student admissions standards. H.R. Rep. No. 92-554 (1972).

The U.S. Department of Justice also recognizes such a Title IX employment discrimination cause of action. *See* U.S. Dep't of Justice, Title IX Legal Manual IV.B.2., available at http://www.justice.gov/crt/about /cor/coord/ixlegal.php ("The Department takes the position that Title IX and Title VII are separate enforcement mechanisms. Individuals can use both statutes to attack the same violations. This view is consistent with the Supreme Court's decisions on Title IX's coverage of employment discrimination, as well as the different constitutional bases for Title IX and Title VII.").

Accordingly, there is little support for the idea that Title VII preempts Title IX employment discrimination claims. Title VII and Title IX do not have concurrent coverage. Title VII offers an aggrieved party the use of the conciliation and investigative machineries of the EEOC, while Title IX does not. Title VII imposes a damages cap on compensatory and punitive damages, while Title IX has no cap but prohibits the receipt of punitive damages. Most importantly, Title VII has a different standard of notice for establishing *respondeat superior* liability for sexual harassment claims than Title IX. These overlapping protections suggest that there is nothing inconsistent or troubling about allowing both Title VII and Title IX claims to be used to vindicate employment discrimination claims, as the different statutes provide different advantages to litigants, just as Title VII and Section 1981 have different advantages and disadvantages.

However, even this Court were to hold that Title VII did preempt employment discrimination claims brought under Title IX as held by *Lakoski*, that case and others like it are nevertheless distinguishable because, here, Plaintiff is both an employee and a student. This, in fact, was the original thrust of Defendant's first motion to dismiss, which recognized Plaintiff's right to bring a Title IX claim against the residency program, but objected to the inclusion of employment-related relief under that claim. For the reasons set forth above, Plaintiff is entitled to employment-related relief, but even if she were not, she seeks reinstatement of her residency and compensatory damages stemming from the termination of same; even this relief is more educational than it is employment, since Plaintiff seeks damages from losing a residency, not just from losing a job, and Plaintiff believes her damages are far higher because of that distinction as well.

As a participant in Defendant's residency program, a component of professional medical education, Plaintiff was both a student and an employee of Defendant. *See Rosenberg v. City of New York*, 2011 U.S. Dist. LEXIS 112818, *17 (E.D.N.Y. Sept. 30, 2011); *Yog v. Texas Southern University*, 2010 U.S. Dist. LEXIS 113822, 2010 WL 4053766, *4 (S.D. Tex. Aug. 30, 2010). In *Rosenberg,* the plaintiff worked for the New York City public school system as part of participation in the New York City Teaching Fellows program, and the court found that the plaintiff was both a student and an employee and could therefore bring her claims under Title IX. Similarly, in *Yog*, a student working as a research assistant for a professor was covered by Title IX because the work she performed was part of her educational experience at the university.

For the above reasons, the Court should deny Defendant's Motion to Dismiss to the extent that it is premised on Defendant not being covered by Title IX or under the erroneous argument

18

that Title VII preempts Title IX claims brought by medical residents for gender discrimination they face in their residency program.

## C. PLAINTIFF'S *QUID PRO QUO* SEXUAL HARASSMENT CLAIM AND RETALIATION CLAIM DERIVE FROM EVENTS OCCURRING LESS THAN TWO YEARS PRIOR TO THE FILING OF THE COMPLAINT, AND THREFORE ARE NOT BARRED UNDER THE STATUTE OF LIMITATIONS

Defendant has moved to dismiss Plaintiff's Counts II (quid pro quo sexual harassment) and Count III (retaliation) to the extent they assert claims for discrete acts of discrimination occurring more than two years prior to the filing of Plaintiff's initial Complaint.[2] Plaintiff agrees that any claims for retaliation or *quid pro quo* sexual harassment resulting in tangible discrete acts (such as the provision of a poor letter of recommendation in February 2013) are untimely. Plaintiff's wrongful termination of her residency, however, which Plaintiff alleges was *quid pro quo* sexual harassment and retaliatory under Title IX, occurred on or after April 21, 2013, and are therefore timely. *See* Third Amended Complaint, ECF Doc. 28, at ¶¶ 117-119.

## D. UNDER THE CONTINUING VIOLATIONS DOCTRINE, THE HOSTILE EDUCATIONAL ENVIRONMENT IMPOSED BY ROE EXTENDED PAST APRIL 20, 2013, AND THEREFORE FALLS WITHIN THE STATUTE OF LIMITATIONS

### (1) Sexual Harassment Claims Are Actionable under Title IX

---

[2] Plaintiff asserts that she first learned of her potential termination on April 20, 2013, in a letter that had been postmarked April 19, 2013 and sent to her via Federal Express on that day. Moreover, even if the letter had been received on April 19, 2013, Plaintiffs' complaint, which was filed on April 20, 2015, is timely because April 19, 2015, was a Sunday, a religious holiday and not counted under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 6(a)(1). Rule 6 applies to any statute that does not specify a method of computing time. Fed. R. Civ. P. 6. As the statute of limitations in Title IX is an implied one, Rule 6 applies. *See also Sellers v. Spiegel, In*c., 551 F. Supp. 235, 237 n.5 (E.D. Pa. 1982).

19

Title IX states that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Discrimination is construed broadly under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2531 (2013). "Title IX was enacted not only to prevent the use of federal dollars to support discriminatory practices, but also to provide individual citizens effective protection against those practices." *Jackson*, 544 U.S. at 180. Title IX's prohibition on gender discrimination extends to prohibiting sexual harassment. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 75 (1992). In holding that Title IX's prohibition on discrimination extended to claims of sexual harassment where a teacher sexually harasses a student, the Supreme Court explicitly relied on its decision in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), a Title VII case that held that in the employer-employee context, sexual harassment constituted gender discrimination. *See Franklin*, 503 at 75 (citing *Meritor*); *see also Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 282 (1998).

## (2) The Continuing Violations Doctrine under Title VII

In *AMTRAK v. Morgan*, 536 U.S. 101 (2002), the Supreme Court dealt with the issue of the proper statute of limitation for a racial harassment claim brought under Title VII based on an allegation of a continuing hostile work environment. Justice Thomas rightly pointed out that the critical question in determining when a hostile work environment claim must be filed required answering two questions: (1) what constitutes an unlawful employment practice; and (2) when has the practice occurred. *Id.* at 110.

*AMTRAK* held that with respect to discrete unlawful employment practices such as terminations, suspensions, failures-to-hire, each act is a separate actionable "unlawful practice" that must occur within the statute of limitations period in order to be timely. *Id.* at 114. However,

20

*AMTRAK* also held that "hostile environment claims are different in kind from discrete acts." *Id.* at 115. *AMTRAK* went on to explain the conceptual difference:

> Their very nature involves repeated conduct. The unlawful employment practice therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

*Id.* (citations omitted).

After outlining this fundamental conceptual difference between hostile environment claims and claims of discrimination based on discrete acts, the Supreme Court held that for a hostile environment claim to be timely under Title VII, a charge must be filed within 180 or 300 days of when the unlawful employment practice occurred, and "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purpose of determining liability." *Id.* at 117. Moreover, *AMTRAK* held that a plaintiff does not need to sue for hostile environment harassment as soon as it became reasonable for the plaintiff to do so, i.e., as soon as a sufficient number of component acts had occurred to make the hostile environment claim actionable or as soon as the plaintiff concluded that she might be being subjected to an actionable hostile work environment.

*Id.* at 119-120.

Since *AMTRAK*, the continuing violations theory for the statute-of-limitations period has been explicitly adopted by the Third Circuit. "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013); *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

21

The Third Circuit has not had an opportunity to rule on whether the "continuing violations" theory applies to Title IX claims.

### (3) **Most courts apply the continuing violations theory to claims of hostile educational environment harassment under Title IX**

Most courts that have had cause to address the issue of whether the continuing violations doctrine applies to hostile educational environment claims of gender-based harassment under Title IX have held that the doctrine can be applied.

