# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## Appellate Docket Number 16-1247

---

### JANE DOE,

Appellant,

v.

### MERCY CATHOLIC MEDICAL CENTER,

Appellee.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## NO. 2:15-CV-02085-MMB

---

## BRIEF OF APPELLEE, MERCY CATHOLIC MEDICAL CENTER

---

A. JAMES JOHNSTON, ESQUIRE
ANDREA M. KIRSHENBAUM, ESQUIRE
ROBIN LOCKE NAGELE, ESQUIRE
DARREN M. CREASY, ESQUIRE
POST & SCHELL, P.C.
FOUR PENN CENTER
1600 J.F.K. BOULEVARD
PHILADELPHIA, PA  19103
(215) 587-1000

COUNSEL FOR APPELLEE,
MERCY CATHOLIC MEDICAL CENTER

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

**No.  16-1247**

**Jane Doe**
v.
**Mercy Catholic Medical Center**

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party' s stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party' s principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,   Mercy Catholic Medical Center
makes the following disclosure:                                   (Name of Party)

     1)   For non-governmental corporate parties please list all parent corporations:

Mercy Health System of Southeastern Pennsylvania.


     2)   For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.


     3)   If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.


     4)   In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A.




_____        Dated:  February 17, 2016
(Signature of Counsel or Party)
A. JAMES JOHNSTON


(Page 2 of 2)


*rev: 09/2014*

## **CERTIFICATE OF SERVICE**

I, A. James Johnston, Esquire, hereby certify that on this date, February 17, 2016, a true and correct copy of the foregoing Corporate Disclosure Statement and Statement of Financial Interest on behalf of appellee, Mercy Catholic Medical Center, was filed electronically with the U.S. Court of Appeals for the Third Circuit which in turn electronically served the following individuals:

Joshua S. Boyette
SWARTZ SWIDLER LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
jboyette@swartz-legal.com

*Attorney for appellant Jane Doe*

Dated: February 17, 2016

A. JAMES JOHNSTON, ESQUIRE

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................iv

I.   COUNTER-STATEMENT OF SUBJECT MATTER AND
     APPELLATE JURISDICTION...................................................................1

II.  COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR
     REVIEW......................................................................................................2

III. COUNTER-STATEMENT OF THE CASE................................................2

IV.  COUNTER-STATEMENT OF FACTS ......................................................3

V.   COUNTER-STATEMENT OF RELATED CASES AND
     PROCEEDINGS .........................................................................................5

VI.  COUNTER-STATEMENT OF THE STANDARD OF REVIEW ...........5

VII. SUMMARY OF THE ARGUMENT ..........................................................6

VIII. ARGUMENT................................................................................................7

     A.   THE DISTRICT COURT PROPERLY DISMISSED
          ALL CLAIMS UNDER TITLE IX, WHICH AFFORDS
          NO RELIEF TO AN EMPLOYED PHYSICIAN IN A
          HOSPITAL RESIDENCY PROGRAM. ........................................7

          1.   The Plain Meaning of Title IX Excludes Mercy
               Because it is an Entity Not Principally Engaged in
               the Business of Education........................................................7

               a.   A Plain Reading of Title IX Precludes its
                    Application to this Case ...............................................10

               b.   Doe and Amicus Misread the CRRA ..........................14

               c.   Judicial Precedent Does Not Rescue Doe's
                    Position.........................................................................18

               d.   Title IX's Implementing Regulations Do Not
                    Support Doe's Position In this Case...........................21

## TABLE OF CONTENTS (CONTINUED)

**PAGE**

2.   **Title IX Does Not Contain an Implied Private Right of Action for Physicians Employed in Private Hospital Residency Programs** ...................................**26**

    a.   **Doe Had Employment Protection Under Title VII** .................................................**27**

    b.   **Title IX's Implied Private Right of Action Must Yield to Title VII's Comprehensive Remedial Scheme** ...........................................**29**

    c.   **An Implied Private Right of Action for Alleged Employment Discrimination Under Title IX Would Undermine Title VII** ..........................**34**

    d.   **Supreme Court Precedent Provides No Support for the Position Urged by Doe and Amicus** ........................................................**39**

    e.   **Expansion of Implied Rights Is Heavily Disfavored** ......................................................**42**

    f.   **The Contractual Nature of Title IX Requires Courts to Exercise Additional Restraint** ...................**45**

B.   **THE DISTRICT COURT PROPERLY DISMISSED COUNT I OF DOE'S TAC BASED ON THE STATUTE OF LIMITATIONS**...........................................................**46**

    1.   **The Continuing Violations Doctrine Does Not Apply in the Title IX Context** .................................**47**

    2.   **Equity Precludes Application of the Continuing Violations Doctrine on These Facts**.......................**49**

    3.   **Doe Has Not Alleged a Timely Non-discrete Component Act of Harassment** .............................**51**

IX.   **CONCLUSION** .......................................................**54**

**CERTIFICATION OF BAR MEMBERSHIP**

## TABLE OF CONTENTS (CONTINUED)

**PAGE**

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

**CERTIFICATION OF SERVICE UPON COUNSEL**

**CERTIFICATION OF VIRUS CHECK**

**CERTIFICATION OF IDENTICAL BRIEFS**

# TABLE OF AUTHORITIES

## CASES                                                                              PAGE(S)

*Alegria v. Williams,* 314 F. App'x 687 (5th Cir. 2009) .................................... 11, 13

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974) .........................................29

*Alexander v. Sandoval,* 532 U.S. 275 (2001)................................................... 42, 43

*Auer v. Robbins,* 519 U.S. 452 (1997) .....................................................................23

*Barrs v. The Southern Conference,* 734 F. Supp. 2d 1229 (N.D. Ala. 2010) ........................................................................................................8

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)..................................................5, 6

*Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152 (1999) ......................................... 27, 28

*Bougher v. Univ. of Pittsburgh,* 882 F.2d 74 (3d Cir. 1989) .................................46

*Burtch v. Milberg Factors, Inc.,* 662 F.3d 212 (3d Cir. 2011) .................................5

*Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979).............. 30, 39, 41-44, 46, 48, 49

*Capone v. Univ. of Ark.,* No. 5:15-CV-5219, 2016 U.S. Dist. LEXIS 79923 (W.D. Ark. June 20, 2016) ................................................................36

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837 (1984)........................................................................................... 16, 22, 23

*Cmty. & Econ. Dev. Ass'n of Cook County, Inc. v. Suburban Cook County Area Agency on Aging,* 770 F.2d 662 (7th Cir. 1985) .....................43

*Connelly v. Lane Constr. Corp.,* 809 F.3d 780 (3d Cir. 2016).................................5

*Connelly v. Steel Valley Sch. Dist.,* 706 F.3d 209 (3d Cir. 2013)............................5

*Crandell v. N.Y. Coll. of Osteopathic Med.,* No. 99 Civ. 2347 (LAK), 87 F. Supp. 2d 304 (S.D.N.Y. 2000) ........................................................9, 18

*Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629 (1999) .................................30

*DeJohn v. Temple Univ.,* 537 F.3d 301 (3d Cir. 2008)...........................................46

*Doe v. Rust Coll.,* No. 3:14-CV-32, 2015 U.S. Dist. LEXIS 129232 (N.D. Miss. Sept. 25, 2015) .........................................................................47

# TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                                **PAGE(S)**

*Fairview Township v. EPA,* 773 F.2d 517 (3d Cir. 1985) .........................................5

*Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009) ..................... 31, 34, 41

*Folkes v. N.Y. College of Osteopathic Med. of N.Y. Inst. of Tech.,* 214
    F. Supp. 2d 273 (E.D. N.Y. 2002).............................................. 45, 47, 48, 49

*Foster v. Morris,* 208 F. App'x 174 (3d Cir. 2006).................................................50

*Franklin v. Gwinnett Cnty. Public Sch.,* 503 U.S. 60 (1992) .......... 16, 31, 33, 39-41

*Fusco v. Bucks County,* No. 08-2082, 2009 U.S. Dist. LEXIS 118924
    (E.D. Pa. Dec. 21, 2009)................................................................................50

*Gebser v. Lago Vista Ind. Sch. Dist.,* 524 U.S. 274 (1998) ........... 35, 36, 45, 48, 49

*Gibson v. Hickman,* 2 F. Supp. 2d 1481 (M.D. Ga. 1998) .....................................34

*Gjeka v. Del. County Comm. Coll.,* No. 12-4548, 2013 U.S. Dist.
    LEXIS 73054 (E.D. Pa. May 23, 2013) ........................................................47

*Glickstein v. Neshaminy Sch. Dist.,* No. 96-6236, 1997 U.S. Dist.
    LEXIS 16317 (E.D. Pa. Oct. 22, 1997).........................................................36

*Great Am. Fed. Sav. and Loan Ass'n v. Novotny,* 442 U.S. 366 (1979)..... 32, 33, 34

*Grove City College v. Bell,* 465 U.S. 555 (1984) ............................................ 10, 11

*Health Care Plan, Inc. v. Aetna Life Ins. Co.,* 966 F.2d 738 (2d Cir.
    1992) ...............................................................................................................44

*Henschke v. The New York Hospital-Cornell Medical Center,* 821 F.
    Supp. 166 (S.D.N.Y. 1993) ................................................................ 8, 10, 19

*In re Olympia Brewing Co. Sec. Litig.,* 674 F. Supp. 597 (N.D. Ill.
    1987) ...............................................................................................................43

*Investment Co. Institute v. Camp,* 401 U.S. 617 (1971) .........................................22

*Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167 (2005) ............................. 39, 40

*Jeldness v. Pearce,* 30 F.3d 1220 (9th Cir. 1994)...................................................20

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                              **PAGE(S)**

*Johnson v. Railway Exp. Agency, Inc.,* 421 U.S. 454 (1975) ...................................32

*Kent v. Henderson,* 77 F. Supp. 2d 628 (E.D. Pa. 1999) .........................................53

*Klinger v. Dep't of Corr.,* 107 F.3d 609 (8th Cir. 1997) ........................................20

*Lakoski v. James,* 66 F.3d 751 (5th Cir. 1995), *cert. denied*, 519 U.S.
      947 (1996)..................................................................... 28, 36, 37, 38, 40, 41

*Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988).............. 10, 18, 19, 35

*Loewen v. Grand Rapids Med. Educ. Partners,* No. 1:10-CV-1284,
      2012 U.S. Dist. LEXIS 49476 (W.D. Mich. Apr. 9, 2012)................ 9, 17, 18

*Ludlow v. Northwestern Univ.,* 79 F. Supp. 3d 824 (N.D. Ill. 2015) .....................36

*Mandel v. M&Q Packaging Corp.,* 706 F.3d 157 (3d Cir. 2013)...........................52

*Mayo Found. for Med. Educ. and Research v. United States,* 562 U.S.
      44 (2011) ................................................................................................ 28, 31

*McLaughlin v. State Sys. of Higher Educ.,* No. 97-CV-1144, 1999
      U.S. Dist. LEXIS 4325 (E.D. Pa. Mar. 31, 1999) ........................................36

*McNary v. Haitian Refugee Ctr., Inc.* 498 U.S. 479 (1991) ...................................14

*Middlesex County Sewerage Auth. v. National Sea Clammers Assn.,*
      453 U.S. 1 (1981)..........................................................................................32

*Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902 (3d Cir. 1997)............................6

*Murray v. New York Univ. Coll. of Dentistry,* 57 F.3d 243 (2d Cir.
      1995) ..............................................................................................................36

*NAACP v. Wilmington Med. Ctr., Inc.,* 599 F.2d 1247 (3d Cir. 1979).....................8

*National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) ........ 47, 48, 52, 53

*NCAA v. Smith,* 525 U.S. 459 (1999)...................................................................8, 9

*North Haven Bd. of Educ. v. Bell,* 456 U.S. 512 (1992)............................ 30, 39, 40

# TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                             **PAGE(S)**

*Northwest Airlines, Inc. v. Transp. Workers Union of Am.,* 451 U.S. 77 (1981) ................................................................................................31

*O'Connor v. Davis,* 126 F.3d 112 (2d Cir. 1997) ............................ 12, 13, 18, 19, 20

*Papasan v. Allain,* 478 U.S. 265 (1986) ......................................................6

*Petrosky v. N.Y. State Dep't of Motor Vehicles,* 72 F. Supp. 2d 39 (N.D.N.Y. 1999) ......................................................................................50

*Regents of the Univ. of Mich. v. Empl't Relations Comm'n,* 204 N.W.2d 218 (Mich. 1973) .................................................................. 27, 28

*Roubideaux v. N.D. Dep't of Corr. & Rehab.,* 570 F.3d 966 (8th Cir. 2009) ............................................................................................ 21, 25

*Rowland v. California Men's Colony,* 506 U.S. 194 (1993) ...................................14

*Sarango v. United States,* 651 F.3d 380 (3d Cir. 2011)...........................................23

*Schultz v. The Bd. of Trustees of the Univ. of West Florida,* No. 3:06-cv-442, 2007 U.S. Dist. LEXIS 36815 (N.D. Fla. May 21, 2007) ......................................................................................................35

*Shine v. Bayonne Bd. of Educ.,* No. 14-4184, 2015 U.S. App. LEXIS 16771 (3d Cir. Sept. 22, 2015) .......................................................49

*Smith v. Reagan,* 844 F.2d 195 (4th Cir. 1988) .......................................................43

*Sobel v. Yeshiva Univ.,* 477 F. Supp. 1161 (S.D.N.Y. 1979) .......................... 45, 46

*Sternberg v. U.S.A. Nat'l Karate-Do Fed'n, Inc.,* 123 F. Supp. 2d 659 (E.D.N.Y. 2000)......................................................... 19, 21, 27, 39

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148 (2008)..............................................................................................42

*Summy-Long v. Pennsylvania State Univ.,* No. 1:06-cv-1117, 2010 U.S. Dist. LEXIS 27953 (M.D. Pa. Mar. 24, 2010) ......................................47

*Thomas Jefferson Univ. Hosp. v. Shalala,* 512 U.S. 504 (1994) ..............................7

# TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                           **PAGE(S)**

*Thompson v. Indep. Sch. Dist. of Stephens Co., Oklahoma,* No. Civ-
    12-13-M, 2013 U.S. Dist. LEXIS 65320 (W.D. Okla. May 8,
    2013) ...................................................................................................47

*Thompson v. Thompson,* 484 U.S. 174 (1988) ................................. 43, 44

*United States v. Baylor Univ. Med. Ctr.,* 736 F.2d 1039 (5th Cir.
    1984) ........................................................................................................8

*United States v. Menasche,* 348 U.S. 528 (1955) ...................................16

*Urie v. Yale Univ.,* 331 F. Supp. 2d. 94 (D. Conn. 2004)........................35

*Weinstock v. Columbia Univ.,* 224 F.3d 33 (2d Cir. 2000)....................36

**STATUTES & CODES**

20 U.S.C. §§ 1681 *et seq.*........................................................................1

20 U.S.C. § 1681 .....................................................................................30

20 U.S.C. § 1681(a) ...................................................................................7

20 U.S.C. § 1681(c) .................................................................................17

20 U.S.C. § 1682.................................................................................7, 30

20 U.S.C. § 1685 .......................................................................................7

20 U.S.C. § 1687 .....................................................................................17

20 U.S.C. § 1687(2)(A).............................................................................8

20 U.S.C. § 1687(3)(A)(ii)........................................... 8, 11, 13, 19, 22, 26

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

29 U.S.C. §§ 201 *et seq* .........................................................................23

29 U.S.C. § 794(a) ...................................................................................11

29 U.S.C. § 794(b)(3)(A)(ii).....................................................................11

# TABLE OF AUTHORITIES (CONTINUED)

**STATUTES & CODES**                               **PAGE(S)**

42 U.S.C. § 1395 *et seq*.................................................................7

42 U.S.C. § 1395ww ........................................................................7

42 U.S.C. § 1395ww(d)(5)(B) ........................................................8

42 U.S.C. § 1395ww(h) ...................................................................8

42 U.S.C. § 1794 .............................................................................8

42 U.S.C. § 1981a(b) .....................................................................37

42 U.S.C. § 1985 ...........................................................................33

42 U.S.C. § 1985(3) .......................................................................33

42 U.S.C. § 2000d ..........................................................................12

42 U.S.C. § 2000d-4a(3)(A)(ii)......................................................11

42 U.S.C. § 2000e *et seq*................................................................3

42 U.S.C. § 2000e-2 .......................................................................29

42 U.S.C. § 2000e-3 .......................................................................29

42 U.S.C. § 2000e-5(e) ...................................................................38

42 U.S.C. § 2000e-5(e)(1)..............................................................48

42 U.S.C. § 2000e-5(g)(1) ..............................................................38

42 U.S.C. § 6102 ............................................................................12

42 U.S.C. § 6107(4)(C)(i)(II).........................................................11

34 C.F.R. § 106.31 ..........................................................................21

45 C.F.R. § 86.2...............................................................................7

45 C.F.R. § 86.31 ............................................................................21

45 C.F.R. § 86.31(a) ................................................................. 22, 23

**TABLE OF AUTHORITIES (CONTINUED)**

**STATUTES & CODES**                                                    **PAGE(S)**

45 C.F.R. §92.4.................................................................................13

**RULES**

Fed. R. App. P. 32(a)(5)........................................................................1

Fed. R. App. P. 32(a)(6)........................................................................1

Fed. R. App. P. 32(a)(7)(B) ...................................................................1

Fed. R. Civ. P. 12(b)(6).........................................................................5

Fed. R. Civ. P. 12(e).............................................................................1

Local Rule 31.1(c)................................................................................1

**LEGISLATIVE MATERIALS**

100 P.L. 259 ......................................................................................16

H.R. Rep. No. 554, 92d Cong., 1st Sess. 1-3 (1972)...............................29

H.R. Rep. No. 92-238, p. 19 (1971).......................................................32

S. Rep. No. 100-64..............................................................................16

118 Cong. Rec. 5804-15 (1972).............................................................29

**OTHER AUTHORITIES**

"*Estimating Public and Private Expenditure on Occupational Training in
    the United States*," Prepared for the U.S. Department of Labor,
    Employment and Training Administration (2004), available at
    https://wdr.doleta.gov/research/FullText_Documents/
    Estimating%20Public%20and%20Private%20Expenditures%20on%2
    0Occupational%20Training%20in%20the%20United%20States.pdf
    (last visited Sept. 19, 2016) ..........................................................24

*Federal Coordination and Compliance* Section, *Nondiscrimination on the
    Basis of Sex in Federally Assisted Programs*,
    http://www.justice.gov/crt/federal-coordination-and-compliance-
    section-186 (last updated Aug. 6, 2015)..........................................22

## TABLE OF AUTHORITIES (CONTINUED)

**OTHER AUTHORITIES**                                                    **PAGE(S)**

Merriam-Webster Dictionary,
    www.merriamwebster.com/dictionary/modifier
    (last visited Aug. 16, 2016) ........................................................................12

Merriam-Webster Dictionary,
    www.merriam-webster.com/dictionary/ residency
    (last visited Aug. 22, 2016) ........................................................................24

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 65 Fed. Reg. 52858  (Aug.
    30, 2000) ...................................................................................................25

*Title IX Legal Manual*, https://www.justice.gov/crt/title-ix (last
    updated Aug. 6, 2015) ................................................................................22

U.S. Code Cong. & Admin. News, 1972, pp. 2137, 2154.......................................32

www.mercyhealth.org/about/mission (last visited, Aug. 22, 2016) ........................21

## I.    COUNTER-STATEMENT    OF    SUBJECT    MATTER    AND APPELLATE JURISDICTION

This appeal stems from an action brought under the Patsy Takemoto Mink Equal Opportunity in Education Act (better known as Title IX of the Education Amendments of 1972), 20 U.S.C. §§ 1681 *et seq.* (2015) ("Title IX"), and Pennsylvania state law.    Appellant Jane Doe ("Doe")[1] contends that, while employed as a medical resident at Appellee Mercy Catholic Medical Center ("Mercy"), she was subjected to hostile environment sexual harassment, retaliation, quid pro quo sexual harassment, and "contract-based gender discrimination," as well as wrongful termination and breach of the covenant of good faith and fair dealing.

Jurisdiction before the District Court was proper pursuant to 28 U.S.C. § 1331.    The Court of Appeals has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291, because the Memorandum and Order by U.S. District Court Judge Michael Baylson granting Mercy's Motion to Dismiss Doe's Third Amended Complaint was a final order.

---

[1]    "Doe" is a pseudonym used by Appellant in this litigation, along with "Roe" to designate the Director of the Mercy Catholic Medical Center's Residency Program.    As part of its Motion to Dismiss, Mercy moved the District Court, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, to require Doe to litigate the case using her own name.    The District Court did not rule on this part of Mercy's motion prior to dismissal of the action.    (App. 62-29).

1

## II. COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

A. WHETHER THE DISTRICT COURT PROPERLY DISMISSED DOE'S TITLE IX CLAIMS BECAUSE TITLE IX DOES NOT REGULATE A PRIVATE HOSPITAL'S RESIDENCY PROGRAM.

B. WHETHER THE DISTRICT COURT PROPERLY DETERMINED THAT TITLE IX CONFERS NO PRIVATE RIGHT OF ACTION ON EMPLOYEES PROTECTED BY TITLE VII.

C. WHETHER THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S ALTERNATIVE RULING THAT COUNT I OF DOE'S THIRD AMENDED COMPLAINT IS TIME-BARRED.

## III. COUNTER-STATEMENT OF THE CASE

On April 20, 2015, Doe initiated this legal action by filing a Complaint against Mercy. App. 14, ECF 1. Doe followed this with additional iterations, and ultimately, a Third Amended Complaint ("TAC"). App. 14-15, App. 100-124. Mercy moved to dismiss Doe's TAC. App. 125-167. By Order dated January 26, 2016, the District Court granted Mercy's Motion Dismiss the TAC, on the basis that Title IX does not extend to physicians employed by a private hospital in a medical residency program, and alternatively as to Count I, based on the statute of limitations. App. 2-13. The District Court declined to exercise supplemental jurisdiction over Doe's state law claims, and they were dismissed without prejudice to be refiled in state court. *Id*.

Judgment was entered in favor of Mercy on all claims asserted under Title IX (Counts I, II, and III). App. 2. This appeal followed.

## IV.    COUNTER-STATEMENT OF FACTS

Doe was employed by Mercy as a medical resident beginning in July 2011, receiving "pay and benefits."  App. 102, TAC at ¶ 12; WHEREFORE clause ¶ (ii). She resigned from Mercy after being advised of a committee decision to terminate her, and of her right to appeal that decision.  App. 115, TAC at ¶¶ 123-24.  Having neither completed Mercy's internal grievance process, nor pursed an administrative claim with the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), Doe now seeks to litigate her claims under Title IX.

Doe contends that Roe, the Director of the Residency Program, orchestrated Doe's dismissal from the Residency program after she rebuffed his romantic advances.  App. 107-08, TAC at ¶¶ 52-58.  Doe alleges that within months of the beginning of her residency program, she had discussed the issue with Roe by phone and email.  App. 108, TAC at ¶ 59-60; App. 102, TAC at ¶ 12.

