# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

## No. 16-1247

---

### JANE DOE,

#### Plaintiff-Appellant,

#### v.

### MERCY CATHOLIC MEDICAL CENTER,

#### Defendant-Appellee.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

## BRIEF OF *AMICUS CURIAE* THE HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENNSYLVANIA IN SUPPORT OF APPELLEE AND AFFIRMANCE OF THE DISTRICT COURT

---

**PHILIP H. LEBOWITZ**
**DUANE MORRIS LLP**
**30 South 17th Street**
**Philadelphia, PA 19103**
**(215) 979-1000**
***Attorneys for Amicus Curiae, The Hospital & Healthsystem Association of Pennsylvania***

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

## NO. 16-1247

---

### JANE DOE,
#### Appellant,

v.

### MERCY CATHOLIC MEDICAL CENTER,
#### Appellee.

---

### CORPORATE DISCLOSURE STATEMENT AND
### STATEMENT OF FINANCIAL INTEREST

Pursuant to Rule 26.1 and Third Circuit L.A.R. 26.1.1, Amicus Curiae The Hospital & Healthsystem Association of Pennsylvania ("HAP") makes the following disclosures:

**1.     For non-governmental corporate parties, please list all parent corporations:**

HAP is a Pennsylvania non-profit corporation that has no parent corporation.

**2.     For non-governmental corporate parties, please list all publicly held companies that own 10% or more of the party's stock:**

None.

**3.     If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.**

Not applicable.

## STATEMENT REQUIRED BY F.R.A.P. 29(c)(5)

Pursuant to Rule 29(c)(5)(A), HAP states that no counsel for a party

authored this brief in whole or in part.

Pursuant to Rule 29(c)(5)(B), HAP states that Appellee Mercy Catholic

Medical Center has made a monetary contribution to fund the preparation and

submission of this brief.


September 27, 2016                    /s/ Philip H. Lebowitz
                                     Philip H. Lebowitz
                                     DUANE MORRIS LLP
                                     30 South 17th Street
                                     Philadelphia, PA  19103
                                     (215) 979-1000

                                     *Attorneys for Amicus Curiae The*
                                     *Hospital & Healthsystem Association*
                                     *of Pennsylvania*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE .......... vii

I.      INTRODUCTION ........................................................... 1

II.     ARGUMENT .................................................................. 1

    A.     Medical Residents Are Employees, Not Merely Students .................... 1

    B.     Residents' Employment Status Confirms That Hospitals Are Not Educational Institutions and Residencies Are Not Education Programs ............................................................. 5

    C.     Holding Private Hospitals with Residency Programs Liable under Title IX for Employment Discrimination Claims Would Expose  Hospitals to Greater Risk and Expense, Increasing the Public's Health Care Costs .................................................. 9

III.    CONCLUSION .............................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Boston Medical Center*
  330 NLRB 152 (1999) ............................................................... 2-5

*Bougher v. University of Pittsburgh*
  882 F.2d 74 (3d Cir. 1989) ............................................. 12

*Bureau of Worker's & Unemployment Compensation v. Detroit
  Medical Center*
  705 N.W.2d 524 (Mich. Ct. App. 2005) ................................ 4

*Burgh v. Borough Council of Borough of Montrose*
  251 F.3d 465 (3d Cir. 2001) ................................... 10, 12

*Davis v. Mann*
  882 F.2d 967 (5th Cir. 1989) ........................................ 8

*Doe v. Mercy Catholic Medical Center*
  158 F. Supp. 3d 256, 260 (E.D. Pa. 2016) .......................... 7

*Fenje v. Feld*
  398 F.3d 620 (7th Cir. 2005) ....................................... 8

*Fitzgerald v. Barnstable School Committee*
  555 U.S. 246 (2009) ................................................. 10-11

*Gebser v. Lago Vista Independent School District*
  524 U.S. 274 (1998) ................................................. 11, 13

*Gul v. Center for Family Medicine*
  762 N.W.2d 629 (S.D. 2009) ......................................... 8

*Henschke v. New York Hospital-Cornell Medical Center*
  821 F. Supp. 166 (S.D.N.Y. 1993) .................................. 8

