PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1247
_____

JANE DOE,
Appellant

v.

MERCY CATHOLIC MEDICAL CENTER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-15-cv-02085)
District Judge:  Honorable Michael M. Baylson
_____

Argued December 6, 2016
Before:  FISHER,* KRAUSE and MELLOY,** *Circuit
Judges.*

_____

* Honorable D. Michael Fisher, United States Circuit Judge
for the Third Circuit, assumed senior status on February 1,
2017.

** Honorable Michael J. Melloy, Senior Circuit Judge,
United States Court of Appeals for the Eighth Circuit, sitting by
designation.

(Filed: March 7, 2017)

Joshua S. Boyette  [ARGUED]
Swartz Swidler
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
        *Counsel for Appellant*

Vanita Gupta, Principal Deputy Assistant Attorney General
Sharon M. McGowan
Christine A. Monta  [ARGUED]
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044
        *Counsel for Amicus Appellant,*
        *United States of America*

Darren M. Creasy
A. James Johnston
Andrea M. Kirshenbaum
Kate A. Kleba
Robin L. Nagele  [ARGUED]
Post & Schell
1600 John F. Kennedy Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103
        *Counsel for Appellee*

Philip H. Lebowitz
Duane Morris

30 South 17th Street, United Plaza
Philadelphia, PA 19103
*Counsel for Amicus Appellee, Hospital &*
*Healthsystem Association of Pennsylvania*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Medical residencies are a vital component of American medical education. *McKeesport Hosp. v. ACGME*, 24 F.3d 519, 525 (3d Cir. 1994). They provide new doctors a supervised transition between the pure academics of medical school and the realities of practice. Generally they do so successfully: Our nation's residency programs reliably produce some of the "finest physicians and medical researchers in the world." 15 U.S.C. § 37b(a)(1)(A). But as this case shows, these programs aren't exempt from charges of sex discrimination. Here we must decide whether an ex-resident, proceeding anonymously as Jane Doe, can bring private causes of action for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, against Mercy Catholic Medical Center, a private teaching hospital operating a residency program. The District Court held she cannot and dismissed her complaint in its entirety. We will affirm in part and reverse in part that order. Doe's Title IX retaliation and *quid pro quo* claims endure. Her Title IX hostile environment claim is, however, time-barred.

3

## I

We recount the facts as Doe alleged them, accepting them as true. *Davis v. Wells Fargo*, 824 F.3d 333, 338 n.2 (3d Cir. 2016); *see* App. 100–24.

Graduate medical education, or residency education, is a period of didactic and clinical instruction in a medical specialty during which physicians prepare for independent practice after graduating from medical school. Residency programs are typically accredited. Leading on that front is the Accreditation Council for Graduate Medical Education, or ACGME, which aims to improve healthcare by assessing and advancing the quality of residents' educations. Its reach is far and its influence wide. During the 2013–14 academic year, around 9,600 ACGME-accredited programs operated in about 700 institutions, enrolling over 120,000 residents and fellows in 130 medical specialties. The ACGME calls these programs structured educational experiences, and completing one generally results in eligibility for board certification.

Predictably, residency programs are expensive to run. The Association of American Medical Colleges says it costs a hospital about $152,000 a year to train a single resident. But the federal government helps with funding by way of direct and indirect graduate medical education payments through Medicare.

Our case is about a residency program at Mercy, a private teaching hospital in Philadelphia that accepts Medicare payments and is affiliated with Drexel University's College of Medicine. Owing to its commitment to medical education, Mercy offers four ACGME-accredited residency programs in internal medicine, diagnostic radiology, general surgery, and a transitional year residency, in addition to providing the clinical bases for Drexel Medicine's emergency medicine residency.

4

Under a residency agreement, Doe joined Mercy's diagnostic radiology residency program in 2011 as a second-year, or R2. The program offered training in all radiology subspecialties in a community-hospital setting combining hands-on experience with didactic teaching. As required, Doe attended daily morning lectures presented by faculty and afternoon case presentations given by residents under faculty or attending physicians' supervision. She took a mandatory physics class taught on Drexel's campus, attended monthly radiology lectures and society meetings, joined in interdepartmental conferences, and sat for annual examinations to assess her progress and competence.

Doe says the director of Mercy's residency program, whom she calls Dr. James Roe, sexually harassed her and retaliated against her for complaining about his behavior, resulting in her eventual dismissal. Early on, Dr. Roe inquired about her personal life and learned she was living apart from her husband. He found opportunities to see and speak with her more than would otherwise be expected, often looking at her suggestively. This made Doe uncomfortable, especially when the two were alone. From these interactions she surmised Dr. Roe was sexually attracted to her and wished to pursue a relationship, though they both were married.

Three months into her residency Doe sent Dr. Roe an email voicing concern that others knew about his interest in her. She wanted their relationship to remain professional, she said, but Dr. Roe persisted, stating he wanted to meet with her while they attended a conference in Chicago. She replied with text messages to clear the air that she didn't want to pursue a relationship with him. Apparently displeased, Dr. Roe reported these messages to Mercy's human resources department, or HR. In response, HR called Doe to a meeting where she described

Dr. Roe's conduct, like how he'd touched her hand at work, and said his unwelcome sexual attention was negatively affecting her training. The next day HR referred Doe to a psychiatrist, noting that her attendance was optional. Doe, however, believed Mercy would use it against her if she didn't go, given her complaints against Dr. Roe. She thus attended three sessions and complained there about Dr. Roe's conduct, but she heard nothing more from HR. Later Dr. Roe apologized to Doe for reporting her. He did it, he said, for fear he'd be reprimanded for having an inappropriate relationship with her. Thereafter two male faculty members, both close with Dr. Roe, trained her significantly less than they had before.

In Fall 2012 Dr. Roe learned Doe was getting divorced. His overtures intensified. He too was getting divorced, he told her, and he wanted a relationship with her. He suggested they go shooting and travel together. He said he was uncomfortable with her going to dinner for fellowship interviews and unhappy about her leaving Philadelphia post-residency. During this time Doe asked Dr. Roe and another faculty member for fellowship recommendation letters. They agreed but wrote short, cursory, and perfunctory ones. Dr. Roe even told the fellowship's director that Doe was a poor candidate. When Doe called Dr. Roe to ask why, he said it was to teach her a lesson before hanging up on her.

In response to Doe's complaints about Dr. Roe, Mercy's vice president, Dr. Arnold Eiser, called Doe to a meeting with Dr. Roe and others. There Doe complained about Dr. Roe's conduct again but was told to wait outside. A short time later Dr. Eiser escorted her to Mercy's psychiatrist. As they walked Dr. Eiser told Doe her second in-service examination score was poor, an issue she needed to address. Later, however, Doe learned this wasn't true: Her score was in the 70th percentile,

and Dr. Eiser had received misinformation. She asked Dr. Roe to report her improvement to the fellowship she'd applied to, but he refused. Mercy later told Doe that to remain in the program, she'd have to agree to a corrective plan. Reluctantly, she signed on.