For instance, the Ninth Circuit has applied the Supreme Court's Title VII continuing violations doctrine to Title IX claims in *Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006). Similarly, in *Jennings v. Univ. of N.C.*, 240 F. Supp. 2d 492, 500 (M.D.N.C. 2002), the court applied the "continuing violations" doctrine to a Title IX case, reasoning that hostile sexual environments under Title IX should be treated analogously to Title VII. On appeal and rehearing *en banc*, the Fourth Circuit reversed the district court's grant of summary judgment and found no issue with the application of a "continuing violations" theory to the plaintiffs' allegations of a continuing educational environment of sexual harassment by her soccer coach. *Jennings v. Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007).

Other cases in which the continuing violations theory has been applied to Title IX claims include *Summy-Long v. Pa. State Univ.*, 2010 U.S. Dist. LEXIS 27953, *35 (M.D. Pa. Mar. 24, 2010), *Clifford v. Regents of Univ.*, 2012 U.S. Dist. LEXIS 60280, *16 (E.D. Cal. Apr. 27, 2012), and *Morrison v. N. Essex Cmty. College*, 56 Mass. App. Ct. 784, 798 (Mass. App. Ct. 2002) (relying on *AMTRAK v. Morgan*, 536 U.S. 101, 116-118 (2002)). "A plaintiff may base a hostile environment claim on acts occurring outside the limitations period, as long as at least one of the component acts on which the claim is based occurred within the filing period." *AB v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 314 (S.D.N.Y. 2005).

22

Defendant has cited to the district court case *Gjeka v. Del. County Cmty. College*, 2013 U.S. Dist. LEXIS 73054, *15 (E.D. Pa. May 23, 2013) for the proposition that it would be inappropriate to extend the continuing violation theory from Title VII to Title IX. *Gjeka* was based on an EDNY case, *Folkes v. N.Y. Coll. of Osteopathic Med. Of N.Y. Inst. Of Tech.*, 214 F. Supp. 2d 273, 288-289 (E.D.N.Y. 2002).

*Folkes* suggested in *dicta* that the continuing violations theory did not apply to Title IX cases because Title IX's contractual nature – i.e., the conditioning of the receipt of federal funds upon a prohibition not to discriminate – made the continuing violations theory a "poor fit" with the goals of Title IX. *Folkes* however failed to explain why this was so, and the Supreme Court case it relied on, *Gebser*, said nothing as to whether a sexual harassment claim brought under Title IX for hostile educational environment could be brought under a continuing violations theory. *Gebser* involved imposing an "actual notice" requirement on sexual harassment claims under Title IX, but should not be read to restrict hostile environment claims that began before the statutory limitations period but extended into the period.

The continuing violations theory should apply to Title IX hostile environment claims because the continuing violations theory is conceptually intrinsic to such claims. Hostile environments are **by their very nature** extensive in time across many days. *AMTRAK v. Morgan* clarified that the continuing violations theory is not an equitable exception to the statute of limitations but rather a textualist application of the statute-of-limitations to a claim that by definition extends over days, months, or even years, and the traditional calculation of statutes of limitation as tolling from the time that a violation occurs.

It is not unfair to impose a continuing violation theory on Title IX defendants, since the Title IX defendants were aware, based on the broad prohibition on discrimination contained in the

23

statutory text, that hostile educational environments based on gender were prohibited. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 75 (1992). Given that, and given that *AMTRAK v. Morgan* was based on the **nature** of hostile environment harassment claims and no specific feature of Title VII, the Court should find that the continuing violations theory applies to claims of hostile educational environment brought under Title IX.

### (4) <u>Plaintiff has pleaded that she suffered from a hostile educational environment that extended throughout her residency and continued during the termination and grievance procedure that occurred after the statutory tolling period</u>

Given that the continuing violations theory applies to Title IX hostile educational environment claims, Plaintiff must still allege that the hostile educational environment continued past April 20, 2013. Plaintiff has done so here, and accordingly, her hostile environment claim should not be dismissed.

Plaintiff has alleged that her residency supervisor, identified in the Third Amended Complaint as John Roe, created a hostile educational environment for her during her residency because she rebuffed his romantic interests. Acts that contributed to this hostile educational environment consisted of the following:

- In 2011, Roe asking about Plaintiff's marriage and the circumstances of her living away from her husband. See TAC at ¶ 53.

- In 2011, Roe looking at Plaintiff in a suggestive manner. See TAC at ¶ 54.

- In 2011, an incident occurred in the reading room in which Roe and Plaintiff were alone and Roe's demeanor and bodily appearance suggested sexual interest. See TAC at ¶ 55.

24

- In 2011, Plaintiff received undue interest and attention from Roe. See TAC at ¶ 56.

- Throughout her residency (i.e., from 2011 until April 19, 2013), several other occurrences occurred in the reading room when the two were alone and Roe made Plaintiff uncomfortable. See TAC at ¶ 57.

- Throughout her residency (i.e., from 2011 until April 19, 2013), several conversations occurred in which Roe implied sexual attraction towards Plaintiff and a desire to pursue a romantic relationship with her. See TAC at ¶ 77, 80-84.

- In November/December 2011, Roe reported Plaintiff to HR for sending him text messages related to her efforts to clarify and keep professional their working relationship. See TAC at ¶ 66.

- In November/December 2011, HR spoke with Plaintiff about her text messages, and in response to Plaintiff's complaint about Roe's unwelcome attention, HR directed Plaintiff to speak to a psychologist. See TAC at ¶ 66-72.

- In Fall and Winter 2012, Roe increased his interest in Plaintiff, regularly asking her to socialize outside of work and proposed starting a romantic relationship. See TAC at ¶ 81.

- In Winter 2012/2013, Roe and another colleague gave Plaintiff negative letters of recommendation for her post-residency fellowship application. See TAC at ¶ 85-90.

25

- In Winter 2012/2013, Plaintiff again complained to Roe about his treatment of
  her, Roe again reported her, and Defendant again directed Plaintiff to seek
  psychological help. See TAC at ¶ 91-94.

- In Spring 2013, Roe brushed Plaintiff's breast with his arm while in the reading
  room. See TAC at ¶ 103.

- In Spring 2013, Roe directed another resident to remove Plaintiff's name from
  a paper which she had contributed to. See TAC at ¶ 105-106.

- In April 2013, in the events leading up to her termination, Roe reported Plaintiff
  again to his supervisors and accused of her unprofessionalism, and refused to
  accept Plaintiff's apology. See TAC at ¶ 112.

- On April 24, 2013, in a hearing to grieve Plaintiff's termination, Roe falsely
  and publicly accused Plaintiff of unprofessionalism and falsely accusing him of
  harassing her in public and in front of other faculty members. See TAC at ¶
  121-122.

Thus, while a majority of the Defendant and Roe's harassment of Plaintiff occurred prior
to April 20, 2013, the harassment and hostile educational environment continued after April 20,
2013, specifically on April 24, 2013, at Plaintiff's grievance of her termination. At that hearing,
Roe attacked Plaintiff publicly and actively advocated for her termination. Roe's comments and
advocacy at this hearing does not constitute a discrete actionable act of sexual harassment but
rather one of the cumulative acts that contribute to a finding of a hostile work environment.
Plaintiff is alleging that she was faced with a continuously hostile supervisor who, as her residency
went on and even after it ended, engaged in hostile speech and behavior towards her because of
his frustrated romantic interest in her. The sexual component of this hostile environment is

26

established by Plaintiff's allegations that he continually spoke about entering into a romantic relationship with Plaintiff; the hostile acts consist of Roe's negative behavior when his romantic overtures were rebuffed. Roe's behavior at the April 24, 2013, grievance hearing was part and parcel of the hostile educational environment that Plaintiff was forced to endure, and establish that the hostile educational environment extended and continued after April 20, 2013.