In November 2011, Roe reported text messages that Doe had sent him to Human Resources.  App. 109, TAC at ¶¶ 63-66.  Doe met with Human Resources, and was referred to a psychologist.  *Id.*, TAC at ¶¶ 67-72 (stating that during the meeting with Human Resources in or about November 2011, Doe "explained the unwelcome sexual and/or romantic attention she believed she was receiving from Roe"); App. 118, TAC at ¶ 145.  Doe also alleges inappropriate conduct during

3

2012.  App. 110-111, TAC at ¶¶ 77-90.  In late December, 2012, Roe reported Doe

to the Vice President of Mercy, Dr. Arnold Eiser who, after meeting with her,

brought her to see a psychiatrist at Mercy.  App. 112, TAC at ¶¶ 91-95.  Mercy

required Doe to be placed on a corrective action plan, and she agreed.  *Id.,* TAC at

¶¶ 98-99.

During the early spring of 2013, Doe again complained to Roe about acts of

alleged harassment, and another meeting was held with Dr. Eiser.  App. 113-114,

TAC at ¶¶ 102-112.  Dr. Eiser suggested another psychiatric consultation, and

informed Doe she was suspended.  *Id.*, TAC at ¶ 113.  After Doe was suspended,

Doe had no further contact with Mercy until April 20, 2013.  *Id.*, TAC at ¶ 115.

On April 20, 2013, Mercy informed Doe of its intent to terminate her, and advised

her of her option to appeal the decision.  *Id.*, TAC at ¶ 116.  Doe appealed, and was

given a hearing on or around April 24, 2013.  App. 115, TAC at ¶ 120.  At the

hearing, Roe "advocated" for Doe's dismissal from the residency program.  *Id.*,

TAC at ¶ 122.  Doe was informed that the committee intended to uphold the

decision to terminate, but that Doe had five days to file a further appeal if she so

chose.  *Id.,* TAC at ¶ 123.  Doe resigned from the residency program prior to the

expiration of her right to appeal, and her resignation was accepted by Mercy.  *Id.,*

TAC at ¶ 124.

On April 20, 2015, more than two years after Mercy suspended her, Doe filed this action. App. 14.

## V.    COUNTER-STATEMENT    OF    RELATED    CASES    AND PROCEEDINGS

Mercy is unaware of any cases or proceedings related to this appeal.

## VI.    COUNTER-STATEMENT OF THE STANDARD OF REVIEW

This Court exercises a plenary standard of review over a District Court's order granting a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013). This Court may affirm on any basis supported by the record, including alternative grounds not relied upon by the District Court. *See Fairview Township v. EPA*, 773 F.2d 517, 525 n.15 (3d Cir. 1985).

A complaint must contain facts which, after being accepted as provisionally true, plausibly establish the required elements of the claims asserted and raise the right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). On a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pled factual allegations and construe all reasonable and supported inferences in favor of the non-moving party. A court need not accept as true, however, bald assertions,

unwarranted inferences, or sweeping legal conclusions couched as factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that factual allegations are entitled to all reasonable inferences, but legal conclusions are entitled to no deference) (cited with approval in *Twombly*, 550 U.S. at 555).

## VII.  <u>SUMMARY OF THE ARGUMENT</u>

The District Court properly dismissed all of Doe's Title IX causes of action because Mercy Catholic Medical Center is not an "education program or activity" within the plain meaning of Title IX, and is therefore not subject to regulation under that statute.  The District Court properly rejected Doe's position, which is based on a misreading of the statutory text and U.S. Department of Health and Human Services ("HHS") regulations, and is unsupported by judicial precedent.

Even if Title IX did reach Mercy, that statute confers no express or implied right of action on an employee, such as Doe, who has full recourse available under Title VII's comprehensive statutory, regulatory, and administrative remedial scheme.

With regard to Count I, well established precedent fully supports the district court's alternative ruling that Doe's hostile environment claim is barred by the two-year statute of limitations.

VIII. **ARGUMENT**

A. **THE DISTRICT COURT PROPERLY DISMISSED ALL CLAIMS UNDER TITLE IX, WHICH AFFORDS NO RELIEF TO AN EMPLOYED PHYSICIAN IN A HOSPITAL RESIDENCY PROGRAM.**

1. **The Plain Meaning of Title IX Excludes Mercy Because it is an Entity Not Principally Engaged in the Business of Education.**

Mercy Catholic Medical Center is not subject to regulation under Title IX because it is not an "education program or activity" within the meaning of that statute. Title IX prohibits sex discrimination in "any education program or activity" receiving "Federal financial assistance." 20 U.S.C. § 1681(a).[2] The term

---

[2]    There is a threshold question as to whether Mercy receives "[f]ederal financial assistance" within the meaning of Title IX. "Federal financial assistance" includes grants, loans and other funds extended by a federal agency in support of education but excludes any "contract of insurance or guaranty." 20 U.S.C. § 1685 ("nothing in [Title IX] shall add to or detract from any existing authority with respect to any program or activity under which Federal financial assistance is extended by way of a contract of insurance or guaranty."); *see also* 20 U.S.C. § 1682 (authorizing federal agencies that issue financial assistance "by way of grant, loan or contract other than a contract of insurance or guarantee" to develop implementing regulations under Title IX); and 45 C.F.R. § 86.2 (excluding "contracts of insurance" from Title IX regulatory scheme). Graduate Medical Education ("GME") funding, which Doe and *Amicus* argue provides the basis for Title IX liability in this case, is received through a contract of "insurance" – *i.e.*, the Medicare insurance program. 42 U.S.C. § 1395 *et seq.*; *see*, *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 506-07 (1994) ("Medicare is a federally funded health insurance program for the elderly and disabled.") Mercy receives payment directly from HHS for services rendered to the elderly and disabled through this federal health insurance program. 42 U.S.C. § 1395ww (Payments to Hospitals for Inpatient Services). In calculating the amounts owed for such services, Congress has directed HHS to takes into account the cost of providing

"education program or activity" encompasses, *inter alia*, "all of the operations" of "a college, university or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A). The prohibition also extends to "all of the operations" of private entities "principally engaged in the business of providing education." *Barrs v. The Southern Conference,* 734 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010) (citing 20 U.S.C. § 1687(3)(A)(ii)); *NCAA v. Smith,* 525 U.S. 459, 466 (1999). A

---

graduate medical education. 42 U.S.C. § 1395ww(h) (direct costs) and 42 U.S.C. § 1395ww(d)(5)(B) (indirect costs). The GME payments are not "federal assistance," but rather, federal health insurance payments made directly to the hospital on behalf of the elderly and disabled patients to whom Mercy has provided hospital services. The question of whether Medicare and Medicaid reimbursement constitutes payment under a "federal contract" has never been squarely addressed or resolved in the context of Title IX. In *Henschke v. The New York Hospital-Cornell Medical Center*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993), the district court "held in abeyance" the question of whether Title IX covered the University hospital while the parties undertook discovery as to whether "the Hospital receives federal funding within the meaning of Title IX." Doe and *Amicus* will no doubt point out that the issue has been addressed in the context of other civil rights legislation, primarily Section 504 of the Rehabilitation Act, -- but that statute contains no exclusion for "contracts of insurance." 42 U.S.C. § 1794. *See*, *e.g., United States v. Baylor Univ. Med. Ctr.,* 736 F.2d 1039, 1048-49 (5th Cir. 1984) (noting that Section 504 has no exclusion for "contracts" of insurance but analyzing the statute on based on an "assumption" that the insurance contract exception was "implicit" in the statute). In *NAACP v. Wilmington Med. Ctr., Inc.*, 599 F.2d 1247, 1248, n.4 (3d Cir. 1979), this court affirmed a district court's determination that hospitals are subject to Title VI regulation as recipients of federal funding, including Medicare and Medicaid, without specifically analyzing Title VI's "contracts of insurance" exception. Given that Medicare and Medicaid clearly qualify as federal health insurance programs, and that the payments to Mercy for GME are statutory Medicare and Medicaid payments, Mercy submits that the GME payments qualify as payments under "contracts of insurance" subject to Title IX's statutory exclusion.

private hospital that employs physicians in its own residency program is, quite plainly, not "principally engaged" in the business of education and therefore does not fall within the ambit of Title IX. *See Loewen v. Grand Rapids Med. Educ. Partners*, No. 1:10-CV-1284, 2012 U.S. Dist. LEXIS 49476, at *33 (W.D. Mich. Apr. 9, 2012) (*dicta*).[3]

While this is a matter of first impression for this court, the lower court's conclusion that Title IX does not extend to a private hospital's residency program is strongly supported by the plain language of Title IX, and by the very few decisions that have been called to address this precise issue in over four decades of Title IX jurisprudence. *E.g., Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 307 n.5 (S.D.N.Y. 2000) (Title IX suit by osteopathic intern properly dismissed as against private hospital where the plaintiff did her internship, St. Barnabas Hospital, as her status was primarily that of a hospital employee); *Crandell v. N.Y. Coll. of Osteopathic Med.,* No. 99 Civ. 2347 (LAK), Order Dated July 1, 1999, App. 165-66 (Title IX did not reach St. Barnabas Hospital as it is not an educational institution); *Loewen,* 2012 U.S. Dist. LEXIS 49476, at *33. The

---

[3]    In *Loewen*, the district court said it "tend[ed] to agree" with the defendant hospitals' position that Title IX did not cover them because they did not qualify as "education program[s] and activit[ies]" within the meaning of Title IX. 2012 U.S. Dist. LEXIS 49476, at *33. In contrast, Title IX did apply to a different defendant in that case, which was a "member-based Michigan nonprofit education corporation . . . that sponsors and operates various post-graduate resident medical training programs, as well as training programs for medical and other healthcare-related students." *Id.* at *3 (emphasis supplied).

cases principally relied upon by Doe and *Amicus* are inapposite because they involved <u>university</u> medical centers, which would be covered by Title IX as educational institutions under other sections of the statute.[4]  Any inference sought to be drawn from those cases that graduate medical education could constitute a "federal program or activity" for purposes of Title IX is at odds with the clear and unambiguous statutory text.

       a.     *A Plain Reading of Title IX Precludes its Application to this Case.*

That Title IX does not apply to a private hospital is apparent from a plain reading of Title IX, as amended by the Civil Rights Restoration Act of 1987 ("CRRA").

The CRRA was enacted specifically to make it clear that the non-discrimination provisions of Title IX, Title VI of the Civil Rights Act of 1964, the Rehabilitation Act, and the Age Discrimination in Employment Act ("ADEA") extend to <u>entire entities</u>, not just to particular programs within those entities—over-ruling the Supreme Court's construction of Title IX in *Grove City College v. Bell*,

---

[4]    *E.g., Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988) (plaintiff had viable Title IX claim against the University of Puerto Rico School of Medicine); *Henschke v. The N.Y. Hospital-Cornell Med. Ctr.*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993) (plaintiff had viable Title IX claim against Cornell University Medical School).  As noted in footnote 2, *supra*, the district court in *Henschke* deferred ruling on whether Title IX reached the affiliated University hospital, pending discovery on whether the hospital received "federal financial assistance" within the meaning of Title IX.  *Id.*

465 U.S. 555 (1984) as extending statutory coverage only to the particular "program or activity" within a private college that was the recipient of federal funding, and not to the entire educational institution. The CRRA's explicit expansion of Title IX coverage to entire entities "did nothing to alter Title IX's underlying requirement that the program or activity must be <u>educational</u>." *Alegria v. Williams*, 314 F. App'x 687, 692 (5th Cir. 2009) (emphasis added).

In the CRRA, Congress adopted a uniform definition of "program or activity" for four distinct civil rights statutes, that included the following text:

> all of the operations of . . . an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation . . . .

20 U.S.C. § 1687(3)(A)(ii) (Title IX), 29 U.S.C. § 794(b)(3)(A)(ii) (Rehabilitation Act), 42 U.S.C. § 6107(4)(C)(i)(II) (ADEA), and 42 U.S.C. § 2000d-4a(3)(A)(ii) (Title VI).