*Jackson v. Birmingham Board of Education*
  544 U.S. 167 (2005) ................................................ 11

*Jeldness v. Pearce*
    30 F.3d 1220 (9th Cir. 1994) .......................................................... 6-7

*Lakoski v. James*
    66 F.3d 751 (5th Cir. 1995) ...............................................................11

*Lipsett v. University of Puerto Rico*
    864 F.2d 881 (1st Cir. 1988)........................................................... 8-9

*Mayo Foundation for Medical Education & Research v. United States*
    562 U.S. 44 (2011)........................................................................1, 4

*Roubideaux v. North Dakota Department of Corrections*
    570 F.3d 966 (8th Cir. 2009) .................................................................7

## STATUTES

20 U.S.C. § 1681(a) .................................................................... 5-6

20 U.S.C. § 1681(c) .................................................................... 5-6

20 U.S.C. § 1867.................................................................... 13-14

42 U.S.C. § 1981a(b)(3).................................................................13

42 U.S.C. § 2000e .........................................................................9

42 U.S.C. § 2000e–5(e)(1).................................................................12

## OTHER AUTHORITIES

Aaron S. Kesselheim and Kirsten E. Austad, *Residents: Workers or Students in the Eyes of the Law?*, 364 N. Engl. J. Med. 697, 699 (2011) (emphasis added)........................................................................3

Assoc. of Am. Med. Colleges, *Survey of Resident/Fellow Stipends and Benefits Report, 2014-2015* (Nov. 2014), https://www.aamc.org/download/412558/data/2014stipendsurveyreportfinal.pdf ........................................................................4

Daniel L. Davenport et al., *Surgery Resident Working Conditions and Job Satisfaction*, 144 Surgery 332, 337 (2008) .................................................3

Robert N. Wilkey, *The Non-Negotiable Employment Contract—
Diagnosing the Employment Rights of Medical Residents*, 44
Creighton L. Rev. 705, 712 (2011).......................................................................2

Sarah L. Geiger*, The Ailing Labor Rights of Medical Residents:
Curable Ill or a Lost Cause?*, 8 U. Pa. J. Lab. & Emp. L. 523, 523
(2006)..............................................................................................................2, 3

Teryl K. Nuckols et al., *Cost Implications of Reduced Work Hours
and Workloads for Resident Physicians*, 360 N. Engl. J. Med. 2202
(2009)...................................................................................................................3

**STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE**

*Amicus curiae*, The Hospital & Healthsystem Association of Pennsylvania ("HAP"), is the principal trade association for Commonwealth of Pennsylvania health care institutions, currently representing over 240 hospitals and health systems, as well as affiliated physicians, nursing homes, home health agencies and other health care providers. These institutions are located across the Commonwealth and range from small, rural facilities in areas with limited health care providers, to community hospitals that serve, among others, the Commonwealth's large elderly population, to the large academic and urban hospitals and health systems that conduct sophisticated medical research as well as serving the urban poor.

HAP has been the principal hospital trade association for Pennsylvania hospitals for over 25 years. As a forum in the Commonwealth for developing health care policy initiatives, HAP works with its diverse members to improve and deliver safe and efficient health care services. HAP frequently raises matters of importance to hospitals and other providers before the courts and government agencies, including through the public rulemaking process.

HAP and its members have a comprehensive and substantial interest in this case. This matter concerns whether a hospital that employs residents may be subject to liability for employment discrimination under Title IX of the Education

Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX" or the "Act"). HAP's members include virtually all of the hospitals across the State that employ residents to provide care for their patients. The Court's decision will have a direct and significant financial impact on these Pennsylvania hospitals. In particular, HAP and its members are concerned that extending Title IX to address situations like that presented in this case will needlessly increase the administrative and financial burdens imposed on hospitals without providing any additional protections to employees who assert claims of sexual discrimination.

HAP is uniquely positioned to inform the Court regarding the general impact that the extension of Title IX to medical residents ("medical residents" or "residents") employed by private hospitals would have. HAP is filing this Amicus Brief in support of Appellee Mercy Catholic Medical Center ("Mercy") to advise the Court of the potential consequences and harm Pennsylvania's hospitals would suffer should the Court overturn the decision of the District Court, and to respectfully request that the Court affirm the District Court's decision in favor of Mercy.