Dr. Roe's conduct continued into Spring 2013. Once while Doe was sitting alone with Dr. Roe at a computer reviewing radiology reports, he reached across her body and placed his hand on hers to control the mouse, pressing his arm against her breasts in the process. She pushed herself back in her chair, stood up, and protested. Another time, when a physician expressed interest in Doe, Dr. Roe became jealous and told Doe she shouldn't date him. Later, in April 2013 Dr. Roe told another resident to remove Doe's name as coauthor from a research paper she'd contributed to. Doe complained, but Dr. Roe said she was acting unprofessionally and ordered her to another meeting with Dr. Eiser. At that meeting Doe again told Dr. Eiser about Dr. Roe's conduct over the past year. Dr. Eiser, however, said the other residents loved Dr. Roe and told her to apologize to him. She did, but Dr. Roe wouldn't accept it, calling it insincere. Dr. Eiser suspended Doe, recommending another visit to the psychiatrist.

Thereafter on April 20, 2013 Doe received a letter from Mercy stating she'd been terminated but could appeal. She appeared before an appeals committee four days later where she described Dr. Roe's behavior. Dr. Roe appeared there too advocating for her dismissal. He did so, she says, because she'd rejected his advances. The committee upheld Doe's dismissal, giving her five days to bring another appeal. She declined and quit the program, with Mercy accepting her resignation. Since then, no other residency program has accepted her, blocking her from full licensure.

7

\*　　\*　　\*

Doe sued Mercy in the District Court on April 20, 2015, exactly two years after she learned she'd been dismissed. Seeking damages and equitable relief, she alleges six claims, three under Title IX — retaliation, *quid pro quo*, and hostile environment — and three under Pennsylvania law — contract-based sex discrimination, wrongful termination, and breach of the covenant of good faith and fair dealing. She concedes she never filed a charge with the Equal Employment Opportunity Commission, or EEOC, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Ultimately the District Court dismissed the third iteration of Doe's complaint under Federal Rule of Civil Procedure 12(b)(6). Title IX doesn't apply to Mercy, the court held, because it's not an "education program or activity" under 20 U.S.C. § 1681(a). Even if Title IX did apply, it stated, Doe can't use Title IX to "circumvent" Title VII's administrative requirements, as Congress intended Title VII as the "exclusive avenue for relief" for employment discrimination. 158 F. Supp. 3d 256, 261 (E.D. Pa. 2016). The court also found Doe's hostile environment claim untimely. Having dismissed all Doe's Title IX claims, the court declined jurisdiction of her state law claims. Doe timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a), and we have it under 28 U.S.C. § 1291. We exercise plenary review of a Rule 12(b)(6) dismissal, *In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 131 (3d Cir. 2016), affirming if the plaintiff failed to allege plausible claims, *see Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009).

## III

Our analysis is threefold. We address whether Title IX applies to Mercy, whether Doe's private causes of action are cognizable under Title IX, and what to do about Doe's state law claims. Title IX's applicability to Mercy is first.

## A

We start, of course, with Title IX's language, *North Haven Board of Education v. Bell*, 456 U.S. 512, 520 (1982), which says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any *education program or activity* receiving Federal financial assistance," 20 U.S.C. § 1681(a) (emphasis added). We must decide, then, if Mercy's operation of a residency program makes it an "education program or activity" under Title IX.

We note this question of first impression reaches far beyond one ex-resident's private lawsuit. It touches on the Executive's very power to address gender discrimination in residency programs under existing federal law. Congress enacted Title IX under its Spending Clause powers, making it in the nature of a contract: In accepting federal funds, States agree to comply with its mandate. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005). Given its origins, Title IX's only (express) enforcement mechanism is through agencies' regulation of federal funding. Congress directs agencies to effectuate § 1681(a) by, among other means, the "termination of or refusal to grant or to continue" funding to education programs. 20 U.S.C. § 1682; *see Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009). Today this directive applies afar: Twenty-one federal agencies currently enforce Title IX. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial

Assistance, 65 Fed. Reg. 52,858 (Aug. 30, 2000) [hereinafter Title IX Common Rule] (codified in various sections of the *Code of Federal Regulations*). And no other federal statute empowers agencies to restrict funding from education programs engaging in sex discrimination. Title VI bars only race, color, and national origin discrimination, not sex discrimination. 42 U.S.C. § 2000d; *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Title VII is rooted in the Commerce Clause and § 5 of the Fourteenth Amendment, not the Spending Clause. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 367 (1978) (Brennan, White, Marshall, & Blackmun, JJ., concurring in the judgment in part and dissenting in part); *Gebser*, 524 U.S. at 286–87. And only a "citizen of the United States" or "person within the jurisdiction thereof" can sue under 42 U.S.C. § 1983 for unconstitutional sex discrimination in education programs. *See Fitzgerald*, 555 U.S. at 252, 255–56. Mindful of Title IX's place in this intricate scheme, we tread carefully.

\*      \*      \*

To resolve whether Mercy's residency program makes it an "education program or activity," we must square Title IX's definition of a "program or activity," codified at 20 U.S.C. § 1687, with § 1681(a)'s language "*education* program or activity." This requires a brief look at Title IX's history.

Patterned after Title VI, Title IX was enacted through the Education Amendments of 1972 in which Congress set out § 1681(a)'s "education program or activity" language. In *Grove City College v. Bell*, however, the Supreme Court read that phrase narrowly, holding that the receipt of federal funds by a particular program within an institution "does not trigger institutionwide coverage" under Title IX. 465 U.S. 555, 573 (1984). Congress disagreed. Overruling *Grove City College* it passed the Civil Rights Restoration Act of 1987, or CRRA, to

define the phrase "program or activity" broadly in provisions of four civil rights statutes — Title VI, 42 U.S.C. § 2000d-4a; the Rehabilitation Act, 29 U.S.C. § 794(b); the Age Discrimination in Employment Act, 42 U.S.C. § 6107(4); and Title IX, 20 U.S.C. § 1687. *See NCAA v. Smith*, 525 U.S. 459, 465–66 & n.3 (1999).