That the appeal hearing occurred after Plaintiff was notified of her termination does not preclude Plaintiff's claim of a hostile educational environment, as Plaintiff remained affiliated with and dependent on Defendant during the appeal hearing and Defendant remained in a position to discriminate against Plaintiff with respect to Plaintiff's participation in Defendant's educational programs during the appeals process. *Compare Stanley v. Trustees of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006) (holding that the plaintiff had not been enrolled in the school since 2000 and had not alleged any hostile acts had occurred while she was not present at the institution, but noting the possibility that plaintiff could have in theory been subjected to sexually-natured conduct after her enrollment ended). But for Roe's comments and actions during her appeal hearing, Plaintiff's termination from her residency program might have been reversed; just as the decision not reverse its decision as to Plaintiff's termination constitutes a discrete act of discrimination by Defendant, so too Roe's *comments and actions* during the appeals process constitutes part of the continuing hostile educational environment Plaintiff was subjected to by Defendant.

Moreover, it is important to make clear that Plaintiff's hostile environment claim related to hostility and sexual harassment faced during her appeal hearing is separate and distinct from the tangible action that occurred when Defendant denied Plaintiff's appeal. Plaintiff was forced to be publicly abused and attacked by Roe because of her gender and because of her rejection of his sexual and romantic advances. It is the abuse and hostility she suffered that is a component of her

27

hostile environment claim, not the outcome of the appeals hearing. This is true because her hostile environment claim would be just as viable even if the appeals hearing had been decided in her favor and she was allowed to return to work. That the hostile behavior from Roe occurred on the same day that a discrete act of tangible discrimination occurred does not mean that the hostile environment that she suffered was not legally and doctrinally distinct under *AMTRAK*.

Accordingly, because at least one component act of the hostile educational environment – Roe's hostility and abuse during the April 24, 2013, hearing occurred after April 20, 2013, Plaintiff's hostile educational environment claim is not time-barred.

### E. PLAINTIFF'S BREACH OF CONTRACT CLAIM FOR WRONGFUL TERMINATION IN CONTRADICTON OF TH RESIDENCY AGREEMENT IS SUFFICIENTLY PLEADED

Defendant also argues that the Court should dismiss Plaintiff's Breach of Contract Claim for Wrongful Termination in Count V. Defendant argues that the claim is deficient because the essential terms of the contract have not been pleaded. Nothing could be further from the truth.

Defendant has not attached the Contract, but Plaintiff will do so if the Court deems it necessary. Plaintiff does not believe it necessary, because essential terms of the contract were pleaded in the Third Amended Complaint. For purposes of Count V, the essential terms are that Plaintiff will only be terminated for "cause" and that Plaintiff's conduct does not constitute such "cause." The relevant facts set forth in the Third Amended Complaint are as follows:

- Plaintiff entered into a Residency Agreement with Defendant at the beginning of her residency and renewed this agreement on an annual basis. See TAC at ¶ 47.

- The Residency Agreement further provided that Defendant could only immediately terminate or not renew a resident's contract for proper cause,

which case the Defendant would provide the resident with due process and access to the grievance procedure. See TAC at ¶ 50.

- The Residency Agreement provided that if the Defendant decided not to renew or reappoint the Resident, the Resident would be given four months' notice of the decision not to re-appoint, unless the events causing the decision not to re-appoint occurred within the four months prior. See TAC at ¶ 51.

- In early April 2013, one of the other residents asked Plaintiff to assist on a research paper the other resident was writing with Roe. For the paper, Plaintiff read the relevant studies and met with the resident to give feedback and advice and planned to continue to contribute as needed. See TAC at ¶ 105.

- Nevertheless, when Roe learned that Plaintiff had been added as an author to the paper, he instructed the other resident to remove Plaintiff's name. See TAC at ¶ 106.

- The other resident than told Plaintiff that Roe had order Plaintiff's removal as an author. See TAC at ¶ 107.

- Plaintiff went to Roe to complain as to his continued unfair treatment. See TAC at ¶ 108.

- Roe then insisted that Plaintiff was acting unprofessional and ordered Plaintiff to another meeting with Vice President Eiser. See TAC at ¶ 109.

- Plaintiff met with the Eiser, Roe and Pam Fierro again. Eiser asked Plaintiff if she had contributed to the paper, and Plaintiff explained her contributions. Eiser told Plaintiff that the other residents "loved [Roe]," to which Plaintiff explained that Roe was torturing her due to his romantic intentions. She further told Eiser

29

that the information provided to him about her results on the second in-service examination had been false, that she had in fact done well, and that Roe had given Eiser false information about her performance on the in-service examination. See TAC at ¶ 110.

- Plaintiff further explained that the issue went beyond the authorship issue but extended to Roe's entire retaliatory behavior over the past year, especially the negative recommendation he provided to the fellowship program. Eiser then directed Plaintiff to apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his "special attention." See TAC at ¶ 111.

- Roe responded by stating that he would not accept Plaintiff's apology, because it was not "sincere." See TAC at ¶ 112.

- Eiser then suggested Plaintiff receive another psychiatric consultation and informed Plaintiff she was suspended. See TAC at ¶ 113.

- On information and belief, prior to this suspension, Defendant had previously decided to renew Plaintiff's residency agreement, as it had not notified her four months prior to expiration of its intention to not-renew Plaintiff's residency. See TAC at ¶ 114.

- On April 20, 2013, Plaintiff received a letter sent via FedEx overnight mail from Defendant Mercy informing Plaintiff for the first time that Defendant Mercy intended to terminate Plaintiff's residency, while giving her the option to appeal that decision. See TAC at ¶ 116.

- Plaintiff appealed the termination decision, and was given a hearing on or around April 24, 2013. See TAC at ¶ 120.

- At the hearing, the committee members heard about Plaintiff's allegations that Roe had romantic and/or sexual interest in her and that Plaintiff thought her treatment was unfair. Roe advocated for Plaintiff's dismissal from the residency program. Roe's advocacy for Plaintiff's dismissal was caused by Plaintiff's rebuffing of Roe's romantic interest in Plaintiff. At the end of the hearing, on April 24, 2013, Plaintiff was informed that the committee intended to uphold the decision to terminate. See TAC at ¶¶ 121-123.

- Defendant terminated Plaintiff because of "unprofessionalism." See TAC at ¶ 181.

- This unprofessionalism consisted of Plaintiff's complains to Roe about unfair, discriminatory, and retaliatory treatment for rejecting his romantic advances. See TAC at ¶ 182.

- Such complaints do not constitute "cause" for termination under the Residency Agreement. See TAC at ¶ 183.

Accordingly, Plaintiff set forth the essential terms of the contract in Paragraphs 49-51, stating that she had an agreement that renewed every year, in which she could only be terminated for cause, and that if she was terminated, she would be entitled to due process and a hearing. In Paragraphs 105-114, Plaintiff set forth her final complaint to Roe and the events for which Plaintiff was accused of being unprofessional. In Paragraphs 116, and 120-123, Plaintiff described the termination and the post-termination hearing in which Plaintiff provided more information and background to her complaints of unfair treatment, including linking them to her prior allegations

31

to Defendant that Roe was romantically interested in her. Paragraph 123 sets forth that the termination was nevertheless upheld. Paragraph 181 sets forth the given reason for Plaintiff's termination, and Paragraph 182 sets forth the conclusion that "unprofessionalism" was simply a euphemism for Plaintiff's complaints to Roe about his unfair, discriminatory, and retaliatory treatment related to her rejecting of his romantic advances. Paragraph 182 is conclusory, but it is based on all the prior facts alleged in the Third Amendment Complaint but specifically the facts alleged in Paragraphs 105-114.