In the case of three of the statutes—the Rehabilitation Act, the ADEA, and Title VI—the prohibition against discrimination applies across the board to private entities principally engaged in <u>any</u> of the categories included in the definition of "program or activity." 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be . . . subject to discrimination under <u>any program or activity</u> receiving

Federal financial assistance. . . ."); 42 U.S.C. § 6102 ("[N]o person in the United States shall, on the basis of age, be . . . subjected to discrimination under, <u>any program or activity</u> receiving Federal financial assistance."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be . . . subjected to discrimination in <u>any program or activity</u> receiving Federal financial assistance.").

In the case of Title IX, however, which was enacted specifically to redress sex discrimination in <u>education</u>, the term "program or activity" is modified by the term "education."  A modifier is a word that "modifies" or "makes specific the meaning of another word or phrase."  Merriam-Webster Dictionary, <u>www.merriam-webster.com/dictionary/modifier</u> (last visited Aug. 16, 2016). Because the phrase "program or activity" is defined in the statute as "all of the operations" of a private entity "which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation . . .," the modifier "education" modifies or limits the term "program or activity" to entities that are "principally engaged in the business of providing <u>education</u>."  *See, e.g., O'Connor v. Davis,* 126 F.3d 112, 117 (2d Cir. 1997) ("[B]y modifying the phrase 'program or activity', Congress left the modifier 'education' intact, and we are bound under ordinary rules of construction to give content to the entire phrase selected by Congress.").

"While expanding the reach of Title IX to include all departments or branches of an educational institution or program that receives federal funding . . . the [CRRA amendments] did not purport to alter the preliminary requirement that the entity funded operate an 'education program.'" *O'Connor*, 126 F.3d at 118.  In *O'Connor*, the Second Circuit determined that a hospital for the mentally disabled did <u>not</u> become an "education program or activity" for Title IX purposes simply by accepting a student intern from a nearby college.  *Id*. at 118.[5]  Likewise, in *Alegria, supra*, the Fifth Circuit ruled that Title IX did not apply to a state probation system because it was not an <u>education</u> program or activity.   314 F. App'x at 692 (O'Connor, J).

In similar fashion, the term "<u>health</u> program or activity" has been defined in HHS regulations issued under Section 1557 of the Affordable Care Act ("ACA") to reach programs and activities involving "<u>health</u>."  45 C.F.R. § 92.4.  It would be anomalous to define "<u>health</u> program or activity" under Section 1557 to include the provision of <u>education</u>-related services—even if the ACA defined the term "program or activity," standing alone, to include "education" as well as "health."

_____

[5]       Although the Second Circuit properly recognized in *O'Connor* the importance of the "education" modifier, we submit that the standard the circuit court adopted did not fully implement the statutory text.  Specifically, the court stated that a private entity with an educational component that receives federal funding is subject to Title IX regulation if it "could reasonably consider its mission to be, <u>at least in part</u>, educational."   *O'Connor*, 126 F.3d at 117 (emphasis supplied).   The "at least in part" test cannot be squared with the "principally engaged in" requirement of the statute's text.  20 U.S.C. § 1687(3)(A)(ii).

*b.    Doe and Amicus Misread the CRRA.*

Doe and *Amicus* argue that, under Title IX and the CRRA, an "education program or activity" is <u>any</u> "program or activity" that receives federal financial assistance and has an educational component, and is not limited to entities that are principally engaged in the business of education.   (Appellant's Brief at 22-23; *Amicus* Brief at 14-15).  In so doing, they conflate the broad definition of "program or activity" enacted in the CRRA with the narrower phrase "<u>education</u> program or activity," which appears only in Title IX.  This leads them down an erroneous path in which the modifier "education" in the phase "education program or activity" can actually be construed as extending to an entity that is "principally engaged in. . . healthcare, housing, social services or parks and recreation."   That construction violates the "common mandate to avoid absurd results."   *Rowland v. California Men's Colony*, 506 U.S. 194, 200 (1993).  It is like defining, in an arts context, the phrase "program" to mean "any entity that is principally engaged in the business of music, theater, visual arts, or dance," and then construing the phrase "music program" in the same statute to mean an entity that is principally engaged in the business of <u>visual arts</u>—a facially absurd result.  "It is presumable that Congress legislates with knowledge of our basic rules of statutory construction."   *Rowland*, 506 U.S. at 201 (citing *McNary v. Haitian Refugee Ctr., Inc*. 498 U.S. 479, 496 (1991)).  Doe's proposed construction of Title IX, which equates "education" with

14

"healthcare, housing, social services [and] parks and recreation" loses sight of that basic presumption.

Doe's position is even more untenable when one includes the phrase "all of the operations of" in the definition of "program or activity." If an "education program or activity" includes an entity that is "principally engaged in the business of providing . . . healthcare," then it necessarily includes "all of the operations" of that healthcare entity. Thus, under Doe's formulation, Title IX would extend not only to a discrete "education" component of a hospital's operations—but to all of its operations. To regulate an entire hospital's operations as an "education program or activity" would be an irrational result—one which even Doe and *Amicus* do not appear to be advocating, but would necessarily follow from their statutory construction arguments. Taken to its inexorable and logical conclusion, the argument advanced by Doe and *Amicus* would create Title IX coverage for the registration, food services and custodial staff of every private hospital that operates a medical residency program.

Instead, Doe and *Amicus* argue that, in the case of Title IX, "education program or activity" does not refer to "all of the operations" of a hospital, but only to its educational component. However, that requires the elimination of the term "all of the operations" from the definition of "program or activity," thus violating the "cardinal principal" of statutory construction that courts must "give effect, if

possible, to every clause or word of a statute." *United States v. Menasche,* 348 U.S. 528, 539 (1955). It also ignores the clear statement of congressional statutory intent from the CRRA itself, which states that the Act's purpose is to "restore . . . broad, <u>institution-wide</u> application" of Title IX, Title VI, the Rehabilitation Act and the ADEA. 100 P.L. 259, at Section 2 (Findings of Congress) (emphasis supplied). *Franklin v. Gwinnett Cnty. Public Sch.*, 503 U.S. 60, 73 (1992) (describing the history and meaning of the CRRA). A court, of course, "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837 (1984). Adopting Doe's and the government's interpretation of Title IX/CRRA as applied to a hospital residency would actually turn the clock back to *Grove City's* "program specific" analysis, which the CRRA was enacted expressly to eliminate.

To buttress their anachronistic interpretation of the term "education program or activity," Doe and *Amicus* cite to an "example" from the Senate Report to the CRRA suggesting that Title IX could extend to a private hospital corporation but, in such event, would apply <u>not</u> to "all of the operations" of the hospital, but only to "education programs operated by the hospital, if any." S. Rep. No. 100-64, at 17. (*Amicus* Brief at 17; Appellant's Brief at 22). That isolated sentence in the Senate Report does not square with the plain language of the statute as actually enacted by Congress in which Title IX applies to "all of the operations" of a covered entity,

16

and runs directly contrary Congress's formally stated objective of "institution-wide" application.  20 U.S.C. § 1687.

Based on the faulty premise that Title IX can, contrary to the text of the CRRA, be applied on a "program specific" basis in the context of a hospital's residency program, Doe and *Amicus* spend an inordinate amount of their briefs arguing that Mercy's residency program is an "education program or activity" simply because medical residency is, in part, educational.  But, the mere fact that a resident furthers his or her medical training while employed to provide clinical services for and on behalf of a private hospital does not convert that hospital into an entity that is principally engaged in the business of education.  *See, e.g., Loewen,* 2012 U.S. Dist. LEXIS 49476 at *33 (noting that "the Court tends to agree" the hospital defendants did "not conduct an 'education program or activity' as required for liability under Title IX").

Doe's argument that Title IX does not limit its prohibitions to the activities of traditional "educational institutions" (defined by Title IX at 20 U.S.C. § 1681(c) as a "public or private preschool, elementary or secondary school, or any institution of vocational, professional or higher education . . .") also misses the mark.  Title IX can extend beyond that narrow class of "educational institutions" to other private entities so long as those entities are principally engaged in the business of education.  That could include, for example, a "nonprofit education

corporation that sponsors and operates various post-graduate resident medical training programs." *Loewen,* 2012 U.S. Dist. LEXIS 49476 at *3. It also could presumably include a private operator of educational tours or outreach programs, vocational programs or other nontraditional forms of schooling, so long as that activity were the entity's principal business. It does not, however, include private hospitals that are principally engaged in the business of providing hospital services.

### c.    *Judicial Precedent Does Not Rescue Doe's Position.*

The patchwork of decisions addressing Title IX's application beyond the traditional educational setting take a variety of analytic approaches, but offer no unifying principal, and certainly do not yield the result sought by Doe in this case. The cases that are most squarely on point all support Mercy's position that medical residency programs operated by private hospitals outside the University setting are not covered by Title IX. *Loewen,* 2012 U.S. Dist. LEXIS 49476 at *33; *Crandell, supra,* at 2 (App. 165-66); *see also O'Connor,* 126 F.3d at 117-18.

The university cases principally relied on by Doe do not support the extension of Title IX liability to Mercy. In *Lipsett v. Univ. of Puerto Rico,* the First Circuit did not analyze or address any liability of the University Hospital separate and distinct from the University itself (which was squarely covered as an "educational institution"). 864 F.2d 881, 895 (1st Cir. 1988) ("The sexual

harassment by the residents could give rise to a cause of action against the University under Title IX."). In *Henschke v. The New York Hospital-Cornell Medical Center*, the district court raised but did not decide the question of whether Title IX extended to the University's <u>affiliated hospital</u>, and therefore does not guide the outcome of this case. 821 F. Supp. 166, 172-73 (S.D.N.Y. 1993).[6] Neither *Lipsett* nor *Henschke* stand for the proposition advocated by Doe here, *i.e.*, that a private hospital's operation of a medical residency program turns it into an entity that is "principally engaged" in the business of education for Title IX purposes.

As noted above, in *O'Connor*, the Second Circuit articulated a test for Title IX coverage which required only that the mission of the defendant entity at issue be "at least in part" educational—an erroneous lesser standard that is at odds with the "principally engaged in" text of Title IX. 20 U.S.C. § 1687(3)(A)(ii). This erroneous lesser standard was the basis for another Second Circuit case relied on by Doe, *Sternberg v. U.S.A. Nat'l Karate-Do Fed'n, Inc.*, 123 F. Supp. 2d 659, 662 (E.D.N.Y. 2000) (finding that the mission of defendant, the national governing body for the sport of Karate, was partly educational). These Second Circuit cases

---

[6]    As discussed *supra*, n. 2, the *Henschke* court "held in abeyance" the question of whether Title IX covered the University hospital while the parties undertook discovery as to whether "the Hospital receives federal funding within the meaning of Title IX." 821 F. Supp. at 172.

do not offer persuasive authority because of their reliance on an erroneous standard.[7]

Doe also relies on a line of correctional institution cases from other circuits to buttress her argument that an "education program or activity" can extend to the educational component of an entity whose primary business is not education. *See e.g., Jeldness v. Pearce*, 30 F.3d 1220, 1224 (9th Cir. 1994) (finding that Title IX applies to state prisons based on their receipt of federal funds and because Title IX did not expressly exclude them); *Klinger v. Dep't of Corr.*, 107 F.3d 609, 615, n.5 (8th Cir. 1997) (same).   However, these decisions did not closely parse the meaning of "education program or activity."[8]  When the Eighth Circuit was called upon, in a more recent decision, to determine the scope of Title IX in the prison

---

[7]    Even the lesser standard adopted in *O'Connor* requires that the <u>corporate mission</u> be "at least in part" educational.  *O'Conner*, 126 F.3d at 117-18.  Although Appellant cites to the description of Mercy's <u>residency programs</u> to argue that <u>they</u> are in part educational (Appellant's Brief, at 16), the health system's <u>institutional</u> mission is the provision of <u>healthcare services</u> to the community.  Specifically, it is to "serve together in the spirit of the gospel as a compassionate and transforming healing presence within our communities.  In fulfilling our mission, we have special concern for persons who are poor and disadvantaged."   www.mercyhealth.org/about/mission (last visited, Aug. 22, 2016).