HAP has been authorized by its Board of Directors to file this Brief on behalf of its member hospitals.

## I.    INTRODUCTION

This case considers whether medical residents should be extended a private cause of action for employment discrimination under Title IX.  The District Court correctly held that Title IX does not provide such a cause of action because defendant Mercy does not operate an "education program or activity" covered under Title IX.  Should the District Court's decision be overturned on appeal, Pennsylvania hospitals would be exposed to significantly expanded liability which would have an adverse financial impact on the hospitals, create confusion and increased litigation regarding the rights of hospital employees, and thereby damage hospitals' ability to serve their patients.

## II.   ARGUMENT

### A.    *Medical Residents Are Employees, Not Merely Students*

Although training is a central aspect of residency programs, residents are employees of the hospitals at which they work, serving an essential role as active physicians and not simply students learning their trade.  Residents are medical school graduates who are licensed physicians, and who work in excess of 40 hours per week and often up to 80 hours or more.  As the U.S. Supreme Court has recognized, residents "work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 60 (2011) (internal quotation marks omitted).  Residents' prominent role and autonomy in

hospital patient care, the benefits they receive, the taxes paid on their wages, and their collective bargaining rights all demonstrate that residents act far more as employees than as students.

Throughout the country, medical residents serve a crucial labor role in their hospitals, allowing these hospitals to treat large numbers of patients each year.  At many hospitals, patients "receive most of their direct care from medical interns, residents, and fellows who are one, two, three, or more years out of medical school."  Sarah L. Geiger, *The Ailing Labor Rights of Medical Residents: Curable Ill or a Lost Cause?*, 8 U. Pa. J. Lab. & Emp. L. 523, 523 (2006); *see also* Robert N. Wilkey, *The Non-Negotiable Employment Contract—Diagnosing the Employment Rights of Medical Residents*, 44 Creighton L. Rev. 705, 712 (2011) ("hospitals derive a significant percentage of its labor force from medical residents enrolled in GME programs").  Residents spend up to 80 percent of their time engaging in direct patient care activities.  *Boston Med. Ctr.*, 330 NLRB 152, 160 (1999).

"[R]esidents are clearly indispensable to the care provided at the hospitals where they are employed" and present substantial differences from students:

> [A] resident differs in notable ways from a 'student' who is 'enrolled in and regularly attending classes.'  Whereas medical students participate in a multidisciplinary plan of study and engage in clinical clerkships to learn from residents and attending physicians without any true service obligations (except when they are acting as sub-interns), *residents serve as a workforce*.

Aaron S. Kesselheim and Kirsten E. Austad, *Residents: Workers or Students in the Eyes of the Law?*, 364 N. Engl. J. Med. 697, 699 (2011) (emphasis added). Furthermore, residents differ from traditional students in that they do not pay tuition or fees, do not take formal classroom exams, and do not receive grades. *Boston Med. Ctr.*, 330 NLRB at 161.

When restrictions on resident work hours and schedules were proposed and implemented in recent years, various studies showed that residents would have to be replaced not by students, but by other trained hospital employees. *See, e.g.*, Geiger, *supra*, at 537 ("residents perform many responsibilities generally assignable to other hospital faculty"); Teryl K. Nuckols et al., *Cost Implications of Reduced Work Hours and Workloads for Resident Physicians*, 360 N. Engl. J. Med. 2202 (2009). Such changes would require "[s]hifting residents' work to substitute providers or an expanded population of residents," and suitable substitutes would include "midlevel providers and attending physicians." Nuckols, *supra*, at 2203, 2212. In fact, residents play such a significant role in the hospital labor force that the required transfer of responsibility to other providers was predicted to cost between $1.1 and $2.5 billion. *Id.* at 2213. Residents "often perceive themselves as carrying the burden for shortfalls in staffing and systems of care at hospitals." Daniel L. Davenport et al., *Surgery Resident Working Conditions and Job Satisfaction*, 144 Surgery 332, 337 (2008).