As amended by the CRRA, Title IX now says in § 1687 that "program or activity" means "*all* of the operations" of the following kinds of entities, "any part of which" is extended federal funding:

- state or local government instrumentalities, 20 U.S.C. § 1687(1);

- colleges, universities, postsecondary institutions, public systems of higher education, local educational agencies, vocational education systems, and "other" school systems, *id.* § 1687(2);

- "entire" corporations, partnerships, "other" private organizations, and sole proprietorships *if* assistance is extended to them "as a whole" *or* they're "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation," *id.* § 1687(3)(A);

- "entire" plants or other "comparable, geographically separate" facilities in the case of "any other" corporation, partnership, private organization, or sole proprietorship not described in subsection (3)(A), *id.* § 1687(3)(B); and

- "any other entity" established by "two or more" entities described in subsections (1) through (3), *id.* § 1687(4).

In enacting § 1687, however, Congress retained in § 1681(a) the modifier "education" before "program or activity." It left "education" undefined and gave no guidance to reconcile § 1687's broad phrase "program or activity" with § 1681(a)'s ostensibly narrower language. Case law is scant on the issue. The Supreme Court has never addressed it. Nor have we. Down this unmarked path we must now travel.

How did the District Court navigate it? It focused on the fact that in enacting the CRRA, Congress kept the word "education" in § 1681(a). That, combined with § 1681(c) — which defines an "educational institution" in part as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education" — "clearly" contemplated cabining Title IX to education programs "in the sense of schooling." 158 F. Supp. 3d at 260. Title IX thus couldn't apply to Mercy, it held, as residents already have a degree, don't pay tuition, and are paid for their services and protected by labor laws.

Respectfully, we find this approach wanting. Sections 1681(a) and 1682 extend Title IX to "education programs or activities," not to the "educational institutions" of § 1681(c). Where Congress used specific language in one part of a statute but different language in another, we presume different meanings were intended. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). That's especially so here, where Congress used "educational institution" only in provisions to describe where Title IX *doesn't* control. *See* 20 U.S.C. §§ 1681(a)(1)–(5), (7)–(8), 1681(b), 1686; *Jackson*, 544 U.S. at 175 (Section 1681(a)'s subsections are "specific, narrow exceptions" to Title IX.); *North Haven*, 456 U.S. at 514 & n.1 (same). We also query: If Congress intended to limit education programs or activities only to educational institutions "in the sense of

schooling," why did it enact detailed provisions expressly exempting *non*educational institutions — like social fraternities, the YMCA, and the Girl Scouts — from Title IX's reach? *See, e.g.*, 20 U.S.C. § 1681(a)(6). Those organizations would have *already* been impliedly exempt from Title IX, rendering superfluous § 1681(a)'s express exemptions for them. Because we strive to avoid superfluity in construing statutes, *see Corley v. United States*, 556 U.S. 303, 314 (2009), we reject this reading of Title IX.

What direction does Mercy suggest we take? Tacitly conceding that § 1681(c) isn't the way, they abandon it for § 1687(3)(A)(ii). That provision says "program or activity" means all the operations of a private entity "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." But because § 1681(a) says "*education* program or activity," Mercy tells us we're to ignore the words "health care, housing, social services, or parks and recreation" and hold that Title IX applies only to private entities "principally engaged in the business of providing *education*." Applying that reading, Mercy deems the result inevitable: A private hospital like Mercy that employs physicians in its own residency program is "quite plainly" not principally engaged in the education business. Mercy Br. 8–9.

If only it were so plain. Yet no part of Title IX says it reaches only entities "principally engaged in the business of providing education." Quite the opposite. Section 1687 leaves space aplenty for a variety of entities irrespective of what they're "principally" engaged in — for example, state and local government instrumentalities, private entities extended assistance as a whole, other private entities' entire plants or separate facilities, and *any* entity established by two or more covered entities. More important, Mercy's approach strikes out

13

considerable portions of § 1687(3)(A)(ii)'s text. Doe's helpful visual aid puts that much on display: Mercy suggests Title IX applies only to private entities "principally engaged in the business of providing education, ~~health care, housing, social services, or parks and recreation~~." Reply Br. 8 (strikethrough in original). By that reading we cannot abide, for it violates a "most basic" interpretive rule that a statute is to be construed so that effect is given to *all* its provisions, so no part will be inoperative or superfluous, void or insignificant. *Corley*, 556 U.S. at 314.

It is then Doe who, we think, charts the soundest course. She says, and we agree, there's no reason to read the phrase "education program or activity" so narrowly. The Supreme Court has twice instructed us that, to give Title IX the scope its origins dictate, we're to accord it a sweep as broad as its language. *North Haven*, 456 U.S. at 521; *see Jackson*, 544 U.S. at 175. And indeed the ordinary meaning of "education" — a word Congress has yet to define — is "very broad." *Roubideaux v. North Dakota Dep't of Corrs. & Rehab.*, 570 F.3d 966, 977 (8th Cir. 2009). Congress expressly exempted specific kinds of programs from Title IX's reach — like military academies, religious schools, and sororities, *see* 20 U.S.C. § 1681(a)(1)–(9) — so we're hesitant to impose further restrictions without strong justifications from Title IX's text. *See North Haven*, 456 U.S. at 521–22 (The "absence of a specific" proffered exclusion from § 1681(a)'s exceptions "tends to support" that it shouldn't be inferred.); *Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (Because § 1681(a) lists specific exemptions, others are not to be "judicially implied."). The statute offers no such justification, so we reconcile § 1687 with § 1681(a) as follows.

Like the Second Circuit we hold that a "program or activity" under § 1687 is an "*education* program or activity"

under § 1681(a) if it has "features such that one could reasonably consider its mission to be, at least in part, educational." *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997). This accords with Title IX's text and structure. It lines up with the Eighth and Ninth Circuits' applications of Title IX beyond educational institutions "in the sense of schooling" to entire state-prison systems offering inmates educational programs. *See Klinger v. Dep't of Corrs.*, 107 F.3d 609, 613–16 & n.5 (8th Cir. 1997); *Roubideaux*, 570 F.3d at 976–79; *Jeldness*, 30 F.3d at 1224–25. It's consistent with the First Circuit's application of Title IX to a university's medical residency program. *See Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988). And it's in step with how twenty-one federal agencies, including the Departments of Education and Health and Human Services, have interpreted the statute. *See* 34 C.F.R. § 106.1; 45 C.F.R. § 86.1; Title IX Common Rule, *supra*, at 52,865 (all saying Title IX applies to "any" education program or activity "whether or not" it's "offered or sponsored by an educational institution"); U.S. *Amicus* Br. 18–19 n.7. We adopt it.

We recognize, however, that creative minds could conceivably read the word "education" in Title IX to "encompass every experience of life," *Roubideaux*, 570 F.3d at 977, transforming Title IX into a remedy for any dispute in which someone is "potentially" learning something, *Doe*, 158 F. Supp. 3d at 260. We see no sign Congress intended as much. Indeed by merely including the word "education" in § 1681(a), Congress signified that Title IX has *some* boundary. We endeavor here to delimit it.