Paragraph 183 does simply state that such complaints as were set forth in Paragraph 182 does not constitute cause under the Residency Agreement. While that is set forth simply, the claim is uncontroversial, since clearly, complaining about sexual harassment cannot constitute good cause for termination under any contract, cause any such contract would be null and void as being inconsistent with law. Moreover, the Paragraph is a factual allegation that relates to the proper construction of the term "cause" under the Residency Agreement.

If the Residency Agreement had defined "cause," such definition would have been included in the Third Amended Complaint. The Agreement does not. In the absence of such a definition, the Court will eventually have to construe the term. Here, Plaintiff's allegation is that the proper construction of the term "cause" does not and cannot include the making of complaints about unfair, discriminatory, and retaliatory treatment. While this is a question of law, Defendant has not moved for a determination as to that question. As to the question of fact – which involves the **<u>actual</u>** reason Plaintiff was terminated, on a 12(b)(6) motion, the Court assumes Plaintiff's allegations are true. This does not mean that Defendant will not be able to make a factual attack on the breach of contract claim at a later date by showing that the reasons for Plaintiff termination all fall well within the meaning of "cause."

32

Plaintiff has set forth in great detail Roe's retaliatory actions and motives which culminated in Roe's retaliatory decision to fire Plaintiff for an offense he called "unprofessionalism" but which Plaintiff contends is simply complaining about *quid pro quo* sexual harassment and retaliation. In the absence of an Agreement, Plaintiff's only remedy for such termination would be statutory. Here, Defendant agreed not to end Plaintiff's residency except for cause; retaliation for complaining about sexual harassment **is not** and **can never be** cause. If Plaintiff prevails in showing that discrimination or retaliation was the reason for her termination, then she has both statutory and contractual damages. The Court should accordingly not dismiss Plaintiff's Breach of Contract claim.

However, if the Court wishes more information, Plaintiff will provide same in a Fourth Amended Complaint. Notably, Plaintiff did not plead these contract claims until the filing of the Third Amended Complaint, because Plaintiff wanted to wait until she was provided a copy of her residency agreement through discovery. The Agreement has been provided and can be made available to the Court. Plaintiff's allegation is that "good cause" in the Agreement may be undefined, but it cannot include complaints about sexual harassment or retaliation, which Plaintiff alleges was Roe's actual motivating factor in securing her termination under the Residency Agreement.

## F. PLAINTIFF AGREES THAT HER BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING MERGES WITH HER BREACH OF CONTRACT CLAIM IN COUNT V

The Third Circuit and this Court have held that a breach of the duty of the good faith and fair dealing in contract claims is not independently actionable but rather merges with a breach of contract claim. *Burton v. Teleflex Inc.*, 707 F.3d 417, 432-33 (3d Cir. 2013) (holding that plaintiff "cannot maintain an independent cause of action for the breach of the covenant of good faith and fair dealing under Pennsylvania law."); *see also Moore v. Angie's List, Inc.*, Civ. A. No. 15-1243,

2015 U.S. Dist. LEXIS 103633, at *39-40 (E.D. Pa. Aug. 8, 2015) (same); *Boeynaems v. LA Fitness Int'l, LLC*, Civ, A, No. 10-2326, 2011 U.S. Dist. LEXIS 103611, at *35-38 (E.D. Pa. Sept. 13, 2011) (same) (Baylson, J.); *Goleman v. York Int'l Corp.*, Civ. A. No. 11-1328, 2011 U.S. Dist. LEXIS 85477, at *16-21 (E.D. Pa. Aug. 3, 2011) (same) (Baylson, J.). Plaintiff does not object to **merging** her Count VI with Count V in accordance with the Court's prior rulings. Here, Plaintiff's second contract argument in Count VI is similar to her first in Count V—that the supposed "cause" to terminate Plaintiff was false and intended to cover for the malicious and retaliatory intentions of, at a minimum, Dr. Roe. Whether such action was prohibited because the construction of the term "cause" cannot include retaliation, or because the termination of a contract for retaliatory and malicious motives violates the duty of good faith and fair dealing, the result is the same.

## G.  PLAINTIFF SHOULD BE PERMITTED TO PROCEED UNDER A PSEUDONYM

At Oral Argument, the Court suggested that it would require Plaintiff to provide her name at the time of trial or at some later point in this litigation, but would not require Plaintiff to do so at the outset of this litigation. Plaintiff believes that such is a fair compromise and does not object to complying with the Court's proposal if the Court orders same.

## V.  **CONCLUSION**

For the reasons set forth above, the Court should deny Defendant's Motion to Dismiss and enter an Order that: (1) Plaintiff's Title IX claims may proceed, because Defendant is covered by Title IX and Plaintiff did not need to bring these claims under Title VII; (2) Plaintiff may bring her hostile environment claim because the last alleged component act of the harassing environment occurred at the earliest on April 24, the date of her grievance hearing; (3)  Plaintiff's Breach of Contract Claim for Wrongful Termination may proceed, but shall merge into a single count asserting both a violation of the letter of the agreement and a violation of the duty of good faith

34

and fair dealing; and (4) Plaintiff may proceed under a pseudonym until trial or until some other

time the Court deems appropriate.

Respectfully submitted,

**SWARTZ SWIDLER, LLC**

_s/ Joshua S. Boyette_____
Joshua S. Boyette, Esq.
1101 Kings Hwy N., Suite 402
Cherry Hill, NJ 08034
(856) 685-7420
(856) 685-7417 Fax

DATED: December 9, 2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | |
| v. | Case No. 2:15-cv-02085 |
| MERCY CATHOLIC MEDICAL CENTER, | |
| Defendant. | |

**DEFENDANT MERCY CATHOLIC MEDICAL CENTER'S REPLY IN
FURTHER SUPPORT OF ITS MOTION TO DISMISS
<u>PLAINTIFF'S THIRD AMENDED COMPLAINT</u>**

A. JAMES JOHNSTON, ESQUIRE
ANDREA M. KIRSHENBAUM, ESQUIRE
KATE A. KLEBA, ESQUIRE
POST & SCHELL, P.C.
Four Penn Center
1600 John F. Kennedy Blvd.
14th Floor
Philadelphia, PA 19103
(215) 587-1000

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION ........................................................................................1

II.     PLAINTIFF'S TITLE IX CLAIMS FAIL AS A MATTER OF LAW .......................2

III.    PLAINTIFF'S HOSTILE ENVIRONMENT CLAIM IS TIME BARRED ................5

IV.     COUNT IV SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS
        TO RESPOND TO DEFENDANT'S ARGUMENT THAT HER
        CONTRACT CLAIM BASED ON ALLEGED GENDER
        DISCRIMINATION IS PREEMPTED BY THE PENNSYLVANIA
        HUMAN RELATIONS ACT ........................................................................11

V.      COUNT V SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS
        NOT PLAUSIBLY PLED A CLAIM FOR BREACH OF CONTRACT
        BASED ON ALLEGED WRONGFUL TERMINATION .......................................11

VI.     PLAINTIFF SHOULD NOT BE PERMITTED TO LITIGATE THIS
        CASE USING A PSEUDONYM ......................................................................12

VII.    CONCLUSION ..........................................................................................13

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES**                                                                           **PAGE(S)**

*Bougher v. Univ. of Pittsburgh,* 882 F.2d 74 (3d Cir. 1989) .................................................. 6

*Cannon v. Univ. of Chicago,* 441 U.S. 677 (1978) .......................................................... 3, 6

*Clifford v. Regents of Univ.,* No. 11-02935, 2012 U.S. Dist. LEXIS 60280 (E.D.
    Cal. Apr. 27, 2012) .............................................................................................. 10

*Collier by Collier v. William Penn Sch. Dist.,* 956 F. Supp. 1209 (E.D. Pa. 1997),
    *rev'd,* 191 F.3d 444 (3d Cir. 1999) ...................................................................... 3

*Del. State Coll. v. Ricks,* 449 U.S. 250 (1980) .................................................................. 9