[8]    In *Jeldness*, the Ninth Circuit concluded that Title IX extended to correctional institutions because the statute contains some explicit exemptions and correctional institutions were not among them—noting that, where a statute identifies some exemptions others are not to be judicially implied.  30 F.3d at 1225.  However, that rule regarding exemptions only applies if the activity in question would otherwise be encompassed by the statutory terms which, in this case, it would not.

context, its closer analysis yielded a different result. *See Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 977-78 (8th Cir. 2009) (holding that Title IX did <u>not</u> cover a "prison industries" program because any beneficial learning opportunity it provided was "incidental to and not the primary focus of the prison industries operation").

In any event, state correctional institutions, which generally include a substantial commitment to education as part of their broader rehabilitative goals for their inmates, do not provide a meaningful analogy to private hospitals. Certainly, no one would argue, and no court has ruled, that a private hospital whose primary mission is the delivery of healthcare services to its community is <u>principally</u> engaged in the business of <u>education</u>.

> d. *Title IX's Implementing Regulations Do Not Support Doe's Position In this Case.*

Title IX's implementing regulations, adopted by both the Department of Education and by HHS, prohibit discrimination based on sex by any "academic, extracurricular, research, occupational training, or other <u>education program or activity</u> operated by a recipient which receives Federal financial assistance." 45 C.F.R. § 86.31; 34 C.F.R. § 106.31.[9] The government puts the rabbit in the hat

---

[9]    The HHS regulations are the pertinent regulations here, because the basis on which the Title IX claims are asserted is the receipt of federal financial assistance in the form of Medicare reimbursement for graduate medical education programs. *See* App. 103, TAC, at ¶ 19.

when it declares that this language "resolve[s] any ambiguity in favor of inclusion" of medical residency programs under Title IX (*Amicus* Brief at 14). The <u>regulatory</u> definition of "education program or activity" explicitly references, and is bounded by, the <u>statutory</u> definition of "program or activity." *Compare* 45 C.F.R. § 86.31(a) (defining "education program or activity") *with* 20 U.S.C. § 1687(3)(A)(ii) (defining "program or activity"). This <u>regulatory</u> definition cannot expand the definition of "program or activity" beyond its <u>statutory</u> definition, which anchors Title IX to private entities that are "principally engaged" in the relevant activity, *i.e.*, education. 20 U.S.C. § 1687(3)(A)(ii).

While formally adopted regulations are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837 (1984), the government's effort, in its *Amicus* Brief, to expand their meaning beyond that authorized by statute, is not.[10] The question for the court is whether an agency

---

[10] The government's litigation position, as expressed in its *Amicus* Brief, is entitled to no deference from this court. *See Investment Co. Institute v. Camp,* 401 U.S. 617, 628 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands."). Likewise, a manual created by the staff of the Department of Justice ("DOJ") providing enforcement advice <u>to</u> the federal agencies actually charged with implementing Title IX does not warrant that same deference as might be due if those agencies had been the ones to create and issue the guidance. *See Amicus Brief* at 19, n.7, citing to the DOJ, Civil Rights Division, *Federal Coordination and Compliance Section, Nondiscrimination on the Basis of Sex in Federally Assisted Programs,* http://www.justice.gov/crt/federal-coordination-and-compliance-section-186 (last updated Aug. 6, 2015), and DOJ, *Title IX Legal Manual,* https://www.justice.gov/crt/title-ix (last updated Aug. 6, 2015).

interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842-43; *Sarango v. United States*, 651 F.3d 380, 384 (3d Cir. 2011). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843.[11]    The statutory definition includes "all of the operations" of an entity "principally engaged" in the relevant activity, *i.e.*, education, and that cannot be reconciled with the government's proposed extension to cover isolated activities of an entity principally engaged in the provision of hospital services.

The government's reliance on the phrase "occupational training" in 45 C.F.R. § 86.31(a) to argue that HHS intended to include medical residency under Title IX is wide of the mark *even assuming* that a private hospital could be swept under Title IX simply by virtue of its willingness to train residents.  HHS funds "occupational training," *i.e.*, focused skills training to qualify a worker to perform a particular job, through a variety of federal programs—including the Temporary

---

[11]    This case is not analogous to the situation presented in *Auer v. Robbins*, 519 U.S. 452, 458-9 (1997) where Congress had left it to the Department of Labor to define the term "bona fide executive, administrative, or professional" employee for purposes of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.*, and the Court ruled that the Department's definition was entitled to deference because it was based on a "permissible construction" of that undefined statutory term.  Here, in contrast, the government is asking the court to interpret the regulatory phrase "education program or activity" in a manner that cannot be reconciled with the statutory definition of "program or activity."

Assistance for Needy Families Program, Tribal Work Programs, Refugee and Entrant Assistance Programs, Social Services Block Grants, Developmental Disabilities Programs, and so forth. Mikelson and Nightingale, "*Estimating Public and Private Expenditure on Occupational Training in the United States*," Prepared for the U.S. Department of Labor, Employment and Training Administration (2004), available at https://wdr.doleta.gov/research/FullText_Documents/Estimating%20Public%20and%20Private%20Expenditures%20on%20Occupational%20Training%20in%20the%20United%20States.pdf (last visited Sept. 19, 2016), at 13-14 and Ex. 1, at 1-12-1-16. Nowhere in the comprehensive listing of HHS-funded occupational training is graduate medical education identified as a form of "occupational training."

To describe medical residency as a form of "occupational training" is a mischaracterization. Medical residents are licensed physicians who are qualified and authorized by their medical degrees and licensure to evaluate and treat patients in the hospital setting, and who are employed by hospitals for that specific purpose. While employed, they also acquire "advance training in a medical specialty" which will enable them to further their professional careers <u>after</u> they leave the hospital residency program that employs them. See www.merriam-webster.com/dictionary/residency (last visited Aug. 22, 2016). The training they receive is not

for the purpose of training them for the residency position itself, but for advancing their career path after they leave residency.

But, even if a residency were a form of "occupational training," any such "occupational training" program would still have to meet the statutory definition of "education program or activity" to come within Title IX's reach. *Roubideaux,* 570 F.3d at 978 ("While on-the-job industry training has an educational component in the broadest sense of the term, the record demonstrates that the primary purpose of the prison industries operation as a whole is to provide employment, not educational opportunities.").

DOJ's reliance on the provisions of the HHS and DOE regulations that state that Title IX reaches any educational program or activity that receives federal funding "whether or not such program or activity is offered or sponsored by an educational institution as defined in this part" likewise misses the mark.[12]  The

---

[12]    The government, as *Amicus*, points out that this same language appears in the regulations of 21 other agencies that adopted consistent regulations in 2000.  This was a coordinated effort spearheaded by the DOJ to implement regulations across all federal agencies that might provide federal funding for education, and were explicitly patterned off of the HHS and DOE regulations that had been adopted decades earlier.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52858 (Aug. 30, 2000).  In its regulatory commentary accompanying this joint effort, DOJ dismissed numerous comments expressing concern that the agencies' approach to Title IX unduly expanded the scope of Title IX, as "unfounded," but did not address the specific interpretive issue raised by this case. *Id*. at 52861.  The actions of the 21 other agencies does not, in any event, help guide this court's interpretation of the HHS regulations at issue here.

statute does not limit Title IX to "education institutions" but it does limit Title IX to "education program[s] and activit[ies]"—which, as stated above, are defined in the statute (and identical regulations) as entities that are "principally engaged" in the business of education. *See* Section VIII(A)(1), *supra*, discussing 20 U.S.C. § 1687(3)(a)(ii).

The district court rightly found that Title IX does not apply. Doe's and the government's attempt to extend Title IX to Mercy's residents is overreaching. The relief sought by Doe would require this court to interpret the phrase "education program or activity" to cover a private hospital's operations, despite the unassailable fact that a hospital is not an entity that is principally engaged in the business of education. Title IX was never intended to reach that far afield.

### 2. Title IX Does Not Contain an Implied Private Right of Action for Physicians Employed in Private Hospital Residency Programs.

Even if Title IX could reach the operations of a private hospital, it would require an even further stretch to imply a private right of action for an employed physician at that hospital to pursue an individual discrimination claim for money damages under Title IX.

While the Supreme Court has never specifically addressed the relationship between Title IX and Title VII, decades of precedent suggest that the Court would not construe a federal statute as conferring a private right of action in the absence

of clear evidence of legislative intent, which is completely absent here. Furthermore, implying a private right of action under Title IX for a medical resident employed at a private hospital would disrupt the comprehensive, detailed, and express provisions of Title VII, which provides a clear and explicit right of action, and would be contrary to the statutory intent of both federal statutes.

### a.    Doe Had Employment Protection Under Title VII.

Doe does not seriously contend that she was not employed by Mercy.  Like all residents, Doe received a salary and benefits from Mercy and, as the lower court noted, did <u>not</u> pay tuition or receive a degree.  App. 7.  Residents are paid employees, subject to withholding of federal and state income taxes and social security.  *Boston Med. Ctr. Corp*., 330 N.L.R.B. 152, 160 (1999); *Regents of the Univ. of Mich. v. Empl't Relations Comm'n*, 204 N.W.2d 218, 225 (Mich. 1973). Like other employees, residents receive benefits, vacation pay, and workers compensation insurance from the hospitals that employ them.  *Id*.  In return, they provide medical care and services to the hospital's patients, for which the hospital is compensated.  *Id.*  Residents spend 75-80% of their time engaged in direct patient care.  *Id.*; *Boston Medical,* 330 N.L.R.B. at 160.  Much of this care is provided independently, subject to later review and confirmation by an attending physician.  *Boston Medical*, 330 N.L.R.B. at 154.  The fact that residents are acquiring advanced medical skills does not detract from their status as employees.

27

*Regents*, 204 N.W.2d at 226. "Members of all professions continue their learning throughout their careers. For example, fledging lawyers employed by a law firm spend a great deal of time acquiring new skills, yet no one would contend that they are not employees." *Id.*

As employees, residents are extended the protections of federal laws, such as the National Labor Relations Act, *Boston Medical Center, supra*, and Title VII. *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995), cert. denied, 519 U.S. 947 (1996). Hospitals are required by Treasury Department regulations to withhold Social Security taxes for medical residents as "full-time employees." *Mayo Found. for Med. Educ. and Research v. United States*, 562 U.S. 44, 59 (2011).

Doe does not contest that she enjoyed Title VII protection as a hospital employee. Instead, she argues that, because the residency program had an educational aspect to it, she could <u>also</u> pursue litigation under Title IX. In this, she is wrong. In fact, Doe's counsel conceded during argument before the District Court that she "is pursuing a Title IX claim because recovery under Title VII is barred for failure to make the required administrative filing within the requisite timeframe." App. 9.