Although they receive supervision from and consult frequently with more experienced physicians, residents act relatively independently as they treat patients. As the National Labor Relations Board noted, one residency program's internal medicine interns saw patients without an attending physician approximately 80 to 90 percent of the time. *Boston Med. Ctr.*, 330 NLRB at 153. During night shifts, residents might be the only physicians present on inpatient wards. *Id.*

In addition to the extent and nature of the work residents perform, residents are employees who receive pay for their services as well as various fringe benefits. *See, e.g.*, *Bureau of Worker's & Unemployment Comp. v. Detroit Med. Ctr.*, 705 N.W.2d 524, 528 (Mich. Ct. App. 2005) ("Further, she received remuneration, i.e., a stipend and benefits, for her services."). Such benefits may include health, dental and life insurance, paid vacations or sick leave. *Boston Med. Ctr.*, 330 NLRB at 156; *see generally* Assoc. of Am. Med. Colleges, *Survey of Resident/Fellow Stipends and Benefits Report, 2014-2015* (Nov. 2014), https://www.aamc.org/download/412558/data/2014stipendsurveyreportfinal.pdf. As with other employees, residents' federal and state income taxes, as well as Social Security taxes, are withheld from their paychecks. *Boston Med. Ctr.*, 330 NLRB at 160; *Mayo Foundation*, 562 U.S. at 58-60 (finding residents to be employees for purposes of FICA tax withholding). In recognition of residents' function as employees, the National Labor Relations Board has found that

4

residents are employees under the National Labor Relations Act and have the right

to organize.  *See generally Boston Med. Ctr.*, 330 NLRB at 152-168.

### B.    Residents' Employment Status Confirms That Hospitals Are Not Educational Institutions and Residencies Are Not Education Programs

The Mercy hospital residency program is the only connection to Title IX

proffered by plaintiff.  That is, if the Mercy residency program is not an education

program or activity under Title IX, no other aspect of the hospital or its operations

poses even a plausible connection to Title IX's requirements and protections.  As

described above, medical residents are hospital employees who receive advanced

training through the performance of their employment duties.  Therefore, the

employment status of residents demonstrates that the residency program is not an

education program or activity and as a result, Title IX is not applicable to the

employment discrimination claims raised against a private hospital in this case by

the plaintiff.

Title IX applies only to "**education** program[s] or activit[ies] receiving

Federal financial assistance[.]"  20 U.S.C. § 1681(a) (emphasis added).  In other

words, Title IX does <u>not</u> apply to any "program or activity" but to "education"

programs  specifically.  When it enacted Title IX, Congress made it clear that Title

IX applies to "educational institutions," which is defined in 20 U.S.C. § 1681(c), in

order to clarify by implication what it meant by the undefined term "education

program or activity." In creating nine exceptions to the broad prohibition against discrimination in education programs or activities, Congress referred in every exception, at least in part, to those aspects of "educational institutions" to which Title IX would not apply. 20 U.S.C. § 1681(a)(1)-(9). Thus, by statute, Title IX does not apply in certain circumstances to admissions to educational institutions, religious educational institutions, military educational institutions, single-sex educational institutions, fraternities and sororities at educational institutions, Boys State or Girls State programs at educational institutions, parent-child activities at educational institutions, and beauty pageant awards by educational institutions. *Id*. The obvious inference from these express exceptions for particular activities at educational institutions, and the inclusion in section 1681(c) of a definition of an educational institution, is that Congress intended "education program or activity" to refer to programs or activities such as those provided at educational institutions.[1]

Although some courts have fostered the expansion of Title IX to other education programs not at educational institutions, those cases typically involve more traditional education, including vocational education, at other institutions where traditional education occurs, such as at prisons. *See, e.g., Jeldness v.*

---

[1] To the extent Title IX exempts entities other than "educational institutions" (*see* 20 U.S.C. § 1681(a)(6)-(7)), such as YMCA, YWCA, Girl Scouts, Boy Scouts, Camp Fire Girls or similar young people's activities, these groups undeniably involve boys or girls whom Congress expected, on account of their age, to be enrolled as students in "educational institutions."

*Pearce,* 30 F.3d 1220 (9th Cir. 1994). Where those activities more closely

approximate employment, however, courts have refused to extend Title IX to the

same types of institutions. *See Roubideaux v. N.D. Dep't of Corr.,* 570 F.3d 966

(8th Cir. 2009).