We note first that Title IX's application turns primarily on whether *the defendant-entity's* questioned program or activity has educational characteristics. *The plaintiff's*

characteristics — for example, whether she's a student, employee, or something else — may be relevant in some cases, but they aren't necessarily dispositive. That caveat aside, we highlight here several features that support deeming a "program or activity" an "*education* program or activity" under Title IX, emphasizing that particular features (or other features not here listed) may be more or less relevant depending on the unique circumstances of each case. In no particular order, these features are that (A) a program is incrementally structured through a particular course of study or training, whether full- or part-time; (B) a program allows participants to earn a degree or diploma, qualify for a certification or certification examination, or pursue a specific occupation or trade beyond mere on-the-job training; (C) a program provides instructors, examinations, an evaluation process or grades, or accepts tuition; or (D) the entities offering, accrediting, or otherwise regulating a program hold it out as educational in nature. *Accord O'Connor*, 126 F.3d at 117–18 (Education programs "typically provide instructors, evaluations, and offer a particular course of training."). These guidelines are, we think, in keeping with the common understanding of the word "education" prevalent when Title IX was enacted. *See, e.g.*, Webster's New World Dictionary 444 (2d ed. 1970) (Education is the "process of training and developing the knowledge, skill, mind, character, etc., esp. by formal schooling; teaching; training."); *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute," we give it its "ordinary meaning.").

We end with this: Whether a program or activity is sufficiently educational under Title IX is a mixed question of law and fact. When the facts are uncontested, the judge decides the matter. Factual disputes material to her legal conclusion are, however, left for the finder of fact.

\*     \*     \*

Applying this reading, we identify two plausible ways Mercy's residency program makes it an "education program or activity" under Title IX.

*First* Doe's allegations raise the plausible inference that Mercy is a private organization principally engaged in the business of providing healthcare, 20 U.S.C. § 1687(3)(A)(ii), whose operation of an ACGME-accredited residency program makes its mission, at least in part, educational, *see O'Connor*, 126 F.3d at 117; 20 U.S.C. § 1681(a). Doe says, and we accept as true, that she was enrolled in a multiyear regulated program of study and training in diagnostic radiology at Mercy. That program required her to learn and train under faculty members and physicians, attend lectures and help present case presentations under supervision, participate in a physics class on a university campus, and sit for annual examinations. Had Doe completed Mercy's program, she would have been eligible to take the American Board of Radiology's certification examinations, and passing scores there would have certified her to practice for six years. Doe also says Mercy held out its residency programs as educational in nature and that the ACGME calls residency programs "structured educational experience[s]." App. 103. These allegations, we think, satisfy Federal Rule of Civil Procedure 8. *See Iqbal*, 556 U.S. at 677–80. Courts have repeatedly recognized the educational qualities of residency *programs* in other contexts, even where ultimately deeming *residents* nonstudents. *See, e.g.*, *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 47 (2011) ("Most doctors who graduate from medical school" pursue "additional education in a specialty to become board certified to practice in that field."); *id.* at 60 (Residents are "engaged in a valuable educational pursuit" and are "students of their craft.");

17

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 507 (1994) (Because residents "learn both by treating patients and by observing other physicians do so," graduate medical education programs "take place in a patient care unit (most often in a teaching hospital), rather than in a classroom."); *McKeesport Hosp.*, 24 F.3d at 525 (Residencies are a "vital component" of "medical education."); *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996) (Residencies combine "features of both employment and academic study."); *Lipsett*, 864 F.2d at 897 (A resident is "both an employee *and* a student."). So too has Congress. *See, e.g.*, 15 U.S.C. § 37b(b)(1)(B)(i) (A "graduate medical education program" is a "residency program" for "medical education and training.").

We hasten to note, however, that our assessment of the educational features of Mercy's residency program does not imply that one must perform a program-specific analysis on each and every prerequisite to Title IX coverage. For instance, whether a covered program or activity receives "Federal financial assistance," 20 U.S.C. § 1681(a), is determined by reference to the "entire" entity or "whole" organization, *id.* § 1687. Congress made that clear in overruling *Grove City College*, 465 U.S. 555. *See* S. Rep. No. 100-64, at 4 (1987). With respect to "Federal financial assistance" for purposes of Title IX coverage, our analysis here does not alter the requirement of an institution-wide assessment.

*Second* we find it plausible Mercy's operation of a residency program makes its mission, at least in part, educational under Title IX because of Mercy's "affiliat[ion]" with Drexel Medicine, App. 104, a university program plausibly covered by Title IX, *see* 20 U.S.C. § 1687(2)(A). Two decisions guide us — *Lam v. Curators of UMKC Dental School*, 122 F.3d 654 (8th Cir. 1997), and *O'Connor* from the Second Circuit.

In *Lam* a clinician hired a university dental student to work at his private office "[un]affiliated" with the university. 122 F.3d at 655. Alleging the clinician sexually assaulted her there, the student sued the university under Title IX. The university argued that she failed to show a "nexus" between the private office and the university, *id.* at 656, and the Eighth Circuit agreed, holding that the "independent, private dental practice" wasn't a "program or activity of the University" under Title IX. *Id.* An education program, the court explained, is one "controlled by" and that inures "some benefit" to the covered institution. *Id.* In the student's case, it found, the clinician conferred "no benefit" to the university by operating a "separate, competing" clinic, as the university exercised "no control" over it and didn't provide it "staff, funding," or "any other support." *Id.*

Similarly in *O'Connor* a college arranged for its student to serve as an unpaid intern at a hospital. 126 F.3d at 113. Alleging she was sexually harassed there, the intern sued the college and hospital under Title IX, but the college was dismissed from the case. The intern argued that Title IX reached the hospital because it accepted interns and thus operated a vocational training program. *Id.* at 116. Framing the issue as whether Title IX applied to a hospital that allowed students to volunteer from a college with which it had "no affiliation," the Second Circuit disagreed. *Id.* at 117. The hospital, it found, maintained "none of the characteristics associated with being an educator," unlike, for example, a "teaching hospital's 'mixed employment-training context.'" *Id.* at 118 (quoting *Lipsett*, 864 F.2d at 897). And the college's status as an education program couldn't be "imputed" to the hospital, it held, because there was no evidence of an "institutional affiliation," a "written agreement binding" them, shared staff, or funds "circulated between them." *Id.*

Our case is different. Unlike *Lam* where the private dental office was "[un]affiliated" with the university, 122 F.3d at 655, here we accept as true that Mercy's residency program is "affiliated" with Drexel Medicine, App. 104. Doe supports that contention with allegations that she took a physics class "taught on Drexel's campus," App. 106, and that Mercy provided the "clinical bases" for Drexel Medicine's emergency medicine residency, App. 104. It's thus plausible, we think, that Mercy's residency program inured "some benefit" to Drexel Medicine (and vice versa) and that these entities shared "staff, funding," and "other support." *Lam*, 122 F.3d at 656; *see Iqbal*, 556 U.S. at 679 (Rule 8's inquiry is a "context-specific task" requiring us to draw on our "judicial experience and common sense.").