*Doe v. Claiborne County,* 103 F.3d 495 (6th Cir. 1996) .................................................... 3

*Doe v. Petaluma City School District,* 54 F.3d 1147 (9th Cir. 1995) .............................. 4

*Doe v. Rust Coll.,* Civ. A. No. 3:14-CV-32-NBB-SAA, 2015 U.S. Dist. LEXIS
    129232 (N.D. Miss. Sept. 25, 2015) ...................................................................... 5

*Emeldi v. Univ. of Or.,* 698 F.3d 715 (9th Cir. 2012) ........................................................ 3

*Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.,* 214 F. Supp. 2d
    273 (E.D.N.Y. 2002) .......................................................................................... 6, 7

*Fordyce v. Prince George's County Md.,* 43 F. Supp. 3d 537 (D. Md. 2014) ................. 2

*Foster v. Morris,* 208 F. App'x 174 (3d Cir. 2006) ............................................................ 7

*Gebster v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998) .................................. 3, 4, 6

*Gjeka v. Del. County Comm. Coll.,* Civ. A. No. 12-4548, 2013 U.S. Dist. LEXIS
    73054 (E.D. Pa. May 23, 2013) ............................................................................ 5

*Guevara v. Marriott Hotel Svcs.,* No. 10-5347, 2012 U.S. Dist. LEXIS 132456
    (N.D. Cal. Sept. 14, 2012) .................................................................................. 10

*Johnson v. Baptist Medical Center,* 97 F.3d 1070 (8th Cir. 1996) .................................. 4

*Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454 (1975) ...................................... 3

*Lakoski v. James,* 66 F.3d 751 (5th Cir. 1995) .................................................................. 3

*Lever v. Northwestern Univ.,* 979 F.2d 552 (7th Cir. 1992) .............................................. 9

*Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir. 1988) .................................. 4

*Loewen v. Grand Rapids Med. Educ. Partners,* Case No. 1:10-CV-1284, 2012
    U.S. Dist. LEXIS 49476 (W.D. Mich. Apr. 9, 2012) .......................................... 2

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                                 **PAGE(S)**

*Mandel v. M&Q Packaging Corp.,* 706 F.3d 157 (3d Cir. 2013) ........................................ 7, 8

*McCray v. Unite Here,* No. 13-6540, 2015 U.S. Dist. LEXIS 34877 (D.N.J. Mar. 20, 2015) ...................................................................................................................... 11

*Monger v. Purdue Univ.,* 953 F. Supp. 260 (S.D. Ind. 1997) ................................................ 5

*National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) .................................... 6, 7, 9

*N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512 (1982) ............................................................ 2

*Schengrund v. Pa. State Univ.,* 705 F. Supp. 2d 425 (M.D. Pa. 2009) .................................... 3

*Smith v. Metropolitan Sch. Dist. Perry Twp.,* 128 F.3d 1014 (7th Cir. 1997) .......................... 3

*Stanley v. Trustees of The Cal. State Univ.,* 433 F.3d 1129 (9th Cir. 2006) ...................... 5, 10

*Summy-Long v. Pennsylvania State Univ.,* Civ. A. No. 1:06-cv-1117, 2010 U.S. Dist. LEXIS 27953 (M.D. Pa. Mar. 24, 2010) .............................................................. 6

*Thompson v. Indep. Sch. Dist. of Stephens Co., Oklahoma,* Case No. CIV-12-13-M, 2013 U.S. Dist. LEXIS 65320 (W.D. Okla. May 8, 2013) ................................ 5, 6

*Williams v. Collins,* No. 12-1149, 2012 U.S. Dist. LEXIS 172839 (E.D. Pa. Dec. 5, 2012) ................................................................................................................ 11

**STATUTES**

20 U.S.C. § 1681(a) ................................................................................................. 1, 2, 4

20 U.S.C. § 1681(c) ....................................................................................................... 2

20 U.S.C. § 1687 ........................................................................................................... 2

42 U.S.C. § 1981 ........................................................................................................... 3

42 U.S.C. § 2000e-5(e)(1) ............................................................................................. 6

**OTHER AUTHORITIES**

H.R. Rep. No. 554, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin. News 2462, 2512 .......................................................................................... 3

## I.   INTRODUCTION

In her Response in Opposition to Defendant Mercy Catholic Medical Center's ("Defendant" or "MCMC") Motion to Dismiss Plaintiff's Third Amended Complaint ("TAC"), Plaintiff concedes that any alleged discrete acts of discrimination or retaliation that occurred more than two (2) years prior to the filing of her Complaint on April 20, 2015 are time barred and that she cannot assert an independent cause of action for breach of the covenant of good faith and fair dealing (Count VI).  Plaintiff fails to address Defendant's argument that Count IV of her TAC for breach of contract based on alleged gender discrimination is preempted by the PHRA, and accordingly Defendant asks that Count IV be dismissed as waived.

As set forth in detail below as well as in Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Memorandum of Law"), Plaintiff simply cannot plausibly state a claim that MCMC's medical residency program qualifies as an "education program or activity" under Title IX.  20 U.S.C. § 1681(a).  Likewise, Plaintiff's hostile environment claim is barred in its entirety by the statute of limitations.  Plaintiff sole remaining breach of contract claim found in Count V (as set forth above, Plaintiff concedes that Count VI is not viable and fails to address MCMC's argument as to Count IV) also cannot survive dismissal as Plaintiff has not plausibly pled the essential terms of the alleged contract at issue (despite the fact that Plaintiff's TAC is her fourth pleading).

Throughout her Response, Plaintiff makes various factual allegations that are not pled in her TAC.  For example, Plaintiff argues that she was "called a liar by her supervisor" at the appeal hearing and recites the alleged definition of cause in her Residency Agreement.  Pl.'s Resp. at 2.  This Court should reject Plaintiff's attempt to in essence amend the allegations in her pleading through the vehicle of their Response Brief, which it is well-established Plaintiff cannot do.

Plaintiff also should be required to prosecute this case under her real name as she has

failed to demonstrate that this is an exceptional case warranting the use of a pseudonym.

## II. PLAINTIFF'S TITLE IX CLAIMS FAIL AS A MATTER OF LAW.

In her Response, Plaintiff mischaracterizes Defendant's argument with regard to her three

(3) Title IX claims, suggesting that Defendant has taken the position that "its residency program

is not covered by Title IX because the program is not educational." Pl.'s Resp. at 4. Plaintiff

misapprehends Defendant's position. Defendant acknowledges that its medical residency

provides valuable on-the-job training to physicians who already have completed a four-year

course of undergraduate instruction followed by a four-year course of medical instruction.

Rather, Plaintiff asks the wrong question, and comes up with the wrong answer. The appropriate

question is not whether MCMC's residency program is "educational," but whether it qualifies as

an "education program or activity" such that it is covered by Title IX. 20 U.S.C. § 1681(a).

The Court's "starting point in determining the scope of Title IX is, of course, the

statutory language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982) (citation omitted).

While Title IX defines "program or activity," *see* 20 U.S.C. § 1687, it nowhere defines what it

means by education. Rather, the closest the statute comes to a definition is its definition of an

"educational institution," which means, in relevant part, "any public or private preschool,

elementary, or secondary school, or any institution of vocational, professional, or higher

education." 20 U.S.C. § 1681(c); *Fordyce v. Prince George's County Md.*, 43 F. Supp. 3d 537,

546 (D. Md. 2014); *Loewen v. Grand Rapids Med. Educ. Partners*, Case No. 1:10-CV-1284,

2012 U.S. Dist. LEXIS 49476, at *31 (W.D. Mich. Apr. 9, 2012).[1] Given the facts alleged by

Plaintiff in her TAC, it is not plausible to infer that MCMC's residency program qualifies as an

---

[1] To the extent any regulations impermissibly expand the definition of "educational institution" or "education" beyond the scope envisioned by Congress when it enacted Title IX, they are not entitled to deference by this Court.