> *b.* *Title IX's Implied Private Right of Action Must Yield to Title VII's Comprehensive Remedial Scheme.*

Title VII provides a comprehensive and carefully balanced remedial scheme for redressing "employment discrimination," which is defined to include unlawful retaliation. *See* 42 U.S.C. § 2000e-2 (giving examples of unlawful employment practices), § 2000e-3 (prohibiting "[o]ther unlawful employment practices," including (a) "[d]iscrimination" in the form of retaliation"). Although a private right of action is an essential means of obtaining judicial enforcement of Title VII, the Supreme Court explained that "cooperation and voluntary compliance" were selected by Congress as the preferred means for eliminating discriminatory practices in the employment setting. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). "To this end, Congress created the [EEOC] and established a procedure whereby existing state and local employment opportunity agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit." *Id.* In addition, the time limitations for administrative and judicial filing are controlled by express provisions of the statute. *Id.*

By contrast, Title IX was passed to address sex discrimination in educational programs, *see* 118 Cong. Rec. 5804-15 (1972); H.R. Rep. No. 554, 92d Cong., 1st Sess. 1-3 (1972), and is a broadly-written general prohibition on discrimination

followed by specific, narrow exceptions to that broad prohibition. *See* 20 U.S.C. § 1681. Title IX's only express enforcement mechanism, codified at § 1682, consists of an administrative procedure to withdraw federal assistance from institutions that are out of compliance. This remedy is unavailable to Doe, or to any private plaintiff.[13]

While Title IX expressly provides for no private right of action to enforce its statutory anti-discrimination mandate, the Supreme Court noted that the absence of such a remedy would leave unfulfilled a primary purpose of the act—*i.e.*, the protection of <u>students</u> who were subjected to discrimination at federally-funded educational institutions. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689-94 (1979) (holding that <u>students</u> are members of the class for whose "especial benefit" Title IX was enacted); *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999) (observing that Title IX was enacted to ensure that "<u>students</u> … not be denied access to educational benefits and opportunities on the basis of gender") (emphasis added). Consequently, the Court found sufficient indicia of congressional intent to imply a private right of action for <u>students</u>. The Court later

---

[13] Aggrieved individuals are free to complain to the Department of Education and seek administrative action under § 1682, as the employees did in *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1992). If unsuccessful, they may seek judicial review of the agency's inaction under the Administrative Procedure Act. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 707 n. 41(1979). Individuals are not authorized by Title IX, however, to seek district court judgments directly terminating funds.

held that Title IX supported an award of monetary damages in a student's claim of intentional sex discrimination by her coach and teacher. *Franklin v. Gwinnett Cnty. Public Sch.*, 503 U.S. 60, 76 (1992). Because medical residents are not students, but rather "full-time employees," *Mayo,* 562 U.S. at 59, the private action available to students does not apply.

While courts can give concrete meaning and application to broadly-worded statutory provisions, they cannot, in the face of a comprehensive legislative scheme including an integrated system of procedures for enforcement, fashion new remedies that might upset carefully considered legislative programs. *See, e.g., Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254-55 (2009) (holding that Title IX did not preclude a § 1983 action alleging unconstitutional gender discrimination in schools and distinguishing cases in which "carefully tailored" enforcement schemes that "required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit" were held to preempt any potential implied private rights of action); *Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 97 (1981).

In particular, the Supreme Court has been hesitant to conclude that different statutory schemes provide parallel paths to relief from a particular injury. Where, as it did with Title VII, Congress creates a comprehensive statutory scheme to vindicate a protected right, it is presumed to be exclusive absent clear evidence of

legislative intent to the contrary. *See Great Am. Fed. Sav. and Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979) (superseded in part on other grounds by the 1991 Amendments to the Civil Rights Act of 1964); *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.*, 453 U.S. 1, 20 (1981) ("[W]hen remedial devices provided in a particular act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

This is not to say that Title VII necessarily is the <u>exclusive</u> remedy for employment discrimination, because corollary state-level anti-discrimination laws and parallel anti-discrimination schemes created by Congress exist and are intended to "augment each other and are not mutually exclusive." *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459 (1975) (citing H.R. Rep. No. 92-238, p. 19 (1971), U.S. Code Cong. & Admin. News, 1972, pp. 2137, 2154). Unlike other anti-discrimination statutes, however, Title IX contains no explicit private right of action. Thus, Title IX does not stand on equal footing with other <u>express</u> parallel enforcement mechanisms borne of legislation, nor is there clear evidence of legislative intent to provide for private means of enforcement.

Because Congress declined to provide victims of employment-related discrimination with a remedy under Title IX, and instead crafted a comprehensive remedial scheme for employment-related discrimination under Title VII, Doe's

claim can stand only if Title IX's legislative history <u>unmistakably</u> reveals Congressional intent to bestow on victims of employment discrimination an avenue of relief in addition to Title VII. Where, as here, such evidence is entirely lacking, a court has no warrant to revise Congress' comprehensive statutory scheme simply because Title IX does not include an express prohibition on creating a private remedy by implication.[14]

The Supreme Court's analysis of the interplay between Title VII and 42 U.S.C. § 1985 is illustrative. In *Great American*, the Court held that § 1985(3), which provides a right of action for persons who are injured by conspiracies to deprive them "of the equal protection of the laws, or of equal privileges and immunities under the laws," 442 U.S. at 366, may not be invoked to redress violations of Title VII. *Id.* at 375-78. Of central importance to the Court's holding were the facts that "[u]nder Title VII, cases of alleged employment discrimination are subject to a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims," and that a claim brought under §1985(3) "could completely bypass the administrative

---

[14]    Although Title IX was enacted after Title VII, it would have been illogical for Congress to have included in the legislation (or the legislative history) an affirmative statement that Title IX's private remedy was preempted by Title VII, insofar as Title IX contains no private remedy at all. *See Franklin v. Gwinnett Cnty. Public Sch.*, 503 U.S. 60, 76 (1992) ("Quite obviously, the search for what was Congress' remedial intent as to a right whose very existence Congress did not expressly acknowledge is unlikely to succeed. . . .") (Scalia, J., concurring in the judgment).

process, which plays such a crucial role in the scheme established by Congress in Title VII." *Id.* at 372-76.  Here, the same rationale the Court employed in *Great American* compels the conclusion that Title VII preempts Doe's Title IX claims to the extent that Doe seeks redress for alleged employment discrimination by her hospital employer.

> c.    An Implied Private Right of Action for Alleged Employment Discrimination Under Title IX Would Undermine Title VII.

A decision in Doe's favor would "eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to the same rules required of every other employment discrimination plaintiff in the country." *Gibson v. Hickman*, 2 F. Supp. 2d 1481, 1484 (M.D. Ga. 1998).  While Title IX contains no express private right of action, the fact that Title VII provides an express, comprehensive remedial scheme is strong evidence of legislative intent to preclude a private right of action for employment discrimination under Title IX.  *See Fitzgerald*, 555 U.S. at 254-55 (recognizing that "[a]llowing a plaintiff to circumvent" a statute's administrative exhaustion and other provisions would be "inconsistent with Congress' carefully tailored scheme") (quotation and citation omitted).

Because a Title IX remedy for employment-related discrimination would disrupt the comprehensive and elaborate Title VII mechanism, most courts have rejected the notion that employees of federally-funded educational institutions have an implied cause of action for money damages for employment discrimination under Title IX, and instead held that Title VII preempts such claims. *See, e.g.*, *Schultz v. The Bd. of Trustees of the Univ. of West Florida*, No. 3:06-cv-442, 2007 U.S. Dist. LEXIS 36815, at *6-9 (N.D. Fla. May 21, 2007) (holding, "consistent with the weight of authority, that the 'precisely drawn, detailed enforcement structure' and 'comprehensive remedial scheme' that is Title VII preempts the more general remedy under Title IX") (citations omitted); *Urie v. Yale Univ.*, 331 F. Supp. 2d. 94, 97-98 (D. Conn. 2004) (adopting the "majority view" that Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII, and dismissing hostile environment and retaliation claims brought by a teaching fellow).

Case law support, which is voluminous,[15] recognizes that "by allowing a comparable cause of action under Title IX the very comprehensive, detailed, and

---

[15] For the sake of brevity, Mercy will not cite to the full universe of authority supporting its position. It is further worth noting that the Circuit-level authority cited by Doe has little or no persuasive value. *Lipsett*, for example, applied Title VII case law to plaintiff's Title IX claim without noting the divergent statutory text highlighted by the Supreme Court a decade later in *Gebser v. Lago*

express provisions of Title VII could be completely avoided." *Ludlow v. Northwestern Univ.*, 79 F. Supp. 3d 824, 833 (N.D. Ill. 2015) (citation omitted)); *accord McLaughlin v. State Sys. of Higher Educ.*, No. 97-CV-1144, 1999 U.S. Dist. LEXIS 4325, at *8-9 (E.D. Pa. Mar. 31, 1999) (holding that employment discrimination claims are not cognizable under Title IX); *Glickstein v. Neshaminy Sch. Dist.*, No. 96-6236, 1997 U.S. Dist. LEXIS 16317, at *38-45 (E.D. Pa. Oct. 22, 1997) ("Congress did not intend that private plaintiffs be able to circumvent the remedial process of Title VII … merely by framing a complaint in terms of Title IX"); *see also, e.g., Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995) ("Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination.") (citation omitted), cert. denied, 519 U.S. 947 (1996); *Capone v. Univ. of Ark.*, No. 5:15-CV-5219, 2016 U.S. Dist. LEXIS 79923, at *10 (W.D. Ark. June 20, 2016) ("This Court agrees with the Fifth Circuit's reasoning in *Lakoski*, and rules that Ms. Capone may not assert a private right of action under Title IX for sex-based employment discrimination that falls

---

*Vista Ind. Sch. Dist.*, 524 U.S. 274, 283 (1998).  In addition, the plaintiff in *Lipsett* advanced claims under both Title IX and Title VII, such that the First Circuit was not required to decide the issue.  *Lipsett*, 864 F.2d at 897 (noting that the plaintiff was "both an employee *and* a student in the program"); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 40 (2d Cir. 2000) (same).  *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995) involved a claim by a student, not an employee, and noted only that Title IX regulations prohibited discrimination against employees (citing *Bell*).  *Murray* did not address the question of whether employees, or anyone else, had a private right of action for alleged employment discrimination.

within the ambit of Title VII."). In addition, employment plaintiffs bringing suit under Title IX could potentially avoid Title VII's statutory cap on compensatory damages. 42 U.S.C. § 1981a(b).

The most analogous case decided in the Courts of Appeal is *Lakoski*, in which a university professor, Dr. Lakoski, alleged that her employer violated Title IX by denying her tenure on the basis of sex. As in this case, "Lakoski did not file a charge with the [EEOC], nor did she plead that the University violated Title VII of the Civil Rights Act of 1964." *Lakoski*, 66 F.3d at 753 ("[A]lthough Lakoski possessed a colorable claim of employment discrimination in violation of Title VII, she chose not to pursue the remedy made available by Title VII. Title VII provides an administrative procedure in which an aggrieved individual must first pursue administrative remedies before seeking judicial relief."). A unanimous Fifth Circuit panel vacated a jury verdict in Dr. Lakoski's favor, and instead held that Title VII preempts a Title IX right of action for employment discrimination. The court explained that Congress did not "intend[] that Title IX offer a bypass of the remedial process of Title VII and that allowing "an implied private right of action for damages under Title IX for employment discrimination … would disrupt a carefully balanced remedial scheme for redressing employment discrimination by employers," including educational institutions. *Id.* at 753-54. Because the panel was "unwilling to do such violence to the congressionally mandated procedures of

Title VII," it held that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Id.* at 753.

Much like Dr. Lakoski, Doe neglected to exhaust her administrative remedies under Title VII, 42 U.S.C. §2000e-5(e), and now seeks to jam the round peg of her unexhausted employment discrimination claims into the square hole of Title IX. App. 9 (Doe "is pursuing a Title IX claim because recovery under Title VII is barred for failure to make the required administrative filing within the requisite timeframe."). While Doe attempts to style her relationship with Mercy as educational, however, she seeks only employment-based remedies including "all pay and benefits" that she purportedly "would have received had it not been for Defendant's illegal actions." App. 123, TAC at pp.24 (seeking in the WHEREFORE clause that Mercy "compensate [Doe], reimburse [her], and make [her] whole for any and all pay and benefits [she] would have received had it not been for [Mercy's] illegal actions"). Doe's request for relief in the form of lost wages and benefits mirrors the remedies available under Title VII. 42 U.S.C. §2000e-5(g)(1). The employment discrimination claims asserted by Doe should therefore face the same fate as those asserted by Dr. Lakoski.

d.    *Supreme Court Precedent Provides No Support for the Position Urged by Doe and Amicus.*

None of the Supreme Court cases cited by Doe and *Amicus* for the proposition that gender-based employment discrimination claims are cognizable under Title IX posed the question of whether an employed participant in a private hospital's "education program or activity" could pursue a private cause of action for employment discrimination under Title IX. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979), *Franklin v. Gwinnett Cnty. Public Sch.*, 503 U.S. 60 (1992), *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1992); and *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005). These cases all arose in a traditional educational setting, such as a private university (*Cannon*) or school district (*Franklin*, *Bell*, *Jackson*). More specifically, neither *Cannon, Franklin, Bell*, nor *Jackson* required the Court to address Title IX's implied private right of action in the context of a plaintiff with a Title VII remedy. Consequently, the Supreme Court was not required to address, much less resolve, a patent conflict between an implied right of action under Title IX and the express, comprehensive remedial scheme of Title VII.