When Congress enacted the Civil Rights Restoration Act of 1987 ("CRRA")

and essentially expanded the definition of "program or activity" in several statutes,

Congress remained silent regarding the term "education program or activity" in

Title IX, and left the definition of "educational institution" unchanged and in full

force and effect. Thus, Title IX is inextricably connected to "'education' programs

in the sense of schooling" as the District Court aptly observed. *See Doe v. Mercy

Catholic Med. Ctr.*, 158 F. Supp. 3d 256, 260 (E.D. Pa. 2016). That residents are

more accurately characterized as employees, as discussed *supra*, evidences that

hospitals do not operate "education programs or activities" covered by Title IX

because in all other respects hospitals are not educational institutions.

The cases relied upon by Appellant and the United States as *amicus curiae*

to support their assertions that Title IX is applicable in the context of a hospital's

residency program are easily distinguishable. First and foremost, each of these

cases involves university hospitals, where the hospital's parent entity is an

educational institution – namely, the university – and the court decision is based on

the university's role as an educational institution operating education programs or

activities.  For example, *Henschke v. New York Hospital-Cornell Medical Center*

involved not a resident but a professor at a university medical center who claimed

to have suffered gender-based adverse employment decisions in violation of Titles

VII and IX.  821 F. Supp. 166 (S.D.N.Y. 1993).  Furthermore, unlike in the instant

case, the plaintiff in *Henschke* had timely filed a Title VII Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC")

prior to filing suit under Titles VII and IX.  *Id.* at 168.  Because the plaintiff held

both academic and clinical appointments as a tenured professor and radiologist, her

discrimination claims necessarily invoked both statutes (but would have yielded

only one remedy).  *Id.*[2]

Even in *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988),

the court stopped far short of ruling that a medical resident could assert a Title IX

claim against a private hospital in which he or she serves as a resident.  The Title

IX claims in that case were asserted against a University of Puerto Rico program

---

[2] Similarly, the cases cited by Appellant and the United States limiting residents'
due process rights because of their student-like characteristics are inapposite.  *See
Fenje v. Feld*, 398 F.3d 620 (7th Cir. 2005); *Davis v. Mann*, 882 F.2d 967 (5th Cir.
1989); *Gul v. Ctr. for Family Med.*, 762 N.W.2d 629 (S.D. 2009).  While these
cases suggest that residents may be considered students for certain purposes, the
cases are completely unrelated to the question of whether hospitals provide
education programs and activities to which Title IX applies.  Instead, the cases
address the limited question of what constitutional due process rights must be
afforded residents who are terminated by residency programs run specifically by
state-sponsored institutions.

and certain of its administrators, 864 F.2d at 884-85.  Again, the claims were

asserted specifically against an "*educational institution*", not a hospital that simply

provides advanced training for junior doctors through a residency program, *see,*

*e.g.*, *id.* at 901.  Moreover, as the plaintiff did not raise claims under Title VII, and

the defendants did not argue that the availability of a Title VII claim precluded a

cause of action under Title IX, the court never addressed whether Title VII pre-

empted or eliminated the necessity of a Title IX claim for the employment

discrimination claim of a medical resident.

### C.    *Holding Private Hospitals with Residency Programs Liable under Title IX for Employment Discrimination Claims Would Expose Hospitals to Greater Risk and Expense, Increasing the Public's Health Care Costs*

Title IX's implied cause of action should not be an available mechanism to

redress individual employment discrimination claims in any setting, let alone a

private hospital with a residency program, given Congress's express provision of

such a remedy in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et*

*seq.*  There are at least four reasons why extending Title IX liability to private

hospitals with medical residency programs frustrates Congressional intent and

imposes an unintended hardship on hospitals.