*O'Connor* is distinguishable too. There the hospital accepted student-interns from a college with which it had "no institutional affiliation." 126 F.3d at 118. Here, in contrast, Doe expressly alleges such an affiliation between Mercy and Drexel Medicine. And given her supporting allegations, we find it plausible to infer an "agreement binding" them and the sharing of "staff" and "funds." *Id.* Given these alleged connections, it's plausible Mercy's operation of a residency program affiliated with Drexel Medicine makes its mission, at least in part, educational under Title IX, satisfying § 1681(a). We will therefore vacate the District Court's order so far as it concludes otherwise.

\*        \*        \*

Of our first inquiry just one matter remains. In a lengthy footnote Mercy claims it doesn't receive "Federal financial assistance" under Title IX because its Medicare payments stem from "contracts of insurance." Mercy Br. 7–8 n.2. Mercy, however, made no such argument in the District Court. Our rule is well established in that circumstance: Theories not raised

20

squarely there cannot be surfaced for the first time on appeal. *Lesende v. Borrero*, 752 F.3d 324, 333 (3d Cir. 2014); *see United States v. Joseph*, 730 F.3d 336, 338–42 (3d Cir. 2013). Seeing no reason to depart from this rule (Mercy offers none), we decline to consider this argument, particularly as "contracts of insurance" in federal civil rights statutes intend to refer to contracts in the traditional sense, like those involving "individual bank accounts in a bank with federally guaranteed deposits." *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1048 (5th Cir. 1984). We thus assume without deciding that Mercy receives "Federal financial assistance" under Title IX, leaving it for the District Court to address on remand.

## B

We continue to our second inquiry — whether Doe's private causes of action are cognizable under Title IX. As we said above, Title IX provides just one *express* enforcement mechanism: action through federal agencies. *See* 20 U.S.C. § 1682. But in *Cannon v. University of Chicago* the Supreme Court held that Title IX *implies* a cause of action for *private* litigants. 441 U.S. 677, 717 (1979). We must decide, therefore, if *Cannon* extends to Doe's Title IX retaliation, *quid pro quo*, and hostile environment claims.

Mercy says, and the District Court agreed, a roadblock stands in Doe's way — Title VII. Residents are employees, Mercy submits, and Title VII governs employment relationships, prohibiting discrimination based on sex. *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a); *Covington v. Int'l Assoc. of Approved Basketball Officials*, 710 F.3d 114, 118–19 (3d Cir. 2013). But, Mercy notes, Title VII also sets out elaborate administrative requirements an employee must satisfy before seeking relief in court. *See Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469–71 (3d Cir. 2001).

Title IX is, in contrast, bare. While it requires proof an appropriate person had notice of the alleged discrimination so the institution had an opportunity to address it, *see* 20 U.S.C. § 1682; *Jackson*, 544 U.S. at 181; *Gebser*, 524 U.S. at 290, Title IX doesn't have administrative hurdles like Title VII. This means Title IX plaintiffs can "file directly in court" under *Cannon*'s implied cause of action. *Fitzgerald*, 555 U.S. at 255. Given Title VII's carefully-drawn framework, Mercy contends, the District Court was right that Congress intended Title VII as the sole avenue of private relief for employees of federally-funded education programs who allege sex discrimination. Private Title IX claims alleging the same conduct, Mercy argues, are not cognizable because they'd allow education-program employees to plead their way round Title VII's administrative scheme.

We agree with just one part of this assessment. While we won't (and can't) speak for *all* residents, we agree *here* it's plausible Doe was Mercy's "employee" notwithstanding any other status the law may or may not have reposed on her (for example, a "student"). We rely on *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992), to decide if a person is an "employee" under Title VII, *see Covington*, 710 F.3d at 119. Applied to Doe's complaint, *Darden*'s factors indeed suggest she was an employee under Title VII. *See* 503 U.S. at 323–24.

For instance, Mercy was the source of the instrumentalities and tools of Doe's work as a resident, the location of Doe's work was at Mercy, and Mercy assigned Doe projects and tasks. *See id.* Doe had no discretion over when and how long she worked beyond ACGME guidelines limiting her workweek to 80 hours. *See id.* And assuming she was paid (a plausible assumption, we think), her paychecks were taxed like other employees under the Federal Insurance Contributions Act,

or FICA. *See id.*; *see Mayo Found.*, 562 U.S. at 47, 60. She had no apparent role in hiring or paying assistants, her work was part of Mercy's regular business of providing healthcare to patients, and she could bargain collectively as a resident like other employees. *See Darden*, 503 U.S. at 323–24; *Boston Med. Ctr. Corp.*, 330 N.L.R.B. 152, 168 (1999). In sum, we agree with Mercy that, had Doe complied with Title VII's administrative requirements, she could have filed Title VII claims in court as an "employee" like other residents have before. *See, e.g.*, *Takele v. Mayo Clinic*, 576 F.3d 834 (8th Cir. 2009).

Nevertheless we reject the rest of Mercy's argument. Title VII's concurrent applicability does not bar Doe's private causes of action for retaliation and *quid pro quo* harassment under Title IX. Six Supreme Court decisions guide us.

\*      \*      \*

First is *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), which involved whether the timely filing of an EEOC charge alleging race discrimination under Title VII tolled the limitations period on a claim alleging race discrimination under 42 U.S.C. § 1981, a statute without administrative requirements. Though it ultimately found the latter claim untimely, the Court held that the "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Id.* at 461. Despite Title VII's "range" and "design as a comprehensive solution" for "invidious discrimination in employment," the Court explained, a private-sector employee "clearly is not deprived of other remedies" and isn't "limited to Title VII in his search for relief." *Id.* at 459. Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other

23

applicable" federal statutes. *Id.* (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48 (1974)). The employer argued that allowing Johnson's § 1981 claim to proceed might permit his circumvention of Title VII's administrative requirements, going against Congress's intent. But the Court disagreed:

> Conciliation and persuasion through the [EEOC's] administrative process [under Title VII], to be sure, often constitute a desirable approach to settlement of disputes based on sensitive and emotional charges of invidious employment discrimination. We recognize, too, that the filing of a lawsuit [under § 1981] might tend to deter efforts at conciliation, that lack of success in the legal action could weaken the [EEOC's] efforts to induce voluntary compliance, and that a suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. *But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies.* The choice is a valuable one. Under some circumstances, the administrative route may be highly preferred over the litigatory; under others the reverse may be true.