"education program or activity" akin to an "educational institution." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 695 n.17 (1978) ("Title IX is applicable only to certain educational institutions receiving federal financial assistance"); *see also* H.R. Rep. No. 554, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin. News 2462, 2512 ("One of the single most important pieces of legislation which has prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act of 1964. . . . **Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision**.") (emphasis added).[2]

Courts repeatedly have cited to this portion of Title IX's legislative history, recognizing that "Title IX was enacted to fill a gap in discrimination law left by Title VII." *See, e.g., Collier by Collier v. William Penn Sch. Dist.*, 956 F. Supp. 1209, 1213 (E.D. Pa. 1997) (Bartle, J.), *rev'd* (following Supreme Court's decision in *Gebster v. Lago Vista Independent School District*, 524 U.S. 274 (1998)), 191 F.3d 444 (3d Cir. 1999); *see also Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012); *Smith v. Metropolitan Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1041 (7th Cir. 1997); *Doe v. Claiborne County*, 103 F.3d 495, 514 (6th Cir. 1996); *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995); *Schengrund v. Pa. State Univ.*, 705 F. Supp. 2d 425, 439 n.17 (M.D. Pa. 2009). That Title IX specifically was enacted to address an area untouched by Title VII strongly undercuts Plaintiff's position that the two statutes are overlapping, and therefore individuals such as Plaintiff can seek remedies under both.

---

[2] Plaintiff cites to *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), a case analyzing the scope of the Civil War era statute (now codified at 42 U.S.C. § 1981) enacted nearly 100 years prior to Title VII for the unremarkable position that Title VII did not preempt claims under 42 U.S.C. § 1981 ("Section 1981"). Of course, Title IX which was enacted several years after Title VII, and specifically for the purpose of filling a hole in Title VII, is on different footing than Section 1981 (which was enacted to provide African-Americans with the right to make and enforce contracts following the Civil War).

In addition, many of the cases relied upon by Plaintiff to support her position that MCMC's residency program qualifies as an "education program or activity" under Title IX have been fatally undermined by subsequent Supreme Court precedent. 20 U.S.C. § 1681(a). For example, the only Court of Appeals decision to hold that a medical resident could bring a claim under Title IX, *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988), applied Title VII case law to plaintiff's Title IX claim without reference to the divergent statutory text. Of course, the Supreme Court in *Gebster*, 524 U.S. at 283, rejected application of exactly the same analysis adopted by the First Circuit in *Lipsett*, reasoning that Title IX must be interpreted in accord with its statutory language. *See also Johnson v. Baptist Medical Center*, 97 F.3d 1070 (8th Cir. 1996) (applying same analytical framework for analyzing Title VII and Title IX claims).

In addition, the First Circuit in *Lipsett* breezed right past the central issue which is before the Court here with a one sentence statement that plaintiff was "both an employee *and* a student in the program." 864 F.2d at 897. This possibly was because the plaintiff in *Lipsett* brought both Title IX and Title VII claims, and therefore the First Circuit did not find it necessary at that stage of the case to conduct a detailed analysis as to whether the residency program qualified as an "education program or activity," because even if it did not, it qualified as an employer under Title VII. In any event, whether it is because the parties did not raise the issue or otherwise, Defendant respectfully submits that a one sentence passing comment in a partly discredited First Circuit decision from more than 25 years ago is not entitled to controlling weight by this Court.[3]

---

[3] Plaintiff also cites to the Ninth Circuit case of *Doe v. Petaluma City School District*, 54 F.3d 1147, 1454 (9th Cir. 1995), which she argues "cited approvingly to *Lipsett*" in *dicta*. Pl.'s Resp. at 11. Plaintiff fails to mention that this citation appears in the dissent, not in the majority opinion.

For all of these reasons, as well as those reasons set forth in MCMC's Memorandum of

Law (and not repeated herein), MCMC respectfully requests that this Court dismiss Plaintiff's

Title IX claims.

## III.   PLAINTIFF'S HOSTILE ENVIRONMENT CLAIM IS TIME BARRED.

As set forth in Defendant's Memorandum of Law, Plaintiff's hostile environment claim

(Count I) is barred by the statute of limitations.  Plaintiff affirmatively pleads that she was on

notice of the alleged hostile educational environment in the "winter of 2011/2012," which is far

more than two years prior to the filing of this action on April 20, 2015.  TAC at ¶¶ 145. 152;

ECF No. 1.  Because Plaintiff was on notice of her claim, yet failed to bring it within two (2)

years of when the claim accrued, Count I of Plaintiff's TAC should be dismissed.  *Monger v.*

*Purdue Univ.*, 953 F. Supp. 260, 264-65 (S.D. Ind. 1997); *see also Stanley v. Trustees of The*

*Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) (stating in the Title IX context that "a

cause of action generally accrues when a plaintiff knows or has reason to know of the injury

which is the basis of his action") (citations omitted).

This Court should reject Plaintiff's invitation to apply the continuing violations doctrine

to stave off dismissal of Plaintiff's Title IX claim.  Although the Third Circuit has not yet spoken

on this question, Judge Slomsky of the Eastern District of Pennsylvania declined to apply the

continuing violations doctrine in the Title IX context.  *Gjeka v. Del. County Comm. Coll.*, Civ.

A. No. 12-4548, 2013 U.S. Dist. LEXIS 73054, at *13-15 (E.D. Pa. May 23, 2013) (refusing to

"expand the continuing violations theory beyond its application to a hostile work environment

claim under Title VII"); *see also Doe v. Rust Coll.*, Civ. A. No. 3:14-CV-32-NBB-SAA, 2015

U.S. Dist. LEXIS 129232, at *6 (N.D. Miss. Sept. 25, 2015) (refusing to apply continuing

violations doctrine to plaintiff's Title IX claim); *Thompson v. Indep. Sch. Dist. of Stephens Co.,*

*Oklahoma*, Case No. CIV-12-13-M, 2013 U.S. Dist. LEXIS 65320, at *14 n.8 (W.D. Okla. May

8, 2013) (same); *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d
273, 288-89 (E.D.N.Y. 2002) (same).

In contrast, the only case cited by Plaintiff in our circuit which has applied the continuing
violations doctrine in the Title IX context, *Summy-Long v. Pennsylvania State University*, Civ.
A. No. 1:06-cv-1117, 2010 U.S. Dist. LEXIS 27953, at *35 n.4 (M.D. Pa. Mar. 24, 2010),
assumed that the continuing violations doctrine applied "**[b]ecause it [was] uncontested**."
(emphasis added).

The underlying (and flawed) assumption of the cases relied upon by Plaintiff is that the
Supreme Court's application of the continuing violations doctrine under Title VII in *National
R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) is equally applicable to Plaintiff's Title IX
claim. The Supreme Court in *Gebster*, 524 U.S. at 286, specifically recognized the distinctions
between Title IX and Title VII, explaining that Title IX "was modeled after Title VI of the Civil
Rights Act of 1964," and not Title VII. *Cannon*, 441 U.S. at 694-95. As the *Gebster* Court
explained, Title IX "condition[s] an offer of federal funding on a promise by the recipient not to
discriminate, in what amounts essentially to a contract between the Government and the recipient
of funds." *Gebster*, 524 U.S. at 286 (citations omitted). In contrast, Title VII is framed as an
"outright prohibition" which applies to "all employers without regard to federal funding." *Id.* In
fact, the Court's decision in *Morgan* was a textual analysis of Title VII's statutory language,
specifically when an "unlawful employment practice occurred" under 42 U.S.C. § 2000e-5(e)(1).
*Morgan*, 536 U.S. at 109. Of course no similar analysis could be conducted under Title IX,
which contains no statute of limitations because a private right of action was implied by the
Court in *Cannon*. *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989).