Both *Cannon* and *Franklin* involved claims by traditional students against the respective educational institution; neither involved a claim of employment discrimination.

*Bell* addressed Title IX's prohibition of employment discrimination in the context of a challenge to administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices, not a discrimination claim by an individual for money damages. Because Congress clearly "did not intend for federal monies to be expended to support the intentional violations it sought to proscribe," *Franklin*, 503 U.S. at 75, the Court upheld regulations requiring that recipients refrain from discriminating against either students or employees as a condition of their receipt of federal assistance. *Bell*, 456 U.S. at 538. A key distinction between *Bell* and this case is that, in *Bell*, "a private remedy for aggrieved employees under Title VII did not affect, much less undermine, the validity of regulations for terminating federal funding." *Lakoski,* 66 F.3d at 754.

And finally, in *Jackson*, the Court concluded that Title IX's private right of action encompassed a claim of retaliation asserted by a former coach of a high school girls' basketball team. Critically, however, the Court reached that result only after noting that the coach had no recourse under Title VII. *Jackson*, 544 U.S. at 179-80 ("[I]f Title IX's private right of action does not encompass retaliation claims [for complaints of gender-based discrimination in the student athletic program], the teacher would have <u>no recourse</u> if he were subsequently fired for speaking out.").

As noted by the Fifth Circuit in *Lakoski*, these cases "all presented legal questions in which Title VII hovered on the distant horizon, if it was implicated at all [whereas] [h]ere, Title VII occupies center stage." *Lakoski*, 66 F.3d at 754. In other words, none of these cases involved a patent conflict between Title IX's implied private right of action and Title VII's express, comprehensive remedial scheme. Consequently, it does not follow from *Cannon*, *Franklin*, *Bell*, and *Jackson* that an employee of a hospital's "education program or activity," who is squarely protected under Title VII, can <u>also</u> pursue Title IX as an alternative remedy. *Lakoski*, 66 F.3d at 754 ("Given the availability of a private remedy under Title VII for aggrieved employees, we are unwilling to follow Dr. Lakoski's beguilingly simple syllogism that *Cannon*, *Bell*, and *Franklin* all add up to an implied private right of action for damages under Title IX for employment discrimination.").

Contrary to the factual underpinnings of *Cannon, Franklin*, *Bell*, and *Jackson*, a decision in Mercy's favor would not leave plaintiffs like Doe without a remedy because Doe is covered by Title VII. In addition, § 1983 suits based on the Equal Protection Clause are available to plaintiffs alleging unconstitutional gender discrimination in federally-funded educational institutions. *See Fitzgerald*, 555 U.S. at 255-256 (holding that Title IX did not preempt § 1983 claims because Title

IX did not constitute an "unusually elaborate," "carefully tailored," and "restrictive" enforcement scheme).

### e.    *Expansion of Implied Rights Is Heavily Disfavored.*

Because the Supreme Court has never specifically addressed the relationship between Title IX and Title VII, Doe is advocating a wholesale expansion of the implied private right of action first recognized in *Cannon*.  Expansion of implied rights, however, is heavily disfavored, should be undertaken with extreme caution, and only where grounded in clear evidence of legislative intent (which, of course, is lacking here).  The Court's hostility toward implied rights signals that it would refuse to expand Title IX's implied private right of action to subsume claims for alleged employment discrimination asserted by a private hospital's employed resident physician.

The Supreme Court has been very clear that "[c]oncerns with the judicial creation of a private cause of action [also] caution against its expansion." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008). Considerations of legislative primacy and judicial restraint dictate that, in the absence of clear Congressional intent, the Judiciary's expansion of implied private rights of action "runs contrary to the established principle that the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation." *Id.* at 164 (internal quotation marks and alteration omitted); *see also Alexander v.*

*Sandoval*, 532 U.S. 275, 286-87 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. … [C]ourts may not create one, no matter how desirable that might be as a policy matter. . . ."); *Smith v. Reagan*, 844 F.2d 195, 201 (4th Cir. 1988) (observing that the Supreme Court's discomfort with expansion of implied rights of action is a reflection of its view that "[t]he regulation of access to the courts is largely a legislative task, and one that courts should hesitate to undertake.").

In the three-plus decades since the Supreme Court's decision in *Cannon*, the Court has become increasingly hostile to implied rights of action. Indeed, jurisprudence over the last 30 years evidences a strong presumption *against* implied rights. *See, e.g., Thompson v. Thompson*, 484 U.S. 174, 190, 188 (1988) (Scalia, J., concurring) (noting that nine of last eleven claims of implied rights have been denied); *In re Olympia Brewing Co. Sec. Litig.*, 674 F. Supp. 597, 608-09 (N.D. Ill. 1987) (observing that "[t]he Supreme Court began giving claims for an implied right of action the cold shoulder starting . . . in 1975 and the Court's frigidity has increased ever since."); *Cmty. & Econ. Dev. Ass'n of Cook County, Inc. v. Suburban Cook County Area Agency on Aging*, 770 F.2d 662, 664 (7th Cir. 1985) ("[Since 1975], implied private rights of action have been doled out parsimoniously, and it is now clear that the maxim *ubi jus ibi remedium* no longer pertains in the construction of federal legislation. To the contrary, the ultimate

question under current law is whether the legislature *intended* to provide an implied right of action.") (emphasis in original) (citation omitted).

Even the four-factor test deployed in *Cannon*, which ultimately yielded an implied private right of action for students under Title IX, has since been discarded in favor of a stricter test. *Thompson*, 484 U.S. at 179-80 (noting that the four-part test for implied rights of action … [has] been effectively overruled by our later opinions") (Scalia, J., concurring); *Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 740 (2d Cir. 1992) ("The Supreme Court, without expressly overruling the earlier precedents, for all practical purposes has adopted Justice Powell's dissenting views in [*Cannon*].").  Congressional intent is now considered "the ultimate issue," and the discarded factors now serve, if at all, only as proxies for legislative intent.  *Thompson*, 484 U.S. at 179 ("The intent of Congress remains the ultimate issue.").

It is not the role of federal judiciary to blaze new trails into uncharted territory in the absence of any clear textual or precedential mandate for doing so. The Supreme Court has signaled quite clearly that courts should exercise restraint when dealing with the expansion of implied rights, and there is plenty of reason for restraint here.  Specifically, there is no evidence that Congress intended to permit private employment plaintiffs to circumvent the remedial process of Title VII and its state analogs merely by framing a complaint in terms of Title IX.

  *f.*  *The Contractual Nature of Title IX Requires Courts to Exercise Additional Restraint.*

The Supreme Court's hostility toward implied private rights of action is especially pronounced in the Title IX context. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 278 (1998). In *Gebser*, the Court noted that the "contractual nature" of Title IX has "implications for [the] construction of the scope of available remedies," then "examine[d] closely the propriety of private actions holding the recipient liable in monetary damages" under Title IX and determined that a school district could not be held liable in a private suit on the theory of *respondeat superior* for an employee's violation of the statute. *Gebser*, 524 U.S. at 287, 292-93; *see also Folkes v. N.Y. College of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 288-89 (E.D. N.Y. 2002) ("*Gebser* shows the Supreme Court's reluctance to extend the reach of Title IX beyond that imposed by Congress"). The Court's decision in *Gebser* is a clear signal that Title IX must be interpreted strictly in accord with its statutory language.

Quite simply, there is no evidence that Congress intended Title IX to serve as an additional protection against gender-based discrimination where other private remedies exist. To the contrary, expansion of Title IX's implied private right of action for individuals alleging employment discrimination that is otherwise cognizable under Title VII would encroach upon Title VII's express, carefully balanced, and comprehensive remedial scheme. *See Sobel v. Yeshiva Univ.*, 477 F.

Supp. 1161, 1168 (S.D.N.Y. 1979) ("[A]lthough the *Cannon* ruling has established that a private right of action may be implied under Title IX for the benefit of [students], [employees] who are protected under the terms of Title VII, do not fall within that class and may not maintain this cause of action.").

Accordingly, Mercy respectfully requests that this Court affirm the District Court's dismissal with prejudice of Counts I, II, and III of Doe's TAC.

## B. THE DISTRICT COURT PROPERLY DISMISSED COUNT I OF DOE'S TAC BASED ON THE STATUTE OF LIMITATIONS

The District Court properly dismissed Count I as time-barred. Count I of Doe's TAC asserts a claim against Mercy for "[s]exual harassment and hostile educational environment."[16] TAC at ¶¶ 17-19. A Title IX hostile environment claim is governed by a two (2) year statute of limitations. *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989).

Doe admittedly knew about—and, in fact, complained of—sexual harassment in "the winter of 2011/2012," yet she neglected to pursue her rights for more than three (3) years thereafter. *Compare* App. 118, TAC at ¶ 145 *and* App. 14, ECF No. 1 (filed on Apr. 20, 2015). Doe's attempt to resurrect her time-barred

---

[16] To state a hostile environment claim under Title IX, Doe must plead "sexual harassment [] that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that [she is] effectively denied equal access to an institution's resources and opportunities." *DeJohn v. Temple Univ.*, 537 F.3d 301, 306 (3d Cir. 2008) (text alterations in original) (citation omitted).

hostile environment claim via the continuing violations doctrine fails as a matter of law, equity, and fact.

### 1. The Continuing Violations Doctrine Does Not Apply in the Title IX Context.

Although it is an issue of first impression in this Court, important differences in the legislative purpose and statutory text signal that Title VII's continuing violations doctrine is inapplicable in the Title IX context. *See Gjeka v. Del. County Comm. Coll.*, No. 12-4548, 2013 U.S. Dist. LEXIS 73054, at *13-15 (E.D. Pa. May 23, 2013) (declining to "expand the continuing violations theory beyond its application to a hostile work environment claim under Title VII").[17]

Doe cites extra-Circuit authority for the proposition that the continuing violations doctrine, which is based on the Title VII case *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), is equally applicable to a Title IX claim. These cases are wrongly decided. Title IX was modeled after Title VI of the Civil Rights Act of 1964, not Title VII, and Congress passed Title IX with the explicit

---

[17]    *See also Doe v. Rust Coll.*, No. 3:14-CV-32, 2015 U.S. Dist. LEXIS 129232, at *6 (N.D. Miss. Sept. 25, 2015) (refusing to apply continuing violations doctrine to plaintiff's Title IX claim); *Thompson v. Indep. Sch. Dist. of Stephens Co., Oklahoma*, No. Civ-12-13-M, 2013 U.S. Dist. LEXIS 65320, at *14 n.8 (W.D. Okla. May 8, 2013) (same); *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 288 (E.D.N.Y. 2002) (same).  By contrast, the only case in this circuit to have applied the continuing violations doctrine in the Title IX context, *Summy-Long v. Pennsylvania State Univ.*, No. 1:06-cv-1117, 2010 U.S. Dist. LEXIS 27953 (M.D. Pa. Mar. 24, 2010), assumed that the continuing violations doctrine applied only "[b]ecause it [was] uncontested." *Id.* at *35 n.4. Consequently, *Summy-Long* has no persuasive weight.

understanding that it would be interpreted in a manner consistent with Title VI. *See Cannon*, 441 U.S., at 696.  Title VII is framed as an "outright prohibition" which "aims centrally to compensate victims of discrimination" and applies to "all employers without regard to federal funding." *Gebser*, 524 U.S. at 286-87 (citations omitted).  By contrast, Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.*  Thus, the continuing violations doctrine is "a poor fit with the goals of Title IX." *Folkes*, 214 F. Supp. 2d at 288 (citing *Gebser*).