First, Congress already created a statutory regime in Title VII to remedy

employment discrimination in a more efficient manner than pursued by plaintiff

here.  Title IX does not add any substance to Title VII's comprehensive statutory

and regulatory framework, which is available as a remedy to any medical resident,

including plaintiff, because residents are hospital employees.  The elaborate

statutory and administrative remedial framework created by Title VII requires

investigations and conciliation by the EEOC, the federal agency that is the

nationwide expert in matters of employment discrimination.  Indeed, "[t]he

congressional policy underlying [Title VII's] framework [i]s to resolve

discrimination claims administratively through cooperation and voluntary

compliance in an informal, noncoercive manner."  *Burgh v. Borough Council of*

*Borough of Montrose*, 251 F.3d 465, 470, 474 (3d Cir. 2001).  To that end, Title

VII's administrative process conserves the time and resources of employers,

employees, and the courts because it affords an opportunity for the early, low-cost

resolution of employment disputes without engaging the litigation machinery.

If private hospitals with medical residency programs were to become

susceptible to employment discrimination suits under Title IX, medical residents'

claims would be subject to the implementing regulations of the Department of

Health and Human Services ("HHS"), which are not focused on employment

issues and have no corresponding administrative exhaustion requirements or early

and informal conciliation process.  Thus, any disputes between private hospitals

with residency programs and their employees under Title IX are less likely to settle

before formal litigation is initiated.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555

U.S. 246, 247 (2009) ("Title IX has no administrative exhaustion requirement and no notice provisions."); *see also Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) ("We are not persuaded that Congress intended that Title IX offer a bypass of the remedial process of Title VII.").  Reversing the District Court would increase the costs and burdens on hospitals without providing any additional benefit to an employed plaintiff, who already has a remedial procedure and a private right of action under Title VII.

Moreover, the main purpose of Title IX is to provide individuals with "effective protection" against discriminatory practices at educational institutions involving federally-funded education programs.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005).   Thus, where Title IX has been extended to provide individual private causes of action, that extension has been in furtherance of this purpose, such as preventing retaliation against employed individuals who protest discriminatory programs, *id.* at 179-80, or affording a remedy to non-employees – particularly students – not covered by Title VII, *see Gebser v. Lago Vista Ind. Sch. Dist.,* 524 U.S. 274 (1998).  Protection against such discrimination by a federally-funded program of education is not warranted here, where the resident has clear protection as an employee under Title VII, and where the hospital employer is not an educational institution operating a federally-funded

education program.  Extending Title IX to such a situation is simply unnecessary to effect congressional intent and is not supported by applicable case law.

Second, Title IX expands the relevant statute of limitations for an employment discrimination claim, thus disincentivizing early investigation and extra-judicial resolution, and increasing the potential risk to hospitals.  Title VII's requirement that a party file a charge within 180 days (or 300 days if a parallel state charge is also filed) of the occurrence of the alleged unlawful employment practice ensures that highly fact-intensive disputes do not become stale and prompt relief can be secured, where warranted, before memories fade and employees and supervisors leave for other employment.  *See* 42 U.S.C. § 2000e–5(e)(1); *see also Burgh*, 251 F.3d at 470-71.  In contrast, Title IX's implied cause of action has been assigned a two-year statute of limitations which expands the temporal scope of any investigations and increases the liability private hospitals face since such hospitals would be forced to carry this Title IX exposure for a longer time period.  *See Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 77–80 (3d Cir. 1989) (referring to Pennsylvania law).

Third, extending Title IX liability for employment disputes expands the financial risk private hospitals with residency programs face.  Where Congress expressly created a cause of action for employment discrimination under Title VII, it concomitantly capped the amount of compensatory damages recoverable by an

aggrieved employee.  *See* 42 U.S.C. § 1981a(b)(3).  By finding that Title IX

creates an implied cause of action, the courts bypassed Title VII's cap and

expanded a Title IX plaintiff's ability to recover compensatory damages.  *See*

*Gebser*, 524 U.S. at 283–84 ("With respect to Title IX, however, the private right

of action is judicially implied, and there is thus no legislative expression of the

scope of available remedies, including when it is appropriate to award monetary

damages." (internal citations omitted)).  Thus, private hospitals with residency

programs that could be facing potential Title IX litigation for individual

employment discrimination lawsuits are potentially at risk for substantially larger

damages verdicts than for verdicts on the same cause of action  under Title VII.

This outcome, wholly unintended by Congress, would increase private hospitals'

costs of doing business with a corresponding increase in health care costs.