*Id.* at 461 (emphasis added). The Court thus declined to infer any positive preference for Title VII without a more "definite" congressional expression. *Id.*

A year later came *Brown v. General Services Administration*, 425 U.S. 820 (1976), which involved an amendment to Title VII (*see* 42 U.S.C. § 2000e-16) that waived sovereign immunity to grant federal employees access to administrative and judicial relief from workplace discrimination. Alleging race discrimination, an ex-GSA

employee filed claims under § 1981 and § 2000e-16, but the latter was untimely under the amendment's jurisdictional limitations period. Holding that Congress intended § 2000e-16 as the "exclusive, pre-emptive administrative and judicial scheme for the redress of *federal* employment discrimination," 425 U.S. at 829 (emphasis added), the Supreme Court affirmed dismissal of Brown's case for want of jurisdiction. Critically, the Court distinguished *Johnson* as "inapposite," for *Johnson* held only that Title VII doesn't "pre-empt" other remedies in "*private employment*," not federal employment. *Id.* at 833. *Johnson*'s inapplicability was especially plain, the Court found, because private employment doesn't raise "problems of sovereign immunity." *Id.*

Then in 1979, seven years after Title IX's enactment, the Court decided *Cannon*, 441 U.S. 677, in which an applicant sued a medical school alleging it denied her admission based on her sex, in violation of Title IX. The Seventh Circuit affirmed dismissal of her claim, holding that Congress intended Title IX's administrative device as the "exclusive means" to enforce the statute. 441 U.S. at 683–84. The Supreme Court disagreed. Reading § 1681(a), it inferred a private cause of action for the applicant to allege the medical school "rejected her" based on sex, *id.* at 688–89, notwithstanding that Title IX doesn't "expressly authorize" private action, *id.* at 683. Title IX "explicitly confers a benefit on *persons* discriminated against" based on sex, the Court held, and the plaintiff was "clearly a member of that class for whose special benefit the statute was enacted." *Id.* at 694 (emphasis added).

Three years later came *North Haven*, 456 U.S. 512, in which ex-school employees filed Title IX agency actions alleging sex discrimination against two school boards. Agencies had promulgated regulations interpreting Title IX to extend to

25

sex-based employment discrimination. *See id.* at 516 (citing, for example, 34 C.F.R. § 106.51(a)(1)). The boards sued the agencies, seeking to declare these regulations *ultra vires* under Title IX. Voting six to three, the Supreme Court upheld them, as the agencies had fairly read § 1681(a)'s "broad directive that 'no *person*' may be discriminated against" based on sex to encompass "employees as well as students." *Id.* at 520 (emphasis added). The Court rejected the argument that Title IX shouldn't extend to private employment because employees have "remedies other than those available under Title IX," like Title VII. *Id.* at 535 n.26. Even if "alternative remedies are available and their existence is relevant," it rejoined, "Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination." *Id.* (citing, among other decisions, *Johnson*, 421 U.S. at 459).

Joined by Chief Justice Burger and Justice Rehnquist, Justice Powell dissented. Given Title VII's "comprehensive" scheme and "carefully prescribed procedures" for EEOC conciliation, he would have held that Title IX doesn't extend to private employment, as Title IX has "no time limits for action, no conciliation provisions, and no guidance as to procedure." *Id.* at 552 (Powell, J., dissenting). He also thought it "unlikely" Congress would "duplicate" enforcement of Titles VII and IX in private-sector employment by "different departments of government with different enforcement powers, areas of expertise, and enforcement methods." *Id.* at 553.

A decade later the Court decided *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), in which a student sought damages for sexual harassment under Title IX. Acknowledging *Cannon*'s implied cause of action and relying on the presumption that "all appropriate remedies" are available

for private litigants, *id.* at 66, the Court held that damages are available in private Title IX actions, *id.* at 76.

Finally in 2005 the Court decided *Jackson v. Birmingham Board of Education*, 544 U.S. 167, in which a school board relieved a high school "employee" of his coaching position after he complained that the girls' basketball team received unequal treatment based on sex. *Id.* at 171. He sued in his private capacity, bringing a Title IX retaliation claim. Reversing the Eleventh Circuit, the Court allowed the employee's retaliation claim to proceed under *Cannon*. *Id.* at 173–74. If funding recipients were "permitted to retaliate freely," the Court held, "individuals" who witness sex discrimination would be "loath to report it" and "all manner of Title IX violations might go unremedied." *Id.* at 180.

\*       \*       \*

From these six decisions we derive four guiding principles. *First* private-sector employees aren't "limited to Title VII" in their search for relief from workplace discrimination. *Johnson*, 421 U.S. at 459. The Supreme Court has so held despite Title VII's "range" and "design as a comprehensive solution" for "invidious discrimination in employment." *Id.*; *see Brown*, 425 U.S. at 833; *North Haven*, 456 U.S. at 535 n.26.

*Second* it is a matter of "policy" left for Congress's constitutional purview whether an alternative avenue of relief from employment discrimination might undesirably allow circumvention of Title VII's administrative requirements. *North Haven*, 456 U.S. at 535 n.26 (Concurrent enforcement was a "policy" consideration for Congress to weigh, and we cannot ignore Title IX's language and history even if we disagree with that legislative choice.); *Johnson*, 421 U.S. at 461 (These are the "natural effects of the choice Congress has made available" to

an employee "by its conferring upon him independent administrative and judicial remedies."). *North Haven* is particularly illuminating. Dissenting there, Justice Powell described vividly the putative inefficiencies, redundancies, and contradictions of parallel enforcement in private-sector employment under Titles VII and IX. 456 U.S. at 540–55 (Powell, J., dissenting). But given Congress's use of the expansive term "person" in § 1681(a), six Justices rejected those views, *see id.* at 514–40 & n.26 (majority opinion), signifying they carry little, if indeed any, weight in our analysis.

*Third* the provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students, *see North Haven*, 456 U.S. at 520 (Section 1681(a)'s "broad directive" that no "person" may be discriminated against based on sex encompasses "employees as well as students."); *Cannon*, 441 U.S. at 694 (A private cause of action exists under Title IX for "persons" suffering sex discrimination.). Because § 1681(a) "neither expressly nor impliedly excludes employees from its reach," we're to interpret it as "covering and protecting these 'persons,'" for Congress easily could have substituted "'student' or 'beneficiary' for the word 'person' if it had wished to restrict" § 1681(a)'s scope. *North Haven*, 456 U.S. at 521.