Given the differences between Title VII and Title IX, Title VII's continuing violations
doctrine should not apply to claims brought under Title IX. *Gebster*, 524 U.S. at 286-87

(explaining that while Title VII aims to "make persons whole for injuries suffered" Title IX

"focuses more on 'protecting' individuals from discriminatory practices.") (citations omitted);

*see also Folkes*, 214 F. Supp. 2d at 288-89 ("*Gebser* shows the Supreme Court's reluctance to

extend the reach of Title IX beyond that imposed by Congress" and "leads this court to question

the advisability of applying the oft-disfavored continuing violation exception to Title IX

claims").

In the alternative, even assuming application of the continuing violations doctrine to

Plaintiff's Title IX hostile educational environment claim, Plaintiff fails to state such a claim.

"The continuing violations doctrine is an equitable exception to a strict application of a statute of

limitations where the conduct complained of consists of a pattern that has only become

cognizable as illegal over time." *Foster v. Morris*, 208 F. App'x 174, 178 (3d Cir. 2006)

(citation omitted).  The doctrine applies only to "**discriminatory acts that are not individually**

**actionable**" which "may be aggregated to make out a hostile work environment claim." *Mandel*

*v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (emphasis added).

"To allege a continuing violation, [Plaintiff] must show that all acts which constitute the

claim are part of the **same unlawful employment practice** and that at least one act falls within

the applicable limitations period." *Morgan,* 536 U.S. at 118 (emphasis added); *see also Mandel*,

706 F.3d at 165-66 (citations omitted).  Since Plaintiff's Complaint (ECF No. 1) was filed on

**April 20**, **2015**, given the two (2) year statute of limitations, if the continuing violations doctrine

applies, Plaintiff must allege at least one act of purported harassment which took place on or

after **April 20, 2013**.

To assess whether the TAC plausibly avers timely conduct related to the same unlawful

employment practice, courts in the Third Circuit look to the subject matter and the frequency of

the conduct.  *Mandel*, 706 F.3d at 166.  In *Mandel*, the Third Circuit reversed the decision of the

district court and allowed plaintiff's hostile work environment claim to go forward, reasoning

that plaintiff has cited to at least one act of harassment during the limitations period (*i.e.*, the

plant manager allegedly called plaintiff a derogatory name), and "many of the acts that occurred

prior to the applicable limitations period **involved similar conduct by the same individuals,**

**suggesting a persistent, ongoing problem**." *Mandel*, 706 F.3d at 167 (emphasis added).

Plaintiff's Response argues that her residency supervisor "John Roe," "created a hostile

educational environment for her during her residency." Pl.'s Resp. at 24. In support of this

allegation, Plaintiff's Response lists at length the alleged acts that "contributed to the hostile

educational environment," which are pled in Plaintiff's TAC. Pl.'s Resp. at 24-26. For example,

Plaintiff alleges that Roe "implied sexual attraction towards Plaintiff" and "regularly ask[ed] her

to socialize outside of work." Pl.'s Resp. at 25. Plaintiff references conduct that took place

"[t]hroughout [Plaintiff's] residency" which Plaintiff defines as "i.e., from 2011 **until April 19,**

**2013**." Pl.'s Resp. at 25. This is, of course, an admission that Plaintiff's residency ended, as

Plaintiff alleged in her TAC, when Plaintiff received a letter on April 20, 2013 that was dated

April 19, 2013. TAC at ¶ 119.

Since Plaintiff learned that her residency was terminated on April 20, 2013, in order to

prevent dismissal of her hostile environment claim, Plaintiff must identify an alleged act of

harassment that took place after the end of her residency. TAC at ¶ 118. Plaintiff attempts to

save her hostile environment claim by relying on Roe's alleged conduct in "advocat[ing] for

Plaintiff's dismissal" at the April 24, 2013 hearing during which Plaintiff appealed the

termination decision, which was "in public and in front of other faculty members." TAC at

¶ 122; Pl.'s Resp. at 26. This Court should reject Plaintiff's position because Roe's alleged

conduct at the April 24, 2013 hearing is not "part of the same [alleged] unlawful employment

practice" identified by Plaintiff in her TAC, as Plaintiff's own Response Brief makes crystal

clear.[4]  *Morgan,* 536 U.S. at 118.  Rather, in her TAC Plaintiff alleges that Roe subjected her to

unwanted sexual attention during her residency.  Pl.'s Resp. at 26-27.  Plaintiff does not allege

that Roe engaged in similar conduct during the appeal hearing.  *Morgan,* 536 U.S. at 118 ("if an

act on day 401 had no relation to the acts between days 1-100 . . . then the employee can not

recover for the previous acts, at least not by reference to the day 401 act.").  And while Plaintiff

in her response continuously refers to Roe's speech at the appeal hearing as "hostile," this of

course does not make Roe's statements at the hearing either part of the same "alleged unlawful

employment practice" that Plaintiff alleges took place prior to April 20, 2013 or a component act

of any purported hostile educational environment as that phrase is defined by law.[5]

When faced with the identical issue, another district court rejected the argument that

---

[4] In fact, the vagueness of the allegation in paragraph 122 of her TAC makes it
unreasonable to infer that any statements made by Roe at the hearing even constitute acts of
harassment.  And while Plaintiff makes various factual allegations throughout her Response as to
what Roe allegedly said during the hearing, this Court should disregard such allegations as they
have not been pled in the TAC.  *See, e.g.,* Pl.'s Resp. at 26.  Plaintiff's various characterizations
of Roe's conduct fare no better, as they either are unsupported by the bare allegations in
Plaintiff's TAC, are wholly legally conclusory in nature or both.  *See, e.g.,* Pl.'s Resp. at 27
(stating that "Plaintiff was forced to be publicly abused and attacked by Roe because of her
gender . . . .").

[5] Plaintiff's argument that the alleged hostile environment "is separate and distinct from
the tangible action that occurred" is a red herring.  Pl.'s Resp. at 27.  Of course Plaintiff's hostile
environment claim differs from her claims bottomed on discrete acts.  The questions before the
Court with regard to Plaintiff's hostile environment claim are simply whether Roe's alleged
"advoca[cy] for Plaintiff's dismissal from the residency program" during the April 24, 2013
appeal hearing, which is the only potentially timely component act of the alleged hostile
environment, even qualifies as actionable harassment or, assuming that the Court finds that it
does, is part of the same purported "unlawful employment practice" as that identified by Plaintiff
in her TAC.  *Morgan,* 536 U.S. at 118.  Defendant respectfully submits both that Roe's alleged
advocacy for Plaintiff termination cannot be inferred to constitute harassment and that, in any
event, it was not a part of the same alleged unlawful employment practice identified by Plaintiff
in her TAC that took place prior to April 20, 2013.  It also is worth noting that Plaintiff is
incorrect when she argues that "the decision not to reverse its decision as to Plaintiff's
termination constitutes a discrete act of discrimination by Defendant."  Pl.'s Resp. at 27.  *See
Del. State Coll. v. Ricks,* 449 U.S. 250, 261 (1980) ("The grievance procedure, by its nature, is a
remedy for a prior decision"); *Lever v. Northwestern Univ.,* 979 F.2d 552, 556 (7th Cir. 1992)
("An employer's **refusal to undo a discriminatory decision is not a fresh act of
discrimination**.") (citations omitted) (emphasis added).

conduct occurring during a termination hearing constituted a "component act" to support a hostile environment claim. *See Guevara v. Marriott Hotel Svcs.*, No. 10-5347, 2012 U.S. Dist. LEXIS 132456, at *16-21 (N.D. Cal. Sept. 14, 2012). In *Guevara*, the plaintiff argued, *inter alia*, that his hostile environment claim should not be dismissed when the only alleged act in support of his hostile environment claim was alleged false statements made by those who contributed to the alleged earlier workplace harassment during an employee's post-termination arbitration hearing. *Id.* However, the simple fact that the alleged harassers "testified at the arbitration hearing . . . without more, does not suffice to establish that the alleged false statements made at the arbitration hearing were premised on racial animus." *Id.* at *19. As such, the court dismissed the plaintiff's hostile environment claim.