The continuing violations doctrine also is premised on statutory text that appears in Title VII, but not Title IX.  Specifically, the Title VII limitations period codified at 42 U.S.C. § 2000e-5(e)(1) provides that a plaintiff must assert his or her rights within a certain period after an "unlawful employment practice occurred." Because "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice," the Supreme Court has noted that the unlawful "practice" could be said to have "occurred" within the limitations period on the basis of one timely component act. *Morgan*, 536 U.S. at 124-25.  Title IX does not permit a similar analysis, however, because it contains no comparable limitations language.  In fact, Title IX contains no private right of action at all; instead, a private right of action was implied by the

Court in *Cannon*.

Given the important differences between Title VII and Title IX, the Supreme Court would likely not apply Title VII's continuing violations doctrine to claims brought under Title IX. *See Gebser*, 524 U.S. at 286-87; *Folkes*, 214 F. Supp. 2d at 288-89 ("*Gebser* … leads this court to question the advisability of applying the oft-disfavored continuing violation exception to Title IX claims").

### 2. Equity Precludes Application of the Continuing Violations Doctrine on These Facts.

Second, Doe's admission that she was fully aware of, and even complained of, hostile treatment outside the limitations period precludes application of the doctrine as a matter of equity. It is well-settled that Doe's cause of action accrued at the moment she either knew or had reason to know of her claimed injury. *Shine v. Bayonne Bd. of Educ.*, No. 14-4184, 2015 U.S. App. LEXIS 16771, at *7-8 (3d Cir. Sept. 22, 2015) (stating that the limitations period on plaintiff's Title IX claim began to run "when the plaintiff knew or should have known of the injury upon which its action is based") (citations omitted).

Here, the District Court was not required to infer the date on which Doe first became aware of her alleged "injury," because Doe affirmatively pleads it. Specifically, Doe admits in ¶ 145 of her TAC that she was fully aware of—and, in fact, complained about—the alleged course of sexual harassment in the "winter of

2011/2012." App. 118, TAC ¶ 145. Because the continuing violations doctrine is an <u>equitable</u> exception intended to protect plaintiffs who could not have known that they should have sued earlier, Doe's admission that she <u>knew</u> she was being sexually harassed a full three years prior to the date on which she filed her Complaint should be claim-dispositive. *See Foster v. Morris*, 208 F. App'x 174, 178 (3d Cir. 2006) ("The continuing violations doctrine is an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable as illegal over time.").

Permitting Doe to avoid the statutory filing requirement by invoking the continuing violations doctrine under these circumstances "would be inconsistent with the doctrine's equitable premise that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Fusco v. Bucks County*, No. 08-2082, 2009 U.S. Dist. LEXIS 118924, at *22-23 (E.D. Pa. Dec. 21, 2009) (citations omitted); *see also Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 50-51 (N.D.N.Y. 1999) ("[Where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she cannot reach back and base her suit on conduct that occurred outside the statute of limitations."). In sum, permitting Doe to invoke an "equitable" exception on these facts would be inequitable.

### 3.    Doe Has Not Alleged a Timely Non-discrete Component Act of Harassment.

And third, as recognized by the District Court, even assuming the continuing violations doctrine could potentially apply to Doe's Title IX hostile environment claim, all non-discrete acts that allegedly contributed to the purported <u>hostile environment</u> occurred outside the limitations period.

Because Doe's initial Complaint was filed on April 20, 2015, and her hostile environment claim is subject to a two (2) year statute of limitations, Doe must allege at least one act of purported harassment that took place on or after April 20, 2013.  The only alleged non-discrete component act of harassment alleged to have occurred on or after April 20, 2013, and therefore within the limitations period, is Roe's alleged act of "advocat[ing] for Plaintiff's dismissal" at the April 24, 2013 hearing during which Doe appealed the termination decision.  App. 115, TAC at ¶ 122.  Significantly, while Doe's Brief attempts to bolster these allegations by adding that "Roe falsely and publically accused Plaintiff of unprofessionalism and falsely accusing him of harassing her … in front of other faculty members," *see* Appellant's Brief at 46, <u>those allegations do not appear in her TAC</u>.

Advocating for Doe's dismissal from the medical residency program is not an act of "sexual harassment."  To allege a continuing violation, Doe must show that "all acts which constitute the claim are part of the <u>same unlawful employment</u>

practice . . . ." *Morgan,* 536 U.S. at 118 (emphasis added).  To assess whether the TAC plausibly avers timely conduct related to the same unlawful employment practice, courts in the Third Circuit look to the subject matter and the frequency of the conduct.  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013).  While Doe's TAC contends that Roe subjected her to unwanted sexual attention during her residency, she does not allege that Roe engaged in conduct of a sexual or harassing nature during the appeal hearing.  *Morgan,* 536 U.S. at 118 ("[I]f an act on day 401 had no relation to the acts between days 1-100 … then the employee can not recover for the previous acts, at least not by reference to the day 401 act.").  Roe's decision to defend the termination decision, cannot as a matter of law or common sense be considered "sexual harassment."  Doe's conclusory characterization of Roe's conduct as "hostile," does not make Roe's statements at the hearing either part of the same "alleged unlawful employment practice" that Doe alleges took place prior to April 20, 2013 or a component act of any purported hostile environment as that phrase is defined by law.[18]

---

[18]    Doe's argument that the alleged hostile environment is separate and distinct from the tangible action that occurred is a red herring.  Mercy agrees that Doe's hostile environment claim differs from her claims bottomed on discrete acts.  The relevant questions before the Court with regard to Doe's hostile environment claim are simply whether Roe's alleged "advoca[cy] for Plaintiff's dismissal from the residency program" during the April 24, 2013 appeal hearing, which is the only potentially timely component act of the alleged hostile environment, qualifies as actionable harassment or, assuming that the Court finds that it does, is part of the

Doe further argues that Roe accused her of unprofessionalism in that she falsely accused <u>him</u> of harassment.   (Appellant's Brief at 46).   Again, these allegations do not appear in Doe's TAC.  Even assuming for the sake of argument the allegations were made in the TAC, however, Roe's denial of harassment does not itself constitute harassment.  To hold otherwise would permit virtually any act disfavored by the plaintiff to suffice as a component act of "an unlawful employment practice," even if the alleged harasser is simply defending himself or his employment decisions.

The District Court below and other courts, in this Circuit and elsewhere, have rejected the notion that any unfavorable act by an alleged harasser qualifies as a component act even where it is qualitatively distinct from the "harassment" for which the plaintiff seeks redress.  *See e.g., Kent v. Henderson*, 77 F. Supp. 2d 628, 635 (E.D. Pa. 1999) ("In this case, plaintiff points to no evidence in the record which shows that the post-January 2, 1996 conduct, even if true, was motivated by plaintiff's sex.  In other words, plaintiff is simply presuming that because Mr. Wentzel had harassed her in the past because of her sex, every subsequent incident between her and Mr. Wentzel was necessarily similarly motivated by her sex. However, not every friction in the workplace between a man and a woman supports a claim of sexual harassment.  Nor does Title VII enact a general labor

same purported "unlawful employment practice" as that identified by Doe in her TAC. *Morgan,* 536 U.S. at 118.

code which addresses all forms of disputes between co-workers.").

For that reason and the other reasons set forth above, Mercy respectfully requests that this Court affirm the District Court's dismissal of Count I of Doe's TAC.

## IX.  <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant/Appellee Mercy Catholic Medical Center respectfully requests that this Court affirm the District Court's January 26, 2016 Order dismissing with prejudice Counts I, II, and III of Plaintiff/Appellant Jane Doe's Third Amended Complaint.

Respectfully submitted,

**POST & SCHELL, P.C.**

BY:  **/s/ Robin Locke Nagele**
      **A. JAMES JOHNSTON, ESQUIRE**
      **ANDREA M. KIRSHENBAUM, ESQUIRE**
      **ROBIN LOCKE NAGELE, ESQUIRE**
      **DARREN M. CREASY, ESQUIRE**

      **COUNSEL FOR APPELLEE,**
      **MERCY CATHOLIC MEDICAL CENTER**

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to L.A.R. 28.3(d) and 46.1(e), I, A. James Johnston, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: <u>September 20, 2016</u>    <u>/s/ A. James Johnston</u>
　　　　　　　　　　　　　　　A. JAMES JOHNSTON, ESQUIRE

Pursuant to L.A.R. 28.3(d) and 46.1(e), I, Andrea M. Kirshenbaum, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: <u>September 20, 2016</u>    <u>/s/ Andrea M. Kirshenbaum</u>
　　　　　　　　　　　　　　　ANDREA M. KIRSHENBAUM, ESQUIRE

Pursuant to L.A.R. 28.3(d) and 46.1(e), I, Robin Locke Nagele, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: <u>September 20, 2016</u>    <u>/s/ Robin Locke Nagele</u>
　　　　　　　　　　　　　　　ROBIN LOCKE NAGELE, ESQUIRE

Pursuant to L.A.R. 28.3(d) and 46.1(e), I, Darren M. Creasy, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: <u>September 20, 2016</u>    <u>/s/ Darren M. Creasy</u>
　　　　　　　　　　　　　　　DARREN M. CREASY, ESQUIRE

# **<u>CERTIFICATION OF COMPLIANCE</u>**
# **<u>WITH TYPE-VOLUME LIMITATION</u>**

I hereby certify that the foregoing Brief contains 13,559 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  In preparing this certification, I relied on the word-processing system used to prepare the foregoing Brief.

The foregoing Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: <u>September 20, 2016</u>        <u>/s/ Darren M. Creasy        </u>
                                           DARREN M. CREASY, ESQUIRE

## <u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that I served two (2) true and correct copies of the foregoing Brief, by mail, upon the following on the date indicated.

Joshua S. Boyette
Swartz Swidler LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
jboyette@swartz-legal.com
Attorney for Appellant Jane Doe

Vanita Gupta
Sharon M. McGowan
Christine A. Monta
U.S. Department of Justice
Civil Rights Division
Appellate Section – RFK 3716
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 14403

Attorneys for United States as *Amicus Curiae*

I further certify that on <u>September 20, 2016</u> the foregoing Brief was electronically filed with the Court.

Seven (7) hard copies of the Brief were sent to the office of the Clerk of Court, by first-class mail, on <u>September 20, 2016</u>.

/s/ Darren M. Creasy
DARREN M. CREASY, ESQUIRE

## **CERTIFICATION OF VIRUS CHECK**

I hereby certify that the foregoing Brief of Appellee, Mercy Catholic Medical Center, was scanned for viruses by Sophos antivirus scan software, version 10.3, on <u>September 20, 2016</u>, and no viruses were detected.


Dated: <u>September 20, 2016</u>          /s/ Darren M. Creasy
                                        DARREN M. CREASY, ESQUIRE

## **CERTIFICATION OF IDENTICAL BRIEFS**

Pursuant to Third Circuit Local Rule 31.1(c), it is hereby certified that the text of this electronically filed Brief and the text of the "hard" copies of the Brief filed with the Court and served on the Appellant are identical.


Dated: <u>September 20, 2016</u>     <u>/s/ Darren M. Creasy</u>
                                        DARREN M. CREASY, ESQUIRE