Finally, if this Court were to interpret Title IX to include medical residency

programs within the phrase "education program or activity," contrary to the many

reasons noted above and in Appellee's Brief, the result would be uncertainty

regarding whether other employees of a private hospital with a residency program

could rely on an implied right of action under Title IX to pursue employment

discrimination claims, even if such employees have no connection to the residency

program.  The plain language of the CRRA, 20 U.S.C. § 1867, stresses that "all of

the operations of" the entity receiving federal funds, not just the program receiving

the federal funds, is included within the meaning of "program or activity." Thus, a reversal of the District Court would potentially lead to the absurd and untenable result that all hospital employees would have a private right of action under Title IX, even if they have no connection whatsoever with the residency program or any other educational activity.

The irrationality of this result demonstrates the flaw in the reasoning and analysis of the plaintiff and the United States. Permitting medical residents to assert claims under Title IX for employment discrimination upsets not only the Title VII system detailed by Congress, but also distorts Title IX jurisprudence beyond recognition. Given Congress' emphasis in section 1867 on "all of the operations of" the entity receiving federal funds, construing "education program or activity" to address traditional educational settings is an interpretation more consistent with Title IX's legislative intent. From the perspective of Pennsylvania hospitals, the uncertainty and potentially greatly expanded liability resulting from a reversal by this Court would be extremely damaging.

Thus, holding private hospitals with residency programs liable under Title IX for employment discrimination claims would expose hospitals to greater risk and expense, reduce the likelihood of a prompt and non-adversarial resolution, and result in costs that will ultimately be borne by the public in the form of higher health care expenses.

## III.  CONCLUSION

For the foregoing reasons, HAP respectfully requests that this Court affirm

the decision of the District Court dismissing Appellant's claims against Mercy

Catholic Medical Center.

Respectfully submitted,

Dated:  September 27, 2016          DUANE MORRIS

By: s/ Philip H. Lebowitz
    PHILIP H. LEBOWITZ
    DUANE MORRIS LLP
    30 South 17th Street
    Philadelphia, PA 19103
    (215) 979-1000

    *Attorneys for Amicus Curiae, The*
    *Hospital & Healthsystem Association*
    *of Pennsylvania*

## COMBINED CERTIFICATIONS

The undersigned hereby certifies the following:

## 1.  L.A.R. 28.3(d) CERTIFICATE OF BAR MEMBERSHIP

I, Philip H. Lebowitz, certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

## 2.  CERTIFICATION OF WORD COUNT AND COMPLIANCE WITH RULE 32(a)

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,781 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This Brief also complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman Font.

## 3.  L.A.R. 31.1(c) CERTIFICATE REGARDING ELECTRONIC FILING

I certify that the electronic version of this brief, in PDF format, is identical to the text in the paper copies; and that the System Center Endpoint Protection antivirus program was run on the PDF version and that no virus was detected.

/s/ Philip H. Lebowitz

September 27, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of September, 2016, I caused seven copies of the foregoing Brief of Amicus Curiae in Support of Appellant to be filed with the Clerk's Office of the United States Court of Appeals for the Third Circuit by hand delivery.  I also certify that I caused a true and correct copy of the Brief to be filed electronically with the Court and to be served through the Court's Electronic Case Filing system on:

A. James Johnston, Esquire
Andrea M. Kirshenbaum, Esquire
Robin Locke Nagele, Esquire
Darren M. Creasy, Esquire
Kate A. Kleba, Esquire
Post & Schell, P.C.
Four Penn Center
1600 J.F.K. Boulevard
Philadelphia, Pa 19103
(215) 587-1000
*Attorneys For Appellee,*
*Mercy Catholic Medical Center*

Joshua S. Boyette, Esquire
Swartz Swidler LLC
1101 Kings Highway North, Ste. 402
Cherry Hill, NJ 08034
(856) 685-7417
jboyette@swartz-legal.com
*Attorney for Appellant Jane Doe*

Sharon M. McGowan, Esquire
Christine A. Monta, Esquire
U.S. Department of Justice
Civil Rights Division
Appellate Section – RFK 3716
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 14403
*Attorneys for United States as*
*Amicus Curiae*

/s/ Philip H. Lebowitz
PHILIP H. LEBOWITZ, ESQUIRE