*Fourth* Title IX's implied private cause of action extends explicitly to *employees* of federally-funded education programs who allege sex-based *retaliation* claims under Title IX. *See Jackson*, 544 U.S. at 171. Retaliation against a "person," including an employee, because she "complained of sex discrimination" is another form of "intentional sex discrimination" actionable under Title IX. *Id.* at 174. Mercy, for its part, urges a narrower reading of *Jackson* because, unlike Doe, the plaintiff there likely had no recourse under Title VII. But *Jackson* bears out no such qualification. Indeed *Jackson*

repeatedly underscores Title IX's wide range. *See, e.g.*, *id.* at 171 (Title IX retaliation claims extend to "individual[s]," not individuals who can't bring Title VII claims.); *id.* at 173 (Section 1681(a) "broadly" encompasses "any person."); *id.* at 175 (Discrimination "covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach."); *id.* (Title IX is a "broadly written general prohibition on discrimination."); *id.* at 179 & n.3 (Title IX is "broadly worded" and its "beneficiaries plainly include all those" subjected to sex discrimination); *id.* at 183 (The Court's decisions since *Cannon* "consistently" have interpreted Title IX's private cause of action "broadly" to encompass "diverse forms of intentional sex discrimination."). And no subsequent decision has narrowed *Jackson* as Mercy so urges. *See Gomez-Perez v. Potter*, 553 U.S. 474, 483 (2008) (*Jackson* holds that a "private party," not a private party who can't proceed under Title VII, "may assert a retaliation claim under Title IX."). This principle thus holds true.

We note the Fifth and Seventh Circuits have held categorically that Title VII provides the "exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995); *accord Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 861–62 (7th Cir. 1996), *abrogated in part on other grounds by Fitzgerald*, 555 U.S. 246. Allowing *any* private Title IX claim to proceed there, these courts held, would "disrupt" Title VII's "carefully balanced remedial scheme for redressing employment discrimination." *Lakoski*, 66 F.3d at 754; *see Waid*, 91 F.3d at 861–62. Given the four principles described above, we decline to follow *Lakoski* and *Waid*, both of which went against the First and Fourth Circuits' decisions recognizing employees' private Title IX claims. *See Lipsett*, 864 F.2d at 895–97; *Preston v. Virginia ex*

*rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) (*Cannon* extends to "employment discrimination on the basis of gender by educational institutions receiving federal funds."); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 131 n.1 (2d Cir. 2013) (noting *Lakoski*'s split from *Lipsett* and *Preston*). More important, *Lakoski* and *Waid* did not address the Supreme Court's decisions in *Johnson* and *Brown* and the provisions of *North Haven* rejecting "policy"-based rationales like those Justice Powell set out in his dissent and that Mercy and its *amicus* raise here. Finally, *Lakoski* and *Waid* were decided a decade before the Supreme Court handed down *Jackson*, which explicitly recognized an employee's private claim under *Cannon*. We thus question the continued viability of *Lakoski* and *Waid* and see fit here to deviate from them.

We now apply these principles to Doe's Title IX claims.

*Retaliation*

For reasons already explained, we confirm that a private retaliation claim exists for employees of federally-funded education programs under Title IX notwithstanding Title VII's concurrent applicability. *Jackson* and the decisions before it make plain: When a funding recipient retaliates against a "person," including an employee, because she complains of sex discrimination, that's "intentional discrimination" based on sex, violative of Title IX and actionable under *Cannon*'s implied cause of action. *Jackson*, 544 U.S. at 174; *see North Haven*, 456 U.S. at 520. Whether that person could also proceed under Title VII is of no moment, for Congress provided a "variety of remedies, at times overlapping, to eradicate" private-sector employment discrimination. *North Haven*, 456 U.S. at 535 n.26; *see Johnson*, 421 U.S. at 459; *Brown*, 425 U.S. at 833. It is thus Congress's prerogative — not ours — to alter that course.

Without addressing *Jackson* or Doe's factual allegations,

30

the District Court dismissed Doe's retaliation claim as inviable under Title IX. Because we disagree, we will vacate that dismissal and remand this claim for consideration in the first instance. The following standards apply: Title VII's familiar retaliation framework "generally governs" Title IX retaliation claims. *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 723–25 & n.3 (9th Cir. 2012). Our fellow Courts of Appeals have so held. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867–68 (9th Cir. 2014) (Under Title IX, speaking out against sex discrimination is "protected activity."); *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011); *Preston*, 31 F.3d at 206–07. Accordingly, to establish a *prima facie* retaliation case under Title IX, Doe must prove she engaged in activity protected by Title IX, she suffered an adverse action, and there was a causal connection between the two. *Cf. Moore v. City of Philadelphia*, 461 F.3d 331, 340–42 (3d Cir. 2006). If she makes this showing, the burden shifts to Mercy to advance a legitimate, nonretaliatory reason for its conduct. *Id.* at 342. If Mercy does so, Doe must show that Mercy's proffered explanation was false and that retaliation was the real reason for the adverse action against her. *Id.*

Finally, Doe's retaliation claim is timely under Title IX's two-year limitations period only so far as she alleges retaliatory conduct that occurred on or after April 20, 2013, two years before she filed this lawsuit. *See Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989) (For Title IX claims arising from actions occurring in Pennsylvania and involving Pennsylvania citizens, Pennsylvania's two-year limitations period "applicable to personal injury actions" controls.); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (Retaliation is a discrete act.). We note that, as Doe's complaint currently stands, only two incidents fit this temporal criteria — Mercy's decision to dismiss her by letter dated April 20, 2013 and Dr. Roe's

advocating for her dismissal at her appeal hearing on April 24, 2013.

Quid Pro Quo <em>Harassment</em>

We likewise hold that a private *quid pro quo* claim exists for employees of federally-funded education programs under Title IX notwithstanding Title VII's concurrent applicability, for private-sector employees may pursue independently their rights under both Title VII and other applicable federal statutes. *Johnson*, 421 U.S. at 459; *see North Haven*, 456 U.S. at 535 n.26; *Brown*, 425 U.S. at 833. We decline here to infer any positive preference for Title VII without a more definite congressional expression — for example, a provision in Title VII barring concurrent private Title IX claims. *Cf. Johnson*, 421 U.S. at 461.