The Ninth Circuit case cited by Plaintiff herself in support of her position undermines rather than supports application of the continuing violations doctrine to the alleged comments made by Roe at the April 24, 2013 hearing to save Plaintiff's claim. Pl.'s Resp. at 27; *Stanley*, 433 F.3d at 1137. In assessing whether Plaintiff Stanley had identified any alleged timely component acts within the limitations period (and finding that she had not), the Ninth Circuit looked to whether Stanley could show "she was subjected to verbal or physical conduct of a sexual nature . . ." within the limitations period. *Stanley*, 433 F.3d at 1137. The Ninth Circuit noted that Stanley "has not alleged that she was subjected to any sexually-natured conduct at the University during a period when she was not present." *Id.; see also Clifford v. Regents of Univ.*, No. 11-02935, 2012 U.S. Dist. LEXIS 60280, at *14-20 (E.D. Cal. Apr. 27, 2012) (case cited by Plaintiff in her Response which held that the continuing violations doctrine did not save the plaintiff's hostile education environment claim because plaintiff failed to show that any of the alleged conduct that occurred during the limitations period (*e.g.*, alleged harassers "glared and continually stared at him during classes") was actually "based on Plaintiff's sex"). So too

Plaintiff here has not identified any timely alleged component act of the hostile educational environment that Plaintiff pleads in her TAC.

Because Plaintiff has not identified a timely act of the alleged unlawful educational practice, Plaintiff's hostile environment claim is time barred.  Accordingly, Defendant respectfully requests that this Court dismiss Count I of Plaintiff's TAC.

## IV.   COUNT IV SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO RESPOND TO DEFENDANT'S ARGUMENT THAT HER CONTRACT CLAIM BASED ON ALLEGED GENDER DISCRIMINATION IS PREEMPTED BY THE PENNSYLVANIA HUMAN RELATIONS ACT.

It is well established that "[t]he failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count." *McCray v. Unite Here*, No. 13-6540, 2015 U.S. Dist. LEXIS 34877, at *7 n.2 (D.N.J. Mar. 20, 2015) (citation omitted); *see also Williams v. Collins*, No. 12-1149, 2012 U.S. Dist. LEXIS 172839, at *15 n.10 (E.D. Pa. Dec. 5, 2012).  Thus, because Plaintiff failed to address Defendant's arguments seeking dismissal of Count IV in any way, Plaintiff has waived this claim.[6]

## V.   COUNT V SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT PLAUSIBLY PLED A CLAIM FOR BREACH OF CONTRACT BASED ON ALLEGED WRONGFUL TERMINATION.

Plaintiff makes several inconsistent arguments throughout her Response in an attempt to prevent dismissal of Count V of the TAC, all of which should be rejected by the Court.  In the Introduction, Plaintiff argues that she has pleaded a plausible breach of contract claim because she contends that she was not terminated for "cause" as that word is defined in the Residency Agreement.  Plaintiff then includes an alleged definition of "cause" nowhere found in her TAC.

---

[6] Although not fully clear, Plaintiff seemingly argues that she can obtain contract-based damages for alleged discrimination or retaliation. Pl.'s Resp. at 33.  Plaintiff is mistaken.  The remedy for discrimination and retaliation is statutory, not contractual, which is the reason why Plaintiff's gender-based breach of contract claim is preempted by the Pennsylvania Human Relations Act ("PHRA").  *See* Def.'s Mem. of Law at 17-18.  Because such a claim is preempted, it necessarily follows that Plaintiff cannot obtain contractual remedies for alleged discrimination or retaliation.

Pl.'s Resp. 2. Plaintiff goes on later to make conflicting arguments with regard to the Residency Agreement, affirmatively representing that the Agreement "does not" define cause. Pl.'s Resp. at 32. Again this factual allegation nowhere appears in Plaintiff's TAC. It is axiomatic that this Court cannot consider facts which do not appear in the four corners of Plaintiff's pleading (nor, given that the facts contained in Plaintiff's Response are contradictory, would it be possible for the Court to simultaneously consider both facts even if the Court were inclined to consider facts not contained in Plaintiff's TAC).

Plaintiff's attempts to bolster the bare bones factual allegations of her TAC in her Response make it abundantly clear that even Plaintiff does not believe that she pleaded the essential terms of the Residency Agreement in her TAC. For the reasons set forth in Defendant's Memorandum of Law at pages 17-18, and not repeated herein, Plaintiff simply has not complied with her obligation to plausibly plead the essential terms of the alleged contract.

Finally, Plaintiff offers to file a fifth pleading "if the Court wishes more information" with regard to Plaintiff's breach of contract claim. Pl.'s Resp. at 33. Defendant vigorously opposes further amendment of Plaintiff's pleading as Plaintiff has had multiple opportunities to plausibly plead claims. That Plaintiff only decided to include breach of contract claims in her fourth pleading should not impact the analysis.

## VI.  PLAINTIFF SHOULD NOT BE PERMITTED TO LITIGATE THIS CASE USING A PSEUDONYM.

Plaintiff fails in any meaningful way to respond to Defendant's argument that Plaintiff should not be permitted to proceed in this action using a pseudonym. Accordingly, to the extent that any claims remain in this matter following consideration of Defendant's Motion, for the reasons set forth in Defendant's Memorandum of Law and not repeated herein, Defendant respectfully requests that this Court order Plaintiff to submit an amended caption in this matter which includes her legal name. In the alternative, Defendant respectfully requests that this Court

hold an *in camera* hearing so that Defendant can present evidence which shows that Plaintiff's identity already is in the public domain due to her own conduct.  As a result, Plaintiff should be required to prosecute this lawsuit under her own name.

## VII.    CONCLUSION

For the foregoing reasons, Defendant Mercy Catholic Medical Center respectfully requests that this Court dismiss Plaintiff's Third Amended Complaint in its entirety with prejudice.  In the alternative, Defendant Mercy Catholic Medical Center respectfully requests that this Court:  (1) dismiss Counts II and III related to any alleged discrete acts under Title IX prior to April 20, 2013 as time barred (which Plaintiff concedes); (2) dismiss Count I alleging a hostile environment under Title IX as time barred; (3) dismiss Count IV (which Plaintiff does not contest, because Plaintiff's breach of contract claim based on alleged gender discrimination is preempted by the PHRA); (4) dismiss Count V for failure plausibly to plead a claim for breach of contract; (5) dismiss Count VI (which Plaintiff concedes); (6) prohibit Plaintiff from proceeding with this action under a pseudonym; and (7) order Plaintiff to file an amended caption which identifies her real name.

**POST & SCHELL, P.C.**

Dated: December 23, 2015                BY:      *s/ Andrea M. Kirshenbaum*
                                                 A. JAMES JOHNSTON, ESQUIRE
                                                 ANDREA M. KIRSHENBAUM, ESQUIRE
                                                 KATE A. KLEBA, ESQUIRE
                                                 Four Penn Center
                                                 1600 John F. Kennedy Blvd.
                                                 Philadelphia, PA 19103
                                                 (215) 587-1000

                                                 Attorneys for Defendant
                                                 Mercy Catholic Medical Center

## CERTIFICATE OF SERVICE

I certify that I filed Defendant's Reply Brief in Further Support of its Motion to Dismiss

Plaintiff's Third Amended Complaint on the below date via the Court's Electronic Case Filing system,

which then caused a copy of the foregoing to be served electronically on the following counsel of

record:

Joshua S. Boyette
Swartz Swidler LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
jboyette@swartz-legal.com

*Attorneys for Plaintiff*

Dated: December 23, 2015             BY:     *s/ Andrea M. Kirshenbaum*
                                             ANDREA M. KIRSHENBAUM, ESQUIRE