In so holding, we recognize that the Supreme Court has yet to extend *Cannon* to *quid pro quo* claims in the private employment setting. But to exclude them would, we think, ignore the import of the Court's "repeated" holdings construing the word discrimination in Title IX broadly and deeming sexual harassment actionable under *Cannon* in other contexts. *Jackson*, 544 U.S. at 174–75 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643, 650 (1999); *Gebser*, 524 U.S. at 290–91; *Franklin*, 503 U.S. at 74–75). As *Jackson* admonished, the term "discrimination" in § 1681(a) covers a "wide range of *intentional* unequal treatment." *Id.* at 175 (emphasis added). And *quid pro quo* sexual harassment — i.e., when tangible adverse action results from an underling's refusal to submit to a higher-up's sexual demands — is, by its very nature, intentional unequal treatment based on sex. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998); *see id.* at 752 (Sex discrimination is "explicit" in a *quid pro quo* scenario.).

The Spending Clause's notice requirements also pose no

obstacle to Title IX *quid pro quo* claims seeking damages in the employment setting. Given the Clause's contractual nature, private Title IX damages actions are available only if the funding recipient had adequate notice it could be liable for the conduct alleged. *Jackson*, 544 U.S. at 181; *cf. id.* at 181–84 (Title IX retaliation claims meet this requirement.). But funding recipients have known they could be sued privately for intentional sex discrimination under Title IX "since 1979" when the Court decided *Cannon. Id.* at 182. And *quid pro quo* sexual harassment is, as we said above, intentional sex discrimination, whether it occurs in an education or employment setting. The First Circuit impliedly recognized as much in 1988 in allowing a medical resident's *quid pro quo* claim to proceed under Title IX. *See Lipsett*, 864 F.2d at 898. And other courts have recognized Title IX *quid pro quo* claims in other contexts. *See, e.g.*, *Papelino*, 633 F.3d at 89; *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). These decisions have, we think, adequately apprised covered entities of their potential liability for *quid pro quo* harassment in the employment setting, as the Spending Clause demands.

The District Court, of course, never got this far. It dismissed Doe's *quid pro quo* claim as inviable under Title IX without considering her factual allegations. We thus treat this claim precisely the way we treated her retaliation claim: We will vacate its dismissal and remand it for consideration in the first instance. These standards apply: Like retaliation, Title VII's *quid pro quo* framework generally governs Title IX claims alleging *quid pro quo* harassment. Our fellow Courts of Appeals have again held as much. *See, e.g.*, *Papelino*, 633 F.3d at 88–90; *Lipsett*, 864 F.2d at 898–89. Accordingly, unwelcome sexual advances, requests for sexual favors, or other verbal or physical actions of a sexual nature constitute *quid pro quo* harassment when (A) the plaintiff's submission to that conduct is made

either explicitly or implicitly a term or condition of her education or employment experience in a federally-funded education program, or (B) submission to or rejection of that conduct is used as the basis for education or employment decisions that affect the plaintiff. *Cf. Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 27 (3d Cir. 1997). Given Title IX's Spending Clause origins, a Title IX plaintiff seeking damages for *quid pro quo* harassment must also prove that an "official who at a minimum" had "authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" had "actual knowledge of discrimination in the recipient's programs" and failed adequately to respond. *Gebser*, 524 U.S. at 290; *see Papelino*, 633 F.3d at 88–89. A response is inadequate if the officer failed to provide one or if she provided one amounting to deliberate indifference to the discrimination alleged. *Gebser*, 524 U.S. at 290; *see Papelino*, 633 F.3d at 88–89 (A recipient's response to sex discrimination must be clearly unreasonable "in light of known circumstances." (citing *Davis*, 526 U.S. at 648)).

Finally, like her retaliation claim, Doe's *quid pro quo* claim is timely only so far as she alleges conduct that occurred on or after April 20, 2013, two years before she sued Mercy. *See Bougher*, 882 F.2d at 78; *Bonenberger*, 132 F.3d at 28 (distinguishing discrete acts of *quid pro quo* harassment from acts aggregated to make out a hostile environment claim). And again, as Doe's complaint currently stands, only her April 20, 2013 dismissal and Dr. Roe's appearance at her April 24, 2013 appeal hearing meet this criteria.

### Hostile Environment

On Doe's final Title IX claim — hostile environment — we need not decide whether Title VII's applicability renders it inviable. Even if Title VII doesn't preclude this claim, we agree

34

with the District Court that it's time-barred. Doe concedes only two incidents occurred on or after April 20, 2013, within Title IX's two-year limitations period — her April 20, 2013 dismissal and Dr. Roe's appearance at her April 24, 2013 appeal hearing. She says these incidents invoke the continuing-violation doctrine recognized under Title VII. We hold otherwise.

Under that doctrine, discriminatory acts that aren't individually actionable may be aggregated to make out a Title VII hostile environment claim. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). These acts can occur at any time if they're linked in a pattern of actions continuing into Title VII's limitations period. *Id.* All the alleged acts, however, must be part of the same unlawful employment practice, *id.* at 165–66, meaning they involved "similar conduct by the same individuals, suggesting a persistent, ongoing pattern," *id.* at 167. It's an open question in our Court whether this doctrine applies under Title IX. Some courts suggest it does. *See, e.g.*, *Stanley v. Trs. of California State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006). Others suggest it doesn't. *See, e.g.*, *Folkes v. New York Coll. of Osteopathic Med.*, 214 F. Supp. 2d 273, 288–91 (E.D.N.Y. 2002). But we need not decide this question today. Even were we to apply the doctrine to Doe's Title IX hostile environment claim, the two timely incidents she points to wouldn't invoke it.

Concerning Doe's April 20, 2013 dismissal, Mercy's decision to dismiss her was a discrete act actionable on its own as retaliation or *quid pro quo* harassment. It cannot simultaneously support a hostile environment claim. *See Mandel*, 706 F.3d at 165 (Discrete acts are not actionable if time-barred even when related to timely acts. (citing *Morgan*, 536 U.S. at 113)). Concerning her April 24, 2013 appeal hearing, Doe alleges only that Dr. Roe "advocated" for her

dismissal there. App. 115. She doesn't allege, as the District Court noted, that he made sexualized comments or touched her in a sexual way there. Dr. Roe's conduct at the hearing, therefore, wasn't sufficiently similar to his pre-April 20, 2013 conduct to plausibly invoke the continuing-violation doctrine, assuming we'd apply it here. *Mandel*, 706 F.3d at 167. Accordingly, this claim is time-barred and we will affirm its dismissal.

## C

We come to our final inquiry — what to do about Doe's state law claims. The District Court declined supplemental jurisdiction of them after dismissing her Title IX claims. A court may do so under 28 U.S.C. § 1367(c)(3) when it dismisses all claims over which it has original jurisdiction. *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009). But we hold that Doe's Title IX retaliation and *quid pro quo* claims endure. We will therefore reverse dismissal of her state law claims and remand them for consideration in the first instance.

## IV

For the reasons above, we will affirm in part and reverse in part the District Court's order and remand for further proceedings consistent with this opinion.